## IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
## IN AND FOR OSCEOLA COUNTY, FLORIDA
## CIVIL DIVISION

**BRIAN HEYMANN** and **STEVE SCHWARZ**, individually and
on behalf of all similarly situated persons,

       Plaintiffs.

v.

**LENNAR HOMES, LLC**
**LEN-CG SOUTH LLC,**
**LEN OT HOLDINGS, LLC,** and
**LENNAR CORPORATION**

       Defendants.

_____/

**CLASS REPRESENTATION**

Case No.: _____

## CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

The plaintiffs, Brian Heymann and Steve Schwarz, individually and on behalf of all those similarly situated, sue the defendants, Lennar Homes, LLC ("**Lennar LLC**"), LEN-CG South LLC ("**LEN CG**"), LEN OT Holdings, LLC ("**LEN OT**"), and Lennar Corporation (collectively hereinafter referred to as the "**Lennar Controlled Entities**") and allege:

### Introduction

1.    The Lennar Controlled Entities developed a residential community in which it subjected home purchasers, through declarations recorded against all of the community's residential parcels, to perpetual assessments for club membership fees.

2.    These recorded declarations, which are the governing documents of the community's homeowners' association, allow the Lennar Controlled Entities to collect the club

membership fees as pure profit, while separately collecting from homeowners all of the expenses

of owning, operating, and maintaining the club's facilities.

3.       Florida's Homeowners' Association Act governs declarations of covenants

recorded against residential parcels and protects homeowners from the inherent risk of developers'

abusing their power to record such declarations. Among other things, the Act only authorizes

declarations that impose assessments for community expenses; the Act prohibits imposing

assessments for profit.

4.       The defendants in this case, then, have violated the Homeowners' Association Act

by recording and enforcing declarations that impose, on the residential parcels in ChampionsGate,

assessments for club membership fees that exceed the community's expenses and generate profit.

The Lennar Controlled Entities have taken the illegal profits from this club fee scheme.

5.       Since at least November 2021, the Lennar Controlled Entities have known that it

was profiting illegally from this club fee scheme, yet its corporate officers and managers at the

highest levels intentionally decided to continue the club fee scheme and continue to take the illegal

profits without informing the residents or homeowners affected by the scheme.

6.       The entire scheme violates the Florida Deceptive and Unfair Trade Practices Act.

7.       This is a class action lawsuit on behalf of the community's homeowners to recover

damages and for declaratory, injunctive, and equitable relief from this unlawful club fee scheme.

**Parties, Jurisdiction, and Venue**

8.       The plaintiffs are residents of the ChampionsGate community in Osceola County,

Florida.

9.       Lennar LLC is a Florida limited liability company with its principal place of

business in Miami, Florida. Lennar LLC is the managing member of LEN CG.

10.    LEN CG is a Florida limited liability company with its principal place of business in Orlando, Florida.

11.    LEN OT is a Florida limited liability company with its principal place of business in Orlando, Florida. LEN OT acted as a general contractor to the ChampionsGate community.

12.    Lennar Corporation is a Delaware corporation authorized to do business in Osceola County, Florida with its principal place of business in Miami, Florida.

13.    The damages in this action exceed $50,000, exclusive of interest, attorney fees, and costs.

14.    Venue is proper under chapter 47, Florida Statutes, because the defendants have agents or other representatives in Osceola County, the causes of action accrued in Osceola County, and property in litigation is located in Osceola County.

15.    All conditions precedent to the maintenance of this action have occurred, been performed, or been waived.

## Development of ChampionsGate

16.    In 2013, LEN CG, with Lennar LLC as its managing member, recorded a declaration of covenants that applied to all of the residential parcels in ChampionsGate. Attached hereto as **Exhibit A** is a copy of the declaration recorded at OR 4420/2244-2404.

## Club Fee Scheme

17.    LEN CG recorded the ChampionsGate Declaration under the Homeowners' Association Act, chapter 720, Florida Statutes.

18.    The ChampionsGate Declaration includes articles of incorporation for ChampionsGate Master Association, Inc. (hereinafter the "**ChampionsGate Association**"), an

"association" under the Homeowners' Association Act, more specifically section 720.301(9), Florida Statutes.

19.    The ChampionsGate Declaration includes the "**Club Plan" (Exhibit A, recorded at OR 4420/2324-2394),** which requires that every purchaser of a residential parcel in ChampionsGate agree to purchase membership in a for-profit club known as "**Oasis Club**."

20.    A joinder to the Club Plan is signed by Joe Fulghum, an employee of LEN CG who was then appointed as president of ChampionsGate Association by LEN CG.

21.    The ChampionsGate Declaration's Club Plan requires payment of "**Club Dues**" for membership in the Oasis Club and access to the "**Club Facilities**." The Club Dues include the "**Club Membership Fee**," which is paid "without setoff or deduction" to the Club Owner (defined as LEN CG) and "**Club Expenses**," which are paid pro rata by the residential parcel owners who thereby "collectively bear all expenses associated with the Club so that the Club Owner shall receive the Club Membership Fees without deduction of expenses or charges in respect of the Club." In other words, the Club Membership Fees are pure profit.

22.    Even though the Club Property is titled in LEN CG'S name and the Club Plan identifies LEN CG as the Club Owner, Lennar LLC controlled and managed the Club, and is liable for all conduct of LEN CG.

23.    Section 9 of the Oasis Club Plan authorizes the ChampionsGate Association to levy "assessments" and to record liens and foreclose on residential parcels whose owners fail to pay those assessments. Subsection 9.3 allows the Club Owner to require the ChampionsGate Association to collect and enforce Club Dues as assessments by foreclosing on residential parcels whose owners fail to pay Club Dues.

24.     The defendants took advantage of the Homeowners' Association Act and the ChampionsGate Association to:

    (a)    enforce the ChampionsGate Declaration and incorporated Club Plan;

    (b)    impose assessments for club membership fees on ChampionsGate's residential parcels;

    (c)    collect assessments for club membership fees from residential parcel owners; and

    (d)    record liens and file foreclosure actions against residential parcels to collect unpaid assessments for club membership fees.

25.     However, the defendants have disregarded the provisions of the Homeowners' Association Act that protect residential parcel owners by prohibiting for-profit assessments.

**Homeowners' Association Act**

26.     The Florida Legislature enacted the "Homeowners' Association Act," now codified in chapter 720, Florida Statutes, to address concerns over developers "retaining control of homeowners' associations, or misusing funds entrusted to the association." Fla. S. Comm. on Govt'l. Ops., CS/SB 1058 (1992) Staff Analysis 1 (March 5, 1992). The Act's stated purposes are to "give statutory recognition" to "not for profit" entities to operate residential communities; to provide operating procedures for homeowners' associations; and "to protect the rights of association members." § 720.302(1), Fla. Stat.

27.     Under section 720.301(1), Florida Statutes, "assessment" means "a sum or sums of money payable to the association, to the developer or other owner of common areas, or to recreational facilities and other properties serving the parcels by the owners of one or more parcels

as authorized in the governing documents, which if not paid by the owner of a parcel, can result in a lien against the parcel."

28.     Under section 720.308(1)(a), Florida Statutes, assessments "must be in the member's proportional share of expenses as described in the governing document." *See also* § 720.308(3), Fla. Stat. ("assessments charged to a member shall not exceed the maximum obligation of the member based on the total amount of the adopted budget and the member's proportionate share of the expenses as described in the governing documents").

29.     Under section 720.301(2), Florida Statutes, "homeowners' association" or "association" means a "Florida corporation responsible for the operation of a community or a mobile home subdivision in which the voting membership is made up of parcel owners or their agents, or a combination thereof, and in which membership is a mandatory condition of parcel ownership, and which is authorized to impose assessments that, if unpaid, may become a lien on the parcel."

30.     Under section 720.305, Florida Statutes, the prevailing party is entitled to recover reasonable attorney fees and costs in an action to redress alleged failure or refusal to comply with the provisions of the Homeowners' Association Act or the community's governing documents.

## Florida Deceptive and Unfair Trade Practices Act

31.     The Florida Legislature enacted the "Florida Deceptive and Unfair Trade Practices Act" to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of trade or commerce." § 501.202(2), Fla. Stat.

32.     Under section 501.204(1), Florida Statutes, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

33.     Under section 501.203(3)(c), Florida Statutes, the violation of any "law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive or unconscionable acts or practices" constitutes a per se violation of the Florida Deceptive and Unfair Trade Practices Act. Thus, violations of the Homeowners' Association Act and the Florida Antitrust Act of 1980 are per se violations of the Florida Deceptive and Unfair Trade Practices Act.

34.     Under sections 501.2105(1) and 501.211(2), Florida Statutes, the prevailing party in civil litigation involving a violation of the Florida Deceptive and Unfair Trade Practices Act is entitled to recover attorney fees and costs.

## Class Representation Allegations

35.     The proposed class is defined as follows:

> All persons who are currently or were previously a mandatory member of the Oasis Club in ChampionsGate and who have paid or been obligated to pay a Club Membership Fee under the Oasis Club Plan.

36.     While the exact number of class members is unknown to the plaintiff at this time, there are more than a thousand homes in ChampionsGate, and the identities of the current and former homeowners are within the knowledge of and can be easily ascertained from the records of the defendants.

37.     The class is so numerous that joinder of all its members is impractical.

38.     The plaintiffs' claims are typical of the claims of the members of the class because the plaintiffs, like all class members, purchased a home in ChampionsGate, are mandatory

members of the Oasis Club and have thus paid and been obligated to pay a Club Membership Fee

under the Club Plan.

39.     This action poses numerous questions of law and fact that are common to the

plaintiff and the class members, and those common questions predominate over any questions

affecting only individual members of the class.

40.     The plaintiffs are committed to the vigorous prosecution of this action and have

retained competent counsel experienced in handling class actions involving, among other things,

community associations, consumer rights and unfair trade practices. As a result, the plaintiffs are

adequate representatives of the class and will fairly and adequately protect the interests of the class.

41.     The plaintiffs bring this class action under Florida Rule of Civil Procedure

1.220(b)(2) because the defendants have acted or refused to act on grounds generally applicable to

all the members of the class, thereby making final injunctive relief or declaratory relief concerning

the class as a whole appropriate.

42.     The plaintiffs also bring this class action under Florida Rule of Civil Procedure

1.220(b)(3) because a class action is superior to other available methods for the fair and efficient

adjudication of this controversy. Because the amounts of the claims of each individual member of

the class are small relative to the cost and scope of this litigation, and due to the financial resources

of defendants, none of the members of the class could afford to seek legal redress individually for

the misconduct alleged in this case. Absent a class action, that misconduct would go unremedied.

Further, individual litigation would significantly increase the delay and cost to all parties and

would burden the judicial system. There will be no manageability problems with prosecuting this

case as a class action.

**Declaratory Relief Allegations**

43.     The plaintiffs, individually, and on behalf of all those similarly situated, make the following allegations supporting entitlement to the declaratory relief requested in the following counts, which request, among other remedies, declaratory relief under chapter 86, Florida Statutes, and section 501.211(1), Florida Statutes, brought by the plaintiffs and the class against the defendants under Florida Rule of Civil Procedure 1.220(b)(2).

44.     The plaintiff and the class have been aggrieved by unfair methods of competition, unconscionable acts or practices, and unfair acts or practices by the defendants in the conduct of trade or commerce as more fully explained above in violation of sections 501.203(3) and 501.204, Florida Statutes.

45.     Pursuant to section 501.211(1), Florida Statutes, without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of the Florida Deceptive and Unfair Trade Practices Act may bring an action to obtain a declaratory judgment that an act or practice violates the Act and to enjoin a person who has violated, is violating, or is otherwise likely to violate the Act.

46.     The plaintiffs are in doubt concerning the parties' rights and obligations under the ChampionsGate Declaration and its incorporated Club Plan, the Homeowners' Association Act, and the Florida Deceptive and Unfair Trade Practices Act.

47.     There are justiciable, bona fide, and present controversies between the class members and the defendants concerning the proper interpretation of the ChampionsGate Declaration and its incorporated Club Plan, the Homeowners' Association Act, the Florida Deceptive and Unfair Trade Practices Act, and the parties' attendant rights and obligations thereunder. The plaintiffs and other class members are entitled to have these uncertainties removed and, more specifically, to the determinations requested in the counts set forth below.

48.     The parties have an actual, present, or adverse and antagonistic interest upon the interpretation of their respective rights and obligations under the ChampionsGate Declaration and its incorporated Club Plan, the Homeowners' Association Act, and the Florida Deceptive and Unfair Trade Practices Act.

49.     All interested parties and potential adverse interests are before this Court.

50.     The relief sought in this action is not merely to seek legal advice or to obtain answers to questions propounded out of curiosity.

51.     The rights, status, or other equitable or legal relations of the parties are affected by the interpretation of the ChampionsGate Declaration and its incorporated Club Plan, the Homeowners' Association Act, and the Florida Deceptive and Unfair Trade Practices Act.

52.     Therefore, under section 86.021, Florida Statutes, the plaintiffs and other class members may obtain a declaration of the rights, status, or other equitable or legal relations, as set forth below.

## Count I
## Injunctive Relief—Prohibiting Future Profit
## from Club Membership Fee

53.     The plaintiffs, individually and on behalf of all those similarly situated, re-allege and incorporates the allegations in paragraphs 1 to 52.

54.     The Homeowners' Association Act prohibits for-profit assessments and provides that an assessment must be in the amount of the homeowner's proportional share of expenses. *See* § 720.308, Fla. Stat.

55.     The defendants are imposing and collecting the Club Membership Fee as an "assessment" under the Homeowners' Association Act.

56.     Thus, under the Homeowners' Association Act, the plaintiff and other members of the class have a clear legal right to prohibit the defendants from profiting by collecting the Club Membership Fee, which by definition under the Club Plan is an amount that exceeds each homeowner's proportional share of the Club's expenses.

57.     Without the requested injunctive relief, the plaintiff and other members of the class will suffer irreparable harm by the defendants (a) continuing to profit from collecting the Club Membership Fee by including it as a component of the monthly Club Dues, which, if unpaid, result in a lien that the defendants may foreclose, or (b) selling the Club to a third party that will do the same.

58.     Under section 720.305, Florida Statutes, the plaintiffs and the class are entitled to recover reasonable attorney fees and costs for prevailing in a dispute regarding the Homeowners' Association Act's prohibition of for-profit assessments and the violation of this prohibition by the Club Plan incorporated in the ChampionsGate Association's governing documents.

59.     Under sections 501.2105 and 501.211, Florida Statutes, the plaintiffs and the class are entitled to recover reasonable attorney fees and costs for obtaining declaratory relief regarding the defendants' unfair practice of profiting from the Club Fee Scheme in violation of the Homeowners' Association Act.

**Count II**
**Equitable Relief and Damages—**
**for Violation of § 720.308, Fla. Stat.**

60.     The plaintiff, individually and on behalf of all those similarly situated, re-alleges and incorporates the allegations in paragraphs 1 to 52.

61.    The Homeowners' Association Act prohibits for-profit assessments and provides
that an assessment must be in the amount of the homeowner's proportional share of expenses. *See*
§ 720.308, Fla. Stat.

62.    The defendants have imposed and collected the Club Membership Fee as an
"assessment" under the Homeowners' Association Act.

63.    The defendants have profited from collection of the Club Membership Fee, which
by definition under the Club Plan is an amount that exceeds each homeowner's proportional share
of the Club's expenses.

64.    Thus, all Club Membership Fees collected to date have been collected in violation
of the Homeowners' Association Act.

65.    The defendants should be required to provide the plaintiffs and the class with an
accounting for its receipt and expenditure of all Club Dues (including the Club Membership Fee
and the other components of Club Dues) that defendants collected under the Club Plan. And each
of the defendants should be disgorged of the illegal profits that each has taken from the collection
of Club Membership Fees.

66.    The collection of Club Membership Fees in violation of the Homeowners'
Association Act has caused the plaintiff and the class to suffer damages.

67.    Under section 720.305, Florida Statutes, the plaintiff and the class are entitled to
recover reasonable attorney fees and costs for prevailing in a dispute regarding the Homeowners'
Association Act's prohibition of for-profit assessments and the violation of this prohibition by the
Club Plan incorporated in the ChampionsGate Association's governing documents.

68.    Under sections 501.2105 and 501.211, Florida Statutes, the plaintiff and the class
are entitled to recover reasonable attorney fees and costs in a claim for damages caused by the

defendants' unfair practice of profiting from the Club Fee Scheme in violation of the Homeowners'
Association Act.

## Count III
## Florida Deceptive and Unfair Trade Practices Act

69.    Plaintiffs, individually and on behalf of all those similarly situated, re-allege and
incorporate the allegations in paragraphs 1 to 52.

70.    The club fee scheme violates the Homeowners' Association Act and is therefore a
per se violation of the Florida Deceptive and Unfair Trade Practices Act.

71.    Defendants' inclusion of the Club Plan in the ChampionsGate Association's
governing documents was an unfair practice that violates the Florida Deceptive and Unfair Trade
Practices Act.

72.    Other aspects of the club fee scheme, described above, are unfair practices that
violate the Florida Deceptive and Unfair Trade Practices Act.

73.    Under section 501.211(1), Plaintiffs and the class are entitled to a judgment
declaring that the club fee scheme violates the Florida Deceptive and Unfair Trade Practices Act.

74.    Defendants' violations of the Florida Deceptive and Unfair Trade Practices Act
have caused damages to Plaintiffs and the class.

75.    Under section 501.211(2), Plaintiffs and the class are entitled to a recover their
damages caused by Defendants' violations of the Florida Deceptive and Unfair Trade Practices
Act.

76.    Under sections 501.2105 and 501.211(2), Plaintiffs and the class are entitled to
recover their reasonable attorney fees and costs.

77.    Plaintiffs and the class are entitled to recover reasonable attorney fees and costs under sections 9.1, 12, and 14 of the Club Plan and section 57.105, Florida Statutes.

### Request for Relief

WHEREFORE, the plaintiffs, individually and on behalf of all those similarly situated, requests the following relief:

(a)    an order certifying that this action is properly maintainable as a class action under Florida Rule of Civil Procedure 1.220(b)(2) and/or (b)(3), appointing the plaintiffs and the undersigned attorneys to represent the class, and requiring reasonable and adequate notice to be given to prospective members of the class following certification;

(b)    under Counts I and III, a judgment enjoining defendants from profiting by collecting the Club Membership Fee in violation of section 720.308, Florida Statutes and the Florida Deceptive and Unfair Trade Practices Act;

(c)    under Count II, a judgment disgorging each of the defendants of the profits received from collection of Club Membership Fees and awarding to the plaintiffs and the class the damages caused by the illegal collection of Club Membership Fees in violation of section 720.308, Florida Statutes;

(d)    a judgment against the defendants for attorney fees under the Homeowners' Association Act; and

(e)    such additional relief as the court deems fair and reasonable to protect the rights and interests of the plaintiff and the class.

**Demand for Jury Trial**

The plaintiffs, individually and on behalf of the class, demands a trial by jury on all issues so triable against the defendants.

Dated: December 31, 2024

<u>/s/ J. Carter Andersen</u>
J. Carter Andersen, FBN 143626
Harold Holder, FBN 118733
Abigail Tamayo, FBN 1049142
**BUSH ROSS, P.A.**
1801 North Highland Avenue
Tampa, FL 33602
813-224-9255
813-223-9620
Primary: <u>candersen@bushross.com</u>
Primary: <u>hholder@bushross.com</u>
Primary: <u>atamayo@bushross.com</u>
Secondary: <u>ksalter@bushross.com</u>
Secondary: <u>hhpld@bushross.com</u>

J. Daniel Clark, FBN 0106471
**CLARK ♦ MARTINO, P.A.**
3407 West Kennedy Boulevard
Tampa, FL 33609
813-879-0700
813-879-5498 (Facsimile)
Primary:  <u>dclark@clarkmartino.com</u>
Secondary:  <u>jliza@clarkmartino.com</u>

John Marc Tamayo, FBN 030910
**CAMPBELL TROHN TAMAYO & ARANDA**
1701 South Florida Avenue
Lakeland, FL 33803
Primary: <u>j.tamayo@cttalaw.com</u>
Secondary: <u>c.velez@cttalaw.com</u>
*Counsel for Plaintiffs*

# EXHIBIT "A"

CFN    2013052371
Bk 4420 Pgs 2244-2404 (161 Pgs)
DATE: 04/04/2013  11:31:47 AM
ARMANDO RAMIREZ, CLERK OF COURT
OSCEOLA COUNTY
RECORDING FEES $1,370.00

PREPARED BY AND RETURN TO:
Christian F. O'Ryan, Esq.
Pennington, P.A.
2701 N. Rocky Point Drive, Suite 900
Tampa, Florida  33607

------------------------------------------------SPACE ABOVE THIS LINE RESERVED FOR RECORDING DATA------------------------------------------

# MASTER DECLARATION
# FOR
# CHAMPIONSGATE

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Article I. | Governance of the Community............................................................... | 1 |
| Article II. | Definitions ............................................................................... | 2 |
| Article III. | Use and Conduct ......................................................................... | 8 |
| Article IV. | Neighborhoods........................................................................... | 10 |
| Article V. | Maintenance, Repair and Replacement Obligations............................. | 10 |
| Article VI. | The Association and Its Members................................................... | 14 |
| Article VII. | Association Powers and Responsibilities.......................................... | 15 |
| Article VIII. | Association Finances................................................................... | 23 |
| Article IX. | Expansion of the Community........................................................... | 30 |
| Article X. | Additional Rights Reserved to Declarant and Material Disclosures......... | 31 |
| Article XI. | Easements................................................................................. | 36 |
| Article XII. | Exclusive Common Area............................................................... | 40 |
| Article XIII. | Party Walls and Other Shared Structures......................................... | 40 |
| Article XIV. | Stoneybrook South Community Development District ......................... | 41 |
| Article XV. | Enforcement............................................................................... | 42 |
| Article XVI. | Surface Water Management System................................................ | 45 |
| Article XVII. | Tennis Common Areas................................................................. | 46 |
| Article XVIII. | Changes In Common Areas; Control of Pets.................................... | 49 |
| Article XIX | Amendment of Declaration............................................................. | 50 |
| Article XX. | Miscellaneous Provisions.............................................................. | 51 |

**EXHIBITS:**

| | |
|---|---|
| Exhibit A | The Project |
| Exhibit B | Rules and Regulations |
| Exhibit C | Articles of Incorporation |
| Exhibit D | Bylaws |
| Exhibit E | Club Plan |
| Exhibit F | SFWMD Permit |
| Exhibit G | Tennis Common Areas |

i

**MASTER DECLARATION**
**FOR**
**CHAMPIONSGATE**

**ARTICLE I**
**GOVERNANCE OF THE COMMUNITY**

1.1.    <u>Purpose and Intent; Binding Effect</u>.

(a)    LEN-CG South, LLC, a Florida limited liability company (the "**Declarant**"), is the record title owner of the real property legally described in **Exhibit A**, attached hereto and incorporated herein by this reference (the "**Project**"), and intends by the recording of this Master Declaration for ChampionsGate (this "**Declaration**") to create a general plan of development for the planned community known as "ChampionsGate." This Declaration provides a procedure for the future expansion of ChampionsGate to include additional real property and provides for the overall development, administration, maintenance and preservation of the real property now and hereafter comprising ChampionsGate. An integral part of the development plan is the creation of ChampionsGate Master Association, Inc., a Florida not for profit corporation (the "**Association**"), a homeowners association to be comprised of all record title owners of residential real property in ChampionsGate. The purpose of the Association is to operate and maintain various Common Areas and community improvements and to administer and enforce this Declaration and the other governing documents referred to herein.

**This Declaration does not and is not intended to create a condominium within the meaning of the Florida Condominium Act, Florida Statutes Section 718.101, et. seq.**

(b)    All property described in **Exhibit A**, and any additional property that is made subject to this Declaration in the future by filing of one or more Supplemental Declarations in the Public Records, shall be owned, conveyed and used subject to all of the provisions of this Declaration, which shall run with the title to such property. This Declaration shall be binding upon all Persons having any right, title or interest in any portion of the Project, as well as the occupants of any Unit and their guests and invitees.

(c)    This Declaration shall be enforceable by Declarant, the Club Owner, the Association, and their respective successors and assigns, and unless terminated as provided in Section 1.1(d), shall have perpetual duration. If Florida law hereafter limits the period during which covenants may run with the land, then to the extent consistent with such law, this Declaration shall automatically be extended at the expiration of such period for successive periods of twenty (20) years each, unless terminated as provided below. Notwithstanding the above, so long as Florida law recognizes the rule against perpetuities, if any of the provisions of this Declaration shall be unlawful, void, or voidable for violation of the rule against perpetuities, then such provisions shall continue only until twenty-one (21) years after the death of the last survivor of the now living descendents of Barak Obama, the 44th President of the United States of America.

(d)    Unless otherwise required by Florida law, this Declaration may not be terminated except by an instrument signed by (i) seventy-five percent (75%) of the total Voting Interests, and (ii) Declarant, if Declarant owns any portion of the Project. Any such instrument shall set forth the intent to terminate this Declaration and shall be recorded in the Public Records. Nothing in this Section shall be construed to permit termination of any easement created in this Declaration without the consent of the holder of such easement or the rights of the Club Owner without the consent of the Club Owner.

1

(e)    If any court finally determines that a provision of this Declaration is invalid, in whole or as applied in a particular instance, such determination shall not affect the validity of other provisions or applications.

1.2.    <u>Governing Documents</u>.    This Declaration, each Supplemental Declaration, the Articles of Incorporation, the Bylaws, and the Use Restrictions and Rules of the Association, as any of them may be supplemented or amended in the future (the "<u>**Governing Documents**</u>") create a general plan of development for the Project that may be supplemented by additional covenants, restrictions, and easements applicable to particular areas within the Project. In the event of a conflict between or among the Governing Documents and any such additional covenants or easements, or the provisions of any other articles of incorporation, bylaws, rules or policies governing any area within the Project, other than the Club Plan (as defined herein) or a DCCRO or PCCRO (as defined herein), the Governing Documents shall control. Nothing in this Section shall preclude any DCCRO, PCCRO, Supplemental Declaration or other recorded covenants applicable to any portion of the Project from containing more restrictive provisions than this Declaration.

1.3.    <u>Club Plan</u>. Each Owner, by acquiring title to a Unit is a member of the Club (as defined herein) and will be subject to all of the terms and conditions of the Club Plan (as defined herein), as amended and supplemented from time to time. Club Owner is responsible for operating and maintaining the Club and Club Facilities and administering the Club Plan. Club Facilities may be added, modified or deleted from time to time in accordance with the Club Plan. The Club Plan contains certain rules, regulations and restrictions relating to the use of the Club. Pursuant to the Club Plan, each Owner shall pay the Club Dues, including without limitation Club Membership Fees as set forth in the Club Plan. Club Owner may increase the number of Club members and users from time to time in accordance with the Club Plan. The Club shall be used and enjoyed by the Owners, on a non-exclusive basis, in common with such other persons, entities, and corporations that may be entitled to use the Club subject to the rules and regulations in the Club Plan. Each Owner, shall be bound by and comply with the Club Plan attached to this Declaration.

ASSOCIATION AND EACH OWNER SHALL BE BOUND BY AND COMPLY WITH THE CLUB PLAN THAT IS INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE CLUB PLAN IS AN EXHIBIT TO THIS DECLARATION, THE GOVERNING DOCUMENTS ARE SUBORDINATE AND INFERIOR TO THE CLUB PLAN. IN THE EVENT OF ANY CONFLICT BETWEEN THE CLUB PLAN AND THE GOVERNING DOCUMENTS, THE CLUB PLAN SHALL CONTROL.

## ARTICLE II
## DEFINITIONS

The terms used in this Declaration generally shall be given their natural, commonly accepted definitions except as otherwise specified. Capitalized terms shall be defined as set forth below.

2.1.    <u>Access Control System</u>. Any system intended to control access to the Project. DECLARANT, BUILDERS, CLUB OWNER AND THE ASSOCIATION SHALL NOT BE HELD LIABLE FOR ANY LOSS OR DAMAGE BY REASON OR FAILURE TO PROVIDE ADEQUATE ACCESS CONTROL OR INEFFECTIVENESS OF ACCESS CONTROL MEASURES UNDERTAKEN. EACH AND EVERY OWNER AND THE OCCUPANT OF EACH UNIT ACKNOWLEDGES THAT DECLARANT, BUILDERS, CLUB OWNER AND THE ASSOCIATION, AND THEIR EMPLOYEES, AGENTS, MANAGERS, DIRECTORS AND OFFICERS, ARE NOT INSURERS OF OWNERS OR UNITS, OR THE PERSONAL PROPERTY LOCATED WITHIN UNITS. DECLARANT, BUILDERS, CLUB OWNER AND THE ASSOCIATION SHALL NOT BE RESPONSIBLE OR LIABLE FOR LOSSES, INJURIES OR DEATHS RESULTING FROM ANY CASUALTY OR INTRUSION INTO A UNIT.

2

2.2.   Area of Common Responsibility.  The Common Area, together with those areas, if any, which by the terms of this Declaration, any Supplemental Declaration, any plat, any other applicable covenants, or by contract, become the responsibility of the Association. The Plaza Restaurant (as defined in Section 5.1(e) of this Declaration) will be an Area of Common Responsibility of the Association, and the Association shall be responsible for management and operation of the Plaza Restaurant.

2.3.   Articles of Incorporation or Articles.  The Articles of Incorporation of ChampionsGate Master Association, Inc., as filed with the Secretary of State for the State of Florida, a copy of which is attached hereto as **Exhibit C** and made a part hereof by this reference, as the same may be amended, supplemented and/or restated from time to time in the future.

2.4.   Association.  The ChampionsGate Master Association, Inc., a Florida not-for-profit corporation, its successors and assigns.

2.5.   ChampionsGate.  All property which is now or hereafter made subject to this Declaration. The term "ChampionsGate" shall be interchangeable with the term "Project."

2.6.   Base Assessment.  Assessments levied on all Units subject to assessment under Article VIII to fund Operating Expenses for the general expenses and operation of the Association and Reserves, if any.

2.7.   Board of Directors or Board.  The body responsible for administration of the Association, selected as provided in this Declaration and the Bylaws and generally serving the same role as the board of directors under Florida corporate law.

2.8.   Builder.  Any Person other than the Declarant who (a) holds title to a Unit prior to, during and until completion thereon of construction of a detached or attached residence for a single family (as evidenced by issuance of a certificate of occupancy) and the sale of such detached or attached residence to a third party, (b) is duly licensed, either itself or through an affiliated entity, to perform construction services in the State of Florida, and (c) is approved by the Declarant in writing as a Builder.  Each Owner, by acceptance of a deed, acknowledges and agrees that a Builder may have rights and obligations pursuant to a separate written instrument, including without limitation, a PCCRO or a DCCRO, that are in addition to, or in lieu of, the rights and obligations provided under the Governing Documents.

2.9.   Bylaws.  The Bylaws of the Association, a copy of which is attached hereto as **Exhibit D** and made a part hereof by this reference, as it may be amended, supplemented and/or restated from time to time in the future.

2.10.   CDD.  The Stoneybrook South Community Development District, a local unit of special-purpose government organized and existing pursuant to Chapter 190, Florida Statutes.

2.11.   Class "B" Control Period.  The period of time during which the Class "B" Member is entitled to appoint a majority of the members of the Board of Directors as defined in Section 6.3(b) of this Declaration.

2.12.   Club.  The Oasis Club, including the Club Property and Club Facilities (as defined in the Club Plan) provided for the Owners pursuant to the provisions of the Club Plan. The Club and Club Facilities will be owned and controlled by the Club Owner (as defined in the Club Plan) and not the Association. As more fully explained in the Club Plan, the Association shall have the option to purchase the Club from the Club Owner on the terms and conditions provided in the Club Plan.

3

2.13.   Club Plan.  The Oasis Club Plan, together with all amendments and modifications thereof. A copy of the Club Plan is attached hereto as **Exhibit E** and made a part hereof. This Declaration is subordinate in all respects to the Club Plan.

2.14.   Common Area.  All real property interests and personalty within the ChampionsGate designated as Common Areas from time to time by the Declarant, by plat or by recorded amendment to this Declaration and provided for, owned, leased by, or dedicated to, the common use and enjoyment of the Owners within ChampionsGate. The Common Areas may include, without limitation, private roadways, fountains, open space areas, internal buffers, entrance features, perimeter buffers, perimeter walls and fences, landscaped areas, improvements, easement areas owned by others, public rights of way, irrigation facilities, sidewalks, street lights, commonly used utility facilities, and project signage. The Common Areas do not include any portion of any Unit. The term "Common Areas" shall include Exclusive Common Areas and the Tennis Common Areas as defined herein. NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY, THE DEFINITION OF "COMMON AREAS" AS SET FORTH IN THIS DECLARATION IS FOR DESCRIPTIVE PURPOSES ONLY AND SHALL IN NO WAY BIND, OBLIGATE OR LIMIT DECLARANT TO CONSTRUCT OR SUPPLY ANY SUCH ITEM AS SET FORTH IN SUCH DESCRIPTION, THE CONSTRUCTION OR SUPPLYING OF ANY SUCH ITEM BEING IN DECLARANT'S SOLE DISCRETION. FURTHER, NO PARTY SHALL BE ENTITLED TO RELY UPON SUCH DESCRIPTION AS A REPRESENTATION OR WARRANTY AS TO THE EXTENT OF THE COMMON AREAS TO BE OWNED, LEASED BY OR DEDICATED TO THE ASSOCIATION, EXCEPT AFTER CONSTRUCTION AND CONVEYANCE OF ANY SUCH ITEM TO THE ASSOCIATION.

2.15.   Community-Wide Standard.  The standard of conduct, maintenance or other activity generally prevailing throughout the Project as established by the Association.  Such standard is expected to evolve over time as development progresses and may be more specifically determined by the Board of Directors or the Declarant.  The standards imposed by this Declaration, including, without limitation, the Use Restrictions and Rules attached hereto as **Exhibit B** and incorporated herein by reference, as the same may be supplemented or amended from time to time, shall be part of the Community-Wide Standard.

2.16.   Declarant.  LEN-CG South, LLC, a Florida limited liability company, or any successor or assign, including its affiliated or related entities that conduct land development, homebuilding and sales activities and who receive a written assignment of all or some of the rights of Declarant hereunder.  Such assignment need not be recorded in the Public Records in order to be effective. In the event of such a partial assignment, the assignee shall not be deemed the Declarant, but may exercise such rights of Declarant specifically assigned to it.  Any such assignment may be made on a non-exclusive basis.

2.17.   DCCRO.  A declaration of covenants, conditions, restrictions and obligations which may be filed by Declarant against one (1) or more Units to provide additional guidelines, without limitation, for the approval, development, construction, use and sale of residences in the Project.   If any provision of any DCCRO conflicts with a term of this Declaration, or a Supplemental Declaration, the more stringent shall apply.

2.18.   Deficit.  This term shall have the meaning ascribed thereto in Section 8.13.

2.19.   Development Order.  The First Amended and Restated Development Order for the Stoneybrook South Development of Regional Impact, recorded in OR Book 04222, Page 0725, Public Records of Osceola County, as amended, supplemented, terminated or modified from time to time.

2.20.   Excess Funding.  This term shall have the meaning ascribed thereto in Section 8.13(b).

4

2.21.   Exclusive Common Area. A portion of the Common Area intended for the exclusive use or primary benefit of one (1) or more, but less than all, Units, as more particularly described in Article XII.

2.22.   Governing Documents. This term shall have the meaning ascribed thereto in Section 1.2 hereof.

2.23.   Master Plan. The land use plan for the development of ChampionsGate included in the Development Order, as it may be amended from time to time. Inclusion of property on the Master Plan shall not, under any circumstances, obligate Declarant to subject such property to this Declaration, nor shall the exclusion of any property from the Master Plan bar its later annexation in accordance with Article IX. The Master Plan is subject to change (including material changes) at any time and from time to time, without notice and such change may increase or decrease the number of Units.

2.24.   Member. A Person entitled to membership in the Association, as provided in Section 6.2.

2.25.   Mortgage. A mortgage, a deed of trust, a deed to secure debt or any other form of security instrument affecting title to a Unit.

2.26.   Mortgagee. An institutional or governmental holder of a mortgage that makes, holds, insures or guarantees mortgage loans in the ordinary course of its business.

2.27.   Neighborhood. Any group of Units designated as a separate Neighborhood by this Declaration or by any Supplemental Declaration. A Neighborhood may be comprised of more than one housing type and may include noncontiguous Units.

2.28.   Neighborhood Association. Any condominium association, as defined by Chapter 718, Florida Statutes, or homeowners' association, as defined by Chapter 720, Florida Statutes, having authority to administer additional covenants applicable to a particular Neighborhood. Nothing in this Declaration requires the creation of a Neighborhood Association. The jurisdiction of any Neighborhood Association shall be subordinate to that of the Association. So long as the Class "B" Member owns any portion of the Project, no Neighborhood Association may be formed without the express written consent of the Class "B" Member.

2.29.   Neighborhood Property. The common elements of any condominium development within ChampionsGate and any property owned by any Neighborhood Association.

2.30.   Operating Expenses. Operating Expenses may include, without limitation, costs of ownership, operation, and administration of the Common Areas and Tennis Common Areas; all costs associated with the operation, leasing and management of the Plaza Restaurant (as defined herein); all amounts payable in connection with any private street lighting agreement between Association and a public utility provider; amounts payable to a telecommunications provider for telecommunications services furnished to Owners; utilities; taxes; insurance; bonds; salaries; management fees; professional fees; service costs; supplies; maintenance; repairs; replacements; refurbishments; and any and all costs relating to the discharge of the obligations hereunder, or determined to be part of the Operating Expenses by the Association. Notwithstanding anything to the contrary herein, Operating Expenses shall not include Reserves.

2.31.   Owner. One or more Persons who hold the record title to any Unit, but excluding in all cases any party holding an interest merely as security for the performance of an obligation. A Builder is an Owner.

2.32.   PCCRO. Declaration of Perpetual Covenants, Conditions, Restrictions and Obligations that may

5

be recorded by Declarant against one (1) or more Units to provide additional guidelines, without limitation, relating to the approval, design, construction, renovation, repair or reconstruction of structures and other improvements on the Project.  In the event of a conflict between this Declaration, any Supplemental Declaration, and the applicable PCCRO, the more stringent shall apply.

2.33.   Permit.  Permit No. 49-01682-P, as amended or modified, issued by SFWMD, a copy of which is attached hereto as **Exhibit F**, as amended from time to time.

2.34.   Person.   A natural person, a corporation, a partnership, a trust or any other legal entity.

2.35.   Project.  All of that certain real property more particularly described on **Exhibit A** attached hereto and made a part hereof, situated in Osceola County that is the subject of the Development Order, as amended from time to time, together with such additional property as is subjected to this Declaration in accordance with Article IX. The term "Project" shall be interchangeable with "ChampionsGate."

2.36.   Public Records.  The Public Records of Osceola County, Florida.

2.37.   Reserves. The term "Reserves" shall have the meaning set forth in Section 8.1(a) hereof.

2.38.   Residential Association.   The Country Club at ChampionsGate Community Association, Inc., a not-for-profit corporation formed under the laws of the State of Florida, its successor and assigns.

2.39.   Residential Declaration.  The Amended and Restated Declaration for Country Club at ChampionsGate recorded among the Public Records and encumbering a portion of the Project and as it may be amended, supplemented and/or restated from time to time in the future.

2.40.   Resort Association.   The Retreat at ChampionsGate Community Association, Inc., a not-for-profit corporation formed or to be formed under the laws of the State of Florida, its successor and assigns.

2.41.   Resort Declaration.   The Declaration for The Retreat at ChampionsGate now or hereafter recorded among the Public Records and encumbering a portion of the Project and as it may be amended, supplemented and/or restated from time to time in the future.

2.42.   Service Area.  Two (2) or more Units to which an Exclusive Common Area is assigned, as described in Article XII, or which receive benefits or services from the Association that are not provided to all Units, as described in Section 7.13. A Unit may be part of more than one (1) Service Area, and Service Areas may overlap.  Where the context permits or requires, the term "Service Area" shall also refer to the Service Area Committee, if any, established in accordance with the Bylaws to act as a liaison between the Board and the Owners of Units within a particular Service Area.

2.43.   Service Area Assessments.  Assessments levied against the Units in a particular Service Area to fund Service Area Operating Expenses, as described in Section 8.2, and Service Area Reserves (if any), as described in Section 8.3.

2.44.   Service Area Operating Expenses.  The actual or estimated expenses incurred or anticipated to be incurred by the Association for the benefit of the Owners and occupants of Units within a particular Service Area. Notwithstanding anything to the contrary herein, Service Area Operating Expenses shall not include Service Area Reserves.

6

2.45.   Service Area Reserves. The term "Service Area Reserves" shall have the meaning set forth in Section 8.2(a) hereof.

2.46.   SFWMD.  The South Florida Water Management District.

2.47.   Special Assessment.  Assessments levied in accordance with Section 8.4.

2.48.   Specific Assessment.  Assessments levied in accordance with Section 8.5.

2.49.   Supplemental Declaration.  An amendment or supplement to this Declaration filed in the Public Records for such purposes as this Declaration may provide.

2.50.   Surface Water Management System or SWMS. A system which is designed and constructed or implemented to control discharges that are necessitated by rainfall events, incorporating methods to collect, convey, store, absorb, inhibit, treat, use or reuse water to prevent or reduce flooding, over drainage, environmental degradation, and water pollution or otherwise affect the quantity and quality of discharges. The SWMS includes those works authorized by SFWMD pursuant to the Permit.

2.51.   Tennis Common Areas. The Association shall operate, maintain and, when deeded by the Declarant, hold record legal title to the Tennis Common Areas. The Tennis Common Areas are anticipated to be comprised of a tennis center, including multiple clay tennis courts, a stadium court, facilities directly related to the tennis courts, and/or other facilities designated by the Declarant as Tennis Common Areas.  The real property upon which the Tennis Common Areas will be situated is legally described in **Exhibit G**, attached hereto and incorporated herein by this reference.  The Board of Directors may promulgate reasonable rules and regulations regarding use of the Tennis Common Areas consistent with the Governing Documents. Use of the Tennis Common Areas shall be available to all Owners and their invitees, guests, family members and tenants, on a non-exclusive basis subject to the rules and the Governing Documents. The costs of operating, maintaining, repairing and insuring and protecting the Tennis Common Areas and the facilities located thereon, or connected therewith, shall be part of the Operating Expenses of the Association. NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY, THE DEFINITION OF "TENNIS COMMON AREAS" AS SET FORTH IN THIS DECLARATION IS FOR DESCRIPTIVE PURPOSES ONLY AND SHALL IN NO WAY BIND, OBLIGATE OR LIMIT DECLARANT TO CONSTRUCT OR SUPPLY ANY SUCH ITEM AS SET FORTH IN SUCH DESCRIPTION, THE CONSTRUCTION OR SUPPLYING OF ANY SUCH ITEM BEING IN DECLARANT'S SOLE DISCRETION. FURTHER, NO PARTY SHALL BE ENTITLED TO RELY UPON SUCH DESCRIPTION AS A REPRESENTATION OR WARRANTY AS TO THE EXTENT OF THE TENNIS COMMON AREAS TO BE OWNED, LEASED BY OR DEDICATED TO THE ASSOCIATION, EXCEPT AFTER CONSTRUCTION AND DEDICATION OR CONVEYANCE OF ANY SUCH ITEM TO THE ASSOCIATION.

2.52.   Unit.  A portion of the Project, whether improved or unimproved, that may be independently owned and is intended for development, use, and occupancy as an attached or detached residence for a single family.  The term shall refer to the land, if any, that is part of the Unit and any improvements thereon. In the case of a building within a condominium or other structure containing multiple dwellings, each dwelling shall be deemed to be a separate Unit.  In the case of a parcel of vacant land or land on which improvements are under construction, the parcel shall be deemed to contain the number of Units allocated (on a per acre basis) to such parcel in this Declaration, or in any applicable Supplemental Declaration, or in the DCCRO or PCCRO recorded against such parcel of land, until such time as a subdivision plat or condominium instrument is filed of record on all or a portion of the parcel.  After recordation of such a plat or condominium instrument, the number of Units on the land shown on such plat or condominium instrument shall be determined as provided in the preceding paragraph, and the number of Units

7

on the remaining land within the parcel, if any, shall continue to be determined in accordance with this paragraph. The term "Unit" shall not include Common Area or Neighborhood Property.

2.53.   <u>Use Restrictions and Rules</u>. The use restrictions and rules of the Association set forth on **<u>Exhibit</u>** **<u>B</u>**, as they may be supplemented, modified and repealed pursuant to Article III.

2.54.   <u>Voting Interest</u>. The appurtenant vote of each Unit located within the Project, which shall include the voting interests of the Declarant.

2.55.   <u>Work</u>. Any grading, staking, clearing, excavation, site work, planting or removal of plants, trees, shrubs or other landscaping materials, or construction, installation or material modification or betterment (including painting) of any structures or other improvements on a Unit or the addition of any structures or other improvements visible from the outside of the Unit.

**ARTICLE III**
**<u>USE AND CONDUCT</u>**

3.1.   <u>Framework for Regulation</u>.

(a)   Declarant has established a general plan of development for the Project as a master planned community in order to address collective interests, the aesthetics and environment within the Project, and the vitality of and sense of community within the Project, all subject to the Board's and the Members' ability to respond to changes in circumstances, conditions, needs and desires within the Project. The Project is subject to the provisions of this Declaration governing individual conduct and uses of or actions upon the Project, and the guidelines, rules and restrictions promulgated pursuant to this Article, all of which establish affirmative and negative covenants, easements and restrictions on the Project.

(b)   All provisions of the Governing Documents shall apply to all Owners, tenants, occupants, guests and invitees of any Unit. Each Owner shall be responsible for inserting a provision in any lease of its Unit informing the lessees and all occupants of the Unit of the Governing Documents; however, failure to include such a provision in the lease shall not relieve any Person of responsibility for complying with the Governing Documents.

3.2.   <u>Rulemaking Authority</u>.

(a)   The existing Use Restrictions and Rules applicable to the Project are attached as **<u>Exhibit B</u>** to this Declaration. Subject to the terms of this Article and Section 10.5 below, such existing Use Restrictions and Rules may be supplemented, modified in whole or in part, repealed or expanded by the Board of Directors in accordance with its duty to exercise business judgment on behalf of the Association and its Members. The Board may adopt rules which supplement, modify, cancel, repeal, limit, create exceptions to or expand the Use Restrictions and Rules.

(b)   Notwithstanding the above, after termination of the Class "B" Membership, no amendment to or modification of any Use Restrictions and Rules shall be effective against any property owned by Declarant without prior notice to and the written approval of Declarant so long as Declarant owns any portion of the Project. Moreover, no rule or action by the Association or Board shall impede Declarant's rights to develop the Project.

3.3.   <u>Owners' Acknowledgement and Notice to Purchasers</u>. All Owners and occupants of Units are given notice that use of their Units is limited by the Use Restrictions and Rules as they may be changed in accordance with this Declaration. Each Owner, by acceptance of a deed to their Unit, acknowledges and agrees that the use and enjoyment and marketability of his or her property can

8

be affected by this provision and that the Use Restrictions and Rules may change from time to time.

3.4.    <u>Assumption of Risk</u>.  Without limiting any other provision herein, each Owner accepts and assumes all risk and responsibility for noise, liability, injury, or damage connected with use or occupancy of any portion of such Common Areas, including, without limitation: (a) noise from maintenance equipment; (b) use of pesticides, herbicides and fertilizers; (c) view restrictions caused by maturation of trees and shrubbery; (d) reduction in privacy caused by the removal or pruning of shrubbery or trees within the Project; (e) views impairment by the construction of any structures; and (f) design of any portion of the Project. Each such person also expressly indemnifies and agrees to hold harmless Declarant, the Association, Club Owner, and all employees, directors, representatives, officers, agents, and partners of the foregoing, from any and all damages, whether direct or consequential, arising from or related to the person's use of the Common Areas, including attorneys' fees, paraprofessional fees and costs at trial and upon appeal. Without limiting the foregoing, all persons using the Common Areas, including, without limitation, all wet and dry retention areas, water bodies, lakes, pools or areas adjacent to a lake, do so at their own risk. BY ACCEPTANCE OF A DEED, EACH OWNER ACKNOWLEDGES THAT THE COMMON AREAS MAY CONTAIN WILDLIFE INCLUDING, WITHOUT LIMITATION, INSECTS, ALLIGATORS, DOGS, RACCOONS, SNAKES, DUCKS, DEER, SWINE, TURKEYS, AND FOXES. DECLARANT, ASSOCIATION, AND CLUB OWNER SHALL HAVE NO RESPONSIBILITY FOR MONITORING SUCH WILDLIFE OR NOTIFYING OWNERS OR OTHER PERSONS OF THE PRESENCE OF SUCH WILDLIFE. EACH OWNER AND HIS OR HER GUESTS AND INVITEES ARE RESPONSIBLE FOR THEIR OWN SAFETY.

3.5.    <u>Owner's Obligation to Indemnify</u>.  Each Owner agrees to indemnify and hold harmless Declarant, Association, and Club Owner, their officers, partners, agents, employees, affiliates, directors and attorneys (collectively, "**Indemnified Parties**") against all actions, injury, claims, loss, liability, damages, costs and expenses of any kind or nature whatsoever ("**Losses**") incurred by or asserted against any of the Indemnified Parties from and after the date hereof, whether direct, indirect, or consequential, as a result of or in any way related to the Common Areas, including, without limitation, use of the lakes and other water bodies within the Project by Owners, and their guests, family members, invitees, or agents, or the interpretation of this Declaration and/or exhibits attached hereto and/or from any act or omission of Declarant, the Association, Club Owner or of any of the Indemnified Parties. Should any Owner bring suit against Declarant, the Association, Club Owner or any of the Indemnified Parties for any claim or matter and fail to obtain judgment therein against such Indemnified Parties, such Owner shall be liable to such parties for all Losses, costs and expenses incurred by the Indemnified Parties in the defense of such suit, including attorneys' fees and paraprofessional fees at trial and upon appeal.

3.6.    <u>Association's Obligation to Indemnify</u>.  Association and Owners each covenant and agree jointly and severally to indemnify, defend and hold harmless Declarant, its officers, directors, shareholders, and any related persons or corporations and their employees from and against any and all claims, suits, actions, causes of action or damages arising from any personal injury, loss of life, or damage to property, sustained on or about the Common Areas or other property serving Association, and improvements thereon, or resulting from or arising out of activities or operations of Association or Owners, and from and against all costs, expenses, court costs, attorneys' fees and paraprofessional fees (including, but not limited to, all trial and appellate levels and whether or not suit be instituted), expenses and liabilities incurred or arising from any such claim, the investigation thereof, or the defense of any action or proceedings brought thereon, and from and against any orders judgments or decrees which may be entered relating thereto. The costs and expense of fulfilling this covenant of indemnification shall be Operating Expenses to the extent such matters are not covered by insurance maintained by Association.

9

3.7.    <u>Negligence</u>. The expense of any maintenance, repair or construction of any portion of the Common Areas, drainage systems or SWMS necessitated by the negligent or willful acts of an Owner or Persons utilizing the Common Areas, drainage systems or SWMS through or under an Owner, shall be borne solely by such Owner and the Unit owned by such Owner shall be subject to a Specific Assessment for that expense. By way of example, and not of limitation, an Owner shall be responsible for the removal of all landscaping and structures placed within easements or Common Areas without the prior written approval of the Association. Further, by way of example, an Owner shall be responsible for the cost to correct any drainage issues caused by any such Owner's negligence.

**ARTICLE IV**
**NEIGHBORHOODS**

4.1.    <u>Neighborhood Designation</u>. Each Unit within the Project shall be located within a Neighborhood. This Declaration or a Supplemental Declaration submitting additional property to this Declaration shall designate the property submitted thereby to a Neighborhood (by name, tract, or other identifying designation), which Neighborhood may be then existing or newly created. So long as it has the right to subject additional property to this Declaration, the Declarant may unilaterally amend this Declaration or any Supplemental Declaration to redesignate Neighborhood boundaries; provided, two or more existing Neighborhoods shall not be combined without the consent of Owners of more than fifty percent (50%) of the Voting Interests in the affected Neighborhoods.

4.2.    The following Neighborhoods are hereby designated by this Declaration:

(a)    The Country Club at ChampionsGate, governed by the Residential Association and subject to the Residential Declaration (the "**Country Club Neighborhood**"); and

(b)    The Retreat at ChampionsGate, governed by the Resort Association and subject to the Resort Declaration (the "**Retreat Neighborhood**").

**ARTICLE V**
**MAINTENANCE, REPAIR AND REPLACEMENT OBLIGATIONS**

5.1.    <u>Maintenance by the Association</u>.

(a)    Except as otherwise specifically provided in this Declaration to the contrary, Association shall at all times maintain, repair, replace and insure the Common Areas and Tennis Common Areas, including all improvements placed thereon.

(b)    Certain roadways within the Project shall be private roadways and shall be maintained by the Association; however, there are also are public roadways within the Project that are dedicated to the County for the perpetual use of the public. The Common Areas contain certain paved areas, including private roadways within the Project. Without limiting any other provision of this Declaration, the Association is responsible for the maintenance, repair and/or resurfacing of all paved surfaces forming a part of the Common Areas, including private roadways. Although pavement appears to be a durable material, it requires maintenance. The Association shall have the right, but not the obligation, to arrange for periodic inspections of all paved surfaces forming a part of the Common Areas by a licensed paving contractor and/or engineer. The cost of such inspection shall be a part of the Operating Expenses. The Association shall determine periodically the parameters of the inspection to be performed, if any. Any patching, grading, or other maintenance work should be performed by a company licensed to perform the work.

10

AT PRESENT, CERTAIN ROADWAYS WITHIN, ADJACENT OR IN PROXIMITY TO THE PROJECT ARE PART OF THE PUBLIC SYSTEM OF ROADWAYS. EACH OWNER BY THE ACCEPTANCE OF A DEED TO THEIR UNIT ACKNOWLEDGES AND AGREES THAT THE ASSOCIATION, BUILDER, CLUB OWNER AND DECLARANT HAVE NO CONTROL WITH REGARD TO ACCESS AND USAGE OF SUCH ROADWAYS BY THE GENERAL PUBLIC

(c)  Declarant may install a controlled access facility at one or more access points to the Project. The Association shall have the right, but no the obligation, to contract for the installation of additional Access Control System facilities for the Project. If provided, all costs associated with any Access Control System will be part of the Operating Expenses. Declarant hereby reserves for itself, and any Builder, their respective contractors and suppliers, their respective agents and employees, and any prospective purchasers of Units from Declarant and/or Builders, an easement for free and unimpeded access through any such Access Control System, subject only to such controls and restrictions as are agreed to in writing by Declarant and Builder. If the Association attempts to restrict or control access into the Project through means not approved by the foregoing, the foregoing may take any and all measures necessary to eliminate same, including disabling any entry system during any hours desired by the foregoing, and the foregoing shall have no liability in this regard.

DECLARANT, BUILDERS, CLUB OWNER AND THE ASSOCIATION SHALL NOT BE HELD LIABLE FOR ANY LOSS OR DAMAGE BY REASON OR FAILURE TO PROVIDE ADEQUATE ACCESS CONTROL OR INEFFECTIVENESS OF ACCESS CONTROL MEASURES UNDERTAKEN. EACH AND EVERY OWNER AND THE OCCUPANT OF EACH UNIT ACKNOWLEDGES THAT DECLARANT, BUILDERS, CLUB OWNER AND THE ASSOCIATION, AND THEIR EMPLOYEES, AGENTS, MANAGERS, DIRECTORS AND OFFICERS, ARE NOT INSURERS OF OWNERS OR UNITS, OR THE PERSONAL PROPERTY LOCATED WITHIN UNITS. DECLARANT, BUILDERS, CLUB OWNER AND THE ASSOCIATION SHALL NOT BE RESPONSIBLE OR LIABLE FOR LOSSES, INJURIES OR DEATHS RESULTING FROM ANY CASUALTY OR INTRUSION INTO A UNIT.

(d)  Association shall, if required by amendment to this Declaration or any document of record, maintain vegetation, landscaping, irrigation systems, community identification/features and/or other areas or elements designated by Declarant (or by Association after the expiration of the Class "B" Control Period) upon areas that are within or outside of the Project. Such areas may abut, or be proximate to, the Project and may be owned by, or dedicated to, others including, but not limited to, a utility, governmental or quasi-governmental entity or a property owners association. These areas may include (for example and not limitation) parks, swale areas, landscape buffer areas, berm areas or median areas within the right-of-way of public streets, roads, drainage areas, community identification or entrance features, community signage or other identification. To the extent there is any agreement between the Association and any Person for the maintenance of any lakes or ponds outside of the Project, the Association shall maintain the same and the costs thereof shall be paid by Owners as part of the Operating Expenses. The Association shall have the right to enter into new agreements or arrangements from time to time for improvements and facilities serving the members of the Association if the Board deems the same reasonable and appropriate for the continued use and benefit of any part of the Common Areas.

(e)  There shall be located within the Recreational Facilities (as defined in the Residential Declaration) a restaurant facility referred to as the "Plaza Restaurant" (or such other name as may be selected by the Declarant) (the "**Plaza Restaurant**"). The Plaza Restaurant shall be an Area of Common Responsibility of the Association and all expenses incurred by the Association in connection with the operation and management of the Plaza Restaurant shall be Operating

11

Expenses of the Association. The Association will not be the record title owner of the Plaza Restaurant; however, the Association may enter into a lease agreement with the Residential Association granting the Association the exclusive right to manage and operate the Plaza Restaurant. Any payments required pursuant to the lease agreement with the Residential Association shall be Operating Expenses of the Association.

5.2.    <u>Maintenance by Owners and Neighborhood Associations</u>.  All Units, including without limitation, all driveways, walkways and any property, structures, improvements and appurtenances not maintained by the Association, or a Neighborhood Association, shall be well maintained and kept in first class, good, safe, clean, neat and attractive condition consistent with the general appearance of ChampionsGate by the Owner of the applicable Unit. In the event a Unit is not maintained by the Owner of the Unit in accordance with the requirements of this Section 5.2, the Association may, but shall not be obligated to, perform the maintenance obligations on behalf of the Owner. Each Owner by acceptance of a deed to their Unit grants the Association an easement over its Unit for the purpose of insuring compliance with the requirements of this Section 5.2. In the event an Owner does not comply with this Section 5.2, the Association may perform the necessary maintenance and charge the costs thereof to the non-complying Owner as a Specific Assessment. The Association shall have the right to enforce this Section 5.2 by all necessary legal action. In the event that Association is the prevailing party with respect to any litigation respecting the enforcement of compliance with this Section 5.2, it shall be entitled to recover all of its attorneys' fees and paraprofessional fees, and costs, at trial and upon appeal

(a)    Each Neighborhood Association shall maintain the Neighborhood Property and all property, structures, parking areas, landscaping and other improvements comprising the Neighborhood Property in a manner consistent with the Community-Wide Standard.

(b)    In addition to any other enforcement rights, if an Owner or Neighborhood Association fails to properly perform his, her or its maintenance responsibilities under this Article V, the Association may perform such maintenance responsibilities and assess all costs incurred by the Association as a result thereof against the benefited Unit(s) and its Owner(s) as a Specific Assessment in accordance with Section 8.5. In the event of a failure of a Neighborhood Association to properly perform its maintenance responsibilities, any resultant assessment may be imposed against all Units under the jurisdiction of such Neighborhood Association as a Specific Assessment in accordance with Section 8.5. The right of the Association to enter any Unit to perform such maintenance is granted to the Association pursuant to Section 11.5 hereof. The Association shall afford the Owner or Neighborhood Association at least seven (7) days notice and opportunity to cure the problem prior to entry, except when entry is required due to an emergency situation.

5.3.    <u>Maintenance of Other Property</u>.  Except as otherwise provided herein, the Association shall also maintain, mow, irrigate, prune and replace all landscaping (including, without limitation, all sod and trees) lying within the right-of-way of adjacent public streets (including streets owned by the CDD), private streets, lakes and ponds, and alleys between the Unit boundary and the curb of such public street, private street or alley, and between the Unit boundary and any adjacent easements for pedestrian paths or sidewalks, and between the Unit boundary and the waters of any lake or pond, in a manner consistent with the Community-Wide Standard unless responsibility for maintaining such areas has been assigned to or assumed by the CDD, a Neighborhood Association or the Club. If such areas are adjacent to a condominium, the applicable Neighborhood Association shall be responsible for the above obligations, or if such areas are adjacent to Units within a Service Area, the applicable Service Area shall be responsible for the above obligations.

12

5.4.    Responsibility for Insurance, Repair and Replacement.

(a)    Each Owner shall be responsible for obtaining and maintaining property insurance on all insurable improvements on his or her Unit, unless a Neighborhood Association, of which the Unit is a part, is obligated to do so or the Association carries such insurance (which it may but is not obligated to do hereunder). If the Association assumes responsibility for obtaining any insurance coverage on behalf of Owners hereunder, the premiums for such insurance shall be levied as a Specific Assessment against the benefited Unit(s) pursuant to Section 8.5.

(b)    The requirements of this Section shall apply to any Neighborhood Association responsible for any portion of the Project in the same manner as if it was an Owner and such property was a Unit. Additional recorded covenants applicable to any portion of the Project may establish more stringent requirements for insurance and more stringent standards for rebuilding or reconstructing structures on the Units within such portion of the Project and for clearing and maintaining such Units in the event the structures are not rebuilt or reconstructed.

(c)    Notwithstanding any provision to the contrary contained herein or in any other Governing Document, neither the Association nor the Declarant shall be responsible for ensuring or confirming compliance with the insurance provisions contained herein, it being acknowledged by all Owners of Units that such monitoring would be unnecessarily expensive and difficult. Moreover, neither the Association nor the Declarant shall be liable in any manner whatsoever for failure of a Unit Owner to comply with this Section 5.4.

5.5.    Standard of Performance. Maintenance, as used in this Article, shall include, without limitation, repair and replacement as needed, as well as such other duties, which may include irrigation, as the Board may determine necessary or appropriate to satisfy the Community-Wide Standard. All maintenance and irrigation shall be performed in a manner consistent with the Community-Wide Standard, all applicable covenants, and the requirements and restrictions set forth in the Development Order.

5.6.    Intentionally Omitted.

5.7.    Surface Water Management System. The Declarant has caused or will cause to be constructed within the Project, various drainage retention/detention areas and facilities that are part of the SWMS. These drainage structures are part of the overall drainage plan for the Project. The CDD shall have unobstructed ingress to and egress from all retention/detention facilities at all reasonable times to maintain said facilities in a manner consistent with its responsibilities as provided herein and any rules and regulations promulgated by the CDD under authority hereof. No Owner shall cause or permit any interference with such access or maintenance. The CDD shall be responsible for the maintenance, operation and repair of the SWMS. Maintenance of the SWMS shall mean the exercise of practices which allow the systems to provide drainage, water storage, conveyance or other surface water or stormwater management capabilities as permitted by SFWMD. Any repair or reconstruction of the SWMS shall be as permitted or, if modified, as approved in writing by the SFWMD.

5.8.    Swale Maintenance. The Declarant may construct drainage swales within certain Units for the purpose of managing and containing the flow of excess surface water, if any, found upon such Units. Each Owner, including Builders, shall be responsible for the maintenance, operation and repair of the swales on the Unit. Maintenance, operation and repair shall mean the exercise of practices, such as mowing and erosion repair, that allow the swales to provide drainage, water storage, conveyance or other stormwater management capabilities as permitted by SFWMD. Filling, excavation, construction of fences or otherwise obstructing the surface water flow in the swales is prohibited. No alteration of the drainage swale shall be authorized and any damage to

13

any drainage swale, whether caused by natural or human-induced phenomena, shall be repaired and the drainage swale returned to its former condition as soon as possible by the Owner(s) of the Units) upon which the drainage swale is located.

5.9.    Rapid Infiltration Basins.

(a)    The Tohopekaliga Water Authority ("**TOHO**") shall own and be responsible for the operation and maintenance of any and all Rapid Infiltration Basins ("**RIBS**"), as so designated on the plat(s) for any portion of the Project. The Declarant hereby grants TOHO an easement over the Project as reasonably necessary to access the RIBs in order to conduct and continue the maintenance operation thereof. Maintenance of the RIBs shall mean the exercise of practices that allow the RIBs to provide for the rapid drainage and conveyance capabilities as required by TOHO.

(b)    Declarant hereby grants, reserves and establishes a non-exclusive perpetual easement for ingress, egress and access to enter any portion of the RIBs, at a reasonable time and in a reasonable manner, in order to use, construct, maintain and/or repair any adjacent Common Areas, Club Property or components of the SWMS and appurtenances thereto, all in favor of: (a) Declarant and the Association, and their officers, members, agents, employees, lessees, invitees or other designees of Declarant or the Association; (b) all Owners; (c) the CDD, Osceola County and all governmental and quasigovernmental agencies and service entities having jurisdiction over the Project, while engaged in their respective functions; and (d) the Club Owner and its officers, members, agents, employees, lessees, guests or other invitees.

(c)    Any amendment to this Declaration which alters any provision relating to the RIBs, beyond maintenance in its original condition, must have the prior approval of TOHO.

(d)    The Declarant hereby expressly establishes and reserves the full right and authority to establish an agreement between the Association, the CDD and TOHO under which the Association, the CDD shall agree to assume and carry out the duties and responsibilities of maintenance of certain RIBs for which TOHO otherwise is responsible. Any such agreement between the Association, the CDD and TOHO shall provide that the Association and/or the CDD must perform such maintenance duties and responsibilities at a level of service satisfactory to TOHO. Further, such agreement may provide that the costs of providing such maintenance of said RIBs, if by the Association, may be assessed and collected as part of the assessments through the Association under this Declaration.

### ARTICLE VI
### THE ASSOCIATION AND ITS MEMBERS

6.1.    Function of Association. The Association shall be the entity responsible for management, maintenance, operation and control of the Common Area. The Association shall be the primary entity responsible for enforcement of this Declaration, each Supplemental Declaration, the Articles of Incorporation, the Bylaws, and such Use Restrictions and Rules of the Association as may be adopted from time to time.  The Association shall perform its functions in accordance with this Declaration, the Bylaws, the Articles and Florida law.

6.2.    Membership.

(a)    Every Owner shall be a Member of the Association.  There shall be only one (1) vote per Unit. If a Unit is owned by more than one (1) Person, all co-Owners shall share the privileges of such membership, subject to reasonable Board regulation and the restrictions on voting set forth in Section 6.3(c) and in the Bylaws, and all such co-Owners shall be jointly and severally obligated to perform the responsibilities of Owners. The vote for any Unit shall be exercised as such

14

Persons determine, but in no event shall more than one (1) vote be cast with respect to any Unit.

(b)    The membership rights and privileges of an Owner who is a natural person may be exercised by the Member or the Member's spouse. The membership rights of an Owner which is a corporation, partnership or other legal entity may be exercised by any officer, director, partner or trustee, or by any other individual designated from time to time by the Owner in a written instrument provided to the secretary of the Association.

6.3.    <u>Classes of Membership and Voting</u>. The Association shall have two (2) classes of membership, Class "A" and Class "B", as follows:

(a)    Class "A" Members shall all be Owners, including Builders, but excluding the Declarant, except as provided in Subsection 6.3(b). Each Class "A" Member shall have one (1) vote for each Unit that they own; provided, however, there shall only be one (1) vote per Unit. Notwithstanding the foregoing, no votes shall be exercised on account of any property that is exempt from assessment under Section 8.10.

(b)    The sole Class "B" Member shall be Declarant. Prior to termination of the Class "B" Membership, the Class "B" Member shall have nine (9) votes for each Unit that it owns. Upon termination of the Class "B" membership, the Declarant shall be a Class "A" Member, if it owns any Units, and shall be entitled to one (1) Class "A" vote for each Unit that it owns. In addition, Declarant's consent shall be required for various actions of the Board, membership and committees as specifically provided elsewhere in the Governing Documents. The Class "B" Control Period shall terminate when the Declarant is no longer permitted under Florida law to appoint a majority of the members of the Board of Directors or such earlier date when, in its discretion, the Class "B" Member so determines and declares in a recorded instrument. After termination of the Class "B" Control Period, Declarant shall continue to have a right to disapprove actions of the Association, the Board, and any committee, as provided in the Governing Documents.

(c)    <u>Exercise of Voting Rights</u>. If there is more than one (1) Owner of a particular Unit, the vote for such Unit shall be exercised as such co-Owners determine among themselves and advise the secretary of the Association in writing prior to the close of balloting. Absent such advice, the Unit's vote shall be suspended if more than one (1) Person seeks to exercise it.

(d)    <u>Appointment and Election of Directors</u>. Prior to termination of the Class "B" Control Period, the Declarant shall have the right to appoint all members of the Board in its sole and absolute discretion. After the termination of the Class "B" Control Period, members of the Board shall be appointed and elected as follows: (i) the President and Vice President of each Neighborhood Association shall be appointed to the Board (in the event there is no Vice President for a Neighborhood Association, the Board of such Neighborhood Association shall designate an alternative representative); and (ii) all Class "A" Members shall be entitled to elect one (1) member of the Board. No more than ninety (90) days following the expiration of the Class "B" Control Period, the Association shall notify the Class "A" Members of the date, location and purpose of a special meeting of the Association to appoint and elect the Board of Directors as provided in this section and the Bylaws.

## ARTICLE VII
## ASSOCIATION POWERS AND RESPONSIBILITIES

7.1.    <u>Acceptance and Control of Association Property</u>. The Association may acquire, hold and dispose of tangible and intangible personal property and real property. Declarant and its designees may convey to the Association improved or unimproved real estate located within the Project, personal

15

property and leasehold and other property interests. Such property shall be accepted by the Association and thereafter shall be maintained as Common Area by the Association at its expense for the benefit of its Members, subject to any restrictions set forth in the deed or other instrument transferring such property to the Association.

7.2.    <u>Maintenance of Common Area and Area of Common Responsibility</u>.

(a)    Except to the extent that responsibility therefor has been assigned to or assumed by the CDD, or the Owners of adjacent Units, or Neighborhood Associations pursuant to Section 5.2, and except to the extent that such responsibility therefor has been assigned to or assumed by a Service Area pursuant to Section 7.13, the Association shall maintain, manage and control the Common Area and Area of Common Responsibility, and all improvements thereon (including, without limitation, furnishings, equipment, and common landscaped areas), and shall keep it in good clean, attractive, and sanitary condition, order, and repair, consistent with this Declaration, the Community-Wide Standard and the Development Order, which shall include, but need not be limited to:

(1)    All landscaping and other flora, parks, lakes, signage, structures, and improvements, including any private streets, and bike and pedestrian pathways/trails, situated upon the Common Area;

(2)    Landscaping, sidewalks, streetlights and signage within public rights-of-way within or abutting the Project, and landscaping and other flora within any public utility easement within the Project (subject to the terms of any easement agreement relating thereto), except to the extent that responsibility therefor has been assigned to or assumed by the CDD;

(3)    Such portions of any additional property as may be included within the Area of Common Responsibility pursuant to this Declaration, any Supplemental Declaration, or any agreement for maintenance entered into by the Association; and

(4)    Any property and facilities owned by Declarant and made available, on a temporary or permanent basis, for the primary use and enjoyment of the Association and some or all of its Members, such property and facilities to be identified by written notice from Declarant to the Association and to remain a part of the Area of Common Responsibility and be maintained by the Association until such time as Declarant revokes such privilege of use and enjoyment by written notice to the Association.

(b)    There are hereby reserved to the Association easements over the Project as necessary to enable the Association to fulfill its responsibilities under this Section. The Association shall maintain the facilities and equipment within the Area of Common Responsibility in continuous operation, except for any reasonable periods necessary, as determined in the sole discretion of the Board, to perform required maintenance or repairs. However, the Association, acting through the Board and without the approval of the membership, may temporarily close any portion of the Common Area and any street or roadway or portion thereof (subject to the Association obtaining all necessary governmental approvals) to control traffic or traffic flow, or to hold events, block parties, or for similar purposes without approval of the membership.

(c)    The Association may assume maintenance responsibility for property within any Service Area either by agreement with the Service Area or because, in the opinion of the Board, the level and quality of service then being provided is not consistent with the Community-Wide Standard. All costs of maintenance pursuant to this paragraph shall be assessed as a Service Area Assessment in accordance with Section 8.2 of this Declaration.

16

(d)     The Association may maintain other property which it does not own, including, without limitation, publicly-owned property and other property dedicated to public use, if the Board determines that such maintenance is necessary or desirable to maintain the Community-Wide Standard.

(e)     Except as otherwise specifically provided herein, all costs associated with maintenance, repair and replacement of the Common Area and Area of Common Responsibility shall be an Operating Expense to be allocated among all Units as part of the Base Assessment, without prejudice to the right of the Association to seek reimbursement from the record title owner(s) thereof.  All costs associated with maintenance, repair and replacement of Exclusive Common Area shall be a Service Area Operating Expense assessed against the Service Area(s) to which the Exclusive Common Area is assigned, notwithstanding that the Association may be responsible for performing such maintenance.

(f)     After termination of the Class "B" Control Period, if the Association fails to properly perform its maintenance responsibilities hereunder, Declarant may, upon not less than ten (10) days notice and opportunity to cure such failure, cause such maintenance to be performed and in such event, shall be entitled to reimbursement from the Association for all costs incurred, plus a ten percent (10%) fee for administrative costs incurred in performing such maintenance.

7.3.    Insurance.

(a)     Required Coverage.  The Association, acting through its Board or its duly authorized agent, shall obtain and continue in effect the following types of insurance if reasonably available, or if not reasonably available, the most nearly equivalent coverages as are reasonably available:

(1)     If the Common Areas are located within an area that has special flood hazards and for which flood insurance has been made available under the National Flood Insurance Program (NFIP), coverage in appropriate amounts, available under NFIP for all buildings and other insurable property within any portion of the Common Areas located within a designated flood hazard area;

(2)     Commercial general liability insurance coverage providing coverage and limits deemed appropriate. Such policies must provide that they may not be cancelled or substantially modified by any party, without at least thirty (30) days' prior written notice to Declarant (until the expiration of the Class "B" Control Period) and the Association;

(3)     Each member of the Board shall be covered by directors and officers liability insurance in such amounts and with such provisions as approved by the Board;

(4)     Fidelity insurance covering all persons responsible for handling Association funds in an amount determined in the Board's best business judgment.  Fidelity insurance policies shall include coverage for officers, directors and other persons serving without compensation; and

(5)     Such additional insurance as the Board, in its best business judgment, determines advisable, which may include, without limitation, flood insurance, boiler and machinery insurance and building ordinance coverage.

(6)     Any time a Service Area is created, unless otherwise provided in the Supplemental Declaration creating such Service Area, if applicable, all Owners within such Service Area shall name the Association as an additional insured under any casualty policy of insurance that provides coverage for any property for which the Association is

17

responsible. In addition, the Association may obtain additional insurance at the expense of the Owners within the Service Area if it feels the coverage otherwise maintained is insufficient.

(7)     Premiums for all insurance on the Area of Common Responsibility shall be Operating Expenses and shall be included in the Base Assessment, except that (i) premiums for property insurance obtained on behalf of a Service Area shall be charged to the Owners of Units within the benefited Service Area as a Service Area Assessment; and (ii) premiums for insurance on Exclusive Common Area may be included in the Service Area Assessment of the Service Area(s) benefited unless the Board of Directors reasonably determines that other treatment of the premiums is more appropriate.

(b)     Policy Requirements.

(1)     All Association policies shall provide for a certificate of insurance to be furnished to the Association.

(2)     The policies may contain a reasonable deductible. In the event of an insured loss to an Area of Common Responsibility (excluding an Exclusive Common Area), the deductible shall be treated as a Operating Expense in the same manner as the premiums for the applicable insurance coverage, or, for an insured loss in an Exclusive Common Area, in the manner described in this Declaration relating to the Service Area benefited by such Exclusive Common Area. However, if the Board reasonably determines, after notice and an opportunity to be heard in accordance with Section 15.5 of this Declaration, that the loss is the result of the negligence or willful misconduct of one (1) or more Owners, their guests, invitees or lessees, then the Board may specifically assess the full amount of such deductible against such Owner(s) and their Unit(s) pursuant to Section 8.5.

(3)     The policies described in Subsection 7.3(a) also shall name Declarant and its partners, officers, directors, employees and agents as additional insureds.

(4)     Prior to the expiration of the Class "B" Control Period, the Declarant shall have the right, at Association's expense, to provide insurance coverage under its master insurance policy in lieu of any of the required coverage.

(c)     Damage and Destruction.

(1)     Immediately after damage or destruction to all or any part of the Project covered by insurance written in the name of the Association, the Board or its duly authorized agent shall file all insurance claims and obtain reliable and detailed estimates of the cost of repair or reconstruction. Repair or reconstruction, as used in this paragraph, means repairing or restoring the property to substantially the condition in which it existed prior to the damage, allowing for changes or improvements necessitated by changes in applicable building codes.

(2)     Any damage to or destruction of the Common Area shall be repaired or reconstructed unless Members representing at least seventy-five percent (75%) of the total Class "A" Voting Interests and the Class "B" Member, if any, decide within sixty (60) days after the loss not to repair or reconstruct.

(3)     If either the insurance proceeds or reliable and detailed estimates of the cost of repair or reconstruction, or both, are not available to the Association within such sixty (60) day period, then the period shall be extended until such funds or information are available.

18

However, such extension shall not exceed sixty (60) additional days. No Mortgagee shall have the right to participate in the determination of whether the damage or destruction to the Common Area shall be repaired or reconstructed.

(4)    If determined in the manner described above that the damage or destruction to the Common Area shall not be repaired or reconstructed and no alternative improvements are authorized, the affected property shall be cleared of all debris and thereafter shall be maintained by the Association in a neat and attractive, landscaped condition consistent with the Community-Wide Standard.

(5)    Any insurance proceeds remaining after paying the costs of repair or reconstruction, or after such settlement as is necessary and appropriate, shall be retained by and for the benefit of the Association or the Service Area, as appropriate.

(6)    If insurance proceeds received, after application of any applicable deductible, are insufficient to cover the costs of repair or reconstruction, the Board of Directors may, without a vote of the Members but subject to applicable law, levy Special Assessments to cover the shortfall against those Owners responsible for the premiums for the applicable insurance coverage.

(7)    In the event of damage to the Club, the responsibility for reconstruction shall be as provided in the Club Plan.

(d)    <u>Conflicts</u>. In the event there is any conflict between the provisions of this Section 7.3 and any insurance provisions relating to a Service Area elsewhere in this Declaration, then the insurance provisions relating to such Service Area shall control as to the Units in such Service Area.

7.4.    <u>Implied Rights: Board Authority</u>. The Association may exercise any right or privilege given to it expressly by this Declaration, the Articles of Incorporation, the Bylaws, or Florida law, along with such rights and privileges which are reasonably necessary to effectuate any such right or privilege and, except as otherwise specifically provided in this Declaration, the Articles of Incorporation, the Bylaws or by Florida law, all rights and powers of the Association may be exercised by the Board without a vote of the membership unless any such right has been reserved to the membership anywhere else in the Governing Documents.

7.5.    <u>Indemnification of Officers, Directors and Others</u>.

(a)    The Association shall indemnify every officer, director, and committee member against all damages and expenses, including counsel fees, reasonably incurred in connection with any action, suit, or other proceeding (including settlement of any suit or proceeding, if approved by the then Board) to which he or she may be a party by reason of being or having been an officer, director, or committee member, except that such obligation to indemnify shall be limited with respect to those actions as to which liability is limited under this Section or Florida law.

(b)    The officers, directors, and committee members shall not be liable for any mistake of judgment, negligent or otherwise, except for their own individual willful misfeasance, malfeasance, misconduct or bad faith. The officers, directors and committee members shall have no personal liability with respect to any contract or other commitment made or action taken, in good faith, on behalf of the Association (except to the extent that such officers or directors may also be Members of the Association) and the Association shall indemnify and forever hold each such officer, director and committee member harmless from any and all liability to others on account of any such contract, commitment or action. This right to indemnification shall not be exclusive of any other rights to which any officer, director, or committee member, or former officer, director, or

19

committee member may be entitled. The Association shall, as an Operating Expense, maintain adequate general liability and officers' and directors' liability insurance to fund this obligation, if such insurance is reasonably available.

(c)     Each Owner shall indemnify and hold harmless the Association from any loss, damages, and expenses, including counsel fees, which they may incur as a result of the failure of such Owner, any occupant of such Owner's Unit, or any contractor, subcontractor, vendor, employee, or agent of such Owner acting within the scope of his contract, agency or employment to comply with this Declaration, any Supplemental Declaration or other covenants applicable to such Owner's Unit, the Bylaws and rules of the Association. By way of example and not limitation, an Owner shall be responsible for damages caused to any Common Area or other property owned by the Association by any such occupant, contractor, subcontractor, vendor, employee, or agent of such Owner whether such damages were caused by the negligence of such Persons or not.

7.6.    <u>Enhancement of Safety.</u>

(a)     THE ASSOCIATION MAY, BUT SHALL NOT BE OBLIGATED TO, MAINTAIN OR SUPPORT CERTAIN ACTIVITIES WITHIN THE PROJECT DESIGNED TO ENHANCE THE SAFETY OF THE PROJECT. ASSOCIATION, CLUB OWNER AND DECLARANT SHALL NOT BE HELD NOT IN ANY WAY BE CONSIDERED INSURERS OR GUARANTORS OF SECURITY OR SAFETY WITHIN THE PROJECT, NOR SHALL ANY OF THEM BE HELD LIABLE FOR ANY LOSS OR DAMAGE BY REASON OF FAILURE TO PROVIDE ADEQUATE SECURITY, ACCESS CONTROL OR INEFFECTIVENESS OF SECURITY MEASURES UNDERTAKEN. NO REPRESENTATION OR WARRANTY IS MADE THAT ANY FIRE PROTECTION SYSTEM, BURGLAR ALARM SYSTEM OR OTHER SECURITY SYSTEMS OR MEASURES CANNOT BE COMPROMISED OR CIRCUMVENTED, NOR THAT ANY SUCH SYSTEMS OR SECURITY MEASURES UNDERTAKEN WILL IN ALL CASES PREVENT LOSS OR PROVIDE THE DETECTION OR PROTECTION FOR WHICH THE SYSTEM IS DESIGNED OR INTENDED. EACH OWNER ACKNOWLEDGES, UNDERSTANDS AND COVENANTS TO INFORM ITS TENANTS THAT THE ASSOCIATION, ITS OFFICERS, DIRECTORS, AND COMMITTEE MEMBERS, CLUB OWNER AND ANY SUCCESSOR OF DECLARANT OR CLUB OWNER, ARE NOT INSURERS OF OWNERS OR UNITS, OR THE PERSONAL PROPERTY LOCATED WITHIN UNITS AND THAT EACH PERSON USING THE PROJECT ASSUMES ALL RISKS FOR LOSS OR DAMAGE TO PERSONS, TO UNITS AND TO THE CONTENTS OF UNITS RESULTING FROM ACCIDENTS, ACTS OF GOD AND ACTS OF THIRD PARTIES.

(b)     The Association is authorized, but not obligated, to petition for establishment of the Project as a safe neighborhood improvement district pursuant to the Safe Neighborhood Act, §163.501-163.523, <u>et seq.,</u> Florida Statutes, and to take any action necessary to qualify for the creation of a safe neighborhood improvement district under such Act. The Association shall have all rights and powers granted to property owners associations under such Act and, upon establishment of a safe neighborhood improvement district, shall assume and perform all obligations imposed by the Act in connection with the operation and administration of such district.

(c)     From time to time, the Association may elect to install video monitoring, alarms and alarm monitoring devices and/or to contract with third parties for the installation, maintenance and/or monitoring of alarms (any such party being referred to herein as a "**Third-Party Alarm Company**") in Common Area improvements, Exclusive Common Area, and other improvements where the Association has agreed to assume certain maintenance responsibilities. Notwithstanding the foregoing, the Association shall have no liability or responsibility to any Owner, tenant, resident, occupant, invitee or .guest in the event that such person or entity sustains any injury, damage or loss as a result of any failure of such alarm or alarm monitoring device, or of any Third-Party Alarm Company, nor shall any Owner have any right to bring

20

separate action against any Third-Party Alarm Company for any failure of such Third-Party Alarm Company, or the facilities or systems installed and monitored by such company, to appropriately monitor or function in connection with such loss. Each Owner, by taking title to any of the Project, hereby agrees on their own behalf, and on behalf of their guests, tenants, invitees and any other persons that may be present on their property from time to time, to indemnify the Association, and further waives and releases any right to bring suit or other action against the Association or any Third-Party Alarm Company. Each Owner shall include in any lease otherwise permitted by the terms of this Declaration similar language to that contained within this Section, or a specific reference to the provisions of this Section, such that such Owner's tenant acknowledges and agrees to be bound by the provisions of this Section; provided, however, failure to do so shall in no way limit the terms of this Section.

(d)     The Association, with or without notice may (but shall not be obligated to) install and operate video surveillance equipment on any portion of the Common Area at any time, the only exception being private areas of restrooms, showers, and dressing rooms in order to help promote the safety and security of people and property. Each Owner, on their own behalf and behalf of all of their guests and invitees, by acceptance of a deed for a Unit, consents to such video surveillance.

7.7.    <u>Powers of the Association Relating to Other Associations</u>.

(a)     The Association shall have the power to veto any action taken or contemplated to be taken by a Neighborhood Association which the Board determines to be inconsistent with the Community-Wide Standard or the Governing Documents. The Association also shall have the power to require specific action to be taken by any Neighborhood Association in connection with any of its obligations and responsibilities. Without limiting the generality of the foregoing, the Association may (i) require specific maintenance or repairs or aesthetic changes to be effectuated by the Neighborhood Association, and (ii) require that the Neighborhood Association include certain items within its budget and that specific expenditures be made.

(b)     Any action required by the Association in a written notice pursuant to the foregoing paragraph shall be taken within the time frame set by the Association in such written notice. If the Neighborhood Association fails to comply with the requirements set forth in such written notice, the Association shall have the right to effect such action on behalf of the Neighborhood Association.

(c)     To cover the Association's administrative expenses in connection with the foregoing and to discourage failure to comply with the requirements of the Association, the Association shall assess the Units subject to the jurisdiction of such Neighborhood Association for their pro rata share of any expenses incurred by the Association in taking such action in the manner provided in Section 8.5. Such assessments may be collected as a Specific Assessment hereunder and shall be subject to all lien rights provided for herein.

7.8.    <u>Governmental, Educational and Religious Interests</u>. So long as Declarant owns any portion of the Project, it may designate sites within the Project for government, education or religious activities and interests, including, but not limited to, fire, police, utility facilities, schools or education facilities, houses of worship, parks, recreation and other public facilities. The sites may include Common Area and in such case, the Association shall dedicate and convey such sites as directed by Declarant and no membership approval shall be required.

7.9.    <u>Volunteer Clearing House</u>.

(a)     One of the important functions of the Association is to encourage and facilitate the organization of volunteer organizations within the community that will serve the interests of community residents

21

as they may be identified from time to time. The Association may maintain a data bank of residents interested in volunteer organizations and may make such data available to volunteer organizations within the Project. The Association, by Board resolution, may also establish or support the establishment of charter clubs or other organizations, as it deems appropriate to encourage or facilitate the gathering of Owners and residents of ChampionsGate to pursue common interests or hobbies. Any resolution establishing a charter club shall designate the requirements, if any, for membership therein. The Board may provide for such organizations to be funded by the Association as an Operating Expense subject to such rules regarding participation, area of interest or other matters as the Board, in its discretion, may establish. Any charter club shall operate in accordance with the resolution establishing it.

(b)     The Association, through its bulletin boards and publications, may assist community groups, religious groups, civic groups, youth organizations, support groups, and similar organizations in publicizing their meetings, events, and need for volunteer assistance.

(c)     The nature and extent of any such assistance shall be in the Board's sole discretion. It is not intended that the Association spend its funds for specific advertising or promotion of events of such volunteer groups unless the Board determines that they merit such support. The Association's contribution will be supplemental to funds raised by the volunteer organization. The Association may also coordinate any such community-wide activity and the funding thereof in such manner as the Association determines in its discretion, or as otherwise may be required by this Declaration.

7.10.    <u>Assumption of Obligations Under Development Order</u>. Declarant shall have the right to assign to the Association, the Residential Association or the Resort Association, or any of them, in whole or in part, any of its continuing obligations or responsibilities under the Development Order so long as such continuing obligations are not prohibited by Chapter 720, Florida Statutes. To the extent such obligations or responsibilities are assigned to the Association, the Association shall accept, assume and fulfill such obligations and responsibilities.

7.11.    Intentionally Omitted.

7.12.    <u>Relationship With Tax Exempt Organizations</u>.

(a)     Declarant or the Association may create, enter into agreements or contracts with, or grant exclusive and/or non-exclusive easements over the Common Area to non-profit, tax-exempt organizations, the operation of which confers some benefit upon the Project, the Association, its Members, or residents. The Association may contribute money, real or personal property, or services to such entity. Any such contribution shall be a Operating Expense and included as a line item in the Association's annual budget. For the purposes of this Section, a "tax exempt organization" shall mean an entity which is exempt from federal income taxes under the Internal Revenue Code ("**Code**"), such as, but not limited to, entities which are exempt from federal income taxes under Sections 501(c)(3) or 501(c)(4), as the Code may be amended from time to time.

(b)     The Association may maintain multiple-use facilities within the Project and allow temporary use by tax-exempt organizations. Such use may be on a scheduled or "first- come, first-serve" basis and shall be subject to such rules, regulations and limitations as the Board, in its sole discretion, adopts concerning such use. A reasonable maintenance and use fee may be charged for the use of such facilities.

7.13.    <u>Provision of Services to Service Areas; Service Area Designations</u>. Portions of the Project may be designated as Service Areas for the purpose of receiving from the Association a higher level of

22

services, special services or other benefits not provided to all Units within the Project. Service Areas may be designated by Declarant through Supplemental Declarations filed in accordance with Article IX, or may be established by the Board of Directors either (i) on the Board's own accord, or (ii) upon petition of the Owners of ninety percent (90%) of the Units to be included in the proposed Service Area. A Unit may be included in multiple Service Areas established for different purposes. The cost of any special services or benefits, and all maintenance, repairs and replacements that the Association provides to a Service Area, including, but not limited to, the cost of water and electricity used in connection with the Association's irrigation of landscaping, and the cost of insurance provided by the Association for the benefit of the Service Area, shall be assessed against the Units within such Service Area as a Service Area Assessment in accordance with Section 8.2. Any Service Area established by the Board upon petition of the Owners within such Service Area may be dissolved or its boundary lines changed upon written consent of the Owners of at least seventy-five percent (75%) of the Voting Interests within such Service Area. Any Service Area established by the Board on its own accord may be dissolved or its boundary lines changed by the Board. During the Class "B" Control Period, a Service Area established by Supplemental Declaration may be dissolved, or its boundary lines changed, by recordation of an amendment to such Supplemental Declaration signed by Declarant and the Owner(s) of the affected property, without the joinder or consent of any other Owner. After expiration of the Class "B" Control Period, a Service Area established by Supplemental Declaration may only be dissolved, or its boundary lines changed, by (i) written consent or affirmative vote of at least seventy-five percent (75%) of the Voting Interests within such Service Area, and (ii) a majority affirmative vote of the Board of Directors. Upon dissolution of a Service Area, any special services or benefits theretofore available to the Units within such Service Area shall cease.

7.14.   <u>Community-Wide Utilities</u>.   The Association shall have the right, on behalf of all Owners, to contract for utility services, including, without limitation, cable or satellite television, internet or other data services, telephone or other communication services or other utilities, if the Board believes that such contract is in the best interest of the Owners, and to include the costs of such utilities in the Base Assessment payable by each Owner, unless such costs are applicable to a Service Area, in which case they shall be included in the applicable Service Area Assessments.

7.15.   <u>Community Publications</u>.   From time to time, the Association may elect to publish news articles and photographs of Owners, residents, occupants, tenants and their guests in community newspapers, online newsletters and websites and other publications intended to provide general information to Owners, residents, occupants, tenants and business owners within ChampionsGate. By virtue of having elected to acquire, lease or occupy property in ChampionsGate, all Owners, residents, occupants, tenants and their minor children, invitees, contractors and guests are deemed to have consented to the use, publication and distribution of their photographs in any of the aforementioned media that the Association may elect to publish or distribute from time to time.

## ARTICLE VIII
## <u>ASSOCIATION FINANCES</u>

8.1.   <u>Budgeting and Allocating Operating Expenses</u>.

(a)   The Board shall prepare a budget annually covering the estimated Operating Expenses during the coming year. The Board may, but shall have no obligation to, include a "Reserve for Replacement" in the Base Assessments in order to establish and maintain an adequate reserve fund for the periodic maintenance, repair, and replacement of improvements comprising a portion of the Common Areas (the "**Reserves**"). Reserves, if established, shall be established in accordance with Section 8.3.

23

(b)     The Association is hereby authorized to levy Base Assessments against all Units subject to assessment under Section 8.6 to fund the Operating Expenses and Reserves, if any. The Base Assessment shall be set at a level that is reasonably expected to produce total income for the Association equal to not less than the total budgeted Operating Expenses, including Reserves, if any. In determining the total funds to be generated through Base Assessments, the Board, in its discretion, may consider other sources of funds available to the Association. The Board shall take into account the number of Units subject to assessment under Section 8.6 on the first day of the fiscal year for which the budget is prepared and may consider the number of Units reasonably anticipated to become subject to assessment during the fiscal year. As Vacant Units (as defined herein) may not receive certain services, Declarant and any record title owner of a Vacant Unit shall not be assessed uniformly.

(c)     The Board shall send a notice of the amount of the Base Assessment for the following year to each Owner prior to the beginning of the fiscal year for which it is to be effective, or prior to the effective date of any budget amendment. The Board shall provide a copy of the budget or amended budget to any Owner upon written request by such Owner.

(d)     If the Board fails for any reason to determine the budget for any year, then until such time as a budget is determined, the budget in effect for the immediately preceding year, increased by five percent (5%), shall continue for the current year.

(e)     The Board shall have the right, without affirmative vote or written consent of the Owners, to (i) spend the full amount budgeted for any particular line item in the budget; (ii) spend more or less than what was budgeted; and (iii) shift revenues within the budget from one line to another; provided any such change does not increase the Base Assessment.

(f)     Base Assessments, including Reserves (if any), and Special Assessments shall be uniform for all Units improved with a detached or attached residence for a single family. Notwithstanding anything to the contrary contained in the Governing Documents, but subject to the rights of Declarant pursuant to Section 8.13 of this Declaration, any Unit that does not have a detached or attached residence for a single family constructed thereon as evidenced by a Certificate of Occupancy (a "**Vacant Unit**") shall be responsible for only ten percent (10%) of the Base Assessments and Special Assessments assessed to Units (other than Vacant Units), which lesser assessment amount reflects that such Vacant Units will not benefit from all maintenance and other services provided by the Association. At such time as a detached or attached residence for a single family is constructed on a Vacant Unit, as evidenced by a Certificate of Occupancy, then the Vacant Unit shall be deemed a fully assessed Unit and shall be responsible for one hundred percent (100%) of Base Assessments and Special Assessments, except as otherwise provided herein.

8.2.    Budgeting and Allocating Service Area Operating Expenses.

(a)     Before the beginning of each fiscal year, the Board shall prepare a separate budget covering the estimated Service Area Operating Expenses for each Service Area on whose behalf Service Area Operating Expenses are expected to be incurred during the coming year. The Board shall be entitled to set such budget only to the extent that this Declaration, any Supplemental Declaration, or the Bylaws specifically authorizes the Board to assess certain costs as a Service Area Assessment. Any Service Area Committee created pursuant to Section 9.2 of the Bylaws may request that additional services or a higher level of services be provided by the Association, and in such case, any additional costs shall be added to such budget if the Board agrees to such request. Such budget may, but shall not be required to, include a "Reserve for Replacement" in the Service Area Assessments in order to establish and maintain an adequate reserve fund for

24

the replacement and deferred maintenance of capital items comprising a portion of the Service Area (the "**Service Area Reserves**"). Service Area Reserves, if established, shall be established in accordance with Section 8.3.

(b)     Service Area Assessments, including Service Area Reserves (if any), shall be uniform for all Units within a Service Area that are improved with a detached or attached residence for a single family. Notwithstanding anything to the contrary contained in the Governing Documents, but subject to the rights of Declarant pursuant to Section 8.13 of this Declaration, any Vacant Unit within a Service Area shall be responsible for only ten percent (10%) of the Service Area Assessments assessed to Units (other than Vacant Units), which lesser assessment amount reflects that such Vacant Units will not benefit from all maintenance and other services provided by the Association. At such time as a detached or attached residence for a single family is constructed on a Vacant Unit, as evidenced by a Certificate of Occupancy, then the Vacant Unit shall be deemed a fully assessed Unit and shall be responsible for one hundred percent (100%) of Service Area Assessments, except as otherwise provided herein; provided, if so specified in the Supplemental Declaration applicable to such Service Area, any portion of the assessment intended for exterior maintenance of structures, insurance on structures, or replacement reserves that pertain to particular structures shall be levied on each of the benefited Units in proportion to the benefit received.

(c)     The Board shall send notice of the amount of the Service Area Assessment for the coming year to each Owner of a Unit in the Service Area prior to the beginning of the fiscal year. The Board shall provide a copy of the budget to any Owner upon written request by such Owner.

(d)     If the Board fails for any reason to determine the Service Area budget for any year, then until such time as a budget is determined, the budget for the Service Area in effect for the immediately preceding year, increased by five percent (5%), shall continue for the current year.

(e)     Notwithstanding anything contained herein to the contrary, the Board shall not be required to prepare a separate budget covering the estimated Service Area Operating Expenses for a newly created Service Area, or provide written notice of the amount of such Service Area Assessments to the Unit Owners liable for same, until thirty (30) days before the first date upon which Service Area Assessments shall be assessed against the Units in such Service Area.

8.3.     Budgeting for Reserves and Service Area Reserves.  The Board may annually prepare Reserves and Service Area Reserves that the Board determines necessary and appropriate and that take into account the number and nature of replaceable assets maintained, the expected life of each asset, and the expected repair or replacement cost.  If established, the Board shall include the required contribution to Reserves or Services Area Reserves in the Base Assessments or Service Area Assessments, as appropriate.

8.4.     Special Assessments.  In addition to other authorized assessments, the Association may levy Special Assessments from time to time to cover unbudgeted or unanticipated expenses or expenses in excess of those budgeted. Any such Special Assessment may be levied against the entire membership, if such Special Assessment is for Operating Expenses or against the Units within any Service Area if such Special Assessment is for Service Area Operating Expenses. After termination of the Class "B" Control Period, no vote of the Owners shall be required for such Special Assessment (or for any other assessment) except to the extent specifically provided herein.  During the Class "B" Control Period, a Special Assessment may be levied by the Association with the approval of (i) a majority of the Board; and (ii) fifty-one percent (51%) of the Class "A" Voting Interests present (in person or by proxy) at a duly called meeting of the Members.

25

8.5.    Specific Assessment.

(a)    The Board shall have the power to levy Specific Assessments against a particular Unit or Units constituting less than all Units within the Project, as follows:

(1)    To cover the costs, including overhead and administrative costs, of providing benefits, items, or services to the Unit or occupants thereof upon request of the Owner pursuant to a menu of special services that the Board may from time to time authorize to be offered to Owners (which might include, without limitation, landscape maintenance, maid service, linen service, handyman service, pool cleaning, pest control, arrival and departure service, courier service, etc.), which assessments may be levied in advance of the provision of the requested benefit, item or service as a deposit against charges to be incurred by the Owner; and

(2)    To cover costs incurred in bringing the Unit into compliance with the terms of the Governing Documents, or costs incurred as a consequence of the conduct of the Owner, tenants or occupants of the Unit, their licensees, invitees, or guests; provided the Board shall give the Unit Owner prior written notice and an opportunity for a hearing before levying any Specific Assessment under this Subsection (2), in compliance with Section 15.5 of this Declaration.

(b)    The Association may also levy a Specific Assessment against any Neighborhood Association to reimburse the Association for costs incurred in bringing the property under its control into compliance with the provisions of the Declaration, any applicable Supplemental Declaration, the Articles, the Bylaws, and Rules, provided the Board gives such Neighborhood Association prior written notice and an opportunity to be heard before levying any such assessment, in compliance with Section 15.5 of this Declaration.  In the case of the failure of a Neighborhood Association to properly perform its responsibilities, any resultant assessment may be imposed against all Units under the jurisdiction of such Neighborhood Association.

8.6.    Authority to Assess Owners; Time of Payment; Allocations of Number of Units on Vacant Land.

(a)    The Board is hereby authorized to levy assessments against each Unit (including each other parcel of unsubdivided land within the Project that has been deemed to contain a specified number of Units for purposes of assessments in this Declaration or in any Supplemental Declaration), as provided for in this Article and elsewhere in the Governing Documents.  The obligation to pay assessments shall commence as to each Unit on the first day the Unit is conveyed by the Declarant, or an affiliate of Declarant, to an Owner other than the Declarant or its affiliates.  The first annual Base Assessment and Service Area Assessment, if any, levied on each Unit shall be adjusted according to the number of months remaining in the fiscal year at the time assessments commence on the Unit.

(b)    All assessments on behalf of the Association shall be levied and collected by the Board. Assessments shall be paid in such manner and on such dates as the Board may establish. Unless the Board otherwise provides, the Base Assessment and any Service Area Assessment shall be due and payable in advance on the first day of each fiscal quarter.

8.7.    Personal Obligation.

(a)    Each Owner, by accepting a deed for any portion of the Project, is deemed to covenant and agree to pay all assessments authorized in this Declaration.  All assessments, together with interest from the due date of such assessment at a rate not to exceed the highest rate permitted by Florida law, a late fee of Twenty-Five and no/100 Dollars ($25.00) per month (or such greater

26

amount established by the Board from time to time), costs, and reasonable attorneys' fees, legal expenses and paralegals' fees, shall be a charge and continuing lien upon each Unit against which the assessment is made until paid, as more particularly provided in Section 8.8. Each such assessment, together with the above-described interest, late charges, costs, and reasonable attorneys' fees, legal expenses and paralegals' fees, also shall be the personal obligation of the Person who was the record title owner of such Unit at the time the assessment became due. Upon a transfer of title to a Unit, the grantee shall be jointly and severally liable for any assessments and other charges due at the time of conveyance, except in the event of a sale or transfer of a Unit pursuant to the foreclosure of a Mortgage (or by deed in lieu of foreclosure or otherwise) of a bona fide first mortgage held by a Mortgagee, in which event, the acquirer of title shall be liable for assessments that became due prior to such sale or transfer to the extent and in such amounts as provided in Section 720.3085, Florida Statutes (2012). Such unpaid assessments shall be deemed to be Operating Expenses collectible from Owners of all Units subject to assessment. For purposes of this subsection (a), the attorneys' fees, legal expenses and paralegals' fees shall be due and owing whether or not there is a lawsuit and shall include reasonable fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction) and appeals.

(b)    Failure of the Board to fix assessment amounts or rates or to deliver or mail to each Owner an assessment notice shall not be deemed a waiver, modification, or a release of any Owner from the obligation to pay assessments.

(c)    No Owner may exempt himself from liability for assessments by non-use of Common Area, abandonment of his Unit, or any other means. The obligation to pay assessments is a separate and independent covenant on the part of each Owner. No diminution or abatement of assessments or set-off shall be claimed or allowed for any alleged failure of the Association or Board to take some action or perform some function required of it, or for inconvenience or discomfort arising from the making of repairs or improvements, or from any other action taken by the Association.

(d)    No Owner shall sell or convey its interest in a Unit unless all sums due to Association have been paid in full and an estoppel certificate shall have been received by such Owner. The Association shall prepare and maintain a ledger noting assessments and Club Dues due from each Owner. The ledger shall be kept in the office of Association, or its designees, and shall be open to inspection by any Owner and Club Owner. Within fourteen (14) days of a written request therefor, there shall be furnished to an Owner an estoppel certificate in writing setting forth whether the assessments have been paid and/or the amount which is due as of any date. As to parties other than Owners who, without knowledge of error, rely on the certificate, the certificate shall be conclusive evidence of the amount of any assessment therein stated. The Owner requesting the estoppel certificate shall be required to pay the Association a fee to cover the costs of examining records and preparing such estoppel certificate. Each Owner waives its rights (if any) to an accounting related to Operating Expenses or assessments.

8.8.    Lien for Assessments.

(a)    All assessments authorized in this Article shall constitute a lien against the Unit or property against which they are levied until paid. The lien shall also secure payment of all interest, late charges and reasonable attorneys' fees, legal expenses and paralegals' fees as provided for in Section 8.7(a) above. All such liens shall be continuing liens upon the property against which each assessment is levied until paid and shall relate back to the recording date of this Declaration. Such liens shall be superior to all other liens, except (i) the lien for Club Dues as provided in the Club Plan, (ii) the liens of all taxes, bonds, assessments, including CDD assessments, and other governmental levies which by law would be superior, and (iii) the lien or

27

charge of any first priority Mortgage of record made in good faith and for value.

(b)    Intentionally Omitted.

(c)    The Association may bid for a Unit at a foreclosure sale and acquire, hold, lease, mortgage, and convey the Unit, which decisions shall be made by the Board without the need for membership approval. While a Unit is owned by the Association following foreclosure (i) no right to vote shall be exercised on its behalf; and (ii) no assessment shall be levied on it. The Association may sue for unpaid Operating Expenses and costs without foreclosing or waiving the lien securing the same.

(d)    The sale or transfer of any Unit shall not affect the assessment lien or relieve such Unit from the lien for any subsequent assessments.

(e)    The lien rights created in this Declaration shall be for the benefit of the Club Owner and the Association, in that order of priority.

(f)    In the event of a default in the payment of any assessment, the Association may accelerate the assessments then due for up to the next ensuing twelve (12) month period.

8.9.    <u>Application of Payments</u>.  Any and all payments received by the Association shall be applied first to any fines levied by the Association, accrued interest, then to any late fees, then to any legal expenses and costs, then to any reasonable attorneys', or paralegals' fees incurred in collection (whether suit be filed or not) and then to the delinquent assessment.  The foregoing shall be applicable notwithstanding any restrictive endorsement, designation, or instruction placed on or accompanying a payment.

8.10.    <u>Exempt Property</u>.  The following shall be exempt from payment of Base Assessments, Service Area Assessments, and Special Assessments:

(a)    All Common Area, Tennis Common Areas and any property that is included in the Area of Common Responsibility;

(b)    Any property dedicated to and accepted by any governmental authority or public utility, including any CDD;

(c)    Any real property, other than a Unit or Units, owned by a Neighborhood Association for the common use and enjoyment of its members, or owned by the members of such an association as tenants-in-common; and

(d)    All property that comprises the Club.

8.11.    <u>Initial and Resale Contributions</u>.

(a)    The first purchaser of each Unit from the Declarant, at the time of closing of the conveyance from Declarant to the purchaser, shall pay to the Association an initial contribution in the amount of Five Hundred and No/100 Dollars ($500.00) (the "**Initial Contribution**"). The funds derived from the Initial Contributions are deemed income to the Association and shall be used at the discretion of Board for any purpose, including without limitation, future and existing capital improvements, operating expenses, support costs and start-up costs.

28

(b)  After the Unit has been conveyed by the Declarant, there shall be collected upon every conveyance of an ownership interest in a Unit by an Owner a resale contribution in the amount equal to Five Hundred and No/100 Dollars ($500.00) (the "**Resale Contribution**"). The Resale Contribution shall not be applicable to conveyances from Declarant. The funds derived from the Resale Contributions are income to the Association and shall be used at the discretion of Board for any purpose, including without limitation, future and existing capital improvements, operating expenses, support costs and start-up costs.

8.12.  Collection from Tenants.  If a Unit is occupied by a tenant and the Owner is delinquent in the payment of assessments, the Association may demand from the tenant payment to the Association of all monetary obligations, including without limitation, assessments and Club Dues due from the Owner to the Association and Club Owner, respectively.  So long as the Owner remains delinquent, future rent payments due to the Owner must be paid to the Association and shall be credited to the monetary obligations of the Owner to the Association and the Club Owner; provided, however, if within fourteen (14) days from the written demand of the Association, the tenant provides the Association with written evidence of making prepaid rent payments, the tenant shall receive a credit for the prepaid rent for the applicable period of such prepaid rent.

8.13.  Declarant's Funding Obligations.  Each Owner acknowledges that because Base Assessments, Special Assessments, and Reserves are allocated based on the formula provided herein, or upon the number of Units conveyed to Owners on or prior to adoption of the Association's budget, it is possible that Association may collect more or less than the amount budgeted for Operating Expenses.  Prior to the termination of the Class "B" Control Period, Declarant shall have the option to (i) pay any Operating Expenses incurred by the Association that exceed the assessments receivable from Owners (other than Declarant) and other income of the Association, including the Initial Contributions and Resale Contributions (the "**Deficit**"), or (ii) pay Base Assessments on Units owned by Declarant at the applicable rate of Base Assessments established for Units, including Vacant Units, owned by Class "A" Members.  Notwithstanding any other provision of this Declaration to the contrary, Declarant shall never be required to (i) pay assessments if Declarant has elected to fund the Deficit instead of paying assessments on Units or Vacant Units owned by Declarant, (ii) pay Special Assessments or Reserves, or (iii) fund deficits due to non-payment by delinquent Owners.  Any surplus assessments collected by the Association may be allocated towards the next year's Operating Expenses or, in Association's sole and absolute discretion, to the creation of Reserves, whether or not budgeted.  Under no circumstances shall the Association be required to pay surplus assessments to Owners. The Declarant may at any time give thirty (30) days prior written notice to the Association terminating its responsibility for the Deficit, and waiving its right to exclusion from assessments.  Upon giving such notice, or upon the termination of the Class "B" Control Period, whichever is sooner, each Unit owned by Declarant shall thereafter be assessed at the applicable rate of Base Assessments established for Units, including Vacant Units, owned by Class "A" Members.  Under no circumstances shall Declarant be responsible for any Reserves or Special Assessments. Declarant shall be assessed only for Units and Vacant Units that are subject to this Declaration. Upon transfer of title of a Unit owned by Declarant, the Unit shall be assessed in the amount established for Units owned by Owners other than the Declarant, prorated as of and commencing with, the month following the date of transfer of title.

THE DECLARANT DOES NOT PROVIDE A GUARANTEE OF THE LEVEL OF ASSESSMENTS. AS SUCH, THERE IS NO MAXIMUM GUARANTEED LEVEL OF ASSESSMENTS DUE FROM OWNERS.  IN THE EVENT THE DECLARANT ELECTS TO FUND DEFICITS IN LIEU OF PAYING ASSESSMENTS ON THE SAME BASIS AS OTHER OWNERS, THE DECLARANT SHALL SPECIFICALLY ELECT TO FUND THE DEFICIT AS PROVIDED IN SECTION 720.308(1)(B), FLORIDA STATUTES (2012).  AS SUCH, THE PROVISIONS OF SECTIONS 720.308(2) THROUGH 720.308(6),

29

FLORIDA STATUTES (2012), ARE NOT APPLICABLE TO THE DECLARANT OR THE CALCULATION OF THE DEFICIT OR OTHER AMOUNTS DUE FROM THE DECLARANT.

(a)     Any funds paid to the Association by Declarant prior to the date on which Declarant elects to, or is obligated to, pay assessments on Units or Vacant Units then owned by Declarant that are then subject to this Declaration, shall be deemed applicable first, to any Deficit payments due from Declarant to the Association for any prior fiscal years, then to Deficit payments due from Declarant to the Association for the current fiscal year and then to Excess Funding (as hereinafter defined).  For example, if in January, 2012 Declarant pays $50,000 to the Association and, either at that time or subsequently, the Association determines that there was a Deficit (not previously funded by Declarant), for fiscal year 2012 of $20,000, $20,000 of the $50,000 paid in January, 2012 by Declarant will be deemed paid to satisfy Declarant's $20,000 Deficit funding obligation for 2012, and the $30,000 balance will be deemed applicable first to any 2012 Deficit funding obligation of Declarant and any excess will be deemed Excess Funding by Declarant, as hereinafter provided.

(b)     If Declarant elects to fund the Association's Deficit for any fiscal year, then any amounts paid by Declarant to the Association for such fiscal year in excess of the Deficit ("**Excess Funding**") shall be deemed to have been a loan to the Association to meet cash flow short falls and shall be repaid to Declarant within thirty (30) days after the end of such fiscal year, along with interest on such Excess Funding from the date advanced by Declarant until paid, calculated at the rate per annum equivalent to the Prime Rate of Interest (or any equivalent successor thereto) announced by SunTrust Bank, N.A., or its successor, from time to time as its "Prime Rate".  Declarant's obligations hereunder may be satisfied in the form of cash or by "in kind" contributions of services or materials, or by a combination of these.  The Association is specifically authorized to enter into subsidy contracts and contracts for "in kind" contribution of services, materials, or a combination of services and materials with Declarant or other entities.

**ARTICLE IX**
**EXPANSION OF THE COMMUNITY**

9.1.    Expansion by Declarant.

(a)     Until forty (40) years after the recording of this Declaration, Declarant may annex (e.g., unilaterally subject to the provisions of this Declaration) additional lands to the Project. Except for applicable governmental approvals (if any), no consent to such annexation shall be required from any other party (including, but not limited to, the Association, Builders, Owners or any Mortgagees). Such annexed lands shall be brought within the provisions and applicability of this Declaration by the recording of a Supplemental Declaration to this Declaration in the Public Records. The Supplemental Declaration shall subject the annexed lands to the covenants, conditions, and restrictions contained in this Declaration as fully as though the annexed lands were described herein as a portion of the Project. Such Supplemental Declaration may contain additions to, modifications of, or omissions from the covenants, conditions, and restrictions contained in this Declaration as deemed appropriate by Declarant and as may be necessary to reflect the different character, if any, of the annexed lands. Except as otherwise provided herein, prior to the termination of the Class "B" Control Period, only Declarant may add additional lands to the Project.

(b)     Such annexation shall be accomplished by filing a Supplemental Declaration in the Public Records describing the property to be annexed and specifically subjecting it to the terms of this Declaration.  Such Supplemental Declaration shall not require the consent of Members, but shall require the consent of the owner of such property, if other than Declarant.  Any such annexation

30

shall be effective upon the filing for record of such Supplemental Declaration unless otherwise provided therein.

9.2.  Expansion by Association.

(a)  The Association may subject any real property to the provisions of this Declaration with the consent of the record title owner of such real property, fifty-one percent (51%) of the Class "A" Voting Interests present (in person or by proxy) at a duly called meeting of the Association, and the consent of Declarant so long as Declarant owns property subject to this Declaration or which may become subject to this Declaration in accordance with Section 9.1.

(b)  Such annexation shall be accomplished by filing a Supplemental Declaration in the Public Records describing the real property to be annexed and specifically subjecting it to the terms of this Declaration.  Any such Supplemental Declaration shall be signed by the President and the Secretary of the Association, and by the record title owner of the annexed property, and by Declarant, if Declarant's consent is required.  Any such annexation shall be effective upon filing for record of such Supplemental Declaration unless otherwise provided therein.

9.3.  Additional Covenants and Easements.  Declarant may subject any portion of the property submitted to this Declaration to additional covenants and easements, including covenants obligating the Association to maintain and insure each property on behalf of the Owners and obligating such Owners to pay the costs incurred by the Association through Service Area Assessments.  Such additional covenants and easements shall be set forth in a Supplemental Declaration filed either concurrent with or after the annexation of the subject property, and shall require the written consent of the record title owner(s) of such property, if other than Declarant.  Any such Supplemental Declaration may supplement, create exceptions to, or otherwise modify the terms of this Declaration as it applies to the subject property in order to reflect the different character and intended use of such property.

**ARTICLE X**
**ADDITIONAL RIGHTS RESERVED TO DECLARANT**
**AND MATERIAL DISCLOSURES**

10.1.  Withdrawal of Property.  So long as Declarant has the right to annex property pursuant to Section 9.1, Declarant reserves the right to withdraw any portion of the Project from the coverage of this Declaration.  Such withdrawal shall not require the consent of any Person other than the record title owner of the property to be withdrawn.

10.2.  Right to Transfer or Assign Declarant Rights.  Any and all of the special rights and obligations of Declarant set forth in the Governing Documents may be transferred in whole or in part to other Persons.  Such assignment need not be recorded in the Public Records in order to be effective.  The foregoing shall not preclude Declarant from permitting other Persons to exercise, on a one (1) time or limited basis, any right reserved to Declarant in this Declaration where Declarant does not intend to transfer such right in its entirety, and in such case it shall not be necessary to execute any written assignment unless necessary to evidence Declarant's consent to such exercise.

10.3.  Right to use Common Area.

(a)  Declarant hereby reserves the right, for so long as it owns any Project, to maintain and carry on upon portions of the Common Area such facilities, activities and events as, in the sole opinion of Declarant, may be required, convenient, or incidental to the construction, sale or marketing of

31

Units, including, but not limited to, business offices, signs, model units, and sales offices. Declarant shall have easements for access to and use of such facilities. Declarant, during the course of construction on the Project, may use Common Area for temporary storage and for facilitating construction on the Project. Declarant shall not be obligated to pay any use fees, rent or similar charges for its use of Common Area pursuant to this Section. Declarant may grant to designees some or all of the rights reserved by it in this Subsection (a).

(b)     Declarant and its employees, agents and designees shall also have a right and easement over and upon all of the Common Area for the purpose of making, constructing and installing such improvements to the Common Area as it deems appropriate in its sole discretion.

10.4.     Right to Approve Additional Covenants.  Except as otherwise provided in this Declaration, no Person shall record any declaration of covenants, conditions and restrictions, or declarations of condominium or similar instrument affecting any portion of the Project without Declarant's review and prior written consent.  Any attempted recordation without such consent shall result in such instrument being void and of no force and effect unless subsequently approved by recorded consent signed by Declarant. Neither the Association nor any Owner, nor group of Owners, may record any documents that, in any way, affect or restrict the rights of Declarant or Club Owner or conflict with the provisions of this Declaration or the other Governing Documents

10.5.     Right to Approve Changes in Community Standards.  Notwithstanding any provision to the contrary in this Declaration, no amendment to or modification of any Use Restrictions and Rules shall be effective without prior notice to and the written approval of Declarant so long as Declarant owns any portion of the Project, which approval may be withheld for any reason.

10.6.     Exclusive Right to Use the Name of the Development.  No Person shall use the word "ChampionsGate" or any derivative thereof in the name of any building or any business or enterprise or in any printed or promotional material without Declarant's prior written consent. However, Owners may use the term "ChampionsGate" in printed or promotional materials solely to specify that particular property is located within ChampionsGate, and the Association shall be entitled to use the word "ChampionsGate" in its name.

10.7.     Development Easement. In addition to the rights reserved elsewhere herein, Declarant reserves an easement for itself or its nominees, and creates an easement in favor of the Club Owner over, upon, across, and under the Project as may be required in connection with the development of the Project, and other lands designated by Declarant and to promote or otherwise facilitate the development, construction and sale and/or leasing of Units, the Club or any portion of the Project, and other lands designated by Declarant. Without limiting the foregoing, Declarant specifically reserves the right to use all paved roads and rights of way within the Project for vehicular and pedestrian ingress and egress to and from construction sites. Specifically, each Owner acknowledges that construction vehicles and trucks may use portions of the Common Areas. Declarant shall have no liability or obligation to repave, restore, or repair any portion of the Common Areas as a result of the use of the same by construction traffic.  All maintenance and repair of such Common Areas shall be deemed ordinary maintenance of Association payable by all Owners as part of Operating Expenses. Without limiting the foregoing, at no time shall Declarant be obligated to pay any amount to the Association on account of Declarant's and Club Owner's use of the Common Areas for construction purposes. Declarant may market other residences and commercial Project located outside of the Project from Declarant's sales facilities located within the Project. Declarant has the right to use all portions of the Common Areas in connection with its marketing activities, including, without limitation, allowing members of the general public to inspect model homes, installing signs and displays, holding promotional parties and picnics, and using the Common Areas for every other type of promotional or sales activity that may be employed in the marketing of residential homes. The easements created by this

32

Section, and the rights reserved herein in favor of Declarant and Club Owner, shall be construed as broadly as possible. At no time shall Declarant or Club Owner incur any expense whatsoever in connection with its use and enjoyment of such rights and easements. Declarant may non-exclusively assign its rights hereunder to any Builder.

10.8. <u>Modification</u>. The development and marketing of ChampionsGate will continue as deemed appropriate in Declarant's sole discretion, and nothing in the Governing Documents, or otherwise, shall be construed to limit or restrict such development and marketing. It may be necessary or convenient for the development of ChampionsGate to, as an example and not a limitation, amend the Development Order, modify the boundary lines of the Common Areas, grant easements, dedications, agreements, licenses, restrictions, reservations, covenants, rights-of-way, and to take such other actions which Declarant, or its agents, affiliates, or assignees may deem necessary or appropriate. Association and Owners shall, at the request of Declarant, execute and deliver any and all documents and instruments that Declarant deems necessary or convenient, in its sole and absolute discretion, to accomplish the same.

10.9. <u>Promotional Events</u>. So long as Declarant owns any portion of the Project, Declarant shall have the right, at any time, to hold marketing, special and/or promotional events within ChampionsGate without any charge for use. Declarant, its agents, affiliates, or assignees shall have the right to market ChampionsGate and Units in advertisements and other media by making reference to ChampionsGate, including, but not limited to, pictures or drawings of at ChampionsGate, the Club, Common Areas and Units. All logos, trademarks, and designs used in connection with at ChampionsGate are the property of Declarant. Without limiting any other provision of this Declaration, Declarant may assign its rights hereunder to each Builder.

10.10. <u>Easements</u>. So long as Declarant owns any portion of the Project, Declarant reserves the exclusive right to grant, in its sole discretion, easements, permits and/or licenses for ingress and egress, drainage, utilities, maintenance, telecommunications services; and other purposes over, under, upon and across ChampionsGate so long as any said easements do not materially and adversely interfere with the intended use of Units previously conveyed to Owners. All easements necessary for such purposes are reserved in favor of Declarant, in perpetuity, for such purposes. Without limiting the foregoing, Declarant may relocate any easement affecting a Unit, or grant new easements over a Unit, after conveyance to an Owner, without the joinder or consent of such Owner, so long as the grant of easement or relocation of easement does not materially and adversely affect the Owner's use of the Unit. As an illustration, Declarant may grant an easement for telecommunications systems, irrigation, drainage lines or electrical lines over any portion of a Unit so long as such easement is outside the footprint of the foundation of any residential improvement constructed on such Unit. Declarant shall have the sole right to any fees of any nature associated therewith, including, but not limited to, license or similar fees on account thereof.  Association and Owners will, without charge, if requested by Declarant: (i) join in the creation of such easements and cooperate in the operation thereof; and (ii) collect and remit fees associated therewith, if any, to the appropriate party.  So long as Declarant owns any portion of the Project, Association will not grant any easements, permits or licenses to any other entity providing the same services as those granted by Declarant, nor will it grant any such easement, permit or license without the prior written consent of Declarant which may be granted or denied in its sole discretion.

10.11. <u>Additional Development</u>. If Declarant withdraws portions of the Project from the operation of this Declaration, Declarant may, but is not required to, subject to governmental approvals, create other forms of residential property ownership or other improvements of any nature on the property not subjected to or withdrawn from the operation of this Declaration. Declarant shall not be liable or responsible to any person or entity on account of its decision to do so or to provide, or fail to provide, the amenities and/or facilities which were originally planned to be included in such areas.

33

If so designated by Declarant, owners or tenants of such other forms of housing or improvements upon their creation may share in the use of all or some of the Common Areas and/or Club and other facilities and/or roadways which remain subject to this Declaration. The expense of the operation of such facilities shall be allocated to the various users thereof, if at all, as determined by Declarant.

10.12.  Representations. Declarant makes no representations concerning development both within and outside the boundaries of the Project including, but not limited to, the number, design, boundaries, configuration and arrangements, prices of Units or the Club and buildings in all other proposed forms of ownership and/or other improvements within the Project or adjacent to or near the Project, including, but not limited to, the size, location, configuration, elevations, design, building materials, height, view, airspace, number of homes, number of buildings, location of easements, parking and landscaped areas, services and amenities offered.

10.13.  Non-Liability. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE GOVERNING DOCUMENTS, ASSOCIATION SHALL NOT BE LIABLE OR RESPONSIBLE FOR, OR IN ANY MANNER A GUARANTOR OR INSURER OF, THE HEALTH, SAFETY OR WELFARE OF ANY OWNER, OCCUPANT OR USER OF ANY PORTION OF CHAMPIONSGATE, INCLUDING WITHOUT LIMITATION, RESIDENTS AND THEIR FAMILIES, GUESTS, LESSEES, LICENSEES, INVITEES, AGENTS, SERVANTS, CONTRACTORS, AND/OR SUBCONTRACTORS OR FOR ANY PROPERTY OF ANY SUCH WITHOUT LIMITING THE GENERALITY OF THE FOREGOING:

(a)     IT IS THE EXPRESS INTENT OF GOVERNING DOCUMENTS THAT THE VARIOUS PROVISIONS THEREOF WHICH ARE ENFORCEABLE BY ASSOCIATION AND WHICH GOVERN OR REGULATE THE USES OF CHAMPIONSGATE HAVE BEEN WRITTEN, AND ARE TO BE INTERPRETED AND ENFORCED, FOR THE SOLE PURPOSE OF ENHANCING AND MAINTAINING THE ENJOYMENT OF CHAMPIONSGATE AND THE VALUE THEREOF;

(b)     THE ASSOCIATION IS NOT EMPOWERED, AND HAS NOT BEEN CREATED, TO ACT AS AN AGENCY WHICH ENFORCES OR ENSURES THE COMPLIANCE WITH THE LAWS OF THE STATE OF FLORIDA AND/OR OSCEOLA COUNTY OR PREVENTS TORTIOUS ACTIVITIES;

(c)     THE PROVISIONS OF GOVERNING DOCUMENTS SETTING FORTH THE USES OF ASSESSMENTS WHICH RELATE TO HEALTH, SAFETY, AND WELFARE SHALL BE APPLIED ONLY AS LIMITATIONS ON THE USES OF ASSESSMENT FUNDS AND NOT AS CREATING A DUTY OF ASSOCIATION TO PROTECT OR FURTHER THE HEALTH, SAFETY, OR WELFARE OF ANY PERSON(S), EVEN IF ASSESSMENT FUNDS ARE CHOSEN TO BE USED FOR ANY SUCH REASON; AND

(d)     EACH OWNER (BY VIRTUE Of ITS ACCEPTANCE OF TITLE TO A UNIT) AND EACH OTHER PERSON HAVING AN INTEREST IN OR LIEN UPON, OR MAKING A USE OF, ANY PORTION OF CHAMPIONSGATE (BY VIRTUE OF ACCEPTING SUCH INTEREST OR LIEN OR MAKING SUCH USE) SHALL BE BOUND BY THIS SECTION AND SHALL BE DEEMED TO HAVE AUTOMATICALLY WAIVED ANY AND ALL RIGHTS, CLAIMS, DEMANDS AND CAUSES OF ACTION AGAINST ASSOCIATION ARISING FROM OR CONNECTED WITH ANY MATTER FOR WHICH THE LIABILITY OF ASSOCIATION HAS BEEN DISCLAIMED IN THIS SECTION OR OTHERWISE. AS USED IN THIS SECTION, "ASSOCIATION" SHALL INCLUDE WITHIN ITS MEANING ALL OF ASSOCIATION'S DIRECTORS, OFFICERS, COMMITTEE AND BOARD MEMBERS, EMPLOYEES AGENTS, CONTRACTORS (INCLUDING MANAGEMENT COMPANIES, SUBCONTRACTORS, SUCCESSORS AND ASSIGNS).

34

10.14.  Resolution of Disputes. BY ACCEPTANCE OF A DEED TO A UNIT, EACH OWNER AGREES THAT THE GOVERNING DOCUMENTS ARE VERY COMPLEX; THEREFORE, ANY CLAIM, DEMAND ACTION, OR CAUSE OF ACTION, WITH RESPECT TO ANY ACTION, PROCEEDING, CLAIM COUNTERCLAIM, OR CROSS CLAIM, WHETHER IN CONTRACT AND/OR IN TORT (REGARDLESS IF THE TORT ACTION IS PRESENTLY RECOGNIZED OR NOT), BASED ON, ARISING OUT OF IN CONNECTION WITH OR IN ANY WAY RELATED TO GOVERNING DOCUMENTS, INCLUDING ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT, VALIDATION PROTECTION, ENFORCEMENT ACTION OR OMISSION OF ANY PARTY SHOULD BE HEARD IN A COURT PROCEEDING BY A JUDGE AND NOT A JURY IN ORDER TO BEST SERVE JUSTICE. DECLARANT STRONGLY RECOMMENDS THAT EACH OWNER UNDERSTAND THE LEGAL CONSEQUENCES OF ACCEPTING A DEED TO A UNIT.

10.15.  Venue. EACH OWNER ACKNOWLEDGES REGARDLESS OF WHERE SUCH OWNER (i) EXECUTED A PURCHASE AND SALE AGREEMENT, (ii) RESIDES, (iii) OBTAINS FINANCING OR (iv) CLOSED ON A UNIT, EACH UNIT IS LOCATED IN OSCEOLA COUNTY, FLORIDA. ACCORDINGLY, AN IRREBUTTABLE PRESUMPTION EXISTS THAT THE APPROPRIATE VENUE FOR THE RESOLUTION OF ANY DISPUTE LIES IN OSCEOLA COUNTY, FLORIDA. IN ADDITION TO THE FOREGOING, EACH OWNER AND DECLARANT AGREES THAT THE VENUE FOR RESOLUTION OF ANY DISPUTE LIES IN OSCEOLA COUNTY, FLORIDA.

10.16.  Reliance. BEFORE ACCEPTING A DEED TO A UNIT, EACH OWNER HAS AN OBLIGATION TO RETAIN AN ATTORNEY IN ORDER TO CONFIRM THE VALIDITY OF THIS DECLARATION. BY ACCEPTANCE OF A DEED TO A UNIT, EACH OWNER ACKNOWLEDGES THAT HE OR SHE HAS SOUGHT AND RECEIVED SUCH AN OPINION OR HAS MADE AN AFFIRMATIVE DECISION NOT TO SEEK SUCH AN OPINION. DECLARANT IS RELYING ON EACH OWNER CONFIRMING IN ADVANCE OF ACQUIRING A UNIT THAT THIS DECLARATION IS VALID, FAIR AND ENFORCEABLE. SUCH RELIANCE IS DETRIMENTAL TO DECLARANT.  ACCORDINGLY, AN ESTOPPEL AND WAIVER EXISTS PROHIBITING EACH OWNER FROM TAKING THE POSITION THAT ANY PROVISION OF THIS DECLARATION IS INVALID IN ANY RESPECT. AS A FURTHER MATERIAL INDUCEMENT FOR DECLARANT TO SUBJECT THE PROJECT TO THIS DECLARATION, EACH OWNER DOES HEREBY RELEASE, WAIVE, DISCHARGE, COVENANT NOT TO SUE, ACQUIT, SATISFY AND FOREVER DISCHARGE DECLARANT, ITS OFFICERS, DIRECTORS, EMPLOYEES, AND AGENTS AND ITS AFFILIATES AND ASSIGNS FROM ANY AND ALL LIABILITY, CLAIMS, COUNTERCLAIMS, DEFENSES, ACTIONS, CAUSES OF ACTION, SUITS, CONTROVERSIES, AGREEMENTS, PROMISES AND DEMANDS WHATSOEVER IN LAW OR IN EQUITY WHICH AN OWNER MAY HAVE IN THE FUTURE, OR WHICH ANY PERSONAL REPRESENTATIVE, SUCCESSOR, HEIR OR ASSIGN OF OWNER HEREAFTER CAN, SHALL OR MAY HAVE AGAINST DECLARANT, ITS OFFICERS, DIRECTORS, EMPLOYEES, AND AGENTS, AND ITS AFFILIATES AND ASSIGNS, FOR, UPON OR BY REASON OF ANY MATTER, CAUSE OR THING WHATSOEVER RESPECTING THIS DECLARATION, OR THE EXHIBITS HERETO. THIS RELEASE AND WAIVER IS INTENDED TO BE AS BROAD AND INCLUSIVE AS PERMITTED BY THE LAWS OF THE STATE OF FLORIDA.

10.17.  Additional Covenants. The Declarant may record additional covenants, conditions, restrictions, and easements applicable to portions of the Project, and may form condominium associations, sub-associations, or cooperatives governing such property. No person or entity shall record any declaration of covenants, conditions and restrictions, or declaration of condominium or similar instrument affecting any portion of the Project without Declarant's prior review and prior written consent. Evidence of Declarant's prior written consent shall be obtained in the form of a joinder executed by the Declarant.  Any attempted recordation without such consent shall result in such instrument being void and of no force and effect unless subsequently approved by written

35

consent signed by the Declarant and recorded in the Public Records.

10.18.  <u>Density Transfers</u>. If any party shall develop any portion of the Project so that the number of Units contained in such portion of the Project is less than the allowable number of Units allocated by governmental authorities to that particular portion of the Project, the excess allowable Units not used by the such party (with respect to that portion of the Project) shall inure to the benefit of Declarant.

10.19.  <u>Paramount Right of Declarant</u>. Notwithstanding anything to the contrary herein, prior to the expiration of the Class "B" Control Period, Declarant shall have the paramount right to dedicate, transfer, and/or convey (by absolute conveyance, easement, or otherwise) portions of the Project for various public purposes or for the provision of telecommunications systems, or to make any portions of the Project part of the Common Areas, or to create and implement a special taxing district which may include all or any portion of the Project. SALES BROCHURES, SITE PLANS, AND MARKETING MATERIALS ARE CURRENT CONCEPTUAL REPRESENTATIONS AS TO WHAT IMPROVEMENTS, IF ANY, WILL BE INCLUDED WITHIN THE COMMON AREAS. DECLARANT SPECIFICALLY RESERVES THE RIGHT TO CHANGE THE LAYOUT, COMPOSITION AND DESIGN OF ANY AND ALL COMMON AREAS, AT ANY TIME, WITHOUT NOTICE AND AT ITS DISCRETION.

10.20.  <u>Amendment and Termination of Rights</u>.  This Article may not be amended without the written consent of Declarant so long as Declarant has any rights hereunder.  The rights contained in this Article shall terminate upon the earlier of (a) December 31, 2053, or (b) upon recording by Declarant of a written statement that Declarant has relinquished such rights.

# ARTICLE XI
## EASEMENTS

11.1.   <u>Easements in Common Area</u>.

(a)     Every Owner shall have a right and nonexclusive easement of use, access, and enjoyment in and to the Common Area, subject to:

(1)     the Club Plan;

(2)     the Governing Documents, any PCCRO or DCCRO and any other applicable covenants and easements, including any declaration of easements and covenants or similar instrument relating to such Common Area which grant non-Members rights to use and enjoy portions of the Common Area upon payment of fees or a portion of the costs relating to such Common Area;

(3)     any restrictions or limitations contained in any deed conveying such property to the Association;

(4)     the right of the Board to adopt rules regulating the use and enjoyment of the Common Area, including rules restricting use of the Tennis Common Areas;

(5)     the right of the Board to suspend the right to use all (except vehicular and pedestrian ingress and egress and necessary utilities) or a portion of the Common Areas or Club after notice and a hearing pursuant to the provisions of Section 15.5 of this Declaration;

(6)     the right of the Association, acting through the Board to dedicate or transfer all or any part of the Common Area subject to such approval requirements as may be set forth in

36

this Declaration. No such dedication or transfer shall be effective prior to the expiration of the Class "B" Control Period without prior written consent of Declarant and, at any time, without prior written consent of the Club Owner;

(7)    the right of the Board to impose membership requirements and charge membership, admission or other fees for the use of any recreational facility situated upon the Common Area;

(8)    the right of the Board to permit use of any the Common Area and Tennis Common Areas by Persons other than Owners, their families, lessees and guests upon payment of use fees established by the Board;

(9)    the right of the Association, acting through the Board, to mortgage, pledge, or hypothecate any or all of its real or personal property as security for money borrowed or debts incurred;

(10)    the right of certain Owners to the exclusive use of those portions of the Common Area designated "Exclusive Common Area" as more particularly described in Article XII;

(11)    the right of Declarant or the Association by and through its Board to grant easements over the Common Area to "tax-exempt organizations" pursuant to Section 7.12 and to any utility or governmental agency;

(12)    The perpetual right of Declarant to access and enter the Common Areas or Club at any time, even after the expiration of the Class "B" Control Period, for the purposes of inspection and testing of the Common Areas or Club. Association and each Owner shall give Declarant unfettered access, ingress and egress to the Common Areas so that Declarant and/or its agents can perform all tests and inspections deemed necessary by Declarant. Declarant shall have the right to make all repairs and replacements deemed necessary by Declarant. At no time shall Association and/or an Owner prevent, prohibit and/or interfere with any testing, repair or replacement deemed necessary by Declarant relative to any portion of the Common Areas or Club; and

(13)    The rights of Declarant, the Association and/or Club Owner reserved in this Declaration, including the right to utilize the same and to grant use rights, etc. to others.

(b)    Any Owner may extend his or her right of use and enjoyment to the members of his or her family who are residing in the Unit, residential lessees of the Unit, and social invitees; provided, however, that if an Owner leases his or her Unit to a residential lessee, such lessee of the Unit shall have the exclusive right to use the Common Area and Club, and the Owner (and their family and invitees) shall have no right to use the Common Area or Club during the term of the lease. All of the foregoing provisions of this Subsection 11.1(b) are subject to reasonable regulation as provided for in this Section 11.1 and Article III hereof.

11.2.    <u>Easements of Encroachment</u>. There shall be reciprocal appurtenant easements of encroachment, and for maintenance and use of any permitted encroachment, between each Unit and any adjacent Common Area and between adjacent Units due to the unintentional placement or settling or shifting of the improvements constructed, reconstructed, or altered on a Unit or the Common Area (in accordance with the terms of these restrictions). However, in no event shall an easement for encroachment exist if such encroachment occurred due to willful and knowing conduct on the part of, or with the knowledge and consent of, an Owner, occupant, or the Association.

37

11.3.  <u>Easements for Utilities</u>.  There are hereby reserved unto Declarant, so long as Declarant owns any portion of the Project, and hereby granted to the Association, the CDD, and the designees of each (that may include, without limitation, Tohopekaliga Water Authority, Osceola County and any other utility), access and maintenance easements upon, across, over, and under all of the Project to the extent necessary for the purpose of installing, replacing, repairing, and maintaining cable television systems, master television antenna systems, security and similar systems, roads, walkways, bicycle pathways, lakes, ponds, wetlands, drainage systems, street lights, signage, irrigations equipment and lines, and all utilities, including, but not limited to, water, sewer, meter boxes, telephone, gas, and electricity, and for the purpose of installing any of the foregoing on property that any such holder owns or within easements designated for such purposes on recorded plats of the Project.  This easement shall not entitle the holders to construct or install any of the foregoing systems, facilities, or utilities over, under or through any existing dwelling on a Unit, and any damage to a Unit resulting from the exercise of this easement shall promptly be repaired by, and at the expense of, the Person exercising the easement.  The exercise of this easement shall not unreasonably interfere with the use of any Unit, and except in an emergency, entry onto any Unit shall be made only after notice to the Owner or occupant.

11.4.  <u>Easements to Serve Additional Property</u>.  Declarant hereby reserves for itself and its duly authorized agents, representatives, successors, successors-in-title, assigns, licensees, and mortgagees, a perpetual nonexclusive easement over the Common Area for the purposes of enjoyment, use, access, and development of the Project, whether or not such property is made subject to this Declaration.  This easement includes, but is not limited to, a right of ingress and egress over the Common Area for construction of roads and for connecting and installing utilities on such property.

11.5.  <u>Easement for Maintenance, Emergency and Enforcement</u>.

(a)  Declarant, the Association and their respective designees shall have the right, but not the obligation, to enter upon any Unit and upon any Neighborhood Property for emergency, security, and safety reasons, and to perform its maintenance and other obligations and self-help remedies set forth in this Declaration, and to inspect for the purpose of ensuring compliance with the Governing Documents, which right may be exercised by any member of the Board, the Association, officers, agents, employees, and managers, and all policemen, firemen, ambulance personnel, and similar emergency personnel in the performance of their duties.  Such entry shall not be considered a trespass.

(b)  Except in an emergency situation, entry shall only be during reasonable hours and after notice to the Owner.  This right of entry shall include the right to enter upon any Unit or Neighborhood Property to cure any condition which may increase the possibility of a fire or other hazard in the event an Owner fails or refuses to cure the condition within a reasonable time after requested by the Board, but shall not authorize entry into any single family detached dwelling without permission of the Owner, except by emergency personnel acting in their official capacities.

(c)  Any costs incurred by Declarant or the Association in carrying out its or their rights pursuant to this Section 11.5 may be assessed as a Specific Assessment in accordance with the provisions of Section 8.5.

11.6.  <u>Easements for Signage</u>.  Declarant hereby reserves for itself and for the Association, and their successors, assigns and designees, a perpetual, non-exclusive easement over the Project, including without limitation the CDD Facilities, Common Area, road right-of-way and other open spaces not owned by the Owner of a Unit within the Project for purposes of installing, maintaining, operating and replacing permanent and/or temporary signage to advertise any and all matters related to the Project as determined by the Declarant in its sole discretion.  Such

38

signage may include general community advertising to homebuyers, directional signage, model designations and locations, commercial tenant directional signage, towncenter master signage, and event signage. The easement granted herein is intended to be blanket in nature over the subservient land; provided, however, Declarant shall have the right, but not the obligation, to designate specific locations for such signage and to record a specific easement over such property among the Public Records.

11.7. <u>Easement for Special Events</u>. Declarant hereby reserves for itself and for the Association, and their successors, assigns and designees, a perpetual, non-exclusive easement over the Common Area for the purpose of conducting parades, running, biking or other sporting events, educational, cultural, artistic, musical and entertainment activities, and other activities of general community interest, at such locations and times as Declarant (or the Association), in its sole discretion, deems appropriate. Each Owner, by accepting a deed or other instrument conveying any interest in a Unit, acknowledges and agrees that the exercise of this easement may result in a temporary increase in traffic, noise, gathering of crowds and related inconveniences, and each Owner agrees on behalf of itself and the occupants of its Unit to take no action, legal or otherwise, which would interfere with the exercise of such easement.

11.8. <u>Easement for Use of Private Streets</u>. Declarant hereby creates a perpetual, non-exclusive easement for access, ingress and egress over the private streets within the Common Area, for law enforcement, fire fighting, paramedic, rescue and other emergency vehicles, equipment and personnel; for school buses, for U.S. Postal Service delivery vehicles and personnel; private delivery or courier services; and for vehicles, equipment and personnel providing garbage collection service to the Project; provided, such easement shall not authorize any such Persons to enter the Project except while acting in their official capacities.

11.9. <u>Easements for Surface Water Management System</u>. A non-exclusive easement shall exist in favor of SFWMD, Declarant, CDD, the Association, and their designees, and any applicable state agency, county agency and/or federal agency having jurisdiction over the Project over, across and upon the Project for drainage, irrigation and water management purposes. Any such drainage easement shall not contain permanent improvements, including but not limited to sidewalks, driveways, impervious surfaces, patios, decks, pools, air conditioners, structures, utility sheds, poles, fences, sprinkler systems, trees, shrubs, hedges or landscaping plants other than grass, except for (i) improvements installed by Declarant, the Association or the CDD, (ii) landscaping of the SWMS, (iii) as required by the County Land Development Code or the Permit, and/or (iv) improvements approved by the ARC. A non-exclusive easement for ingress and egress shall burden each Unit and benefit the Declarant, the Association and the CDD in order to construct, maintain, inspect, record data on, monitor, test, or repair, as necessary, any water management areas, mitigation areas, irrigation systems and facilities thereon and appurtenances thereto. No structure, landscaping, or other material shall be placed or be permitted to remain which may damage or interfere with the drainage or irrigation of the Project and/or installation or maintenance of utilities or which may obstruct or retard the flow of water through the Project or otherwise interfere with any drainage, irrigation and/or easement provided for in this Section or the use rights set forth elsewhere in this Declaration.

11.10. <u>Club Easements</u>. A non-exclusive easement shall exist in favor of the Club Owner and its respective designees, invitees, guests, agents, employees, and members over and upon the Common Areas, and portions of the Project necessary for ingress, egress, access to, construction, maintenance and/or repair of the Club. Club Owner, Club employees, agents, invitees, guests, any manager of the Club, and all members of the Club shall be given access to the Club on the same basis as Owners, but without any charge therefor (in the term of assessments or otherwise).

39

### ARTICLE XII
### EXCLUSIVE COMMON AREA

12.1.    Purpose.  Certain portions of the Common Area may be designated as Exclusive Common Area and reserved for the exclusive use or primary benefit of Owners, occupants and invitees of Units within a particular Service Area.  By way of illustration and not limitation, Exclusive Common Area may include entry features, recreational facilities, landscaped medians and cul-de-sacs, lakes and other portions of the Common Area within a particular Service Area.  All costs associated with maintenance, repair, replacement, and insurance of Exclusive Common Area shall be assessed as a Service Area Assessment against the Owners of Units in Service Areas to which the Exclusive Common Area is assigned.

12.2.    Designation.

(a)    Initially, Declarant shall designate any Exclusive Common Area and shall assign the exclusive use thereof in the deed conveying the Common Area to the Association, or on the plat of survey relating to such Exclusive Common Area, or by amendment or Supplemental Declaration to this Declaration.  No such assignment shall preclude Declarant from later assigning use of the same Exclusive Common Area to additional Units and/or Service Areas so long as Declarant has a right to subject additional property to this Declaration.

(b)    Thereafter, a portion of the Common Area may be assigned as Exclusive Common Area of a particular Service Area and Exclusive Common Area may be reassigned upon the vote of a majority of the Class "A" votes within the Service Area(s) to which the Exclusive Common Area are assigned, if applicable, and within the Service Area(s) to which the Exclusive Common Area are to be assigned.  As long as Declarant owns any property subject to this Declaration or has the right to subject additional property to this Declaration, any such assignment or reassignment shall also require Declarant's prior written consent.

12.3.    Use by Others.  The Association may, upon approval of a majority of the members of the Service Area Committee for the Service Area(s) to which certain Exclusive Common Area is assigned, permit Owners of Units in other Service Areas to use all or a portion of such Exclusive Common Area upon payment of user fees, which fees shall be used to offset the Service Area Operating Expenses attributable to such Exclusive Common Area.

### ARTICLE XIII
### PARTY WALLS AND OTHER SHARED STRUCTURES

13.1.    General Rules of Law to Apply.  Each wall, fence, driveway or similar structure built as a part of the original construction on the Units that serves and/or separates any two adjoining Units, and which is part of the general scheme of development for such Units and not an extra or optional item built at the request of an Owner, shall constitute a party structure.  To the extent not inconsistent with the provisions of this Section, the general rules of law regarding party walls and liability for property damage due to negligence or willful acts or omissions shall apply thereto.

13.2.    Maintenance; Damage and Destruction.  Except as may otherwise be provided by law, or by a written agreement between Owners of adjacent Units, or by other recorded documents applicable to adjacent Units:

(a)    All Owners who make use of any party structure shall share the cost of reasonable repair and maintenance of such structure equally; and

(b)    If a party structure is destroyed or damaged by fire or other casualty, then to the extent that such

40

damage is not covered by insurance and repaired out of the proceeds of insurance, any Owner who has used the structure may restore it. If other Owners subsequently use the structure, they shall contribute to the restoration cost in equal proportions. However, such contribution will not prejudice the right to call for a larger contribution from the other users under any rule of law regarding liability for negligent or willful acts or omission.

13.3.    Right to Contribution Runs with Land.   The right of an Owner to contribution from any other Owner under this Section shall be appurtenant to the land and shall pass to such Owner's successor-in-title.

### ARTICLE XIV
### STONEYBROOK SOUTH COMMUNITY DEVELOPMENT DISTRICT

14.1.    Generally. Declarant may create or has created the Stoneybrook South Community Development District (the "**CDD**") within the Project. Portions of the Project may be owned by the CDD, such as the roads, perimeter walls, drainage systems and/or utilities. In the event that any portions of the Project are owned by the CDD, such facilities shall not be part of the Common Areas, but will be part of the infrastructure facilities owned by the CDD (the "**Facilities**"). AT THIS TIME IT IS NOT KNOWN WHAT PORTIONS OF THE PROJECT WILL BE DESIGNATED COMMON AREAS OR FACILITIES OF THE CDD. FINAL DETERMINATION OF WHICH PORTION OF THE PROJECT WILL BE COMMON AREAS MAY NOT OCCUR UNTIL THE COMPLETION OF ALL DEVELOPMENT.

14.2.    Creation of the CDD. The CDD may issue Special Assessment Bonds (the "**Bonds**") to finance a portion of the cost of the Facilities. The CDD is an independent, multi-purpose, special district created pursuant to Chapter 190 of the Florida Statutes. The creation of the CDD puts residential units and non-residential development of the Project under the jurisdiction of the CDD. The CDD may be authorized to finance, fund, install, equip, extend, construct or reconstruct, without limitation, the following: water and sewer facilities, environmental mitigation, roadways, the Surface Water Management System, utility plants and lines, land acquisition, perimeter walls/fences, miscellaneous utilities for the community and other infrastructure projects and services necessitated by the development of, and serving lands, within the Project (the "**Public Infrastructure**"). The estimated design, development, construction and acquisition costs for these facilities may be funded by the CDD in one or more series of governmental bond financings utilizing special assessment bonds or other revenue backed bonds. The CDD may issue both long term debt and short term debt to finance the Public Infrastructure. The principal and interest on the special assessments bonds may be repaid through non ad valorem special assessments (the "**District Debt Service Assessments**") levied on all benefiting Project in the CDD, which property has been found to be specially benefited by the Public Infrastructure. The principal and interest on the other revenue backed bonds (the "**District Revenue Bonds**") may be repaid through user fees, franchise fees or other use related revenues. In addition to the bonds issued to fund the Public Infrastructure costs, the CDD may also impose an annual non ad valorem special assessment to fund the operations of the CDD and the maintenance and repair of its Public Infrastructure and services (the "**District Maintenance Special Assessments**").

14.3.    CDD Assessments. The District Debt Service Assessments and District Maintenance Special Assessments will not be taxes but, under Florida law, constitute a lien co-equal with the lien of state, county, municipal, and school board taxes and may be collected on the ad valorem tax bill sent each year by the Tax Collector of Osceola County and disbursed to the CDD. The homestead exemption is not applicable to the CDD assessments. Because a tax bill cannot be paid in part, failure to pay the District Debt Service Assessments, District Maintenance Special Assessments or any other portion of the tax bill will result in the sale of tax certificates and could

41

ultimately result in the loss of title to the property of the delinquent taxpayer through the issuance of a tax deed. The District Revenue Bonds are not taxes or liens on property. If the fees and user charges underlying the District Revenue Bonds are not paid, then such fees and user charges could become liens on the property which could ultimately result in the loss of title to the property through the issuance of a tax deed. The initial amount of the District Debt Service Assessments per year per Unit and the total amount of District Maintenance Special Assessments are unknown at this time. The actual amount of District Debt Service Assessments will be set forth in the District Assessment Methodology Report. District Maintenance Special Assessments relating to Facilities will he determined by the CDD. Any future CDD assessments and/or other charges due with respect to the Facilities are direct obligations of each Owner and are secured by a lien against the Unit. Failure to pay such sums may result in loss of property. The CDD may construct, in part or in whole, by the issuance of Bonds certain facilities that may consist of roads, perimeter walls/fences, utilities and/or drainage system, as the CDD determines in its sole discretion.

14.4.    <u>Common Areas and Facilities Part of CDD</u>. Portions of the Common Areas may be conveyed by Declarant to the CDD. Such Facilities will be part of the CDD and the CDD shall govern the use and maintenance of the Facilities. Some of the provisions of this Declaration will not apply to such Facilities, as the Facilities will no longer be Common Areas once conveyed to the CDD. ANY CONVEYANCE OF COMMON AREAS TO THE CDD SHALL IN NO WAY INVALIDATE THIS DECLARATION. Declarant may decide, in its sole and absolute discretion, to convey additional portions of the Common Areas to either the CDD or the Association. If conveyed to the CDD, such portions of the Common Areas shall thereafter be part of the CDD's Facilities. The CDD or Association may promulgate membership rules, regulations and/or covenants that may outline use restrictions for the Facilities, or Association's responsibility to maintain the Facilities, if any. The establishment of the CDD and the inclusion of Facilities in the CDD will obligate each Owner to become responsible for the payment of District Debt Service Assessments and District Maintenance Special Assessments for the construction and operation of the Facilities as set forth in this Section.

14.5.    <u>Facilities Owned by CDD</u>. The Facilities may be owned and operated by the CDD or owned by the CDD and maintained by Association. The Facilities may be owned by a governmental entity other than the CDD. The Facilities shall be used and enjoyed by the Owners, on a non-exclusive basis, in common with such other persons, entities, and corporations that may be entitled to use the Facilities. In addition to the Facilities, the CDD may purchase and own the Club.

**ARTICLE XV**
**ENFORCEMENT**

15.1.    <u>Compliance and Enforcement</u>.

(a)    Every Owner, tenant, guest, invitee and occupant of any Unit shall comply with the Governing Documents, the Club Plan and any applicable PCCRO and DCCRO. Failure to comply shall be grounds for an action by the Association, Declarant, Club Owner or, by any aggrieved Unit Owners(s) to recover sums due, for damages or injunctive relief, or for any other remedy available at law or in equity, in addition to those enforcement powers granted to the Association pursuant to the Governing Documents.

(b)    All remedies set forth in the Governing Documents shall be cumulative of any remedies available at law or in equity. Should the Declarant, Club Owner, an Owner, or the Association be required to enforce the provisions of the Governing Documents, the reasonable attorneys' and paralegal fees and costs incurred, whether or not judicial proceedings are involved, including the attorneys' and paralegal fees and costs incurred on appeal of any judicial proceedings that may be brought and including any fees incurred in the context of creditor's rights proceedings, to the extent

42

permitted by law (e.g., bankruptcy), shall be collectible from the party against which enforcement is sought.

(c)     The Association may also impose sanctions for violations of the Governing Documents in accordance with the procedures set forth in this Declaration, including reasonable monetary fines and suspension of the right to vote for nonpayment of assessments that are delinquent in excess of ninety (90) days, and suspension of the right to use any facilities within the Common Area; provided, however, nothing herein shall authorize the Board to limit ingress and egress to or from a Unit.  In addition, the Association may suspend any services it provides to the Unit of any Owner who is more than thirty (30) days delinquent in paying any assessment or other charge due to the Association, or for any other violation of the Governing Documents, and may exercise self-help to cure violations.

(d)     ALL OWNERS ARE HEREBY PLACED ON NOTICE THAT ASSESSMENTS MAY INCLUDE CHARGES FOR CABLE SERVICES CHARGED BY A CABLE SERVICES PROVIDER. IN THE EVENT AN OWNER FAILS TO PAY ANY ASSESSMENT DUE PURSUANT TO THE TERMS OF THIS DECLARATION, THE ASSOCIATION SHALL HAVE THE RIGHT TO DISCONNECT SERVICES PROVIDED TO THE OWNER'S UNIT, INCLUDING BUT NOT LIMITED TO CABLE AND INTERNET SERVICES.

(e)     The Association may, but shall not be obligated to take action to enforce any provision of the Governing Documents.  Any such determination shall not be construed as a waiver of the right to enforce such provision under other circumstances or stop the Association from enforcing any other covenant, restriction or rule.

(f)     SFWMD shall have the right to enforce, by a proceeding at law or in equity, the provisions contained in the Declaration which relate to the maintenance, operation and repair of SWMS.

15.2.   <u>Owners Obligated for Lessees, Occupants and Guests</u>.  All lessees, occupants and guests shall be subject to the terms and conditions of the Governing Documents, the Club Plan and any applicable PCCRO or DCCRO, as though such lessees, occupants or guests were Owners. Each Owner agrees to cause the Owner's lessees or the Owner's or lessee's occupants, guests, or other persons living with Owner or lessee to comply with the Governing Documents and any applicable PCCRO or DCCRO, and such Owner is responsible and liable for all violations and losses caused by such lessees, guests or occupants, notwithstanding the fact that such lessees, guests, or occupants of the Unit are also fully liable for any violation of the Governing Documents and any applicable PCCRO or DCCRO.  Should the Declarant, Club Owner, an Owner or the Association be required to enforce the provisions of this Section, the reasonable attorneys' and paralegals' fees and costs incurred, whether or not judicial proceedings are involved, including the attorneys' and paralegals' fees and costs incurred on appeal of any judicial proceedings that may be brought and including any fees incurred in the context of creditor's rights proceedings, to the extent permitted by law (e.g., bankruptcy), shall be collectible from the party against which enforcement is sought.

15.3.   <u>Covenants Enforcement</u>.    Acting in accordance with the provisions of this Declaration, the Bylaws, and any resolutions the Board of Directors may adopt, the Board may appoint a Covenants Committee of at least three (3) and no more than seven (7) members who are not officers, directors, or employees of the Association, or the spouse, parent, child, brother, or sister of an officer, director or employee of the Association. The Covenants Committee shall hold those hearings required by Florida Statutes §720.305(2)(a) (2012).

15.4.   <u>Sanctions</u>. The Association may suspend, for a reasonable period of time, the rights of an Owner or Owner's tenants, guests or invitees, or both, to use Common Areas and Tennis Common

43

Areas and may levy reasonable fines, not to exceed One Hundred Dollars ($100.00) per violation or One Hundred Dollars ($100.00) per day for a continuing violation, against any Owner or any tenant, guest or invitee. A fine may be levied on the basis of each day of a continuing violation, with a single notice and opportunity for hearing. There shall be no limit to the aggregate amount of the fine that may be imposed for continuing violations of this Declaration.

15.5. <u>Hearing Procedure</u>.

(a)    The Board shall have the authority to adopt notice and hearing procedures provided such procedures comply with Section 720.305, Florida Statutes. A fine or suspension (a late charge shall not constitute a fine) may not be imposed without first providing notice to the Person sought to be fined or suspended and an opportunity for a hearing before the Covenants Committee in accordance with the procedures adopted by the Board. If the Covenants Committee, by majority vote, does not approve a proposed fine or suspension, it may not be imposed. If the Covenants Committee approves a suspension, it shall be immediately applicable. If the Covenants Committee approves a proposed fine, it shall be immediately due in an amount equal to the number of days such person, or property, has been in violation of this Declaration, multiplied by the per day fine approved by the Covenants Committee (and fines for continuing infractions shall thereafter be due daily without further notice, demand or opportunity for hearing).

(b)    The requirements of Section 15.5(a) do not apply to the imposition of suspensions or fines upon any Owner because of the failure of the Owner to pay assessments or other charges when due; however, any such suspension must be approved at a properly noticed meeting of the Board of Directors. In the event of these types of infractions, the Association may impose fines or sanctions without affording the Person to be sanctioned or fined a hearing.

15.6.    <u>No Waiver</u>. The rights of Declarant, the Club Owner, any Owner or the Association under the Governing Documents or the Club Plan shall be cumulative and not exclusive of any other right or available remedy. Declarant's, any Owner's or the Association's pursuit of any one or more of the rights or remedies provided for in this Article XV shall not preclude pursuit of any other right, remedy or remedies provided in the Governing Documents or any other right, remedy or remedies provided for or allowed by law or in equity, separately or concurrently or in any combination. Declarant's, Club Owner's any Owner's or the Association's pursuit of any one or more of its rights or remedies shall not constitute an election of remedies excluding the election of another right, remedy or other remedies, or a forfeiture or waiver of any right or remedy or of any damages or other sums accruing to Declarant, the Club Owner such Owner or the Association by reason of any obligated person's failure to fully and completely keep, observe, perform, satisfy and comply with all of the covenants, restrictions and easements set forth in the Governing Documents or the Club Plan. Declarant's, Club Owner's, an Owner's or the Association's forbearance in pursuing or exercising one or more of its or their rights or remedies, or the failure of Declarant, Club Owner, an Owner or the Association to enforce any of the covenants, restrictions and easements set forth in the Governing Documents or the Club Plan or to promptly pursue and exercise any right or remedy contained in the Governing Documents or the Club Plan, shall not be deemed or construed to constitute a waiver of any other right or remedy or any waiver of the further enforcement or the provision or the exercise of the right or remedy that was the subject of the forbearance or failure. No waiver by Declarant, Club Owner, an Owner or the Association of any right or remedy on one occasion shall be construed as a waiver of that right or remedy on any subsequent occasion or as a waiver of any other right or remedy then or thereafter existing. No failure of Declarant, Club Owner, an Owner or the Association to pursue or exercise any of their respective powers, rights or remedies or to insist upon strict and exact compliance with the Governing Documents or Club Plan, and no custom or practice at variance with the terms of the Governing Documents or the Club Plan, shall constitute a waiver by Declarant, Club Owner, any Owner or the Association of the right to demand strict and exact

44

compliance with all terms and conditions of the Governing Documents and Club Plan. No termination of any of the Governing Documents or the Club Plan shall affect Declarant's, Club Owner', an Owner's or the Association's right to collect any monetary amounts due to it for the period prior to termination.

## ARTICLE XVI
## SURFACE WATER MANAGEMENT SYSTEM

16.1.   <u>Surface Water Management Systems</u>. The CDD shall be responsible for maintenance of SWMS within the Project, except to the extent dedicated to the Osceola County by plat. All SWMS within the Project that are accepted or constructed by the CDD or the Declarant, excluding those areas dedicated to the Osceola County by plat, will be the ultimate responsibility of the CDD, whose agents, employees, contractors and subcontractors may enter any portion of the SWMS and make whatever alterations, improvements or repairs that are deemed necessary to provide or restore property water management.

(a)     No construction activities may be conducted relative to any portion of the SWMS. Prohibited activities include, but are not limited to: digging or excavation; depositing fill, debris or any other material or item; constructing or altering any water control structure; or any other construction to modify the SWMS. To the extent there exists within the Project a wetland mitigation area or a wet detention pond, no vegetation in these areas shall be removed, cut, trimmed or sprayed with herbicide without specific written approval from SFWMD. Construction and maintenance activities which are consistent with the design and permit conditions approved by SFWMD in the Permit may be conducted without specific written approval from SFWMD.

(b)     No Owner or other person or entity shall unreasonably deny or prevent access to water management areas for maintenance, repair, or landscaping purposes by Declarant, the CDD, Association or any appropriate governmental agency that may reasonably require access. Nonexclusive easements therefor are hereby specifically reserved and created.

(c)     No Unit or Common Area shall be increased in size by filling in any lake, pond or other water retention or drainage areas that it abuts. No person shall fill, dike, rip-rap, block, divert or change the established water retention and drainage areas that have been or may be created without the prior written consent of the CDD and the Association. No person other than the Declarant, the CDD or the Association may draw water for irrigation or other purposes from any lake, pond or other water management area, nor is any boating, swimming, or wading in such areas allowed.

(d)     All SWMS and conservation areas, excluding those areas (if any) maintained by Osceola County or another governmental agency, will be the ultimate responsibility of the CDD. The CDD may enter any Unit or Common Area and make whatever alterations, improvements or repairs are deemed necessary to provide, maintain, or restore proper SWMS. The cost shall be part of the District Maintenance Special Assessments. NO PERSON MAY REMOVE NATIVE VEGETATION THAT MAY BECOME ESTABLISHED WITHIN THE CONSERVATION AREAS. "REMOVAL" INCLUDES DREDGING, APPLICATION OF HERBICIDE, PULLING AND CUTTING.

(e)     Nothing in this Section shall be construed to allow any person to construct any new water management facility, or to alter any SWMS or conservation areas, without first obtaining the necessary permits from all governmental agencies having jurisdiction, including SFWMD, the CDD, the Association and the Declarant, its successors and assigns.

45

(f)   SFWMD has the right to take enforcement measures, including a civil action for injunction and/or penalties, against the Association to compel it to correct any outstanding problems with the SWMS.

(g)   Any amendment of the Declaration affecting the SWMS or the operation and maintenance of the SWMS shall have the prior written approval of SFWMD.

(h)   If the CDD shall cease to exist, all Owners shall be jointly and severally responsible for the operation and maintenance of the SWMS in accordance with the requirements of the Permit, unless and until an alternate entity assumes responsibility as explained in the Permit.

(i)   No Owner may construct or maintain any building, residence or structure, or undertake or perform any activity in the wetlands, wetland mitigation areas, buffer areas, upland conservation areas and drainage easements described in the approved permit and recorded plat of the subdivision, unless prior approval is received from the SFWMD.

(j)   Each Owner at the time of the construction of a building, residence, or structure shall comply with the construction plans for the SWMS approved and on file with SFWMD.

(k)   Owners shall not remove native vegetation (including cattails) that becomes established within the wet detention ponds abutting their property. Removal includes dredging, the application of herbicide, cutting, and the introduction of grass carp. Owners shall address any questions regarding authorized activities within the wet detention ponds to SFWMD.

16.2.   <u>Proviso</u>. Notwithstanding any other provision in this Declaration, no amendment of the Governing Documents by any person, and no termination or amendment of this Declaration, will be effective to change the CDD's responsibilities for the SWMS, unless the amendment has been consented to in writing by SFWMD. Any proposed amendment which would affect the SWMS must be submitted to SFWMD for a determination of whether the amendment necessitates a modification of the Permit.

**ARTICLE XVII**
**<u>TENNIS COMMON AREAS</u>**

17.1   <u>Right to Use the Tennis Center</u>. Rights to use any Tennis Common Areas will be granted only to such persons, and on such terms and conditions, as may be determined from time to time by the Association. The Owner(s) of each Unit and their guests, when accompanied by such Owner(s), are entitled use the Tennis Common Areas. Use rights in the Tennis Common Areas for each Owner shall be limited to the natural persons comprising a "**Family**" residing in the Unit. For purposes of this Article XVII, "Family" means one (1) natural person or not more than two (2) natural persons who are not related to each other by blood or adoption, who customarily reside and live together. The decision as to whether two (2) natural persons reside and constitute a qualifying Family shall be a matter for the Board of Directors in their sole and absolute discretion. Once designated and accepted by the Board as a Family, no change in such persons so constituting the Family for a particular Unit may be made except with the Board's approval in its reasonable discretion. Further, the biological or adopted children of the Family shall be entitled to use the Tennis Common Areas, including the tennis courts, if they meet all of the following conditions: (i) said child or children are age twenty-one (21) or less; (b) such child or children are not married or co-habitating with any third party; (c) said children do not have custodial children of their own (i.e., grandchildren of the Unit Owner); and (d) said children reside with the Owner in

46

the Unit on a permanent basis, or in the case of college or graduate students, at such times as the student is not enrolled in a college or university. If a Unit is owned by two (2) or more natural persons who are not a Family, or is owned by an entity that is not a natural person, the Owner of the Unit shall be required to select and designate one (1) Family as defined above to utilize the Tennis Common Areas. The Association may restrict the frequency of changes in such designation when there is no change in ownership of the Unit.

The Association shall have the right to determine from time to time, and at anytime, in the Association's sole discretion, the manner in which the Tennis Common Areas will be made available for use, and the Association may make such facilities open and available to the public for such fees and charges as the Association may determine from time to time in its sole discretion.

17.2    Use of Tennis Common Areas. The Association shall have the following powers with respect to the Tennis Common Areas:

(a)    To allow public use of the Tennis Common Areas on such terms as conditions as may be established by the Board of Directors in their sole and absolute discretion;

(b)    To lease, assign or otherwise transfer the operating rights to, and any and all profits from, any restaurant, snack bar, pro shop or other facility on the Tennis Common Areas to a third party;

(c)    To restrict or prohibit use of any portion of the Tennis Common Areas, for jogging, cycling, walking pets or other activities not directly related to the playing of tennis;

(d)    To take all other actions with respect to operation, management and control of the Tennis Common Areas deemed necessary or convenient by the Board of Directors in their sole and absolute discretion.

17.3    Tennis Common Area Hazards. THE LOCATION, CONSTRUCTION, AND OPERATION OF TENNIS COMMON AREAS WITHIN THE PROJECT CONFERS A SUBSTANTIAL BENEFIT UPON THE OWNER(S) OF ANY UNIT, WHETHER OR NOT ANY SUCH OWNER USES THE TENNIS COMMON AREAS AND WHETHER OR NOT ANY SUCH UNIT IS LOCATED NEAR OR ADJACENT TO THE TENNIS COMMON AREAS. BY ACCEPTANCE OF A DEED TO A UNIT, EACH OWNER ACKNOWLEDGES THE DECLARANT AND THE ASSOCIATION SHALL HAVE NO RESPONSIBILITY OR LIABILITY TO SUCH OWNER, MEMBERS OF HIS OR HER FAMILY, GUESTS OR INVITEES, BECAUSE OF ANY EXCESSIVE LIGHTING OR NOISE ASSOCIATED WITH USE OR MAINTENANCE OF THE TENNIS COMMON AREAS, OR BECAUSE OF ANY DAMAGE OR INJURY CAUSED TO OWNER, HIS OR HER FAMILY, GUESTS, INVITEES, LICENSEES, EMPLOYEES, AND AGENTS, OR TO PROPERTY OF OWNER, HIS OR HER FAMILY, GUESTS, INVITEES, LICENSEES, EMPLOYEES, AND AGENTS FROM THE FLIGHT OF ERRANT TENNIS BALLS, FROM PERSONS RECOVERING TENNIS BALLS, OR FROM OTHER ACTS OF PERSONS ARISING OUT OF, OR ASSOCIATED WITH, USE OF THE TENNIS COMMON AREAS. BY ACCEPTANCE OF A DEED TO ANY UNIT EACH OWNER WAIVES ANY CLAIMS OR CAUSES OF ACTION THAT HE OR SHE, HIS OR HER FAMILY, GUESTS, INVITEES, LICENSEES, EMPLOYEES, OR AGENTS MAY HAVE AGAINST THE DECLARANT AND THE ASSOCIATION ARISING OUT OF SUCH PERSONAL INJURY OR PROPERTY DAMAGE. BY ACCEPTANCE OF SAID DEED TO A UNIT, EACH OWNER ACKNOWLEDGES THAT HE OR SHE KNOWS AND APPRECIATES THE NATURE OF ALL RISKS BOTH APPARENT AND LATENT ASSOCIATED WITH LIVING NEAR OR ADJACENT TO TENNIS COURTS AND FACILITIES AND EXPRESSLY ASSUMES THE RISKS OF    PERSONAL    INJURY    OR    PROPERTY    DAMAGE    THAT    MAY    OCCUR

47

IN CONNECTION WITH SUCH RISKS.

17.4    <u>Easement for Benefit of Tennis Common Areas</u>.  All permitted users, including paying guests, of
the Tennis Common Areas shall have an easement, or easements, over and across the Common
Areas (including without limitation, all streets located within the Project) for the purpose of
providing access to, and facilitating the use of, the Tennis Common Areas.  In addition, an
easement is hereby created as to all portions of the Project, including all Units, in favor of the
permitted users of the Tennis Common Areas and their permitted guests and invitees, to permit
the doing of every act necessary and incident to the playing of tennis on the Tennis Common
Areas and to permit the doing of every act necessary and incident to maintaining the Tennis
Common Areas.  These acts shall include, without limitation, the recovery of tennis balls from any
Unit, the creation of the usual noise level associated with the playing of the game of tennis, the
creation of the usual noise level associated with maintenance of tennis courts and facilities, the
driving of machinery and equipment used in connection with maintenance of tennis courts and
facilities upon the Project and the Tennis Common Areas, together with all such other common
and normal activities associated with the sport of tennis and with all such other common and
normal activities associated with the maintenance and operation of a tennis center, including
tennis courts, spectator area and related facilities.  Such noises and activities may occur on or off
the Tennis Common Areas, throughout the day from early morning until late evening.

17.5    <u>Additional Restrictions, Easements and Conditions</u>.  No Owner, and no guest, invitee, tenant,
employee, agent or contractor of any Owner, shall at any time interfere in any way with tennis
play on the Tennis Common Areas, whether in the form of physical interference, noise,
harassment of players or spectators, or otherwise.  Each Owner (for such Owner and its tenants,
guests and invitees) recognizes, agrees and accepts that (a) operation of a tennis courts and
related facilities will often involve parties and other gatherings (whether or not related to tennis) at
or on the Tennis Common Areas, tournaments, loud music, use of public address systems and
the like, occasional supplemental lighting and other similar or dissimilar activities throughout the
day, from early in the morning until late at night; (b) by their very nature, tennis courts present
certain potentially hazardous conditions that may include, without limitation, errant tennis balls;
and (c) neither such Owner nor its tenants, guests, and invitees shall make any claim against the
Declarant, the Association, any committee of the Association, any sponsor, promoter or organizer
of any tournament or other event (or any affiliate, agent employee or representative of any of the
foregoing) in connection with the matters described or referenced in (a) or (b) above, whether in
the nature of a claim for damages relating to personal injury or property damage, or otherwise.

17.6    <u>Tennis Center Area Encroachments</u>.  If (i) any portion of the Tennis Common Areas encroaches
upon any Unit; (ii) any Unit encroaches upon any portion of the Tennis Common Area; or (iii) any
encroachment shall hereafter occur as a result of (1) construction of the Tennis Common Areas;
(2) settling or shifting of the Tennis Common Areas; (3) any alteration or repair to the Tennis
Common Areas made by or with the consent of the Declarant; or (4) any repair or restoration of
the Tennis Common Areas (or any portion thereof) after damage by fire or other casualty or any
taking by condemnation or eminent domain proceedings of all or any portion of any Tennis
Common Areas, then, in any such event, a valid easement shall exist for such encroachment and
for the maintenance of same.

17.7    <u>Tennis Ball Damage or Injury.</u> Tennis balls are not susceptible of being easily controlled and may
enter a Unit's airspace, strike a Owner, Owner's guests, yard, walls, roof, windows, landscaping
and personal property causing personal injury and property damage. The Declarant, the
Association, and any agents, servants, employees, directors, officers, affiliates, representatives,
receivers, subsidiaries, predecessors, successors and assigns of any such party ("**<u>Released</u>
<u>Parties</u>**"), collectively are all not in any way be responsible for any claims, damages, losses,
demands, liabilities, obligations, actions or causes of action whatsoever, including, without

48

limitation, actions based on (a) any invasion of the Owner's use or enjoyment of their Unit, (b) improper design of the tennis courts and facilities, (c) the level of skill of any tennis player (regardless of whether such tennis player has the permission to use the tennis courts and facilities), or (d) trespass by any tennis player on any Unit that may result from property damage or personal injury from tennis balls (regardless of number) or from the exercise by any tennis player of the easements granted herein. Furthermore, each Owner hereby assumes the risk inherent in owning property adjacent to or nearby tennis courts and related facilities, including, without limitation, the risk of personal injury and property damage from errant tennis balls, and hereby indemnifies and agrees to hold the Released Parties harmless from any and all loss arising from claims by such Owner, or any Owner's guests, tenants and invitees, for any personal injury or property damage.

## ARTICLE XVIII
## CHANGES IN COMMON AREAS; CONTROL OF PETS

18.1.   Condemnation. If any part of the Common Area shall be taken (or conveyed by the Board in lieu of and under threat of condemnation) by any authority having the power of condemnation or eminent domain, the award made for such taking shall be payable to the Association as trustee for all Owners to be disbursed as follows:

(a)   If the taking involves a portion of the Common Area on which improvements have been constructed, the Association shall restore or replace such improvements on the remaining land included in the Common Area to the extent available, unless within sixty (60) days after such taking Declarant, so long as Declarant owns any of the Project, objects to any such restoration of the Common Areas. Any such construction shall be in accordance with plans approved by the Board. The provisions of Section 7.3(c) regarding funds for the repair of damage or destruction shall apply.

(b)   If the taking does not involve any improvements on the Common Area, or if a decision is made not to repair or restore, or if net funds remain after any such restoration or replacement is complete, then such award or net funds shall be disbursed to the Association and used for such purposes as the Board shall determine.

(c)   Partition. Except as permitted in this Declaration, there shall be no judicial partition of the Common Area. No Person shall seek any judicial partition unless the portion of the Common Area which is the subject of such partition action has been removed from the provisions of this Declaration. This Article shall not prohibit the Board from acquiring and disposing of tangible personal property nor from acquiring and disposing of real property which may or may not be subject to this Declaration.

18.2.   Transfer or Dedication of Common Area. The Association may dedicate portions of the Common Area to Osceola County, Florida, or to any other local, state, or federal governmental or quasi-governmental entity. No conveyance or encumbrance of the Common Area may deprive any Unit of rights of access or support.

18.3   Control of Pets; Enforcement of Laws Governing Pets. The requirements of Owners to control their pets on all private property, public property and Common Area within ChampionsGate may be governed by applicable local laws. Notwithstanding the foregoing, the Association shall have the right, but not the obligation, to promulgate additional rules and restrictions regarding pet ownership and control. In the event the Association promulgates any such rules, the more restrictive of the Association's rules or the applicable local laws shall apply. The Association does not grant and shall not grant permission to any Person to allow any animal to run at large

49

(e.g., unleashed) upon any property in ChampionsGate. In addition, if requested by any governmental authority with jurisdiction over this matter, or if necessary to effectuate enforcement by such governmental authority, the Association shall provide written confirmation to the governmental authority that the Association does not grant such permission. The responsibility for enforcement of any laws rests solely with the applicable governmental authority and the Association disclaims responsibility for such enforcement.

## ARTICLE XIX
## AMENDMENT OF DECLARATION

19.1    <u>By Declarant</u>. In addition to specific amendment rights granted elsewhere in this Declaration, until termination of the Class "B" Control Period, Declarant may unilaterally amend this Declaration for any purpose. Such amendments may include, without limitation (i) the creation of easements for telecommunications systems, utility, drainage, ingress and egress and roof overhangs over any portion of the Project; (ii) additions or deletions from the Project and/or the properties comprising the Common Areas; (iii) changes in the Use Restrictions and Rules; (iv) changes in maintenance, repair and replacement obligations; and (v) modifications of the use restrictions for Units. Declarant's right to amend under this provision is to be construed as broadly as possible. By way of example, and not as a limitation, Declarant may create easements over, under and across Units conveyed to Owners, provided that such easements do not prohibit the use of Units as residential dwellings. In the event the Association shall desire to amend this Declaration prior to the termination of the Class "B" Control Period, the Association must first obtain Declarant's prior written consent to any proposed amendment. Thereafter, an amendment identical to that approved by Declarant may be adopted by the Association pursuant to the requirements for amendments from and after the termination of the Class "B" Control Period. Declarant shall join in such identical amendment so that its consent to the same will be reflected in the Public Records. To the extent legally required, each Owner shall be deemed to have granted to Declarant and, thereafter, the Association, an irrevocable power of attorney, coupled with an interest, for the purposes herein expressed.

19.2.    <u>By the Association</u>.

(a)    After the termination of the Class ""B" Control Period, this Declaration may be amended with the approval of (i) majority of the Board; and (ii) fifty-one percent (51%) of the Voting Interests present (in person or by proxy) at a duly called meeting of the Members. Such votes must be cast at a Members' meeting called for the purpose of considering the proposed amendment and may be cast in person, by proxy, by written absentee ballot, or any combination thereof. The Association shall give Declarant and Club Owner sixty (60) days' prior written notice of its intent to amend this Declaration, along with their proposed written amendment, in accordance with the notice provisions contained in Section 20.2, or by prepaid, certified mail, return receipt requested. Declarant and/or Club Owner shall be deemed to have approved such amendment if the Association does not receive a written response from Declarant and/or Club Owner within said 60-day period.

(b)    Notwithstanding the above, the percentage of votes necessary to amend a specific clause shall not be less than the prescribed percentage of affirmative votes required for action to be taken under that clause. Any amendment under a particular clause specifying requisite percentage of affirmative votes shall be adopted with the approval of the Voting Interests present (in person or by proxy) at a duly called meeting of the Members.

19.3.    <u>Validity and Effective Date of Amendments</u>.

(a)    Amendments to this Declaration shall become effective upon recordation in the Public Records,

unless a later effective date is specified therein. Any procedural challenge to an amendment must be made within six (6) months of its recordation or such amendment shall be presumed to have been validly adopted. In no event shall a change of conditions or circumstances operate to amend any provisions of this Declaration.

(b)    If an Owner consents to any amendment to the Governing Documents, it will be conclusively presumed that such Owner has the authority so to consent, and no contrary provision in any Mortgage or contract between the Owner and a third party will affect the validity of such amendment.

(c)    No amendment may, directly or indirectly, remove, revoke, or modify the status of, or any right or privilege of, the Declarant or the Club Owner without the written consent of the Declarant or the Club Owner, respectively (or the assignee of such right or privilege). Notwithstanding any other provision herein to the contrary, no amendment to this Declaration shall affect the rights of Declarant or Club Owner unless such amendment receives the prior written consent of Declarant or Club Owner, which consent may be withheld for any reason whatsoever.

(d)    If the prior written approval of any governmental entity or agency having jurisdiction is required by applicable law or governmental regulation for any amendment to this Declaration, then the prior written consent of such entity or agency must also be obtained.

(e)    Each Owner by acceptance of a deed to a Unit irrevocably waives any claim that such Owner has any vested rights pursuant to case law or statute with respect to the Governing Documents or Club Plan. It is expressly intended that Declarant has the unfettered right to amend this Declaration and the other Governing Documents except as expressly set forth herein.

(f)    Any amendment to the Declaration that alters any provision relating to the SWMS, beyond maintenance in its original condition, including the water management portions of the Common Areas, must have the prior written approval of the SFWMD.

19.4.    <u>Compliance with HUD, FHA, VA, FNMA, GNMA and SFWMD</u>. Notwithstanding any provision of this Declaration to the contrary, prior to the termination of the Class "B" Control Period, the Declarant shall have the right to amend this Declaration, from time to time, to make such changes, modifications and additions therein and thereto as may be requested or required by HUD, FHA, VA, FNMA, GNMA, SFWMD, or any other governmental agency or body as a condition to, or in connection with, such agency's or body's regulatory requirements or agreement to make, purchase, accept, insure, guaranty or otherwise approve loans secured by Mortgages on Units. No approval or joinder of the Association, other Owners, or any other party shall be required or necessary to such amendment. After the termination of the Class "B" Control Period, but subject to the general restrictions on amendments set forth above, the Board shall have the right to amend this Declaration, from time to time, to make such changes, modifications and additions therein and thereto as may be requested or required by HUD, FHA, VA, FNMA, GNMA, SFWMD or any other governmental agency or body as a condition to, or in connection with such agency's or body's regulatory requirements or agreement to make, purchase, accept, insure, guaranty or otherwise approve loans secured by Mortgages on Units.

**ARTICLE XX**
**<u>MISCELLANEOUS PROVISIONS</u>**

20.1.    <u>Exhibits</u>. Exhibits A, B, C, D, E, F and G attached to this Declaration are incorporated herein and made a part hereof by this reference.

51

20.2.    Notices.  Unless otherwise provided in this Declaration, each notice or communication given under this Declaration shall be deemed delivered and received if in writing and either: (i) personally delivered; (ii) delivered by reliable overnight air courier service; or (iii) deposited with the United States Postal Service or any official successor thereto, first-class or higher priority, postage prepaid, and delivered to the addressee's last known address at the time of such mailing.

20.3.    Conflicts.   If there is any conflict between the provisions of Florida law, the Articles of Incorporation, the Bylaws and this Declaration, the provisions of Florida law, this Declaration, the Articles and the Bylaws, in that order, shall prevail.

20.4.    Applicable Law.  Whenever this Declaration refers to the Florida Statutes, it shall be deemed to refer to the Florida Statutes as they exist on the date this Declaration is recorded except to the extent provided otherwise as to any particular provision of the Florida Statutes.

20.5.    Termination of Rights Reserved by Declarant.   Notwithstanding anything contained in this Declaration to the contrary, as to any right reserved by Declarant in this Declaration, such right may be terminated at any time by Declarant, in Declarant's sole discretion and without the consent of the Association or its Board or Members, by written instrument recorded among the Public Records, and thereafter Declarant shall have no right or obligation to exercise any such terminated right.

20.6.    Authority of Board. Except when a vote of the membership of Association is specifically required, all decisions, duties, and obligations of Association hereunder may be made by the Board. Association and Owners shall be bound thereby.

20.7.    Municipal Service Taxing or Benefit Units. In order to perform the services contemplated by this Declaration, the Association or Declarant, in conjunction with local governmental authorities, may seek the formation of special purpose municipal service taxing units ("MSTUs") or municipal service benefit units ("MSBUs"). The MSTUs or MSBUs will have responsibilities defined in their enabling resolutions which may include, but are not limited to, maintaining roadway informational signs, traffic control signs, benches, trash receptacles and other street furniture, keeping all public roadways and roadside pedestrian easements clean of windblown trash and debris, mowing, payment of electrical charges, maintenance of drainage structures, maintenance of designated landscape areas, payment of energy charges for street and pedestrian lighting, and other services benefiting the Project. In the event such MSTUs or MSBUs are formed, the Project will be subject to ad valorem taxes or special assessments for the cost of services performed within the MSTU or MSBU and personnel working for or under contract with local governmental authorities shall have the right to enter upon lands within the Property to affect the services contemplated. The Association retains the right to contract with local governmental authorities to provide the services funded by the MSTU or MSBU.

20.8.    Severability. Invalidation of any of the provisions of this Declaration by judgment or court order shall in no way affect any other provision, and the remainder of this Declaration shall remain in full force and effect.

[Signatures on Following Page]

52

IN WITNESS WHEREOF, the undersigned, being Declarant hereunder, has hereunto set its hand and seal this _____ day of March, 2013.

**WITNESSES:**

**"DECLARANT"**

LEN-CG South, LLC, a Florida limited liability company

By:   LENNAR HOMES, LLC, a Florida limited liability company, its Managing Member

Print Name: _Whitney Cardinale_

Print Name: _Dustin Johnson_

By: _____
Name: Mark Metheny
Title: Vice President

Date: March _____, 2013

STATE OF FLORIDA     )
COUNTY OF HILLSBOROUGH     )

The foregoing instrument was acknowledged before me this _22nd_ day of March, 2013, by Mark Metheny, Vice President of LENNAR HOMES, LLC, a Florida limited liability company, Managing Member of LEN-CG South, LLC, a Florida limited liability company. He [is personally known to me] [has produced _____ as identification].

My commission expires:

_____
NOTARY PUBLIC, State of Florida at Large

Print Name: _Suzanne J. Crouch_

SUZANNE J. CROUCH
Notary Public - State of Florida
My Comm. Expires Apr 5, 2016
Commission # EE 176434
Bonded Through National Notary Assn.

53

## JOINDER

CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation (the **"Association"**) does hereby join in this DECLARATION FOR CHAMPIONSGATE (this **"Declaration"**), to which this Joinder is attached, and the terms thereof are and shall be binding upon the undersigned and its successors in title. The Association agrees this joinder is for the purpose of evidencing the Association's acceptance of the rights and obligations provided in the Declaration and does not affect the validity of this Declaration as the Association has no right to approve this Declaration.

IN WITNESS WHEREOF, the undersigned has executed this Joinder on this _22nd_ day of _March_, 2013.

**WITNESSES:**

Print Name: _Whitney Cardinale_

Print Name: _CRISERIA PEREZ_

CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida corporation not for profit

By: _____

Name: _Joe Fulghum_

Title: President

{CORPORATE SEAL}

STATE OF FLORIDA          )
COUNTY OF HILLSBOROUGH    )

The foregoing instrument was acknowledged before me this _22nd_ day of _March_, 2013, by _Joe Fulghum_, as President of CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida corporation not for profit, on behalf of the corporation, who is personally known to me or who has produced _____ as identification.

My commission expires: _7/26/2015_

NOTARY PUBLIC, State of Florida at Large

Print Name: _Kathy A Deml_

KATHY A. DEML
MY COMMISSION # EE 103119
EXPIRES: July 26, 2015
Bonded Thru Notary Public Underwriters

54

## **EXHIBIT A**

ALL OF THE PLAT, STONEYBROOK SOUTH, PHASE I, according to plat thereof, as recorded in Plat Book 22, Pages 58 through 66, of the Public Records of Osceola County, Florida.

A-1

Exhibit A

**EXHIBIT B**

**USE RESTRICTIONS AND RULES**

       The following restrictions shall apply to the entire Project, exclusive of the Club Property and Units owned by the Declarant, until such time as they are amended, modified, repealed, or limited by rules of the Association adopted pursuant to Article III of the Declaration. Use Restrictions for particular Neighborhoods may be different in order to reflect the character of the Units in such Neighborhood and, in such event, such Use Restrictions shall control.

    1.    <u>Vehicles</u>.

        (a)    <u>Parking</u>. Owners' automobiles shall be parked in the garage or driveway and shall not block the sidewalk. No vehicles of any nature shall be parked on any portion of the Project or a Unit except on the surfaced parking area thereof. Vehicles shall not park on the private or public roadways or any area comprising the Common Area. To the extent the Project has any guest parking, Owners are prohibited from parking in such guest parking spaces. No vehicles used in business for the purpose of transporting goods, equipment and the like, shall be parked in the Project except during the period of a delivery.

        (b)    <u>Repairs and Maintenance of Vehicles</u>. No vehicle which cannot operate on its own power shall remain on the Project for more than twelve (12) hours, except in the garage of a Unit. No repair or maintenance, except emergency repair, of vehicles shall be made within the Project, except in the garage of a Unit. No vehicles shall be stored on blocks. No tarpaulin covers on vehicles shall be permitted anywhere within the public view.

        (c)    <u>Prohibited Vehicles</u>. No commercial vehicle, limousine, recreational vehicle, all terrain vehicle, boat, trailer, including without limitation, boat trailers, house trailers, and trailers of every other type, kind or description, or camper, may be kept within the Project except in the garage of a Unit. The term "commercial vehicle" shall not be deemed to include law enforcement vehicles or recreational or utility vehicles (*i.e.,* Broncos, Blazers, Explorers, Navigators, etc.) or clean "non-working" vehicles such as pick-up trucks, vans, or cars if they are used by the Owner on a daily basis for normal transportation; provided, however, vehicles with ladders, racks, and hooks attached to such vehicles shall be "commercial vehicles" prohibited by this Section. No vehicles displaying commercial advertising shall be parked within the public view. No vehicles bearing a "for sale" sign shall be parked within the public view anywhere within the Project. For any Owner who drives an automobile issued by the County or other governmental entity (i.e., police cars), such automobile shall not be deemed to be a commercial vehicle and may be parked in the garage or driveway of the Unit. No vehicle shall be used as a domicile or residence either temporarily or permanently. No all terrain vehicles (ATVs), golf carts, scooters or mini motorcycles are permitted at any time on any paved surfaces forming a part of the Common Areas; provided, however, golf carts shall be permitted but only to the extent permitted by applicable law and Osceola County regulations and foregoing restrictions shall be inapplicable to "Neighborhood Electric Vehicles" which may be otherwise authorized for use within the Project by Osceola County. Additionally no ATV or mini motorcycle may be parked or stored within the Project, including any Unit, except in the garage of a Unit. Notwithstanding any other provision in this Declaration to the contrary, the foregoing restrictions shall not apply to construction vehicles utilized in connection with construction, improvement, installation, or repair by Declarant, or its agents.

        (d)    <u>Towing</u>. Subject to applicable laws and ordinances, any vehicle parked in violation of these or other restrictions contained herein or in the Rules and Regulations may be towed by the Association at the sole expense of the owner of such vehicle if such vehicle remains in violation for a period of twenty-four (24) hours from the time a notice of violation is placed on the vehicle or if such a vehicle was cited for such violation within the preceding fourteen (14) day

period. Each Owner by acceptance of title to a Unit irrevocably grants the Association and its designated towing service the right to enter a Unit and tow vehicles in violation of this Declaration. Neither the Association nor the towing company shall be liable to the owner of such vehicle for trespass, conversion or otherwise, nor guilty of any criminal act, by reason of such towing or removal and once the notice is posted, neither its removal, nor failure of the owner to receive it for any other reason, shall be grounds for relief of any kind. For purposes of this paragraph, "vehicle" shall also mean campers, mobile homes, trailers, etc. By accepting title to a Unit, the Owner provides to the Association the irrevocable right to tow or remove vehicles parked on the Owner's Unit and Common Area which are in violation of this Declaration. An affidavit of the person posting the foresaid notice stating that it was properly posted shall be conclusive evidence of proper posting.

2.    Completion and Sale of Units. No person or entity shall interfere with the completion and sale of Units within the Project. WITHOUT LIMITING THE FOREGOING, EACH OWNER, BY ACCEPTANCE OF A DEED, AGREES THAT ACTIONS OF OWNERS MAY IMPACT THE VALUE OF UNITS; THEREFORE EACH OWNER IS BENEFITED BY THE FOLLOWING RESTRICTIONS: PICKETING AND POSTING OF NEGATIVE SIGNS IS STRICTLY PROHIBITED IN ORDER TO PRESERVE THE VALUE OF THE UNITS AND THE RESIDENTIAL ATMOSPHERE THEREOF.

3.    Lawful Use. No immoral, improper, offensive, unlawful or obnoxious use shall be made in any portion of the Project. All laws, zoning ordinances and regulations of all governmental entities having jurisdiction thereof shall be observed. The responsibility of meeting the requirements of governmental entities for maintenance, modification or repair of a portion of the Project shall be the same as the responsibility for maintenance and repair of the property concerned.

4.    Nuisances. No nuisance or any use or practice that is the source of unreasonable annoyance to others or which interferes with the peaceful possession and proper use of the Project is permitted. No firearms shall be discharged within the Project. Nothing shall be done or kept within the Common Areas or any other portion of the Project, including a Unit that will increase the rate of insurance to be paid by Association.

5.    Signs and Flags. No sign, flag, banner, advertisement, notice or other lettering shall be exhibited, displayed, inscribed, painted or affixed in, or upon any part of the Project, including without limitation, any Unit, that is visible from the outside; provided, however, any Owner may display in a respectful manner one (1) portable, removable United States flag or official flag of the State of Florida and one (1) portable, removable official  flag of the United States Army, Navy, Air Force, Marine Corps, or Coast Guard, or a POW-MIA flag.  Any such permitted flags may not exceed four and one-half feet (4 ½') by six feet (6').

Each Owner may erect one (1) freestanding flag pole that is no more than twenty feet (20') high on any portion of such Owner's Unit if the flag pole does not obstruct sightlines at intersections and is not erected within or upon any easement.  The flag pole may not be installed any closer than ten feet (10') from the back of curb, or within ten feet (10') of any Unit boundary line.  Any Owner may further display from the flagpole, one (1) official United States flag, not larger than four and one-half feet (4 ½') by six feet (6'), and may additionally display one (1) official flag of the State of Florida or the United States Army, Navy, Air Force, Marine Corps, or Coast Guard, or a POW-MIA flag.  Such additional flag must be equal in size to or smaller than the United States flag. Any flag pole installed in accordance with this Section is subject to all building codes, zoning setbacks, and other applicable governmental regulations, including without limitation noise and lighting ordinances in the County or municipality in which the flag pole is erected and all setback and location criteria contained in this Declaration.

Declarant is exempt from this Section; provided, further, the Declarant specifically reserves the right, for itself and its agents, employees, nominees and assigns the right, privilege and easement to construct, place and maintain upon any property within the Project such signs as it deems appropriate in connection with the development, improvement, construction, marketing and sale of any of the Units. The

B-2

prohibitions on signs displayed on or within vehicles contained above in this Section shall not apply to commercial vehicles such as for construction use or providing pick-up and delivery services and other commercial services.

B-3



# State of Florida

## Department of State

I certify from the records of this office that CHAMPIONSGATE MASTER
ASSOCIATION, INC. is a corporation organized under the laws of the State
of Florida, filed on March 6, 2013.

The document number of this corporation is N13000002179.

I further certify that said corporation has paid all fees due this office
through December 31, 2013, and its status is active.

I further certify that said corporation has not filed Articles of
Dissolution.

I further certify that this is an electronically transmitted certificate
authorized by section 15.16, Florida Statutes, and authenticated by the
code, 113A00005469-030713-N13000002179-1/1, noted below.

Authentication Code: 113A00005469-030713-N13000002179-1/1



Given under my hand and the
Great Seal of the State of Florida,
at Tallahassee, the Capital, this the
Seventh day of March, 2013

Ken Detzner
Secretary of State

Exhibit C



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the Articles of Incorporation of CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida corporation, filed on March 6, 2013, as shown by the records of this office.

I further certify the document was electronically received under FAX audit number H13000052140. This certificate is issued in accordance with section 15.16, Florida Statutes, and authenticated by the code noted below.

The document number of this corporation is N13000002179.

Authentication Code: 113A00005469-030713-N13000002179-1/1

Given under my hand and the
Great Seal of the State of Florida,
at Tallahassee, the Capital, this the
Seventh day of March, 2013



Ken Detzner
Secretary of State

05 MAR 7 2013 1:07PM PENNINGTON LAW FIRM 01 PM PAGE 3/003 F NO 741 rve p 3
Case 6:25-cv-00466-PGB-UAM    Document 1-1    Filed 03/17/25    Page 78 of 177 PageID
429



March 7, 2013

**FLORIDA DEPARTMENT OF STATE**
Division of Corporations

CHAMPIONSGATE MASTER ASSOCIATION, INC.
4600 WEST CYPRESS STREET
SUITE 200
TAMPA, FL  33607

The Articles of Incorporation for CHAMPIONSGATE MASTER ASSOCIATION, INC.
were filed on March 6, 2013, and assigned document number N13000002179.
Please refer to this number whenever corresponding with this office.

Enclosed is the certification requested.  To be official, the
certification for a certified copy must be attached to the original
document that was electronically submitted and filed under FAX audit
number H13000052140.

To maintain "active" status with the Division of Corporations, an annual
report must be filed yearly between January 1st and May 1st beginning in
the year following the file date or effective date indicated above.  It is
your responsibility to remember to file your annual report in a timely
manner.

A Federal Employer Identification Number (FEI/EIN) will be required when
this report is filed.  Contact the IRS at 1-800-829-4933 for an SS-4 form
or go to www.irs.gov.

Please be aware if the corporate address changes, it is the responsibility
of the corporation to notify this office.

Should you have questions regarding corporations, please contact this
office at (850) 245-6052.

Ruby Dunlap
Regulatory Specialist II
New Filings Section
Division of Corporations              Letter Number: 113A00005469

P.O BOX 6327 – Tallahassee, Florida 32314

**ARTICLES OF INCORPORATION**

**FOR**

**CHAMPIONSGATE MASTER ASSOCIATION, INC.**

(((H13000052140 3)))

# TABLE OF CONTENTS

Page

1.  Name of Corporation ............................................................................. 3

2.  Principal Office .................................................................................... 3

3.  Registered Office - Registered Agent ............................................... 3

4.  Definitions ......................................................................................... 3

5.  Purpose of the Association ............................................................... 3

6.  Not for Profit ..................................................................................... 3

7.  Powers of the Association ................................................................. 3

8.  Voting Rights .................................................................................... 4

9.  Board of Directors ............................................................................ 4

10. Dissolution ....................................................................................... 5

11. Duration ............................................................................................ 5

12. Amendments ..................................................................................... 5

      12.1   General Restrictions on Amendments ..................................... 5
      12.2   Amendments During the Class "B" Control Period ................. 5
      12.3   Amendments From and After the Class "B" Control Period ..... 5
      12.4   Compliance with HUD, FHA, VA, FNMA, GNMA and SFWMD ... 5

13. Limitations ........................................................................................ 6

      13.1   Declaration is Paramount .......................................................... 6
      13.2   Rights of Declarant ................................................................... 6

14. Incorporator ...................................................................................... 6

15. Officers .............................................................................................. 6

16. Indemnification of Officers and Directors ......................................... 6

17. Transactions in Which Directors or Officers are Interested ............. 7

## ARTICLES OF INCORPORATION
## FOR
## CHAMPIONSGATE MASTER ASSOCIATION, INC.
## (A CORPORATION NOT FOR PROFIT)

In compliance with the requirements of the laws of the State of Florida, and for the purpose of forming a corporation not for profit, the undersigned does hereby acknowledge:

1.    <u>Name of Corporation</u>. The name of the corporation is ChampionsGate Master Association, Inc., a Florida corporation not for profit (the "**Association**").

2.    <u>Principal Office</u>. The principal office of the Association is 4600 West Cypress Street, Suite 200, Tampa, Florida 33607.

3.    <u>Registered Office - Registered Agent</u>. The street address of the Registered Office of the Association is 1200 South Pine Island Road, Plantation, Florida 33324.  The name of the Registered Agent of the Association is:

### CT CORPORATION SYSTEM

4.    <u>Definitions</u>. The MASTER DECLARATION FOR CHAMPIONSGATE (the "**Declaration**") will be recorded in the Public Records of Osceola County, Florida, and shall govern all of the operations of a residential community to be known as CHAMPIONSGATE. All initially capitalized terms not defined herein shall have the meanings set forth in the Declaration.

5.    <u>Purpose of Association</u>. Association is formed to: (a) provide for ownership, operation, maintenance and preservation of the Common Areas, including without limitation, any improvements thereon; (b) perform the duties delegated to it in the Declaration; and (c) administer the interests of Association and the Owners.

6.    <u>Not for Profit</u>.  Association is a not for profit Florida corporation and does not contemplate pecuniary gain to, or profit for, its Members.

7.    <u>Powers of Association</u>.  Association shall, subject to the limitations and reservations set forth in the Declaration, have all the powers, privileges and duties reasonably necessary to discharge its obligations, including without limitation, the following:

7.1.    To perform all the duties and obligations of Association set forth in the Declaration and Bylaws, as herein provided.

7.2.    To enforce, by legal action or otherwise, the provisions of the Declaration and Bylaws and of all rules, regulations, covenants, restrictions and agreements governing or binding Association and CHAMPIONSGATE.

7.3.    To fix, levy, collect and enforce payment, by any lawful means, of all assessments pursuant to the terms of the Declaration, these Articles and Bylaws.

7.4.    To pay all Operating Expenses, including, but not limited to, all licenses, taxes or governmental charges levied or imposed against the property of the Association.

7.5.    To acquire (by gift, purchase or otherwise), annex, own, hold, improve, build upon, operate, maintain, convey, grant rights and easements, sell, dedicate, lease, transfer or

otherwise dispose of real or personal property (including the Common Areas) in connection with the functions of the Association except as limited by the Declaration.

7.6    To borrow money, and upon the approval of (i) a majority of the Board of Directors; and (ii) a majority of the Voting Interests present, in person or by proxy, at a duly noticed meeting of the Members, mortgage, pledge, deed in trust, or hypothecate any or all of its real or personal property as security for money borrowed or debts incurred, including without limitation, the right to collateralize any such indebtedness with the Association's assessment collection rights.

7.7.    To dedicate, grant, license, lease, concession, create easements upon, sell or transfer all or any part of CHAMPIONSGATE to any public agency, entity, authority, utility or other person or entity for such purposes and subject to such conditions as it determines and as provided in the Declaration.

7.8.    To participate in mergers and consolidations with other non-profit corporations organized for the same purposes.

7.9.    To adopt, publish, promulgate or enforce rules, regulations, covenants, restrictions or agreements governing the Association, CHAMPIONSGATE and the Common Areas, and Units as provided in the Declaration and to effectuate all of the purposes for which the Association is organized.

7.10.    To have and exercise any and all powers, rights, and privileges which a corporation organized under Chapter 617 or Chapter 720, Florida Statutes by law may now or hereafter have or exercise.

7.11.    To employ personnel and retain independent contractors to contract for management of the Association, CHAMPIONSGATE and the Common Areas as provided in the Declaration and to delegate in such contract all or any part of the powers and duties of the Association.

7.12.    To contract for services to be provided to, or for the benefit of, Association, Owners, the Common Areas, and CHAMPIONSGATE, as provided in the Declaration, such as, but not limited to, telecommunications services, maintenance, garbage pick-up, and utility services.

7.13.    To establish committees and delegate certain of its functions to those committees.

8.    <u>Voting Rights</u>.  Owners and Declarant shall have the voting rights set forth in the Declaration.

9.    <u>Board of Directors</u>.  The affairs of the Association shall be managed by a Board of odd number with not less three (3) Directors prior to the termination of the Class "B" Control Period and no less than five (5) Directors after the termination of the Class "B" Control Period.  Board members shall be appointed and/or elected as stated in the Declaration and Bylaws.  Prior to termination of the Class "B" Control Period, the Declarant shall have the right to appoint all members of the Board in its sole and absolute discretion.  After the termination of the Class "B" Control Period, members of the Board shall be appointed and elected as follows: (i) the President and Vice President of each Neighborhood Association shall be appointed to the Board (in the event there is no Vice President for a Neighborhood Association, the Board of such Neighborhood Association shall designate an alternative representative); and (ii) all Class "A" Members shall be entitled to elect one (1) member of the Board.  No more than ninety (90) days following the expiration of the Class "B" Control Period, the Association shall notify the Class "A" Members of the date, location and purpose of a special meeting of the Association to appoint and

elect the Board of Directors as provided in the Declaration and the Bylaws. The names and addresses of the members of the Board who shall hold office until their successors are appointed or elected, or until removed, are as follows:

| NAME | ADDRESS |
|------|---------|
| Joe Fulghum | 4600 West Cypress Street, Suite 200<br>Tampa, Florida 33607 |
| John Valantasis | 4600 West Cypress Street, Suite 200<br>Tampa, Florida 33607 |
| Jack Lazinsk | 4600 West Cypress Street, Suite 200<br>Tampa, Florida 33607 |

10.    Dissolution. In the event of the dissolution of Association other than incident to a merger or consolidation, any Member may petition the Circuit Court having jurisdiction of the Judicial Circuit of the State of Florida for the appointment of a receiver to manage its affairs of the dissolved Association and to manage the Common Areas, in the place and stead of Association, and to make such provisions as may be necessary for the continued management of the affairs of the dissolved Association. In addition, if Association is dissolved and the Association owns the Surface Water Management System, the Surface Water Management System shall be conveyed to an appropriate agency of local government.  If a governmental agency will not accept the Surface Water Management System, then it must be dedicated to a similar non-profit corporation.

11.    Duration. Association shall have perpetual existence.

12.    Amendments.

12.1    General Restrictions on Amendments.  Notwithstanding any other provision herein to the contrary, no amendment to these Articles shall affect the rights of Declarant unless such amendment receives the prior written consent of Declarant, as applicable, which may be withheld for any reason whatsoever.  If the prior written approval of any governmental entity or agency having jurisdiction is required by applicable law or governmental regulation for any amendment to these Articles, then the prior written consent of such entity or agency must also be obtained.  No amendment shall be effective until it is recorded in the Public Records.

12.2    Amendments During the Class "B" Control Period.  During the Class "B" Control Period, Declarant shall have the right to amend these Articles as it deems appropriate, without the joinder or consent of any person or entity whatsoever.  Declarant's right to amend under this Section is to be construed as broadly as possible.  In the event that the Association shall desire to amend these Articles prior to the termination of the Class "B" Control Period, the Association must first obtain Declarant's prior written consent to any proposed amendment.  Thereafter, an amendment identical to that approved by Declarant may be adopted by the Association pursuant to the requirements for amendments from and after the termination of the Class "B" Control Period.  Declarant shall join in such identical amendment so that its consent to the same will be reflected in the Public Records.

12.3    Amendments From and After the Class "B" Control Period.  After the Class "B" Control Period, but subject to the general restrictions on amendments set forth above, these Articles may be amended with the approval of (i) a majority of the Board; and (ii) a majority of the Voting Interests present, in person or by proxy, at a duly called meeting of the Members.

12.4    Compliance with HUD, FHA, VA, FNMA, GNMA and SFWMD.  Notwithstanding any provision of this Declaration to the contrary, prior to the termination of the Class "B" Control

5

Period, the Declarant shall have the right to amend these Articles, from time to time, to make such changes, modifications and additions therein and thereto as may be requested or required by HUD, FHA, VA, FNMA, GNMA, SFWMD, or any other governmental agency or body as a condition to, or in connection with, such agency's or body's regulatory requirements or agreement to make, purchase, accept, insure, guaranty or otherwise approve loans secured by Mortgages on Units. No approval or joinder of the Association, other Owners, or any other party shall be required or necessary to such amendment. After the termination of the Class "B" Control Period, but subject to the general restrictions on amendments set forth above, the Board shall have the right to amend these Articles, from time to time, to make such changes, modifications and additions therein and thereto as may be requested or required by HUD, FHA, VA, FNMA, GNMA, SFWMD or any other governmental agency or body as a condition to, or in connection with such agency's or body's regulatory requirements or agreement to make, purchase, accept, insure, guaranty or otherwise approve loans secured by Mortgages on Units.

13.   <u>Limitations</u>.

     13.1.   <u>Declaration is Paramount</u>. No amendment may be made to these Articles which shall in any manner reduce, amend, affect or modify the terms, conditions, provisions, rights and obligations set forth in the Declaration.

     13.2.   <u>Rights of Declarant</u>. There shall be no amendment to these Articles which shall abridge, reduce, amend, effect or modify the rights of Declarant.

14.   <u>Incorporator</u>. The name and address of the Incorporator of this corporation is:

Christian F. O'Ryan<br>
Pennington, P.A.<br>
2701 N. Rocky Point Drive, Suit 900<br>
Tampa, Florida 33607

15.   <u>Officers</u>. The Board shall elect a President, Secretary, Treasurer, and as many Vice Presidents, Assistant Secretaries and Assistant Treasurers as the Board shall from time to time determine. The names and addresses of the Officers who shall serve until their successors are elected by the Board are as follows:

| NAME | TITLE | ADDRESS |
| --- | --- | --- |
| Joe Fulghum | President | 4600 West Cypress Street Suite 200 Tampa, Florida 33607 |
| Jack Lazinsk | Vice President | 4600 West Cypress Street Suite 200 Tampa, Florida 33607 |
| John Valantasis | Secretary/Treasurer | 4600 West Cypress Street Suite 200 Tampa, Florida 33607 |

16.   <u>Indemnification of Officers and Directors</u>. Association shall and does hereby indemnify and hold harmless every Director and every Officer, their heirs, executors and administrators, against all loss, cost and expenses reasonably incurred in connection with any action, suit or proceeding to which such Director or Officer may be made a party by reason of being or having been a Director or Officer of the Association, including reasonable counsel fees and

(((H13000052140 3)))

paraprofessional fees at all levels of proceeding. This indemnification shall not apply to matters wherein the Director or Officer shall be finally adjudged in such action, suit or proceeding to be liable for or guilty of gross negligence or willful misconduct. The foregoing rights shall be in addition to, and not exclusive of, all other rights to which such Director or Officers may be entitled.

17.      Transactions in Which Directors or Officers are Interested. No contract or transaction between Association and one (1) or more of its Directors or Officers or Declarant, or between Association and any other corporation, partnership, association, or other organization in which one (1) or more of its Officers or Directors are Officers, Directors or employees or otherwise interested shall be invalid, void or voidable solely for this reason, or solely because the Officer or Director is present at, or participates in, meetings of the Board thereof which authorized the contract or transaction, or solely because said Officers' or Directors' votes are counted for such purpose. No Director or Officer of Association shall incur liability by reason of the fact that such Director or Officer may be interested in any such contract or transaction. Interested Directors shall disclose the general nature of their interest and may be counted in determining the presence of a quorum at a meeting of the Board which authorized the contract or transaction.

IN WITNESS WHEREOF, for the purpose of forming this corporation under the laws of the State of Florida, the undersigned, being the Incorporator of this Association, has executed these Articles of Incorporation as of this __6th__ day of March, 2013.

Christian F. O'Ryan
Incorporator

## ACCEPTANCE BY REGISTERED AGENT

The undersigned, having been named to accept service of process for the above-stated corporation at the place designated in this certificate, hereby agrees to act in this capacity, and is familiar with, and accepts, the obligations of this position and further agrees to comply with the provisions of all statutes relative to the proper and complete performance of its duties.

Dated this 5th day of March, 2013.

CT CORPORATION SYSTEM

By: _____

Title: Madonna Cuddihy

Print Name: Special Assistant Secretary

**Registered Office:**

1200 South Pine Island Road
Plantation, Florida 33324

**Principal Corporation Office:**

4600 West Cypress Street, Suite 200
Tampa, Florida 33607

S:\JayZ\Clients\Lennar\Stoneybrook South\ChampionsGate Master\Governing Documents\Articles\Articles2 - ChampionsGate Master.doc

8

(((H13000052140 3)))

**BYLAWS**

**OF**

**CHAMPIONSGATE MASTER ASSOCIATION, INC.**

**(A FLORIDA CORPORATION NOT FOR PROFIT)**

Exhibit D

## TABLE OF CONTENTS

1.    Name and Location ................................................................................................................1

2.    Definitions ..............................................................................................................................1

3.    Members..................................................................................................................................1

4.    Board of Directors...................................................................................................................3

5.    Meeting of Directors. ..............................................................................................................4

6.    Powers and Duties of the Board..............................................................................................4

7.    Obligations of Association ......................................................................................................5

8.    Officers and Their Duties........................................................................................................6

9.    Committees. ............................................................................................................................7

10.   Records ...................................................................................................................................7

11.   Corporate Seal ........................................................................................................................7

12.   Amendments. ..........................................................................................................................7

13.   Conflict....................................................................................................................................8

14.   Fiscal Year ..............................................................................................................................8

15.   Miscellaneous..........................................................................................................................8

**BYLAWS**
**OF**
**CHAMPIONSGATE MASTER ASSOCIATION, INC.**

1.      <u>Name and Location</u>.   The name of the corporation is CHAMPIONSGATE MASTER ASSOCIATION, INC. (the "**Association**").  The principal office of the corporation shall be located at 4600 West Cypress Street, Suite 200, Tampa, Florida 33607, or at such other location determined by the Board of Directors (the "**Board**") from time to time.

2.      <u>Definitions</u>.  The definitions contained in the MASTER DECLARATION FOR CHAMPIONSGATE (the "**Declaration**") relating to the residential community known as CHAMPIONSGATE, recorded, or to be recorded, in the Public Records of Osceola County, Florida, are incorporated herein by reference and made a part hereof.  In addition to the terms defined in the Declaration, the following terms shall have the meanings set forth below:

     "**Minutes**" shall mean the minutes of all Member and Board meetings, which shall be in the form required by the Florida Statutes.  In the absence of governing Florida Statutes, the Board shall determine the form of the Minutes.

     "**Official Records**" shall mean all records required to be maintained by Association pursuant to Section 720.303(4) of the Florida Statutes, as amended from time to time.

3.      <u>Members</u>.

     3.1      <u>Voting Interests</u>.   Each Owner, including the Declarant, shall be a Member of the Association.  No person who holds an interest in a Unit only as security for the performance of an obligation shall be a Member of Association.  Membership shall be appurtenant to, and may not be separated from, ownership of any Unit. Except as otherwise provided herein, there shall be one (1) vote appurtenant to each Unit.  Prior to the termination of the Class "B" Control Period, the Declarant shall have Voting Interests equal to nine (9) votes per Unit owned.  Thereafter, the Declarant shall have Voting Interests equal to one (1) vote for each Unit owned.  For the purposes of determining who may exercise the Voting Interest associated with each Unit, the following rules shall govern:

        3.1.1   <u>Units Owned By Husband and Wife</u>.  Either the husband or wife (but not both) may exercise the Voting Interest with respect to a Unit.  In the event the husband and wife cannot agree, neither may exercise the Voting Interest.

        3.1.2   <u>Trusts</u>.  In the event that any trust owns a Unit, the Association shall have no obligation to review the trust agreement with respect to such trust.  By way of example, if the Unit is owned by Robert Smith, as Trustee, Robert Smith shall be deemed the Owner of the Unit for all Association purposes. If the Unit is owned by Robert Smith as Trustee for the Laura Jones Trust, then Robert Smith shall be deemed the Member with respect to the Unit for all Association purposes.  If the Unit is owned by the Laura Jones Trust, and the deed does not reference a trustee, then Laura Jones shall be deemed the Member with respect to the Unit for all Association purposes.  If the Unit is owned by the Jones Family Trust, the Jones Family Trust may not exercise its Voting Interest unless it presents to Association, in the form of an attorney opinion letter or affidavit reasonably acceptable to Association, the identification of the person who should be treated as the Member with respect to the Unit for all Association purposes.  If Robert Smith and Laura Jones, as Trustees, hold title to a Unit, either trustee may exercise the Voting Interest associated with such Unit.  In the event of a conflict between trustees, the Voting Interest for the Unit in question cannot be exercised.  In the event that any other form of trust ownership is presented to the Association, the decision of the Board as to who may exercise the Voting Interest with respect to any Unit shall be final.  The Association shall have no obligation to obtain an attorney opinion letter in making its decision, which may be made on any reasonable basis whatsoever.

CHAMPIONSGATE
Bylaws

3.1.3 <u>Corporations</u>. If a Unit is owned by a corporation, the corporation shall designate a person, an officer, employee, or agent who shall be treated as the Member who can exercise the Voting Interest associated with such Unit.

3.1.4 <u>Partnerships</u>. If a Unit is owned by a limited partnership, any one of the general partners may exercise the Voting Interest associated with such Unit. By way of example, if the general partner of a limited partnership is a corporation, then the provisions hereof governing corporations shall govern which person can act on behalf of the corporation as general partner of such limited partnership. If a Unit is owned by a general partnership, any one of the general partners may exercise the Voting Interest associated with such Unit. In the event of a conflict among general partners entitled to exercise a Voting Interest, the Voting Interest for such Unit cannot be exercised.

3.1.5 <u>Multiple Individuals</u>. If a Unit is owned by more than one individual, any one of such individuals may exercise the Voting Interest with respect to such Unit. In the event that there is a conflict among such individuals, the Voting Interest for such Unit cannot be exercised.

3.1.6 <u>Liability of Association</u>. The Association may act in reliance upon any writing or instrument or signature, whether original or facsimile, that Association, in good faith, believes to be genuine, may assume the validity and accuracy of any statement or assertion contained in such a writing or instrument, and may assume that any person purporting to give any writing, notice, advice or instruction in connection with the provisions hereof has been duly authorized to do so. So long as the Association acts in good faith, the Association shall have no liability or obligation with respect to the exercise of Voting Interests, and no election shall be invalidated (in the absence of fraud) on the basis that the Association permitted or denied any person the right to exercise a Voting Interest. In addition, the Board may impose additional requirements respecting the exercise of Voting Interests (e.g., the execution of a Voting Certificate).

3.2 <u>Annual Meetings</u>. The annual meeting of the Members (the "**Annual Members Meeting**") shall be held at least once each calendar year on a date, at a time, and at a place to be determined by the Board.

3.3 <u>Special Meetings of the Members</u>. Special meetings of the Members (a "**Special Members Meeting**") may be called by the President, a majority of the Board, or upon written request of thirty percent (30%) of the total Voting Interests. The business to be conducted at a Special Members Meeting shall be limited to the extent required by Florida Statutes.

3.4 <u>Notice of Members Meetings</u>. Written notice of each Members' meeting shall be given by, or at the direction of, any officer of the Board or any management company retained by Association. A copy of the notice shall be mailed to each Member entitled to vote, postage prepaid, not less than ten (10) days before the meeting (provided, however, in the case of an emergency, two (2) days' notice will be deemed sufficient), unless otherwise required by Florida law. The notice shall be addressed to the Member's address last appearing on the books of the Association. The notice shall specify the place, day, and hour of the meeting and, in the case of a Special Members Meeting, the purpose of the meeting. Alternatively, and to the extent not prohibited by the Florida Statutes, the Board may adopt from time to time, other procedures for giving notice to the Members of the Annual Members Meeting or a Special Members Meeting. By way of example, and not of limitation, such notice may be included in a newsletter sent to each Member.

3.5 <u>Quorum of Members</u>. Until the termination of the Class "B" Control Period, a quorum shall be established by Declarant's presence, in person or by proxy, at any meeting. From and after the termination of the Class "B" Control Period, a quorum for purposes of conducting business shall be established by the presence, in person or by proxy, of the Members entitled to cast ten percent (10%) of the total Voting Interests. Notwithstanding any provision herein to the contrary, in the event that technology permits Members to participate in Member meetings and vote on matters electronically, then the Board shall have authority, without the joinder of any other party, to revise this provision to establish appropriate quorum requirements.

2

3.6    Adjournment of Members' Meetings.  If, however, a quorum shall not be present at any Members' meeting, the meeting may be adjourned as provided in the Florida Statutes.  In the absence of a provision in the Florida Statutes, the Members present shall have power to adjourn the meeting and reschedule it on another date.

3.7    Action of Members.  Decisions that require a vote of the Members must be made by a concurrence of a majority of the Voting Interests present in person or by proxy, represented at a meeting at which a quorum has been obtained unless provided otherwise in the Declaration, the Articles, or these Bylaws.

3.8    Proxies.  At all meetings, Members may vote their Voting Interests in person or by proxy.  All proxies shall comply with the provisions of Section 720.306(8) of the Florida Statutes, as amended from time to time, be in writing, and be filed with the Secretary at, or prior to, the meeting.  Every proxy shall be revocable prior to the meeting for which it is given.

4.    Board of Directors.

4.1    Number.  The affairs of the Association shall be managed by a Board of odd number with not less three (3) Directors prior to the termination of the Class "B" Control Period and no less than five (5) Directors after the termination of the Class "B" Control Period.  Board members appointed by Declarant need not be Members of Association.  Board members elected by Owners other than the Declarant must be Members of the Association, or the officer, director, agent or other duly authorized representative of a Member of the Association.

4.2    Appointment and Election of Directors.  Prior to termination of the Class "B" Control Period, the Declarant shall have the right to appoint all members of the Board in its sole and absolute discretion.  After the termination of the Class "B" Control Period, members of the Board shall be appointed and elected as follows: (i) the President and Vice President of each Neighborhood Association shall be appointed to the Board (in the event there is no Vice President for a Neighborhood Association, the Board of such Neighborhood Association shall designate an alternative representative) and (ii) all Class "A" Members shall be entitled to elect one (1) member of the Board who shall serve as a Director until the next Annual Members Meeting.  No more than ninety (90) days following the expiration of the Class "B" Control Period, the Association shall notify the Class "A" Members of the date, location and purpose of a special meeting of the Association to appoint and elect the Board of Directors as provided in this Section and the Declaration.  At each Annual Members Meeting thereafter, the Members shall elect the appropriate one (1) Director for a term of one (1) year.

4.3    Removal.  Any vacancy created by the resignation or removal of a Board member appointed by Declarant may be replaced by Declarant.  Declarant may replace or remove any Board member appointed by Declarant in Declarant's sole and absolute discretion.  In the event of death or resignation of a Director elected by the Members, the remaining Directors may fill such vacancy.  Except for Directors appointed by the Declarant, Directors may be removed with or without cause by the vote or agreement in writing of Members holding a majority of the total Voting Interests.

4.4    Compensation.  No Director shall receive compensation for any service rendered as a Director to Association; provided, however, any Director may be reimbursed for actual expenses incurred as a Director.

4.5    Action Taken Without a Meeting.  Except to the extent prohibited by law, the Board shall have the right to take any action without a meeting by obtaining the written approval of the required number of Directors.  Any action so approved shall have the same effect as though taken at a meeting of Directors.

4.6    Election.  Election to the Board shall be by secret written ballot, unless unanimously waived by all Members present. The person receiving the largest numbers of votes shall be elected. Cumulative voting is not permitted.

5.    Meeting of Directors.

5.1    Regular Meetings.  Regular meetings of the Board shall be held on a schedule adopted by the Board from time to time. Meetings shall be held at such place and hour as may be fixed, from time to time, by resolution of the Board.

5.2    Special Meetings.  Special meetings of the Board shall be held when called by the President, or by any two (2) Directors. Each Director shall be given not less than two (2) days' notice except in the event of an emergency.  Notice may be waived.  Attendance shall be a waiver of notice. Telephone conference meetings are permitted.

5.3    Emergencies.  In the event of an emergency involving immediate danger of injury or death to any person or damage to property, if a meeting of the Board cannot be immediately convened to determine a course of action, the President or, in his absence, any other officer or director, shall be authorized to take such action on behalf of Association as shall be reasonably required to appropriately respond to the emergency situation, including the expenditure of Association funds in the minimum amount as may be reasonably required under the circumstances.  The authority of officers to act in accordance herewith shall remain in effect until the first to occur of the resolution of the emergency situation or a meeting of the Board convened to act in response thereto.

5.4    Quorum.  A majority of the number of Directors shall constitute a quorum for the transaction of business. Every act or decision done or made by a majority of the Directors present at a duly held meeting, at which a quorum is present, or in writing in lieu thereof, shall be action of the Board. Directors may attend meetings telephonically.  When some or all Directors meet by telephone conference, those Directors attending by telephone conference shall be counted toward obtaining a quorum and may vote by telephone.   A telephone speaker shall be utilized at the noticed location of the meeting so that the conversation of those Directors may be heard by the Board, as well as any Member present at the meeting.  Members may not attend Board meetings telephonically.

5.5    Open Meetings.  Meetings of the Board shall be open to all Members, except when otherwise permitted by Florida law.

5.6    Voting.  Board members shall cast votes in the manner provided in the Florida Statutes. In the absence of a statutory provision, the Board shall establish the manner in which votes shall be cast.

5.7    Notice of Board Meetings.  Notices of meetings of the Board shall be posted in a conspicuous place on the Common Areas or Club Property at least 48 hours in advance, except in an event of an emergency.  Alternatively, notice may be given to Members in any other manner provided by Florida Statute.  By way of example, and not of limitation, notice may be given in any newsletter distributed to the Members.  For the purposes of giving notice, the area for notices to be posted selected by the Board shall be deemed a conspicuous place.  Notwithstanding anything to the contrary herein, notice of any meeting of the Board at which a Special Assessment will be levied must be provided to all Members at least fourteen (14) days before the meeting, which notice shall include a statement that Special Assessments will be considered at the meeting and the nature of the Special Assessments.

6.    Powers and Duties of the Board.

6.1    Powers.  The Board shall, subject to the limitations and reservations set forth in the Declaration and Articles, have the powers reasonably necessary to manage, operate, maintain and discharge the duties of Association, including, but not limited to, the power to cause Association to do the following:

6.1.1    General.  Exercise all powers, duties and authority vested in or delegated to Association by law and in these Bylaws, the Articles, and the Declaration, including without limitation, adopt budgets and levy assessments.

6.1.2    Rules and Regulations.  Adopt, publish, promulgate and enforce rules and regulations governing the use of CHAMPIONSGATE, by the Members, tenants and their guests and invitees, and to establish penalties and/or fines for the infraction thereof subject only to the requirements of the Florida Statutes, if any.

6.1.3    Enforcement.  Suspend the right of use of the Common Areas (other than for vehicular and pedestrian ingress and egress and for utilities) of a Member during any period in which such Member shall be in default in the payment of any assessment or charge levied, or collected, by the Association.

6.1.4    Declare Vacancies.  Declare the office of a member of the Board to be vacant in the event such member shall be absent from three (3) consecutive regular Board meetings.

6.1.5    Hire Employees.  Employ, on behalf of the Association, managers, independent contractors, or such other employees as it deems necessary, to prescribe their duties and delegate to such manager, contractor, etc., any or all of the duties and functions of the Association and/or its officers.

6.1.6    Common Areas.  Acquire, sell, operate, lease, manage and otherwise trade and deal with property, real and personal, including the Common Areas, as provided in the Declaration, and with any other matters involving the Association or its Members, on behalf of the Association or the discharge of its duties, as may be necessary or convenient for the operation and management of the Association and in accomplishing the purposes set forth in the Declaration.

6.1.7    Granting of Interest.  Grant licenses, easements, permits, leases, or privileges to any individual or entity, which affect Common Areas and to alter, add to, relocate or improve the Common Areas as provided in the Declaration.

6.1.8    Financial Reports.  Prepare all financial reports required by the Florida Statutes.

6.2    Vote.  The Board shall exercise all powers so granted, except where the Declaration, Articles or these Bylaws specifically require a vote of the Members.

6.3    Limitations.  Until the termination of the Class "B" Control Period, Declarant shall have and is hereby granted a right to disapprove or veto any such action, policy, or program proposed or authorized by the Association, the Board, any committee of Association, or the vote of the Members. This right may be exercised by Declarant at any time within sixty (60) days following a meeting held pursuant to the terms and provisions hereof. This right to disapprove may be used to veto proposed actions but shall not extend to the requiring of any action or counteraction on behalf of Association, the Board, or any committee of the Association.

7.    Obligations of Association.  Association, subject to the provisions of the Declaration, Articles, and these Bylaws shall discharge such duties as necessary to operate Association pursuant to the Declaration, including, but not limited to, the following:

7.1    Official Records.  Maintain and make available all Official Records.

7.2    Supervision.  Supervise all officers, agents and employees of Association, and to see that their duties are properly performed.

CHAMPIONSGATE
Bylaws

    7.3    <u>Assessments and Fines</u>. Fix and collect the amount of the Assessments and fines; take all necessary legal action; and pay, or cause to be paid, all obligations of Association or where Association has agreed to do so, of the Members.

    7.4    <u>Enforcement</u>. At the Association's discretion, enforce the provisions of the Declaration, Articles, these Bylaws, and Rules and Regulations.

8.    <u>Officers and Their Duties</u>.

    8.1    <u>Officers</u>. The officers of this Association shall be a President, a Vice President, a Secretary, and a Treasurer.

    8.2    <u>Election of Officers</u>. Except as set forth below, the election of officers shall be by the Board and shall take place at the first meeting of the Board following each Annual Members Meeting.

    8.3    <u>Term</u>. The officers named in the Articles shall serve until their replacement by the Board. The officers of Association shall hold office until their successors are appointed or elected unless such officer shall sooner resign, be removed, or otherwise disqualified to serve.

    8.4    <u>Special Appointment</u>. The Board may elect such other officers as the affairs of Association may require, each of whom shall hold office for such period, have such authority, and perform such duties as the Board may, from time to time, determine.

    8.5    <u>Resignation and Removal</u>. Any officer may be removed from office, with or without cause, by the Board. Any officer may resign at any time by giving written notice to the Board. Such resignation shall take effect on the date of receipt of such notice or at any later time specified therein. Acceptance of such resignation shall not be necessary to make it effective.

    8.6    <u>Vacancies</u>. A vacancy in any office shall be filled by appointment by the Board. The officer appointed to such vacancy shall serve for the remainder of the term of the replaced officer.

    8.7    <u>Multiple Offices</u>. The office of President and Vice-President shall not be held by the same person. All other offices may be held by the same person.

    8.8    <u>Duties</u>. The duties of the officers are as follows:

        8.8.1    <u>President</u>. The President shall preside at all meetings of Association and Board, sign all leases, mortgages, deeds and other written instruments and perform such other duties as may be required by the Board. The President shall be a member of the Board.

        8.8.2    <u>Vice President</u>. The Vice President shall act in the place and stead of the President in the event of the absence, inability or refusal to act of the President, and perform such other duties as may be required by the Board.

        8.8.3    <u>Secretary</u>. The Secretary shall record the votes and keep the Minutes of all meetings and proceedings of Association and the Board; keep the corporate seal of Association and affix it on all papers required to be sealed; serve notice of meetings of the Board and of Association; keep appropriate current records showing the names of the Members of Association together with their addresses; and perform such other duties as required by the Board.

        8.8.4    <u>Treasurer</u>. The Treasurer shall cause to be received and deposited in appropriate bank accounts all monies of Association and shall disburse such funds as directed by the Board; sign, or cause to be signed, all checks, and promissory notes of Association; cause to be kept proper books of account and accounting records required pursuant to the provisions of Section 720.303 of the Florida Statutes cause to be prepared in accordance with generally accepted accounting principles

CHAMPIONSGATE
Bylaws

all financial reports required by the Florida Statutes; and perform such other duties as required by the Board.

9.    Committees.

    9.1    General.  The Board may appoint such committees as deemed appropriate.  The Board may fill any vacancies on all committees.

    9.2    Service Area Committees.  In addition to any other committees appointed by the Board as provided above, various Service Area Committees may be established by the Board to determine the nature and extent of services, if any, it recommends be provided to the Service Area(s) by the Association in addition to those provided to all Members of the Association in accordance with the Declaration. Service Area Committees may only advise the Board on issues and shall not have the authority to bind the Board.  The Board also reserves the right to abolish any committee established by the Board if, in its sole discretion, it chooses to do so. Service Area Committees shall consist of three (3), five (5), or seven (7) committee members, as determined by the Board, which committee members shall be Owners in the applicable Service Area(s).  A Service Area Committee may represent several Service Areas of similar type provided there is at least one (1) member on such Service Area Committee from each Service Area represented by such committee.

10.    Records.  The official records of Association shall be available for inspection by any Member at the principal office of Association.  Copies may be purchased, by a Member, at a reasonable cost.

11.    Corporate Seal.  Association shall have an impression seal in circular form.

12.    Amendments.

    12.1    General Restrictions on Amendments.  Notwithstanding any other provision herein to the contrary, no amendment to these Bylaws shall affect the rights of Declarant unless such amendment receives the prior written consent of Declarant, which may be withheld for any reason whatsoever.  If the prior written approval of any governmental entity or agency having jurisdiction is required by applicable law or governmental regulation for any amendment to these Bylaws, then the prior written consent of such entity or agency must also be obtained.  No amendment shall be effective until it is recorded in the Public Records.

    12.3    Amendments Prior to the Termination of the Class "B" Control Period.  Prior to the termination of the Class "B" Control Period, Declarant shall have the right to amend these Bylaws as it deems appropriate, without the joinder or consent of any person or entity whatsoever.  Declarant's right to amend under this provision is to be construed as broadly as possible.  In the event that Association shall desire to amend these Bylaws prior to the termination of the Class "B" Control Period, the Association must first obtain Declarant's prior written consent to any proposed amendment.  Thereafter, an amendment identical to that approved by Declarant may be adopted by Association pursuant to the requirements for amendments from and after the termination of the Class "B" Control Period.  Declarant shall join in such identical amendment so that its consent to the same will be reflected in the Public Records.

    12.4    Amendments From and After the Termination of the Class "B" Control Period.  After the termination of the Class "B" Control Period, but subject to the general restrictions on amendments set forth above, these Bylaws may be amended with the approval a majority of the Board.

    12.5    Compliance with HUD, FHA, VA, FNMA, GNMA, and SFWMD.  Prior to the termination of the Class "B" Control Period, the Declarant shall have the right to amend these Bylaws, from time to time, to make such changes, modifications and additions therein and thereto as may be requested or required by HUD, FHA, VA, FNMA, GNMA, SWFMD, or any other governmental agency or body as a condition to, or in connection with such agency's or body's regulatory requirements or agreement to make, purchase,

accept, insure, guaranty or otherwise approve loans secured by mortgages on Units. No approval or joinder of the Association, other Owners, or any other party shall be required or necessary to such amendment. After the termination of the Class "B" Control Period, but subject to the general restrictions on amendments set forth above, the Board shall have the right to amend these Bylaws, from time to time, to make such changes, modifications and additions therein and thereto as may be requested or required by HUD, FHA, VA, FNMA, GNMA, SFWMD or any other governmental agency or body as a condition to, or in connection with such agency's or body's regulatory requirements or agreement to make, purchase, accept, insure, guaranty or otherwise approve loans secured by mortgages on Units. No approval or joinder of the Owners, or any other party, shall be required or necessary to any such amendments by the Board.

13.    _Conflict_. In the case of any conflict between the Articles and these Bylaws, the Articles shall control. In the case of any conflict between the Declaration and these Bylaws, the Declaration shall control.

14.    _Fiscal Year_. The first fiscal year shall begin on the date of incorporation and end on December 31 of that year. Thereafter, the fiscal year of Association shall begin on the first day of January and end on the 31st day of December of every year.

15.    _Miscellaneous_.

    15.1    _Florida Statutes_. Whenever these Bylaws refers to the Florida Statutes, it shall be deemed to refer to the Florida Statutes as they exist on the date these Bylaws are recorded except to the extent provided otherwise as to any particular provision of the Florida Statutes.

    15.2    _Severability_. Invalidation of any of the provisions of these Bylaws by judgment or court order shall in no way affect any other provision, and the remainder of these Bylaws shall remain in full force and effect.

CERTIFICATION

I, John Valantasis, do hereby certify that:

I am the duly elected and acting Secretary of CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida corporation not for profit; and

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the seal of said Association this _19_ day of March, 2013.

_____
John Valantasis, Secretary

(CORPORATE SEAL)

S:\JayZ\Clients\Lennar\Stoneybrook South\ChampionsGate Master\Governing Documents\Bylaws\Bylaws2 - ChampionsGate Master.doc

CHAMPIONSGATE
Bylaws

**PREPARED BY AND RETURN TO:**
Christian F. O'Ryan, Esq.
Pennington, P.A.
2701 N. Rocky Point Drive, Suite 900
Tampa, Florida 33607

# OASIS
# CLUB PLAN

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Definitions | 3 |
| 2. | Benefits of Club | 5 |
| 3. | Club Facilities | 5 |
| 4. | Persons Entitled to Use the Club | 7 |
| 5. | Ownership and Control of the Club | 7 |
| 6. | Club Dues | 9 |
| 7. | Initial Club Contribution | 11 |
| 8. | Determination of Club Expenses | 11 |
| 9. | Creation of the Lien and Personal Obligation | 12 |
| 10. | Operations | 13 |
| 11. | Paramount Right of Association | 13 |
| 12. | Attorneys' Fees | 13 |
| 13. | Rights to Pay and Receive Reimbursement | 13 |
| 14. | General Restrictions | 14 |
| 15. | Violation of the Club Rules and Regulations | 15 |
| 16. | Destruction | 15 |
| 17. | Risk of Loss | 16 |
| 18. | Eminent Domain | 16 |
| 19. | Additional Indemnification of Club Owner | 16 |
| 20. | Estoppel | 16 |
| 21. | No Waiver | 17 |

Oasis Club Plan

3/14/13

Exhibit E

22.   Franchises and Concessions ................................................................17

23.   Resolution of Disputes ........................................................................17

24.   Venue ..................................................................................................17

25.   Release ................................................................................................17

26.   Amendment ..........................................................................................18

27.   Severability ..........................................................................................18

28.   Notices .................................................................................................18

29.   Florida Statutes ...................................................................................18

30.   Headings ..............................................................................................18

**LIST OF EXHIBITS**

Exhibit A          Legal Description of Club
Exhibit B          Legal Description of ChampionsGate
Exhibit C          General Release
Exhibit D          Club Membership Fee Schedule
Exhibit E          Option Notice
Exhibit F          Agreement of Sale and Purchase

Oasis Club Plan

3/14/13

## OASIS CLUB PLAN

LEN-CG SOUTH, LLC, a Florida limited liability company ("**LEN-CG**"), is presently the owner of the real property described on **Exhibit A**, attached hereto and made a part hereof (the "**Club Property**"). The Club Property is located within the real property described on **Exhibit B** attached hereto and made a part hereof ("**CHAMPIONSGATE**"). LEN-CG hereby declares that the real property comprising CHAMPIONSGATE shall be subject to the restrictions, covenants, terms and conditions set forth in this Club Plan. THE CHAMPIONSGATE MASTER ASSOCIATION, INC. (THE "**ASSOCIATION**") AND EACH OWNER SHALL BE BOUND BY AND COMPLY WITH THIS CLUB PLAN. ALTHOUGH THIS CLUB PLAN IS AN EXHIBIT TO THE DECLARATION FOR CHAMPIONSGATE (THE "**DECLARATION**"), THE DECLARATION IS SUBORDINATE AND INFERIOR TO THIS CLUB PLAN. IN THE EVENT OF ANY CONFLICT BETWEEN THIS CLUB PLAN AND THE DECLARATION, THIS CLUB PLAN SHALL CONTROL.

1.     <u>Definitions</u>.  All initially capitalized terms not defined herein shall have the meanings set forth in the Declaration. In addition to the terms defined elsewhere herein, the following terms shall have the meanings specified below:

"**Assessments**" shall mean any assessments levied in accordance with the Declaration.

"**Club**" shall mean the "Oasis Club" and shall include the Club Property and all facilities constructed thereon subject to additions and deletions made by Club Owner from time to time. The Club may be comprised of one or more parcels of land that may not be connected or adjacent to one another.

"**Club Dues**" shall mean the charges related to the Club to be paid by the Owners pursuant to the provisions of this Club Plan and the Declaration, including without limitation, the Club Membership Fee.

"**Club Expenses**" shall mean all costs (as such term is used in its broadest sense) of owning (including Club Owner's debt service), operating, managing, maintaining, and insuring the Club, whether direct or indirect, including without limitation, trash collection, utility charges, cable service charges, maintenance, legal fees of Club Owner relative to the Club, cost of supervision, management fees, reserves, repairs, replacement, refurbishments, payroll and payroll costs, insurance, working capital, ad valorem or other taxes (excluding income taxes of Club Owner), assessments, costs, expenses, levies and charges of any nature that may be levied, imposed or assessed against, or in connection with, the Club. Club Expenses shall <u>not</u> include the initial cost of construction of the Club Facilities. Club Owner may allocate a reasonable portion of its overhead (*e.g.,* employee salaries) to Club Expenses to extent the Club benefits from such overhead. Club Expenses shall include all legal expenses of Club Owner with respect to the Club.

"**Club Facilities**" shall mean the actual facilities, improvements and personal property that Club Owner shall actually have constructed and/or made available to Owners pursuant to this Club Plan. The Club Facilities are more specifically set forth in Section 3.2 herein.  THE CLUB FACILITIES ARE SUBJECT TO CHANGE AT ANY TIME AT CLUB OWNER'S SOLE AND ABSOLUTE DISCRETION.

"**Club Manager**" shall mean the entity operating and managing the Club at any time.  Club Owner may be Club Manager as provided in this Club Plan. Club Owner reserves the right to designate the Club Manager in Club Owner's sole and absolute discretion.

"**Club Membership Fee**" shall mean the fee to be paid to Club Owner by each Owner pursuant to the provisions of Section 6.2 hereof.

"**Club Membership Fee Schedule**" shall have the meaning set forth in Section 6.2 hereof.

"**Club Owner**" shall mean the owner of the real property comprising the Club and any of its designees, successors and assigns who receive a written assignment of all or some of the rights of Club

3

Owner hereunder.  Such assignment need not be recorded in the Public Records in order to be effective.  In the event of such a partial assignment, the assignee shall not be deemed Club Owner but may exercise such rights of Club Owner specifically assigned to it.  Any such assignment may be made on a non-exclusive basis.  At this time, LEN-CG is Club Owner.  Club Owner may change from time to time (*e.g.*, LEN-CG may sell the Club).  Notwithstanding that the Club Owner and the Declarant may be the same party, affiliates or related parties from time to time, each Owner acknowledges that Club Owner and Declarant shall not be considered being one and the same party, and neither of them shall be considered the agent or partner of the other.  At all times, Club Owner and Declarant shall be considered separate and viewed in their separate capacities.  No act or failure to act by Declarant shall at any time be considered an act of Club Owner and shall not serve as the basis for any excuse, justification, waiver or indulgence to the Owners with regard to their prompt, full, complete and continuous performance of their obligations and covenants hereunder.

"**Club Plan**" shall mean this document, together with all exhibits, schedules, amendments and modifications hereto.

"**Club Property**" shall initially mean the real property described on **Exhibit A** attached hereto and made a part hereof.  Thereafter, Club Property shall include any real property designated by Club Owner as part of the Club Property by amendment to this Club Plan.

"**Club Rules and Regulations**" shall have the meaning set forth in Section 14.8 hereof.

"**Immediate Family Members**" shall mean the spouse of the Member and all unmarried children twenty-two (22) years and younger of either the Member or the Member's spouse.  If a Member is unmarried, the Member may designate one other person who is living with such Member in the Unit in addition to children of the Member as an adult Immediate Family Members.  No unmarried child or other person shall qualify as an Immediate Family Member unless such person is living with the Member within the Unit.

"**Initial Club Contribution**" shall have the meaning set forth in Section 7 hereof.

"**Lessee**" shall mean the lessee named in any written lease respecting a Unit who is legally entitled to possession of any Unit within CHAMPIONSGATE.  An Owner and Lessee shall be jointly and severally liable for all Club Dues.

"**LEN-CG**" shall mean LEN-CG SOUTH, LLC, a Florida limited liability company, and its successors or assigns.  Although not obligated to do so, LEN-CG may identify its successors or assigns by an amendment to this Club Plan.

"**Member**" shall mean every Owner (other than an Owner who has leased his Unit to a Lessee) and Lessee; provided, however, for the purposes of Membership, there shall be only one Owner or Lessee per Unit.  A Person shall continue to be a Member until he or she ceases to be an Owner, or ceases to be a Lessee legally entitled to possession of a Unit.  Once an Owner leases a Unit, only the Lessee shall be entitled to exercise the privileges of a Member with respect to such Unit; however, the Owner and Lessee shall be jointly and severally liable for all Club Dues.  Notwithstanding the foregoing, Club Owner may provide access to the Club for contract purchasers upon the signing of a membership agreement and payment of Club Dues.  Club Owner shall establish qualification requirements, fees and dues for a contract purchaser to have use of the Club Facilities prior to becoming an Owner of a Unit.  Once the purchaser obtains title to the Unit, then such purchaser shall be deemed an Owner and Member hereunder.

"**Parking Areas**" shall mean all areas designated for parking within the Club Facilities.

"**Purchase Option**" shall have the meaning set forth in Section 5.5 hereof.

"**Special Use Fees**" shall have the meaning set forth in Section 6.9 hereof.

2.    <u>Benefits of Club</u>.  The Association and each Owner, by acceptance of title to a Unit, ratify and confirm this Club Plan and agree as follows:

2.1    <u>Term and Covenant Running with Land</u>.  The terms of this Club Plan shall be covenants running with CHAMPIONSGATE in perpetuity and be binding on each Owner and his, her or its successors in title and assigns.  Every portion of CHAMPIONSGATE that can be improved with a Unit shall be burdened with the payment of Club Dues.  Every Owner, by acceptance of a deed to any Unit, shall automatically assume and agree to pay all Club Dues owing in connection with such Unit.  Every Builder, upon receipt of a Certificate of Occupancy for a Unit owned by such Builder, shall automatically assume and agree to pay all Club Dues which shall be due and payable from and after the issuance of such Certificate of Occupancy unless this requirement is waived in writing by Club Owner in its sole and absolute discretion as to any particular Builder.

2.2    <u>Value</u>.  By acceptance of a deed to a Unit, each Owner acknowledges that the automatic membership in the Club granted to Owners and Lessees renders ownership of CHAMPIONSGATE and any part thereof more valuable than it would be otherwise.  All Owners and Club Owner agree that the provisions and enforceability of this Club Plan are mutually beneficial.  Each Owner acknowledges that Club Owner is initially investing substantial sums of money and time in developing the Club Facilities on the basis that eventually the Club will generate a substantial profit to Club Owner.  Each Owner agrees that Club Owner would not have made such a substantial investment of money without the anticipation of such profit and such profit shall not, if ever generated, affect the enforceability of this Club Plan.

2.3    <u>Product Purchased</u>.  There were significant other housing opportunities available to each Owner in the general location of CHAMPIONSGATE.  The Unit, and rights to utilize the Club, were material in each Owner's decision to purchase a Unit in CHAMPIONSGATE and were, for the purposes of this Club Plan, a "single product."  Each Owner understands that the Club is an integral part of CHAMPIONSGATE.

2.4    <u>Disclosure</u>.  Full disclosure of the nature of the Club and obligations associated therewith was made to each Owner prior to or upon that Owner executing a contract to purchase a Unit and each Owner has, or was afforded the opportunity to, consult with an attorney.

2.5    <u>Non-Exclusive License</u>.  The provisions of this Club Plan do not grant any ownership rights in the Club in favor of the Association or Members but, rather, grant a non-exclusive license to use the Club subject to full compliance with all obligations imposed by this Club Plan.

3.    <u>Club Facilities</u>.

3.1    <u>Club Property</u>.  Club Owner presently owns all of the real property comprising the Club Property.  The Club Property may be expanded to include additional property in Club Owner's sole and absolute discretion.  Likewise, Club Owner may elect to remove portions of real property from the definition of Club Property by amendment to this Club Plan.  Such additions and deletions, while not causing an increase or decrease in the Club Membership Fees payable with respect to each Unit, may cause an increase or decrease in Club Expenses and thereby increase or decrease in overall Club Dues.

3.2    <u>Club Facilities</u>.  Club Owner intends to construct certain club facilities on the Club Property (the "**Club Facilities**") that will be and shall remain the property of Club Owner, subject only to the provisions hereof.  At this time, the Club Facilities are planned to include a clubhouse, fitness center, game room, and outdoor swimming pool and water amenities (subject to Club Owner's paramount right to unilaterally, and without the joinder of any party whomsoever, add to, remove from, alter, modify and amend the Club Facilities at any time subject to the provisions hereof). NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY, THE DESCRIPTION OF "CLUB FACILITIES" AS SET FORTH IN THIS CLUB PLAN IS FOR DESCRIPTIVE PURPOSES ONLY AND SHALL IN NO WAY

Oasis Club Plan

3/14/13

BIND, OBLIGATE OR LIMIT THE CLUB OWNER TO CONSTRUCT OR SUPPLY ANY SUCH ITEM, THE
CONSTRUCTION OR SUPPLYING OF ANY SUCH ITEM BEING IN CLUB OWNER'S SOLE AND
ABSOLUTE DISCRETION. FURTHER, NO PARTY SHALL BE ENTITLED TO RELY UPON SUCH
DESCRIPTION AS A REPRESENTATION OR WARRANTY AS TO THE EXTENT OF THE CLUB
FACILITIES THAT WILL BE A PART OF THE CLUB.

    3.3    Construction of the Club. Club Owner will construct the Club Facilities at its sole cost and
expense.  Club Owner shall be the sole and absolute judge as to the plans, size, design, location,
completion, schedule, materials, equipment, size, and contents of the Club Facilities.  Club Owner shall
have the unequivocal right to:

        3.3.1    develop, construct and reconstruct, in whole or in part, the Club and related
improvements, and make any additions, alterations, improvements, or changes thereto;

        3.3.2    without the payment of rent and without payment of utilities or any other part of
the Club Expenses, maintain leasing and/or sales offices (for sales and resales of Units and residential
properties located outside of CHAMPIONSGATE), general offices, and construction operations on the
Club Property including, without limitation, displays, counters, meeting rooms, and facilities for the sales
and re-sales of Units;

        3.3.3    place, erect, and/or construct portable, temporary, or accessory buildings or
structures upon the Club Property for sales, construction storage, or other purposes;

        3.3.4    temporarily deposit, dump or accumulate materials, trash, refuse and rubbish
on the Club Property in connection with the development or construction of any of the Club or any
improvements located within CHAMPIONSGATE;

        3.3.5    post, display, inscribe or affix to the exterior of the Club and the Club Property,
signs and other materials used in developing, constructing, selling, or promoting the sale of portions of
CHAMPIONSGATE, including, without limitation, the sale of Units;

        3.3.6    conduct whatever commercial activities within the Club deemed necessary,
profitable and/or appropriate by Club Owner;

        3.3.7    develop, operate and maintain the Club as deemed necessary, in its sole and
absolute discretion;

        3.3.8    excavate fill from any lakes or waterways within and/or contiguous to the Club
Property by dredge or dragline, store fill within the Club Property, remove and/or sell excess fill, grow or
store plants and trees within, or contiguous to, the Club Property, and use and/or sell excess plants and
trees; and

        3.3.9    all activities that, in the sole opinion of Club Owner, are necessary for the
development and sale of the Club or any lands or improvements therein.

    3.4    Changes. Club Owner reserves the absolute right in Club Owner's sole and absolute
discretion to, from time to time, alter or change the Club, including construction of additional Club
Facilities and/or the removal or modification thereof, at any time. Such alterations, modifications and
amendments may cause an increase or decrease in Club Expenses and thereby increase or decrease in
overall Club Dues.

    3.5    Commercial Space. It is possible that portions of the Club Facilities may include a sales
office, retail space and/or other commercial space as Club Owner may deem appropriate in Club Owner's
sole and absolute discretion. Club Owner may permit Members to access any commercial facilities
located within the Club Property at Club Owner's sole and absolute discretion.  Club Owner may grant

Oasis Club Plan

3/14/13

leases, franchises, licenses or concessions to commercial concerns on all or part of the Club. If a lease, franchise, license or concession agreement permits continuing use of the Club Facilities by anyone other than Club Owner or Members, then Club Owner shall require such other user(s) to pay a fair and reasonable share of the Club Expenses as determined by Club Owner in its sole and absolute discretion. Club Owner shall have no duty to account for any rents, fees or payments from third parties for the right to occupy and/or lease such commercial space; all of such rents, fees and payments, if any, shall be the sole property of Club Owner and shall not offset or reduce the Club Dues payable by Owners.

4.      Persons Entitled to Use the Club.

4.1     Rights of Members. Each Member and his or her Immediate Family Members shall have such non-exclusive rights and privileges as shall from time to time be granted by Club Owner. In order to exercise the rights of a Member, a person must be a resident of the Unit. If a Unit is owned by a corporation, trust or other legal entity, or is owned by more than one family, then the Owner(s) collectively shall designate up one (1) person residing in the Unit who will be the Member of the Club with respect to such Unit. Members shall have no right to access the commercial space comprising part of the Club Facilities, or portions of the Club Property leased or licensed to third parties or Members, except as and when permitted by Club Owner.

4.2     Use by Persons Other than Owners and Lessees. Club Owner has the right at any and all times, and from time to time, to make the Club available to individuals, persons, firms or corporations other than Members. Club Owner shall establish the fees to be paid, if any, by any person using the Club who is not a Member. The granting of such rights shall not invalidate this Club Plan, reduce or abate any Owner's obligations to pay Club Dues pursuant to this Club Plan, or give any Owner the right to avoid any of the provisions of this Club Plan. Club Owner shall have the right to determine from time to time, and at anytime, in the Club Owner's sole absolute discretion, the manner in which the Club Facilities will be made available to the public and the fees and charges that may be charged for such public use.

4.3     Subordination. This Club Plan and the rights of Members to use the Club is and shall be subject and subordinate to  (a) any ground lease, mortgage, deed of trust, or other encumbrance and any renewals, modifications and extensions thereof, now or hereafter placed on the Club by Club Owner; and (b) easements, restrictions, limitations and conditions, covenants and restrictions of record, and other conditions of governmental authorities. This provision shall be self-operative. Association, in its own name and, as agent for all Owners, shall sign any documents confirming the subordination provided herein promptly upon request of Club Owner.

5.      Ownership and Control of the Club.

5.1     Control of Club By Club Owner. The Club shall be under the complete supervision and control of Club Owner unless Club Owner appoints a third party as Club Manager.

5.2     Transfer of Club. Club Owner may sell, encumber or convey the Club to any person or entity in its sole and absolute discretion at any time.

5.3     Change in Terms of Offer. Club Owner may provide that some Owners pay Club Membership Fees on a different basis than Owners currently pay under this Club Plan by recording a supplement or amendment to this Club Plan with respect to one or more Units. No Owner shall have the right to object to any other Owner paying greater or lesser Club Membership Fees so long as the Club Membership Fee applicable to any particular Unit is in accordance with the Club Plan and the Club Membership Fee Schedule applicable to such Unit.

5.4     Option of Club Owner. In Club Owner's sole discretion, Club Owner shall have the option to transfer the Club to the Association so that it will be under the complete control of the Owners.

5.5    Association's Option to Purchase the Club.  On such date that is two (2) years after the Declarant conveys the last Unit in CHAMPIONSGATE to a third party purchaser other than a Builder, the Association shall have the option to purchase the Club from Club Owner (the "**Purchase Option**") for an amount (the "**Purchase Price**") resulting from the application of the capitalization rate of six percent (6%) applied to the total annual Club Membership Fees that would be payable by all Owners to Club Owner during the calendar year in which the closing occurs (assuming the Purchase Option was not exercised). This Purchase Option may be exercised by a resolution of the majority of the Board of Directors of the Association, without the joinder of any Owner or any other person or entity.  Such Purchase Option shall be exercised by written notice (the "**Option Notice**") to Club Owner signed by a majority of the Board in the form attached hereto as **Exhibit E**, which Option Notice shall be delivered by professional overnight courier to Club Owner at the following address (or such other address as may be designated by Club Owner from time to time by amendment to this Club Plan):

LEN-CG SOUTH, LLC
700 N.W. 107th Avenue
Miami, Florida  33172
Attention:  Legal Department

With a copy to:          Lennar Homes, LLC
4600 West Cypress Street, Suite 200
Tampa, Florida 33607
Attention:  Division President

The Option Notice shall be irrevocable once signed by a majority of the Board.  Club Owner shall convey the Club to the Association within sixty (60) days of Club Owner's receipt of the Option Notice.  The conveyance of the Club shall occur in accordance with the terms as set forth in the Agreement for Sale and Purchase by and between Club Owner and the Association which shall be in substantially the form attached hereto as **Exhibit F**.

5.6    Documentation of Transfer.

5.6.1    Documentation from Club Owner.  At the time that the Club is transferred to the Association, Club Owner shall be obligated to deliver the following:  a special warranty deed for the real property comprising the Club, a bill of sale respecting the personal property comprising the Club, an assignment of any alcoholic beverage license used in connection with the Club (subject to all state requirements for such transfer), if any, an owner's title insurance policy for the Club Property at Association's sole cost and expense, a closing statement and all affidavits and other documents required by the title insurance company to effect the transfer of the Club Property.

5.6.2    Documentation from Association.  At the time that the Club is transferred to the Association, the Association shall be obligated to deliver the following:  the Purchase Price, all costs to effect the transfer including, without limitation, the cost of the owner's title insurance policy, all documentary stamp taxes and surtaxes, and the costs of preparing all closing documentation; a closing statement; a general release in the form attached hereto as **Exhibit C**; and all affidavits and other documents required by the title insurance company to effect the transfer of the Club Property. The Association shall be responsible for arranging for all purchase money financing and paying costs associated therewith.

5.7    Transfer of Control.  The conveyance of the Club shall be subject to easements, restrictions, reservations, conditions, limitations and declarations of record, real estate taxes for the year of conveyance, zoning, land use regulations and survey matters.  The Association shall be deemed to have assumed and agreed to pay all continuing obligations and service and similar contracts relating to the ownership, operation, maintenance and administration of the Club.  The Association shall, and does hereby, indemnify and hold Club Owner harmless on account thereof.  The Association shall be obligated to accept such conveyance without setoff, condition, or qualification of any nature.  The Association shall

8

Oasis Club Plan

3/14/13

execute all forms necessary for transfer of the alcoholic beverage license used in connection with the Club (if any). THE CLUB PROPERTY, PERSONAL PROPERTY AND EQUIPMENT THEREON AND APPURTENANCES THERETO SHALL BE CONVEYED IN "AS IS, WHERE IS" CONDITION WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IN FACT OR BY LAW, AS TO THE CONDITION, FITNESS OR MERCHANTABILITY OF SUCH ITEM BEING CONVEYED.

5.8    Ambiguities/Association to Bear Legal Expenses.  In the event that there is any ambiguity or question regarding the provisions of this Club Plan, Club Owner's determination of such matter shall be conclusive and binding absent manifest error. Therefore, and in order to ensure that the Owners and the Association abide by Club Owner's determination, in the event that there is any dispute respecting the interpretation of this Club Plan, the Purchase Option, or any other aspect of the transfer of the Club to the Association, the Association shall bear all legal expenses of both the Association and Club Owner including, without limitation, all attorneys' fees, paraprofessional fees and costs at trial and upon appeal, regardless of the outcome of such proceedings.

5.9    Early Purchase.  The majority of the Board, without the joinder of any Owner or any other person, may make an earlier offer to purchase the Club from Club Owner. Club Owner, in its sole and absolute discretion, may consider such offer and negotiate an early sale to the Association on terms satisfactory to Club Owner. Alternatively, Club Owner may refuse to consider any early offer to purchase the Club by the Association.

6.    Club Dues.  In consideration of the construction and providing for use of the Club by the Owners, each Owner by acceptance of a deed to a Unit shall be deemed to have specifically covenanted and agreed to pay all Club Dues that are set forth herein. Club Owner presently intends to collect Club Dues on a quarterly basis but reserves the right to change the payment period from time to time (e.g., to require payment on a monthly basis). Notwithstanding the foregoing, Club Owner may require an Owner or all Owners to pay Club Dues on an annual or other basis, in advance, based on prior payment history or other financial concerns, in Club Owner's sole and absolute discretion.

6.1    Club Expenses.  Each Owner agrees to pay and discharge, in a timely fashion when due, its pro rata portion (as hereinafter set forth) of the Club Expenses. All Owners, other than Declarant, shall collectively bear all expenses associated with the Club so that Club Owner shall receive the Club Membership Fees without deduction of expenses or charges in respect of the Club. Commencing on the first day of the period covered by the annual budget, and until the adoption of the next annual budget, the Club Expenses shall be allocated so that each Owner other than Declarant shall pay his pro rata portion of Club Expenses based upon a fraction, the numerator of which is one (1) and the denominator of which is (i) the total number of Units subjects to this Club Plan and anticipated to be subject to Assessments under the Declaration in the upcoming period covered by the annual budget, or (ii) any greater number determined by Club Owner from time to time.  Club Owner, in its sole and absolute discretion, may change the denominator from time to time.

6.2    Club Membership Fee.  Each Owner shall pay quarterly in advance (or other payment period designated by Club Owner) as part of the Club Dues, without setoff or deduction, to Club Owner, or its designee, the club membership fee (the "**Club Membership Fee**") set forth in the Club Membership Fee Schedule attached hereto as **Exhibit D** (the "**Club Membership Fee Schedule**").  As provided in the Club Membership Fee Schedule, Owners within the Retreat Neighborhood and Owners within the Country Club Neighborhood (both as defined in the Declaration) shall not pay Membership Fees in the same amounts. The specific amounts that such Owners are required to pay are set forth in the Club Membership Fee Schedule.  No Owner shall have the right to object to any other Owner paying greater or lesser Club Membership Fees so long as the Club Membership Fee applicable to any particular Unit is in accordance with this Club Plan and the Club Membership Fee Schedule attached as **Exhibit D**.

6.3    Taxes.  In addition to the Club Membership Fee, each Owner shall pay all applicable sales, use or similar taxes now or hereafter imposed on the Club Membership Fee.

Oasis Club Plan

3/14/13

6.4     Builders.  Each Builder shall pay Club Dues on each Unit owned by such Builder on the same basis as all other Owners commencing upon the date that such Builder receives a Certificate of Occupancy for a Unit owned by such Builder.

6.5     Perpetual.  Each Owner's obligation to pay Club Dues shall be perpetual regardless of whether such Unit is occupied, destroyed, renovated, replaced, rebuilt or leased.

6.6     Individual Units.  Owners of individual Units shall pay Club Dues for one (1) membership per month per Unit.  If an Owner owns more than one Unit, Club Dues are payable for each and every Unit owned by such Owner.

6.7     Excuse or Postponement.  Club Owner may excuse or postpone the payment of Club Dues in its sole and absolute discretion.

6.8     Club Owner's Obligation.  Under no circumstances shall Club Owner or Declarant be required to pay Club Dues. To the extent that Club Owner elects, in Club Owner's sole and absolute discretion, to base the annual budget on a number of Units greater than those owned by Owners other than Declarant, Club Owner agrees to pay the difference, if any, between actual Club Expenses and Club Dues paid by Owners, if any.

6.9     Special Use Fees.  Club Owner shall have the right to establish from time to time, by resolution, rule or regulation, or by delegation to the Club Manager, specific charges, ticket service and/or use fees and charges ("**Special Use Fees**"), for which one or more Owners (but less than all Owners) are subject, including without limitation, costs of special services or facilities provided to an Owner relating to the special use of the Club or tickets for shows, special events, or performances held in the Club Facilities that are paid initially by Club Owner.  Special Use Fees shall be payable at such time or time(s) as determined by Club Owner.  Without limiting the foregoing, Owners shall be charged Special Use Fees for the use of vending machines, video arcade machines and entertainment devices, if any.  Club Owner shall have no duty to account for any Special Use Fees; all of such Special Use Fees shall be the sole property of Club Owner and shall not offset or reduce the Club Dues payable by Owners.  For those programs or events, if any, for which tickets are sold, Club Owner shall determine how to distribute any such tickets in its sole and absolute discretion.

6.10    Additional Club Dues.  If an Owner, his or her guests, invitees, licensees, agents, servants or employees do anything that increases the cost of maintaining or operating the Club, or cause damage to any part of the Club, Club Owner may levy additional Club Dues against such Owner in the amount necessary to pay such increased cost or repair such damage.

6.11    Commencement of First Charges.  The obligation to pay Club Dues, including, without limitation, the Club Membership Fee, shall commence as to each Owner on the day of the conveyance of title of a Unit to an Owner and as to each Builder on the date that a Unit owned by such Builder receives a Certificate of Occupancy.  Notwithstanding the foregoing, no Owner shall be obligated to pay Club Dues until the first day of the calendar month upon which any portion of the Club Facilities can be used by Owners (e.g., upon issuance of a temporary Certificate of Occupancy for any structure forming part of the Club Facilities).

6.12    Time Is of Essence.  Faithful payment of the sums due and performance of the other obligations hereunder, at the times stated, shall be of the essence.

6.13    Obligation to Pay Real Estate Taxes and Other Expenses on Units.  Each Owner shall pay all taxes, assessments and obligations relating to his or her Unit that if not paid, could become a lien against the Unit that is superior to the lien for Club Dues created by this Club Plan.  Although a lien for Assessments payable to the Association is inferior to the lien of Club Owner (regardless of when the lien for Assessments is filed in the Public Records), each Owner agrees to pay all Assessments when due.  Upon failure of an Owner to pay the taxes, assessments, obligations, and Assessments required under

10

this Section, Club Owner may (but is not obligated to) pay the same and add the amount advanced to the Club Dues payable by such Owner.

6.14    Initial Budget.    The initial budget prepared by Club Owner is not based on historical operating figures and is not a contractual statement or guaranty of actual Club Expenses.    It is not intended that any third party rely on any budget in electing to purchase a Unit. The figures shown in the initial budget are based on good faith analysis; therefore, it is likely that the actual budget for the Club may be different once historical figures are known. Projections in budgets are an effort to provide some information regarding future Club Expenses.    Budgets may not take inflation into account.    It is impossible to predict actual Club Expenses once the Club begins operation because there is no history of operation.

7.    Initial Club Contribution.    For the transfer of a Club membership to a any person or entity purchasing a Unit from the Declarant, there shall be collected from such person or entity, at the time of closing, an initial contribution (the "**Initial Club Contribution**") in the amount of Five Hundred and No/100 Dollars ($500.00) per Unit.    Each Owner's Initial Club Contribution shall be transferred to Club Owner at the time of closing.    Initial Club Contributions are not to be considered as advance payment of Club Dues. Club Owner shall be entitled to keep such funds, and shall not be required to account for the same. Initial Club Contributions may be used and applied by Club Owner as it deems necessary in its sole and absolute discretion, including, without limitation, to reduce Club Expenses.    Notwithstanding anything herein to the contrary, Club Owner shall have the option to waive Initial Club Contributions in its sole and absolute discretion.

8.    Determination of Club Expenses.

8.1    Fiscal Year.    The fiscal year for the Club shall be the calendar year.

8.2    Adoption of Budget.    Club Dues shall be established by the adoption of a projected operating annual budget.    Written notice of the amount and date of commencement thereof shall be given to each Owner in advance of the due date of the first installment thereof.

8.3    Adjustments if Budget Estimates Incorrect.    In the event the estimate of Club Expenses for the year is, after the actual Club Expenses for that period is known, more or less than the actual Club Expenses, then the difference shall, at the election of Club Owner (i) be added or subtracted, as the case may be, to the calculation for the next ensuing year; (ii) be immediately collected from the Owners by virtue of a special bill which shall be payable by each Owner within ten (10) days of receipt, or (iii) the remaining quarterly Club Dues shall be adjusted to reflect such deficit or surplus.

8.4    No Right to Withhold Payment.    Each Owner agrees that so long as such Owner does not pay more than the amount of Club Dues established for such Owner pursuant to this Club Plan, such Owner shall have no grounds upon which to object to either the method of payment or non-payment by other Owners of any sums due.

8.5    Reserves.    The annual budget may, at the election of Club Owner, include one or more reserve funds for the periodic maintenance, repair and replacement of improvements to the Club Facilities.

8.6    Statement of Account Status.    Within fourteen (14) days of a demand by any Owner, there shall be furnished to such Owner a certificate in writing setting forth whether their Club Dues have been paid and/or the amount that is due as of any date.    As to parties (other than Owners) who, without knowledge of error, rely on the certificate, the certificate shall be conclusive evidence of the amount of any charges therein stated.

8.7    Collection.    Club Owner shall determine from time to time the method by which Club Dues, Special Use Fees and any other amounts due to Club Owner shall be collected.

Oasis Club Plan

3/14/13

9.    Creation of the Lien and Personal Obligation.

9.1    Claim of Lien.  Each Owner, by acceptance of a deed to a Unit, shall be deemed to have covenanted and agreed that the Club Dues, Special Use Fees, and other amounts Club Owner permits an Owner to put on a charge account, if any, together with interest, late fees, costs and reasonable attorneys' and paraprofessional fees at all levels of proceedings including appeals, collection and bankruptcy, shall be a charge and continuing first lien in favor of Club Owner encumbering each Unit and all personal property located thereon owned by the Owner.  The lien is effective from and after recording a Claim of Lien in the Public Records stating the description of the Unit, name of the Owner, and the amounts due as of that date, but shall relate back to the date this Club Plan is recorded.  The Claim of Lien shall also cover any additional amounts that accrue thereafter until satisfied.  All unpaid Club Dues, Special Use Fees, and other amounts Club Owner permits an Owner to put on a charge account, if any, together with interest, late fees and reasonable attorneys' and paraprofessional fees at all levels including appeals, collections and bankruptcy, and other costs and expenses provided for herein, shall be the personal obligation of the person or entity who was the record title owner of the Unit at the time when the charge or fee became due, as well as such person's heirs, devisees, personal representatives, successors or assigns.  If a Unit is leased, the Owner shall be liable hereunder notwithstanding any provision in his lease to the contrary.  Further, the lien created by this Section is superior to the lien of the Association for Assessments.

9.2    Right to Designate Collection Agent.  Club Owner shall have the right, in its sole and absolute discretion, to designate who shall collect Club Dues, Special Use Fees and other charges authorized under this Club Plan.  Club Owner may, in its sole discretion, designate the Association as the collection agent.

9.3    Subordination of the Lien to Mortgages.  The lien for Club Dues, Special Use Fees, and related fees and expenses shall be subordinate to a bona fide first mortgage held by a Mortgagee on any Unit, if the mortgage is recorded in the Public Records prior to the Claim of Lien.  The Club Claim of Lien shall not be affected by any sale or transfer of a Unit, except in the event of a sale or transfer of a Unit pursuant to a foreclosure (or deed in lieu of foreclosure) of a bona fide first mortgage held by a Mortgagee, in which event, the acquirer of title shall be liable for Club Dues that became due prior to such sale or transfer to the extent provided in Section 720.3085, Florida Statutes (2012) as if such Club Dues were Association Assessments; provided, however, Club Dues shall in no manner be deemed "assessments" or other charges subject to the provisions of Chapter 720, Florida Statutes. However, any such unpaid fees or charges for which such acquirer of title is not liable may be reallocated and assessed to all Owners (including such acquirer of title) as a part of the Club Expenses.  Any sale or transfer pursuant to a foreclosure shall not relieve the Owner from liability for, or the Unit from, the lien of any fees or charges made thereafter.  Nothing herein contained shall be construed as releasing the party liable for any delinquent fees or charges from the payment thereof, or the enforcement of collection by means other than foreclosure.  A Mortgagee shall give written notice to Club Owner if the mortgage held by such Mortgagee is in default.  Club Owner shall have the right, but not the obligation, to cure such default within the time periods applicable to Owner.  In the event Club Owner makes such payment on behalf of an Owner, Club Owner shall, in addition to all other rights reserved herein, be subrogated to all of the rights of the Mortgagee.  All amounts advanced on behalf of an Owner pursuant to this Section shall be added to Club Dues payable by such Owner with interest at the maximum rate allowed under Florida law.

9.4    Acceleration.  In the event of a default in the payment of any Club Dues and related fees and expenses, Club Owner may, in Club Owner's sole and absolute discretion, accelerate the Club Dues for the next ensuing twelve (12) month period and for twelve (12) months from each subsequent delinquency.

9.5    Non-payment.  If any Club Dues are not paid within ten (10) days after the due date, a late fee (to compensate Club Owner for administrative expenses due to late payment) of $25.00 per month, or such greater amount established by Club Owner, together with interest on all amounts payable to Club Owner in an amount equal to the maximum rate allowable by law, per annum, beginning from the due date until paid in full, may be levied.  Club Owner may, at any time thereafter, bring an action at law

Oasis Club Plan

3/14/13

against the Owner personally obligated to pay the same, and/or foreclose the lien against the Unit, or both. No notice of default shall be required prior to foreclosure or institution of a suit to collect sums due hereunder. Club Owner shall not be required to bring such an action if it believes that the best interests of the Club would not be served by doing so. There shall be added to the Claim of Lien all costs expended in preserving the priority of the lien and all costs and expenses of collection, including attorneys' fees and paraprofessional fees, at all levels of proceedings, including appeals, collection and bankruptcy. Club Owner shall have all of the remedies provided herein and any others provided by law and such remedies shall be cumulative. The bringing of an action shall not constitute an election or exclude the bringing of any other action.

9.6    Non-Use. No Owner may waive or otherwise escape liability for fees and charges provided for herein by non-use of, or the waiver of the right to use, the Club or abandonment of a Unit.

9.7    Suspension. Should an Owner not pay sums required hereunder, or otherwise default, for a period of thirty (30) days, Club Owner may, without reducing or terminating Owner's obligations hereunder, suspend Owner's (or in the event the Unit is leased, the Lessee's) rights to use the Club until all fees and charges are paid current and/or the default is cured.

9.8    Collection from Lessees. If a Unit is occupied by a Lessee and the Owner is delinquent in the payment of Club Dues, the Club Owner may demand from the Lessee payment to the Club Owner of all monetary obligations, including without limitation, Club Dues due from the Owner to the Club Owner. So long as the Owner remains delinquent, future rent payments due to the Owner must be paid to the Club Owner and shall be credited to the monetary obligations of the Owner to the Club Owner; provided, however, if within fourteen (14) days from the written demand of the Club Owner, the Lessee provides the Club Owner with written evidence of making prepaid rent payments, the Lessee shall receive a credit for the prepaid rent for the applicable period of such prepaid rent.

10.    Operations.

10.1    Control. The Club shall be under the complete supervision and control of Club Owner until Club Owner, in its sole and absolute discretion, delegates all or part of the right and duty to operate, manage and maintain the Club to a third party as Club Manager, if ever, as hereinafter provided.

10.2    Club Manager. At any time, Club Owner may appoint a Club Manager to act as its agent. The Club Manager shall have whatever rights hereunder as are assigned in writing to it by Club Owner. Without limiting the foregoing, the Club Manager, if so agreed by Club Owner, may file liens for unpaid Club Dues against Units, may enforce the Club Rules and Regulations, and prepare the annual budget for the Club.

11.    Paramount Right of Association. Association shall have the right to post all notices of its Board and member meetings and all notices required by the Florida Statutes at a location designated by the Association within the Club Facilities visible to all Members without charge.

12.    Attorneys' Fees. If at any time Club Owner must enforce any provision hereof, Club Owner shall be entitled to recover all of its reasonable costs and attorneys' and paraprofessional fees at all levels, including appeals, collections and bankruptcy.

13.    Rights to Pay and Receive Reimbursement. Club Owner and/or the Association shall have the right, but not the obligation, to pay any Club Dues or Special Use Fees that are in default and that may or have become a lien or charge against any Unit. If so paid, the party paying the same shall be subrogated to the enforcement rights with regard to the amounts due. Further, Club Owner and/or Association shall have the right, but not the obligation, to loan funds and pay insurance premiums, taxes or other items of costs on behalf of an Owner to protect its lien. The party advancing such funds shall be entitled to immediate reimbursement, on demand, from the Owner for such amounts so paid, plus interest thereon at

Oasis Club Plan

3/14/13

the maximum rate allowable by law, plus any costs of collection, including without limitation, reasonable attorneys' and paraprofessional fees at all levels including appeals, collections and bankruptcy.

14.    General Restrictions.  Club Owner has adopted the following general restrictions governing the use of the Club.  Each Member, Immediate Family Member and other person entitled to use the Club shall comply with following general restrictions:

14.1    Minors.  Minors sixteen (16) years and older are permitted to use the Club Facilities (other than the fitness center) without adult supervision.  Minors sixteen (16) years of age and older may use the fitness center either with adult supervision or without adult supervision if such minor's parent or legal guardian releases Club Owner from liability for such use pursuant to consent form(s) provided by Club Owner from time to time; provided, however, parents are responsible for the actions and safety of such minors and any damages to the equipment in the fitness center caused by such minors.  Minors under sixteen (16) years of age are not permitted to use the fitness center.  Minors under sixteen (16) years of age are not permitted to use the Club Facilities without adult supervision.  Parents are responsible for the actions and safety of such minors and any damages to the Club Facilities caused by such minors.  Notwithstanding the foregoing, if minors use the Club Facilities without the proper execution of a consent form or without adult supervision, Club Owner is not liable for the actions of such minors.

14.2    Responsibility for Personal Property and Persons.  Each Member assumes sole responsibility for the health, safety and welfare of such Member, his or her Immediate Family Members and guests, and the personal property of all of the foregoing, and each Member shall not allow any of the foregoing to damage the Club or interfere with the rights of other Members hereunder.

14.3    Cars and Personal Property.  The Club is not responsible for any loss or damage to any private property used, placed or stored on the Club Facilities.  Without limiting the foregoing, any person parking a car within the Parking Areas assumes all risk of loss with respect to his or her car in the Parking Areas.  Further, any person entering the Club Facilities assumes all risk of loss with respect to his or her equipment, jewelry or other possessions stored in the Club Facilities or any part thereof. No trailers or boats may be parked on the Club Property at any time.

14.4    Activities.  Any Member, Immediate Family Member, guest or other person who, in any manner, makes use of, or accepts the use of, any apparatus, appliance, facility, privilege or service whatsoever owned, leased or operated by the Club, or who engages in any contest, game, function, exercise, competition or other activity operated, organized, arranged or sponsored by the Club, either on or off the Club Property, shall do so at their own risk.  Every Member shall be liable for any property damage and/or personal injury at the Club, or at any activity or function operated, organized, arranged or sponsored by the Club, caused by any Member, Immediate Family Member or guest.  No Member may use the Club Facilities for any club, society, party, religious, political, charitable, fraternal, civil, fundraising or other purposes without the prior written consent of Club Owner, which consent may be withheld for any reason.

14.5    Property Belonging to the Club.  Property or furniture belonging to the Club shall not be removed from the room in which it is placed or from the Club Property.

14.6    Indemnification of Club Owner. Each Member, Immediate Family Member and guest agrees to indemnify and hold harmless Club Owner and Club Manager, their officers, partners, agents, employees, affiliates, directors and attorneys (collectively, "**Indemnified Parties**") against all actions, injury, claims, loss, liability, damages, costs and expenses of any kind or nature whatsoever ("**Losses**") incurred by or asserted against any of the Indemnified Parties from and after the date hereof, whether direct, indirect, or consequential, as a result of, or in any way related to, such Member's membership, including, without limitation, use of the Club Facilities by Members, Immediate Family Members and their guests, or the interpretation of this Club Plan, and/or the Club Rules and Regulations and/or from any act or omission of the Club or of any of the Indemnified Parties.  Losses shall include the deductible payable under any of the Club's insurance policies.

14

Oasis Club Plan

3/14/13

14.7    Attorneys' Fees.  Should any Member or Immediate Family Member bring suit against Club Owner or Club Manager or any of the Indemnified Parties for any claim or matter and fail to obtain judgment therein against such Indemnified Parties, the Member and/or Immediate Family Member shall be liable to such parties for all Losses, costs and expenses incurred by the Indemnified Parties in the defense of such suit, including attorneys' fees and paraprofessional fees at trial and upon appeal.

14.8    Unrecorded Rules.  Club Owner may adopt rules and regulations ("**Club Rules and Regulations**") from time to time.  Such Club Rules and Regulations may not be recorded; therefore, each Owner and Lessee should request a copy of unrecorded Club Rules and Regulations from the Club and become familiar with the same.  Such Club Rules and Regulations are in addition to the general restrictions set forth in this Club Plan.

14.9    Waiver of Club Rules and Regulations.  Club Owner may waive the application of any Club Rules and Regulations to one (1) or more Owners, Lessees, guests, invitees, employees or agents in Club Owner's sole and absolute discretion.  A waiver may be revoked at any time upon notice to affected Lessees and Owners.

15.    Violation of the Club Rules and Regulations.

15.1    Basis for Suspension.  The membership rights of a Member may be suspended by Club Owner if, in the sole judgment of Club Owner:

15.1.1    such person is not an Owner or a Lessee;

15.1.2    the Member violates one or more of the Club Rules and Regulations;

15.1.3    an Immediate Family Member, a guest or other person for whom a Member is responsible violates one or more of the Club Rules and Regulations;

15.1.4    an Owner fails to pay Club Dues or Association Assessments in a proper and timely manner; or

15.1.5    a Member and/or guest has injured, harmed or threatened to injure or harm any person within the Club Facilities, or harmed, destroyed or stolen any personal property within the Club Facilities, whether belonging to an Owner, third party or to Club Owner.

15.2    Types of Suspension.  Club Owner may restrict or suspend, for cause or causes described in the preceding Section, any Member's privileges to use any or all of the Club Facilities.  By way of example, and not as a limitation, Club Owner may suspend the membership of a Lessee if such Lessee's Owner fails to pay Club Dues due in connection with a leased Unit.  In addition, Club Manager may suspend some membership rights while allowing a Member to continue to exercise other membership rights.  For example, Club Manager may suspend the rights of a particular Member (and/or Immediate Family Member) or Club Manager may prohibit a Member (and/or Immediate Family Member) from using a portion of the Club Facilities.  No Member whose membership privileges have been fully or partially suspended shall, on account of any such restriction or suspension, be entitled to any refund or abatement of Club Dues or any other fees.  During the restriction or suspension, Club Dues shall continue to accrue and be payable each quarter.  Under no circumstance will a Member be reinstated until all Club Dues and other amounts due to the Club are paid in full.

16.    Destruction.  In the event of the damage by partial or total destruction by fire, windstorm, or any other casualty for which insurance shall be payable, any insurance proceeds shall be paid to Club Owner. If Club Owner elects, in Club Owner's sole and absolute discretion, to reconstruct the Club Facilities, the insurance proceeds shall be available for the purpose of reconstruction or repair of the Club; provided, however, Club Owner shall have the right to change the design or facilities comprising the Club in its sole and absolute discretion.  There shall be no abatement in payments of Club Dues, including the Club

15

Membership Fee, during casualty or reconstruction. The reconstruction or repair, when completed, shall, to the extent legally possible, restore the Club Facilities substantially to the condition in which they existed before the damage or destruction took place. After all reconstruction or repairs have been made, if there are any insurance proceeds left over, then and in that event, the excess shall be the sole property of Club Owner. If Club Owner elects not to reconstruct the Club Facilities, Club Owner shall terminate this Club Plan and the provisions of the Declaration relating to the Club by document recorded in the Public Records.

17.    <u>Risk of Loss</u>.  Club Owner shall not be liable for, and the Members assume all risks that may occur by reason of, any condition or occurrence, including, but not limited to, damage to the Club on account of casualty, water or the bursting or leaking of any pipes or waste water about the Club, or from any act of negligence of any other person or entity, or fire, or hurricane, or other act of God, or from any cause whatsoever, occurring after the date of the recording of this Club Plan. Neither Association nor any Owner shall be entitled to cancel this Club Plan or any abatement in Club Dues on account of any such occurrence. By way of example, if the Club is destroyed in whole or part by a casualty, Owners shall remain liable to pay all Club Dues notwithstanding that the Club is not available for use.

18.    <u>Eminent Domain</u>.  If, during the operation of this Club Plan, an eminent domain proceeding is commenced affecting the Club, then in that event, the following conditions shall apply:

18.1    <u>Complete Taking</u>.  If the whole or any material part of the Club is taken under the power of eminent domain, Club Owner may terminate this Club Plan and the provisions of the Declaration relating to the Club by written notice given to Association, which notice shall be recorded in the Public Records. Should such notice be given, this Club Plan and the provisions in the Declaration relating to the Club shall terminate. All damages awarded in relation to the taking shall be the sole property of Club Owner.

18.2    <u>Partial Taking</u>.  Should a portion of the Club be taken in an eminent domain proceeding that requires the partial demolition of any of the improvements located on the Club so that Club Owner determines the taking is <u>not</u> a complete taking, then, in such event, Club Owner shall have the option, to the extent legally possible, to utilize a portion of the proceeds of such taking for the restoration, repair, or remodeling of the remaining improvements to the Club, or to terminate this Club Plan as provided in Section 18.1 hereof. All damages awarded in relation to the taking shall be the sole property of Club Owner, and Club Owner shall determine what portion of such damages, if any, shall be applied to restoration, repair, or remodeling.

19.    <u>Additional Indemnification of Club Owner</u>.  The Association and each Owner covenant and agree, jointly and severally, to indemnify, defend and hold harmless Declarant and Club Owner, their respective officers, directors, shareholders, and any related or affiliated persons or entities and their employees, attorneys, agents, officers and directors from and against any and all claims, suits, actions, causes of action or damages arising from any personal injury, loss of life, or damage to property, sustained on or about the Common Areas, Club Property, or other property serving the Association, and improvements thereon, or resulting from or arising out of activities or operations of Association or Owners, and from and against all costs, expenses, court costs, counsel fees, paraprofessional fees (including, but not limited to, all trial and appellate levels and whether or not suit be instituted), expenses and liabilities incurred or arising from any such claim, the investigation thereof, or the defense of any action or proceedings brought thereon, and from and against any orders, judgments or decrees that may be entered relating thereto. The indemnifications provided in this Section shall survive termination of this Club Plan. The costs and expense of fulfilling this covenant of indemnification shall be Operating Expenses of the Association to the extent such matters are not covered by insurance maintained by the Association.

20.    <u>Estoppel</u>.  Association shall, from time to time, upon not less than ten (10) days' prior written notice from Club Owner, execute, acknowledge and deliver a written statement  (a) certifying that this Club Plan is unmodified and in full force and effect (or, if modified, stating the nature of such modification, listing the instruments of modification, and certifying that this Club Plan, as so modified, is in full force and effect) and the date to which the Club Dues are paid; and (b) acknowledging that there are not, to the

16

Oasis Club Plan

3/14/13

Association's knowledge, any uncured defaults by the Association, Club Owner or Members with respect to this Club Plan. Any such statement may be conclusively relied upon by any prospective purchaser of Club Owner's interest or mortgagee of Club Owner's interest or assignee of any mortgage upon Club Owner's interest in the Club. The Association's failure to deliver such statement within such time shall be conclusive evidence (x) that this Club Plan is in full force and effect, without modification except as may be represented, in good faith, by Club Owner; (y) that there are no uncured defaults; and (z) that the Club Dues have been paid as stated by Club Owner.

21.    <u>No Waiver</u>. The failure of Club Owner in one or more instances to insist upon strict performance or observance of one or more provisions of the Club Plan or conditions hereof or to exercise any remedy, privilege or option herein conferred upon or reserved to Club Owner, shall not operate or be construed as a relinquishment or waiver of such covenant or condition or of the right to enforce the same or to exercise such privilege, option or remedy, but the same shall continue in full force and effect. The receipt by Club Owner of any payment required to be made by any Owner, or any part thereof, shall not be a waiver of any other payment then due, nor shall such receipt, though with knowledge of the breach of any covenant or condition hereof, operate as, or be deemed to be a waiver of, such breach. No waiver of Club Owner (with respect to Association or a Member) shall be effective unless made by Club Owner in writing.

22.    <u>Franchises and Concessions</u>. Club Owner may grant franchises or concessions to commercial concerns on all or part of the Club and be entitled to all income derived therefrom.

23.    <u>Resolution of Disputes</u>. **ASSOCIATION AND, BY ACCEPTANCE OF A DEED, EACH OWNER, AGREE THAT THIS CLUB PLAN IS A VERY COMPLEX DOCUMENT. ACCORDINGLY, ASSOCIATION AND EACH OWNER AGREE THAT JUSTICE WILL BEST BE SERVED IF ALL DISPUTES RESPECTING THIS CLUB PLAN ARE HEARD BY A JUDGE, AND NOT A JURY. ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION, WITH RESPECT TO ANY ACTION, PROCEEDING, CLAIM, COUNTERCLAIM, OR CROSS CLAIM, WHETHER IN CONTRACT AND/OR IN TORT (REGARDLESS IF THE TORT ACTION IS PRESENTLY RECOGNIZED OR NOT), INCLUDING, BUT NOT LIMITED TO, PERSONAL INJURIES, PAIN, SUFFERING AND WRONGFUL DEATH, BASED ON, ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY RELATED TO THIS CLUB PLAN, INCLUDING ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT, VALIDATION, PROTECTION, ENFORCEMENT ACTION OR OMISSION OF ANY PARTY, SHALL BE HEARD IN A COURT PROCEEDING BY A JUDGE, AND NOT A JURY. CLUB OWNER HEREBY SUGGESTS THAT EACH OWNER UNDERSTAND THE LEGAL CONSEQUENCES OF ACCEPTING A DEED TO A UNIT.**

24.    <u>Venue</u>. **EACH OWNER ACKNOWLEDGES REGARDLESS OF WHERE SUCH OWNER (i) EXECUTED A PURCHASE AND SALE AGREEMENT, (ii) RESIDES, (iii) OBTAINS FINANCING OR (iv) CLOSED ON A UNIT, EACH UNIT IS LOCATED IN OSCEOLA COUNTY, FLORIDA. ACCORDINGLY, AN IRREFUTABLE PRESUMPTION EXISTS THAT THE ONLY APPROPRIATE VENUE FOR THE RESOLUTION OF ANY DISPUTE LIES IN OSCEOLA COUNTY, FLORIDA. CLUB OWNER AGREES THAT THE VENUE FOR RESOLUTION OF ANY DISPUTE LIES IN OSCEOLA COUNTY, FLORIDA.**

25.    <u>Release</u>. **BEFORE ACCEPTING A DEED TO A UNIT, EACH OWNER HAS AN OBLIGATION TO RETAIN AN ATTORNEY IN ORDER TO CONFIRM THE VALIDITY OF THIS CLUB PLAN. BY ACCEPTANCE OF A DEED TO A UNIT, EACH OWNER ACKNOWLEDGES THAT HE OR SHE HAS SOUGHT (OR HAD THE OPTION TO SEEK) AND RECEIVED (OR DECLINED TO OBTAIN) SUCH AN OPINION OR HAS MADE AN AFFIRMATIVE DECISION NOT TO SEEK SUCH AN OPINION. CLUB OWNER IS RELYING ON EACH OWNER CONFIRMING IN ADVANCE OF ACQUIRING A UNIT THAT THIS CLUB PLAN IS VALID, FAIR AND ENFORCEABLE. SUCH RELIANCE IS DETRIMENTAL TO CLUB OWNER. ACCORDINGLY, AN ESTOPPEL AND WAIVER EXISTS PROHIBITING EACH OWNER FROM TAKING THE POSITION THAT ANY PROVISION OF THIS CLUB PLAN IS INVALID IN ANY RESPECT. AS A FURTHER MATERIAL INDUCEMENT FOR CLUB OWNER TO SUBJECT THE CLUB PROPERTY TO THIS CLUB PLAN, EACH OWNER DOES HEREBY RELEASE, WAIVE, DISCHARGE, COVENANT NOT TO SUE, ACQUIT, SATISFY AND FOREVER DISCHARGE CLUB**

Oasis Club Plan

3/14/13

**OWNER, ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AFFILIATES AND ASSIGNS FROM ANY AND ALL LIABILITY, CLAIMS, COUNTERCLAIMS, DEFENSES, ACTIONS, CAUSES OF ACTION, SUITS, CONTROVERSIES, AGREEMENTS, PROMISES AND DEMANDS WHATSOEVER IN LAW OR IN EQUITY THAT AN OWNER MAY HAVE IN THE FUTURE, OR THAT ANY PERSONAL REPRESENTATIVE, SUCCESSOR, HEIR OR ASSIGN OF OWNER HEREAFTER CAN, SHALL OR MAY HAVE AGAINST CLUB OWNER, ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AFFILIATES AND ASSIGNS, FOR, UPON OR BY REASON OF ANY MATTER, CAUSE OR THING WHATSOEVER RESPECTING THIS CLUB PLAN, OR THE EXHIBITS HERETO. THIS RELEASE AND WAIVER IS INTENDED TO BE AS BROAD AND INCLUSIVE AS PERMITTED BY THE LAWS OF THE STATE OF FLORIDA.**

26.    Amendment.  Notwithstanding any other provision herein to the contrary, no amendment to this Club Plan shall affect the rights of Declarant or Club Owner unless such amendment receives the prior written consent of Declarant or Club Owner, as applicable, which may be withheld for any reason whatsoever.  No amendment shall alter the provisions of this Club Plan benefiting Mortgagees without the prior approval of the Mortgagee(s) enjoying the benefit of such provisions.   No amendment shall be effective until it is recorded in the Public Records.  Club Owner shall have the right to amend this Club Plan as it deems appropriate, without the joinder or consent of any Person or entity whatsoever.  Club Owner's right to amend under this provision is to be construed as broadly as possible.  By way of example, Club Owner may terminate this Club Plan (and all rights and obligations hereunder) in the event of partial or full destruction of the Club.  Further, Club Owner may elect, in Club Owner's sole and absolute discretion, to subject property outside of CHAMPIONSGATE to this Club Plan by amendment recorded in the Public Records.  Likewise, Club Owner may elect, in Club Owner's sole and absolute discretion, to remove portions of CHAMPIONSGATE from the benefit and encumbrance of this Club Plan by amendment recorded in the Public Records.  Each Owner agrees that he, she or it has no vested rights under current case law or otherwise with respect to any provision in this Club Plan other than those setting forth the maximum level of each individual Unit's Club Membership Fee that shall be imposed from time to time.

27.    Severability.  Invalidation of any of the provisions of this Club Plan by judgment or court order shall in no way affect any other provision of this Club Plan, and the remainder of this Club Plan shall remain in full force and effect.

28.    Notices.  Any notice required to be sent to any Person, firm, or entity under the provisions of this Club Plan shall be deemed to have been properly sent when mailed, postpaid, hand delivered, telefaxed, or delivered by professional carrier or overnight delivery to the last known address at the time of such mailing.

29.    Florida Statutes.  Whenever this Club Plan refers to the Florida Statutes, the reference shall be deemed to refer to the Florida Statutes as they exist on the date the Club Plan was recorded except to the extent provided otherwise as to any particular provision of the Florida Statutes.

30.    Headings.  The headings within this Club Plan are for convenience only and shall not be used to limit or interpret the terms hereof

[Signatures on Following Page]

Oasis Club Plan

3/14/13

IN WITNESS WHEREOF, the undersigned, being the Club Owner hereunder, has hereunto set its hand and seal this _____ day of March, 2013.

**WITNESSES:**

Print Name: _Whitney Cardinale_

Print Name: _Dustin Johnson_

**"CLUB OWNER"**

LEN-CG SOUTH, LLC, a Florida limited liability company

By:    LENNAR HOMES, LLC, a Florida limited liability company, its Managing Member

   By: _____
   Name: Mark Metheny
   Title: Vice President

Date: March 22, 2013

STATE OF FLORIDA          )
COUNTY OF HILLSBOROUGH    )

The foregoing instrument was acknowledged before me this 22nd day of March, 2013 by Mark Metheny, as Vice President of LENNAR HOMES, LLC, a Florida limited liability company, Managing Member of LEN-CG SOUTH, LLC, a Florida limited liability company.  He [is personally known to me] [has produced _____ as identification].

My commission expires:

_Suzanne J. Crouch_
NOTARY PUBLIC, State of Florida at Large

Print Name: _Suzanne J. Crouch_

SUZANNE J. CROUCH
Notary Public - State of Florida
My Comm. Expires Apr 5, 2016
Commission # EE 176434
Bonded Through National Notary Assn.

S:\JayZ\Clients\Lennar\Stoneybrook South\ChampionsGate Master\Governing Documents\Club Plan\Club Plan3 - ChampionsGate.doc

19

Oasis Club Plan

3/14/13

Book4420/Page2342    CFN#2013052371          Page 99 of 161

## JOINDER

CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation (the "**Association**") does hereby join in the this Club Plan for the Oasis Club (this "**Club Plan**"), to which this Joinder is attached, and the terms thereof are and shall be binding upon the undersigned and its successors in title. The Association agrees this Joinder is for the purpose of evidencing the Association's acceptance of the rights and obligations provided in the Club Plan and does not affect the validity of this Club Plan as the Association has no right to approve this Club Plan.

IN WITNESS WHEREOF, the undersigned has executed this Joinder on this _____ day of March, 2013.

WITNESSES:

"ASSOCIATION"

CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation

Print Name: _Whitney Cardinale_

By: _____
Name:  Joe Fulghum
Title:  President

Print Name: _Dustin Johnson_

Date:  March 22, 2013

STATE OF FLORIDA          )
COUNTY OF HILLSBOROUGH    )

The foregoing instrument was acknowledged before me this 22nd day of March, 2013, by Joe Fulghum, as President of CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida corporation not for profit, on behalf of the corporation, who is personally known to me or who has produced _____ as identification.

My commission expires:

_____
NOTARY PUBLIC, State of Florida at Large
Print Name: _Suzanne J. Crouch_

SUZANNE J. CROUCH
Notary Public - State of Florida
My Comm. Expires Apr 5, 2016
Commission # EE 176434
Bonded Through National Notary Assn.

Oasis Club Plan

3/14/13

## **EXHIBIT A**

TRACT R2, STONEYBROOK SOUTH, PHASE I, according to plat thereof, as recorded in Plat Book 22, Pages 58 through 66, of the Public Records of Osceola County, Florida.

Exhibit A

## **EXHIBIT B**

ALL OF THE PLAT, STONEYBROOK SOUTH, PHASE I, according to plat thereof, as recorded in Plat Book 22, Pages 58 through 66, of the Public Records of Osceola County, Florida.

Exhibit B

**EXHIBIT C**

GENERAL RELEASE

**KNOW ALL MEN BY THESE PRESENTS:** That CHAMPIONSGATE MASTER ASSOCIATION, INC., a not-for-profit corporation (the "**Releasor**"), for and in consideration of the sum of TEN DOLLARS ($10.00), and other valuable consideration, received from or on behalf of LEN-CG SOUTH, LLC, a Florida limited liability company (the "**Releasee**"), the receipt whereof is hereby acknowledged;

**DOES HEREBY** remise, release, acquit, satisfy, and forever discharge the Releasee, and its officers, directors, shareholders, employees, attorneys, agents, affiliates, affiliates' officers, directors, shareholders, employees, attorneys, agents, members, partners, representatives, and all other related parties who may be jointly liable with them, (collectively, the "**Releasee's Affiliates**") of and from all, and all manner of, action and actions, cause and causes of action, suits, debts, sums of money, accounts, bills, covenants, controversies, agreements, promises, damages (including consequential, incidental, punitive, special or other), judgments, executions, claims, liabilities and demands, whatsoever, at law and in equity (including, but not limited to, claims founded on tort, contract, contribution, indemnity or any other theory whatsoever), which such Releasor ever had, now has, or which any officer, director, shareholder, representative, successor, or assign of such Releasor, hereafter can, shall or may have, against such Releasee and the Releasee's Affiliates, for, upon or by reason of any matter, cause or thing, whatsoever, from the beginning of the world to the day of these presents, whether known or unknown (either through ignorance, oversight, error, negligence or otherwise), and whether matured or unmatured, and which matter, cause, or thing, relates, in any manner, directly or indirectly, to (a) the property described on **Exhibit A** hereto, or the improvements thereon (collectively, the "**Property**"), or (b) any occurrences, circumstances, and/or documentation (*e.g.*, the Club Plan) whatsoever, relating to the Property, which occurred or took place prior to the transfer of the Property from Releasee to Releasor (the "**Closing**"), except (i) representations of Releasee in that certain Agreement for Sale and Purchase of Property dated _____, 20_____ between Releasor and Releasee that survive the Closing, and (ii) warranties of the Releasee contained in that certain Special Warranty Deed delivered by Releasee in connection with such Closing.

**(ADDITIONAL TEXT, SIGNATURES AND ACKNOWLEDGEMENTS APPEAR ON FOLLOWING PAGE)**

Exhibit C

Oasis Club Plan

3/13/13

**IN WITNESS WHEREOF**, we have hereunto set our hands and seals this _____ day of _____, 20____.

**WITNESSES:**                                          **"BUYER"**

                                                        CHAMPIONSGATE MASTER ASSOCIATION,
                                                        INC., a Florida not-for-profit corporation

_____                        By:_____
Print Name:_____                        Name:_____
                                                        Title: _____

_____                        Date: _____, 20___
Print Name:_____

STATE OF FLORIDA                    )
COUNTY OF HILLSBOROUGH              )

        The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____, as President of CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation, on behalf of such corporation who [ ] is personally known to me or [ ] has produced _____ as identification and did not take an oath.

          [NOTARIAL SEAL]              _____
                                       Name: _____
                                       Notary Public, State of _____
                                       Commission No.: _____
                                       My Commission Expires: _____

Oasis Club Plan

3/13/13

## EXHIBIT D

### THE OASIS CLUB AT CHAMPIONSGATE MEMBERSHIP FEE SCHEDULE

| YEAR | Monthy Fee *<br>Country Club | Monthy Fee *<br>Retreat |
|:---:|---:|---:|
| 2013 | $ 31.00 | $ 51.00 |
| 2014 | $ 32.50 | $ 52.50 |
| 2015 | $ 34.00 | $ 54.00 |
| 2016 | $ 35.50 | $ 55.50 |
| 2017 | $ 37.00 | $ 57.00 |
| 2018 | $ 38.50 | $ 58.50 |
| 2019 | $ 40.00 | $ 60.00 |
| 2020 | $ 41.50 | $ 61.50 |
| 2021 | $ 43.00 | $ 63.00 |
| 2022 | $ 44.50 | $ 64.50 |
| 2023 | $ 46.00 | $ 66.00 |
| 2024 | $ 47.50 | $ 67.50 |
| 2025 | $ 49.00 | $ 69.00 |
| 2026 | $ 50.50 | $ 70.50 |
| 2027 | $ 52.00 | $ 72.00 |
| 2028 | $ 52.00 | $ 72.00 |
| 2029 | $ 52.00 | $ 72.00 |
| 2030 | $ 52.00 | $ 72.00 |
| 2031 | $ 52.00 | $ 72.00 |
| 2032 | $ 52.00 | $ 72.00 |
| 2033 | $ 52.00 | $ 72.00 |

* plus applicable sales tax

From 2033 and thereafter, Club Membership Fees shall be determined by Club Owner.

Exhibit D

**EXHIBIT E**

OPTION NOTICE

**IRREVOCABLE OPTION NOTICE**

The Board of Directors of CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation (the "**Board**") hereby provide Club Owner (as defined in that certain Club Plan recorded in Official Records Book ____ of ____ of the Public Records of Osceola County, Florida) with notice of its intent to purchase the Club (as defined in the Club Plan) pursuant to the terms of the Club Plan. Attached hereto as **Schedule 1** is a resolution executed by the majority of the Board approving this Irrevocable Option Notice.

The undersigned Board has executed this Irrevocable Option Notice on this ___ day of _____, 20__.

Name:_____
Director


Name: _____
Director


Name: _____
Director

Oasis Club Plan

3/13/13

Exhibit E

## Schedule 1

**CHAMPIONSGATE MASTER ASSOCIATION, INC.,
a Florida not-for-profit corporation
(THE "ASSOCIATION")**

ACTION BY THE BOARD OF DIRECTORS OF THE ASSOCIATION
WITHOUT A MEETING

The undersigned Board of Directors of the Association do hereby consent to and approve the following actions:

WHEREAS, the Board of Directors hereby acknowledges and agrees that it is in the best interest of the Association to purchase the Club (as defined in that certain Club Plan recorded in Official Records Book ____ of ____ of the Public Records of Osceola County, Florida); and

WHEREAS, the Board of Directors hereby agrees to provide Club Owner (as defined in the Club Plan) with the Option Notice (as defined in the Club Plan) in order to evidence its intent to purchase the Club (as defined in the Club Plan) pursuant to the terms of the Club Plan;

NOW THEREFORE, BE IT RESOLVED, that the Board of Directors by unanimous consent hereby approves the purchase of the Club and the giving of the Option Notice to Club Owner.

Effective: _____

Name:_____
Director

Name: _____
Director

Name: _____
Director

**Exhibit F**

**AGREEMENT FOR SALE AND PURCHASE OF PROPERTY
CLUB OASIS**

Club Oasis
3/14/13

Exhibit F

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 1. | Recitals | 1 |
| 2. | Defined Terms | 1 |
| 3. | Inspection | 3 |
| | Information Regarding Property | 3 |
| | Buyer's Inspection Rights | 3 |
| | Access | 3 |
| | Indemnification | 3 |
| | Buyer's Obligations with Respect to Inspections | 4 |
| | Condition of the Property | 4 |
| | Pending Litigation | 4 |
| 4. | Purchase Price and Terms of Payment; Closing Adjustments. | 5 |
| | Purchase Price | 5 |
| | Payment of Purchase Price | 5 |
| | Closing Adjustments and Prorations | 5 |
| | Costs and Expenses | 7 |
| 5. | Title; Survey. | 7 |
| | Evidence of and Encumbrances Upon Title | 7 |
| | Review of Evidence of Title | 7 |
| | Survey | 8 |
| | Title Update | 8 |
| 6. | Closing. | 8 |
| | Closing Date; Place | 8 |
| | Seller's Deliveries | 8 |
| | Buyer's Deliveries | 9 |
| | Possession | 9 |
| | Closing Costs and Start-up Fund | 9 |
| 7. | Certain Special Provisions Which Shall Survive Closing | 9 |
| | Club Covenants | 9 |
| | Employees | 10 |
| | Use of Name | 10 |
| | Effect | 10 |
| | Enforcement; Remedies | 10 |
| 8. | Indemnification | 10 |
| 9. | Warranties And Representations | 10 |
| | Buyer's Warranties and Representations | 10 |
| | Seller's Warranties and Representations | 11 |
| | Survival | 11 |
| 10. | Assignment | 11 |
| 11. | Brokerage | 11 |
| 12. | Default. | 11 |

Club Oasis
3/14/13

Buyer's Default ........................................................................................11
Seller's Default .........................................................................................11
No Obligation of Seller after Closing ........................................................11

13.    **No Joint Venture** ..........................................................................................**12**

14.    **Miscellaneous.** .............................................................................................**12**
Risk of Loss .............................................................................................12
Construction .............................................................................................12
Counterparts ............................................................................................13
Severability and Waiver ...........................................................................13
Governing Law .........................................................................................13
Further Acts .............................................................................................13
Radon Gas ...............................................................................................13
Notices .....................................................................................................13
Entire Agreement and Amendment ..........................................................14
Recording ................................................................................................14
Exhibits ....................................................................................................14
Time of the Essence .................................................................................14
No Third Party Beneficiary .......................................................................14
Requisite Senior Management Approval ..................................................14
Limitation on Liability ...............................................................................14
Confidentiality ..........................................................................................15
Attorneys fees ..........................................................................................15
**WAIVER OF TRIAL BY JURY** .................................................................15

## AGREEMENT FOR SALE AND PURCHASE OF PROPERTY
## CLUB OASIS

This Agreement for Sale and Purchase of Property (this "**Agreement**") is among LEN-CG SOUTH, LLC, a Florida limited liability company ("**Seller**"), and CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida corporation not for profit ("**Buyer**").

### RECITALS:

A.    Seller is the owner of the fee simple estate in the Land (hereinafter defined) which is comprised of the Club;

B.    Seller executed Oasis Club Plan dated _____, 2013 (the "Club Plan");

C.    The Club Plan is subject to the covenants and restrictions of the Declaration for ChampionsGate recorded in O.R. Book ____, Page _____, public records of Osceola County, Florida (the "Declaration").

D.    On _____, 20___, Seller entered into the Club Declaration (hereinafter defined) which govern the use and operation of the Club.

C.    Seller has agreed to sell to Buyer and Buyer has agreed to purchase from Seller the Club on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements of each party to the other contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby mutually covenant and agree as follows:

1.    <u>Recitals</u>.  The foregoing Recitals are true and correct and are incorporated into and form a part of this Agreement.

2.    <u>Defined Terms</u>. All initially capitalized terms not defined herein shall have the meanings set forth in the Club Plan.  In addition to the terms defined elsewhere herein, the following terms shall have the meanings specified below:

"**Acceptable Encumbrances**" shall have the meaning set forth in Section 5.1 hereof.

"**Agreement**" shall have the meaning set forth in the initial sentence hereof.

"**Business Day**" means any day on which business is conducted by national banking institutions in the County.

"**ChampionsGate**" shall mean the planned community within which the Land is located.

"**Closing Date**" shall have the meaning as defined in Section 6.1 hereof.

"**Closing**" shall mean the execution and delivery of the Special Warranty Deed and the other instruments to be executed by Seller conveying the Property to Buyer and the payment by Buyer to Seller of the Purchase Price and execution and delivery by Buyer of all documents to be executed by Buyer at Closing.

"**Club Declaration**" shall mean the Club Oasis Club Covenants recorded in Official Records Book _____, Page _____ of the County.

Club Oasis
3/14/13

"**Clubhouse Land**" means that certain real property described on **Exhibit A** attached hereto and made a part hereof.

"**County**" shall mean Osceola County, Florida.

"**Due Diligence Reports**" shall mean all reports, documents, studies, analyses, and other written information obtained by Buyer with respect to the Property including, without limitation, results of physical inspections, surveys, site plans, feasibility studies, architectural plans, specifications and drawings, title reports, permits, approvals and authorizations (whether obtained from governmental authorities or third parties); and all other work product generated by or for Buyer (other than attorney work product) in connection with the Property, if any.

"**Effective Date**" shall mean 5:00 p.m. Eastern time on the date upon which both Buyer and Seller shall have executed this Agreement.

"**Feasibility Date**" shall mean 5:00 p.m. Eastern time on the tenth (10) day following the Effective Date.

"**Foreign Substance**" shall mean any substance which is commonly referred to as foreign or hazardous under local, state or federal law.

"**Improvements**" shall mean all of Seller's right, title and interest in and to any and all buildings, structures or other improvements located on the Land, including, but not limited to the Clubhouse and any other improvements located on the Land. "Improvements" does not include any improvements located on the Land which are not owned by Seller (*e.g.*, equipment and facilities owned by utility companies).

"**Institutional Loan**" shall have the meaning set forth in Section 4.2.1 hereof.

"**Inventory**" shall mean the furniture, fixtures and equipment listed on **Exhibit G** attached hereto and made a part hereof.

"**Land**" shall mean all of Seller's right, title and interest in and to the Clubhouse Land.

"**Lender**" shall have the meaning set forth in Section 4.2.1 hereof.

"**Pending Litigation**" shall mean those litigation matters, including collection matters, if any, listed on **Exhibit H** attached hereto and made a part hereof.

"**Permits**" shall mean all permits, licenses, and other governmental approvals and authorizations affecting the Improvements.

"**Personal Property**" shall mean all Seller's right, title and interest in and to: (i) all Inventory and fixtures (if any not listed as part of the Inventory) owned by Seller and located on, or attached to, the Land; (ii) all supplies owned by Seller and used in the maintenance or operation of the Clubhouse located on the Land; (iii) those Permits which are assignable or transferable to Buyer at Closing; (iv) all assignable or transferable service, maintenance, and equipment contracts, and all personal property leases and all other contracts, if any exist, relating to the ownership, maintenance, occupancy, use or operation of the Property and (v) the right to use the name ChampionsGate as permitted by Section 7.3 hereof. Buyer acknowledges that there are no transferable warranties from third parties with respect to the Personal Property.

"**Property**" shall mean, collectively, the Improvements, the Land and the Personal Property.

"**Prorations Date**" shall mean 11:59 p.m. on the date prior to the Closing Date.

Club Oasis
3/14/13

"**Special Warranty Deed**" shall mean the Special Warranty Deed conveying fee title to the Land to Buyer, duly executed by Seller and acknowledged and in proper form for recordation.

"**Termination Notice**" shall have the meaning set forth in Section 3.2 of this Agreement.

"**Title Commitment**" shall mean the commitment for issuance of an owner's title insurance policy to be issued on the Title Company and delivered to Buyer pursuant to Section 5.1 hereof.

"**Title Company**" shall mean _____, which issues the Title Commitment and the owner's title insurance policy to Buyer and mortgagee title insurance policy, if any, to Lender in accordance with the terms hereof.

Other capitalized terms contained in this Agreement not defined herein shall have the meanings set forth in the Club Covenants.

3.      Inspection.

3.1.    Information Regarding Property.  Within five (5) days after the Effective Date, Seller shall make available to Buyer at Seller's office for inspection and copying during regular business hours any surveys, financial statements plans, certificates of occupancy, environmental reports, and information about the payment of Club Charges with respect to the Land, which Seller shall make a good faith attempt to locate in its files and which Seller has not already provided to Buyer.  All of such information is provided simply as an accommodation to Buyer, and Seller makes no warranties or representations as to their accuracy or completeness.  Seller shall incur no liability to Buyer for any information contained in any materials furnished to Buyer or for Seller's failure to furnish any materials in Seller's possession to Buyer.  Without limiting the foregoing, Seller shall have no obligation to obtain plans, permits or other information respecting the Property from governmental agencies or utilities.

3.2.    Buyer's Inspection Rights.  Buyer's obligations hereunder are expressly subject to Buyer's approval of the Property in all respects.  Buyer shall have until the Feasibility Date in which to determine whether the Property is acceptable to Buyer in all respects.  In the event that Buyer elects not to proceed with the purchase contemplated by this Agreement, Buyer shall deliver to Seller, at no cost to Seller, copies of all Due Diligence Reports within thirty (30) days of Buyer's election not to proceed.  If Buyer determines that the Property is not acceptable in its sole discretion and elects not to proceed with the transaction contemplated hereby, Buyer shall on or before the Feasibility Date give written notice of termination to Seller (the "**Termination Notice**") and upon such delivery this Agreement shall be terminated.  Upon such termination and delivery to Seller of all Due Diligence Reports, neither party shall have any further rights or obligations hereunder, except, however, that Buyer shall remain obligated with respect to the indemnities and obligations contained in Sections 3.4 and 3.5 of this Agreement.  Unless Buyer delivers the Termination Notice in a timely manner, this Agreement shall remain in full force and effect, except that the inspection rights contingency in this Section 3.2 shall be deemed satisfied.

3.3.    Access.  Until the Feasibility Date, and thereafter if this Agreement has not been terminated pursuant to Section 3.2, Buyer and Buyer's agents and contractors shall be entitled to enter upon the Property at all reasonable times established by Seller, but only for the purpose of conducting tests and making site inspections and investigations.  In doing so, Buyer agrees not to cause any damage or make any physical changes to the Property or interfere with the rights of any parties who may have a legal right to use or occupy the Property (including, without limitation, those using the Clubhouse, employees, licensees, and service providers).  All persons retained by Buyer to conduct such inspections, investigations and tests shall be licensed and maintain liability and property damage insurance in amounts as reasonably requested by Seller.  Under no circumstances shall the right of entry granted herein be interpreted as delivery of possession of the Property prior to Closing.

3.4.    Indemnification.  Buyer shall protect, indemnify, save and hold Seller harmless against any and all claims, demands, fines, suits, actions, proceedings, orders, decrees, judgments, damage or liability (including attorneys' fees, paraprofessional fees and court costs at the trial level and at all levels

Club Oasis<br>3/14/13

of appeal) of any kind or nature, by or in favor of anyone whomsoever, resulting from, arising from, or occasioned in whole or in party by an act or omission by Buyer, its agents, contractors, employees, representatives or invitees in, upon, or about the Property, or from Buyer's inspection, testing, examination and inquiry of or on the Property. The provisions of this Section shall survive the Closing or termination of this Agreement.

 3.5.  Buyer's Obligations with Respect to Inspections. Buyer shall restore the Property to its original condition promptly after Buyer's independent factual, physical and legal examinations and inquiries of the Property. Buyer shall promptly pay for all inspections and Due Diligence Reports upon the rendering of statements therefor. Buyer shall not suffer or permit the filing of any liens against the Property and if any such liens are filed, Buyer shall promptly cause them to be released or otherwise eliminated from being a lien upon the Property. In the event the transaction contemplated by this Agreement is not closed for any reason whatsoever, Buyer shall remain obligated with respect to the indemnities and other obligations contained in Section 3.4 and this Section 3.5. The provisions of this Section shall survive the Closing or termination of this Agreement.

 3.6.  Condition of the Property. If this Agreement is not terminated pursuant to Section 3.2 above, Buyer shall be deemed to have acknowledged that Seller has provided Buyer sufficient opportunity to make such independent factual, physical and legal examinations and inquiries as Buyer deems necessary and desirable with respect to the Property and the transaction contemplated by this Agreement and that Buyer has approved the Property and this transaction in all respects. Buyer is expressly purchasing the Property in its existing condition "AS IS, WHERE IS" with respect to all facts, circumstances and conditions. Seller has no obligation to inspect for, repair or correct any such facts, circumstances, and conditions or to compensate Buyer regarding the Property. From and after Closing, Buyer assumes the full risk with respect to the Property including, without limitation, any liability resulting from the condition of the Property or resulting from any claims by third parties relating to the past, present, or future ownership, use or operation of the Property, with the exception of personal injury claims arising prior to Closing, and by execution hereof Buyer specifically agrees to indemnify and hold Seller harmless from all liability, loss, cost (including reasonable attorneys', paralegals' and legal assistants' fees and court costs at all trial and appellate levels) arising from the condition of the Property, including those arising from the presence of Foreign Substances on or at the Property. SELLER HEREBY DISCLAIMS ALL WARRANTIES OF ANY KIND OR NATURE WHATSOEVER PERTAINING TO THE CONDITION OF THE PROPERTY (INCLUDING WARRANTIES OF MERCHANTABILITY OR HABITABILITY AND FITNESS FOR PARTICULAR PURPOSES), WHETHER EXPRESSED OR IMPLIED, including warranties with respect to the Property, zoning, land value, availability of access or utilities, presence of Foreign Substances, rights of ingress or egress, governmental approvals, rights of third parties relating to the condition of the Property, future restrictions upon use or sale, or the soil or water conditions of the Land. Buyer further acknowledges that Buyer is not relying upon any representation of any kind or nature made by Seller, or any of its employees or agents with respect to the Property and that, in fact, no such representations were made, except as expressly set forth in this Agreement. Buyer hereby specifically releases Seller from any and all claims, losses, liabilities, fines, charges, damages, injuries, penalties, response costs, and expenses of any and every kind, whatsoever (whether known or unknown) relating to the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release of any Foreign Substance on the Property, if any, including without limitation, any residual contamination, in, on, under or about the Property or affecting natural resources, whether prior to or following Closing. Each covenant, agreement, representation, and warranty of Buyer contained in this Section 3.6 of this Agreement shall survive the Closing or termination of this Agreement.

 3.7.  Pending Litigation. Seller has no knowledge of any pending or threatened litigation or claims by third parties or governmental entities respecting the Property except for the Pending Litigation.

Club Oasis
3/14/13

4.    <u>Purchase Price and Terms of Payment; Closing Adjustments.</u>

4.1.    <u>Purchase Price</u>.    The purchase price ("**Purchase Price**") of the Property shall be _____ and No/100 Dollars ($_____) subject only to prorations and adjustments herein provided (see Club Covenants for Purchase Price).

4.2.    <u>Payment of Purchase Price</u>.    The Purchase Price shall be paid, all cash at closing, as follows:

4.2.1.    <u>Institutional Loan</u>.    Buyer's obligations hereunder are contingent upon its obtaining, by the Feasibility Date a commitment from an institutional lender ("**Lender**") for an acquisition loan secured by a first mortgage and security agreement and/or secured by an assignment and pledge of the Club Charges payable pursuant to the Club Covenants (hereinafter, the "**Institutional Loan**") in an amount equal to the Purchase Price with terms acceptable to Buyer and subject to conditions to be satisfied by Buyer or with respect to the Property as are customary in loans of similar type and size in Florida.  If Buyer does not give Seller written notice, on or before the Feasibility Date, that Lender has issued a loan commitment containing the terms and conditions set forth in this subsection, and which is capable of being closed as between Lender and Buyer, not later than the Closing Date, then either party may terminate this Agreement by written notice to the other and the terms of Section 3.2 regarding termination shall apply.

4.3.    <u>Closing Adjustments and Prorations</u>.    Except as otherwise provided in this Section, all adjustments and prorations to the Purchase Price payable at Closing shall be computed as of the Prorations Date.  Buyer shall be responsible for all items after the Prorations Date.  All prorations shall be based on thirty (30) day months.  Such adjustments and prorations shall include the following:

4.3.1.    <u>Taxes and Assessments; Pending and Certified Liens</u>.    All *ad valorem* real estate taxes, special taxing district assessments and personal property taxes and all assessments associated with the Property for the year of Closing shall be prorated as of the Prorations Date upon the amount of such taxes for the year of Closing if the amount of such taxes is known at the time of Closing; if such amount cannot be then ascertained, proration shall be based upon the amount of the taxes, with the maximum discount allowed by law, for the preceding year.  If any tax prorations shall be based upon the amount of taxes for the year preceding the year of Closing; such taxes, at the request of any party hereto, shall be reprorated and adjusted between the parties, on the basis of the November payment, forthwith after the tax bills for the year of Closing are received.  County or other public liens, if any, certified or for which the work has been substantially completed on the date of this Agreement shall be paid by Seller and any other such liens shall be assumed by Buyer; provided, however, that if any assessments are payable in installments, the installment due for the year in which Closing occurs shall be prorated between Seller and Buyer, and Buyer shall assume responsibility for payment of all installments for subsequent years.

4.3.2.    <u>Club Charges</u>.    All Club Charges and any other amounts due to Seller as dues arising out of the Club Covenants shall be prorated as of the Prorations Date.  Buyer shall receive a credit at Closing against the Purchase Price for any Club Charges paid to Seller as of the Prorations Date but applicable to any period after the Prorations Date.  By way of example, pre-paid Club Charges received by Seller prior to Closing for periods after the Closing shall be credited to Buyer.  Upon collection by Buyer of any Club Charges relating to the period prior to the Prorations Date, Buyer shall promptly deliver such amounts to Seller, and it shall be conclusively deemed that any amounts received after Closing by Buyer from any Owner (as defined in the Club Covenants) whose account was not current on the Closing Date shall be applied first to satisfy amounts attributable to Seller for periods prior to the Proration Date and then to amounts due to Buyer.  By way of example, if the Closing occurs mid-month, and Buyer receives a payment of Club Charges for such month after Closing, Buyer shall prorate the payment and remit to Seller the portion of the payment due to Seller under this Agreement.  Buyer shall not change collection counsel with respect to any collection matters pending on the Prorations Date.  The current pending collections matters are listed on **Exhibit H** attached hereto and made a part hereof.  Buyer

Club Oasis
3/14/13

acknowledges that Seller has prepaid certain legal fees and Seller shall be entitled to reimbursement of such amounts advanced to the extent they are collected by legal counsel from and after Closing.

4.3.3.    Payables.   All of Seller's accounts payable incurred in the ordinary course of business in connection with the ownership and operation of the Property including amounts payable to vendors and other trade payables as of the Prorations Date, are herein called the "Payables".  Seller agrees that between the Effective Date and the Closing Date all Payables shall be paid and discharged in the ordinary course of business.  Any Payables that would have been paid by Seller in ordinary course of business not paid on or before the Prorations Date and not discovered until after the Closing Date shall be paid by Seller at such time as they are discovered, provided such are discovered within one hundred and eighty (180) days of the Closing Date.

4.3.4.    Revenues.   All revenue generated from periods prior to the Closing Date shall be attributable to Seller.  If payment for any such items received by Buyer after Closing, Buyer shall promptly remit such amounts to Seller (it being understood that any amounts owed by third parties shall be applied first towards amounts owed for periods prior to the Closing Date and last towards amounts owned for periods subsequent to the Closing Date).

4.3.5.    Cash.   There are no separate operating accounts and no reserves to be transferred respecting the Club.

4.3.6.    Fuel and Utilities.   Fuel, water charges and other utilities upon the Property, if any, shall be adjusted and apportioned as of the Prorations Date.  Deposits, if any, made by Seller, or any manager of the Property on behalf of Seller, or any predecessor in title as security under any utility or public service contract shall be credited to Seller to the extent that the same remains on deposit for the benefit, and in the name of, Buyer.  If such deposits cannot remain on deposit for the benefit of Buyer, Buyer shall place new deposits with the utility company(ies) and the existing deposits shall be released to Seller prior to Closing.  Readings will be secured for all utilities as close as practicable to the Prorations Date, and the remaining meter charge, if any, for the intervening time shall be apportioned on the basis of such last reading.

4.3.7.    Contracts; Leases.   All prepayments made under any continuing contracts or leases affecting the Property, if any, including, but not limited to, garbage removal and maintenance agreements shall be adjusted and apportioned as of the Prorations Date and Seller shall receive a credit for any deposits.

4.3.8.    Other Prorations.   In addition to the previously stated adjustments and prorations at Closing the parties shall also make such adjustments and prorations with respect to operating revenues and expenses to the Purchase Price as are customary and usual in transactions similar to the transaction contemplated by this Agreement.

4.3.9.    Reprorations and Post-Closing Adjustments.   If any adjustments or prorations cannot be apportioned or adjusted at Closing by reason of the fact that final or liquidated amounts have not been ascertained or are not available as of such date, the parties agree to apportion or adjust such items on the basis of their best estimates of the amounts at Closing and to re-prorate any and all of such amounts promptly when the final or liquidated amounts are ascertained.  In the event of any omissions or mathematical error on the closing statement, or if the prorations, apportionments and computations shall prove to be incorrect for any reason, the same shall be promptly adjusted when determined and the appropriate party paid any monies owed.  This provision shall survive the Closing for a period of twelve (12) months as to *ad valorem* taxes and six (6) months as to all other adjustments and no claims for adjustment may be made thereafter.

4.3.10.    Intent of Prorations Provisions.   The intent of the prorations and adjustments provided for herein is that Seller shall bear all expenses of operation of the Property and shall receive all income therefrom accruing through the Prorations Date, and Buyer shall bear all such expenses and receive all such income accruing thereafter.

4.4.  Costs and Expenses.  All Closing costs and expenses including, but not limited to, the cost of recording the Special Warranty Deed, documentary stamp taxes and surtax on the Special Warranty Deed, and the title insurance premium for the owner's title insurance policy to be provided by Title Agent and issued to Buyer after Closing, shall be paid by Buyer.  Buyer shall also pay for the cost of any survey obtained by Buyer.  Attorneys' fees, consulting fees, and other due diligence expenses shall be borne by the party incurring such expense.  By way of example, Seller shall pay its own legal fees and costs and these shall not be charged to home owners in the event the transaction contemplated by this Agreement does not close.

5.  Title; Survey.

5.1.  Evidence of and Encumbrances Upon Title.  Seller's counsel has delivered a form Title Commitment prepared by Seller's counsel and approved by Title Company for issuance by the Title Agent.  The Title Commitment shall be the basis upon which Buyer shall review the status of title to the Property.  Buyer shall review the Title Commitment to determine whether title is free and clear of liens, encumbrances, and objections other than following, herein referred to as the "**Acceptable Encumbrances**":

5.1.1.  The standard printed exceptions in the Title Commitment, provided, however, that to the extent allowed by the Title Company and Florida law the standard printed exceptions for parties in possession and construction liens may be deleted from the owner's title insurance policy based upon Seller's Affidavit and the standard printed exception for matters that would be reflected on a current survey and for easements not shown by the public records may be deleted if Buyer obtains a current survey, as contemplated by Section 5.3 hereof, which satisfies the requirements of the Title Company;

5.1.2.  Zoning and other regulatory laws and ordinances affecting the Property;

5.1.3.  Easements for public utilities and drainage;

5.1.4.  Any matters reflected on the plats of the Land;

5.1.5.  Any other matters of record that do not render title unmarketable;

5.1.6.  All matters in the Title Commitment not objected to by Buyer within the Title Review Period (as hereinafter defined);

5.1.7.  Any matters which are approved in writing by Buyer (including those contemplated by this Agreement); and

5.1.8.  Any matters created by or against Buyer.

5.2.  Review of Evidence of Title.

5.2.1.  Buyer shall have seven (7) days from the Effective Date within which to cause the Title Commitment to be examined and to notify Seller in writing of any liens, encumbrances, or exceptions other than the Acceptable Encumbrances (the "**Title Review Period**").  If no liens, encumbrances, or exceptions other than the Acceptable Encumbrances are shown, or if Buyer shall fail to notify Seller in writing of any liens, encumbrances or exceptions other than the Acceptable Encumbrances prior to the end of the Title Review Period, then except as provided in Section 5.4, Buyer shall be deemed to have waived any right to object to the status of title and all matters reflected on the Title Commitment shall be deemed Acceptable Encumbrances.  Subject to Section 5.4, Buyer shall thereupon, with respect to the status of title to the Land and Improvements, be obligated to close the purchase at the time and in the manner herein specified.

5.2.2.  If prior to the end of the Title Review Period, Buyer gives written notice of any liens, encumbrances or exceptions, other than the Acceptable Encumbrances, then Seller shall have the

Club Oasis
3/14/13

right, but not the obligation, to attempt to remove, discharge or correct such liens, encumbrances or exceptions and shall have a period of sixty (60) days after receipt of notice thereof ("**Cure Period**") in which to do so (and if necessary the Closing Date shall be extended). Seller shall not in any event be obligated to pay any sums of money or to litigate any matter in order to remove, discharge or correct any lien, encumbrance or exceptions, except, however, that Seller shall be required to satisfy, release, or discharge any mortgages in a liquidated amount voluntarily placed on the Property by Seller or by Seller's predecessors in title. If Seller shall be unable or otherwise refuses to remove or discharge such other liens, encumbrances or exception within such period, then Buyer may, at its option, either accept title in its then existing condition without reduction of the Purchase Price or terminate this Agreement by giving written notice of termination within three (3) Business Days after the first to occur of (a) receipt of Seller's written notice that Seller is unable to remove the lien, encumbrance, or exception or (b) the expiration of the Cure Period. If Buyer shall fail to give written notice of termination within the aforesaid three (3) Business Day period, Buyer shall irrevocably be deemed to have accepted title in its existing condition ( and all outstanding title matters shall then constitute Acceptable Encumbrances). If Buyer shall elect to terminate this Agreement pursuant to this paragraph, this Agreement shall terminate, and thereafter neither Seller nor Buyer shall have any further rights or obligations hereunder except that Buyer shall remain obligated with respect to the provisions of Sections 3.4 and 3.5 hereof.

5.3.    Survey.  Prior to the Feasibility Date, Buyer may cause a survey of the Land to be prepared at Buyer's sole cost and expense. Any such survey shall conform to ALTA requirements and be certified to Buyer, Seller, the Title Company, and Title Company's agent. If any encroachments not acceptable to Buyer are shown, Buyer may give written notice of objection to Seller prior to the Feasibility Date, in which case any such encroachment shall be treated in the same manner as a title defect pursuant to Section 5.2.2 above; provided, however, that Buyer shall have no right to object to (a) any matters which constitute Acceptable Encumbrances; or (b) any public utility facilities or equipment located on the Land regardless of whether or not an easement for such facilities or equipment has been granted or recorded in the Public Records (and Buyer acknowledges that it is likely that such facilities and equipment do in fact exist on the Land); or (c) any matters reflected on any existing survey delivered by Seller to Buyer on or before the tenth day after the Effective Date. If, however, Buyer fails to obtain a survey, or if Buyer obtains a survey, but fails to give written notice of objection prior to the Feasibility Date, all encroachments and other matters of survey shall be deemed approved by Buyer and shall constitute Acceptable Encumbrances.

5.4.    Title Update.  Seller shall cause the Title Company to update the Title Commitment, to a date not earlier than seven (7) days prior to the Closing Date. If the updated Title Commitment contains exceptions which arose subsequent to the effective date of the Title Commitment and which do not constitute Acceptable Encumbrances, Buyer may file written objection thereto within three (3) Business Days after receipt thereof, but in any event prior to completion of the Closing. If Buyer timely and properly files written objection to any such other item, all of the provisions of the last portion of Section 5.2.2 shall then be applicable. If the updated Title Commitment contains no exceptions, other than those reflected on the Title Commitment delivered pursuant to Section 5.1 and other Acceptable Encumbrances or if Buyer fails to give written notice of objection to Seller as and when required, all matters reflected on the updated Title Commitment shall be deemed Acceptable Encumbrances, and this Agreement shall remain in full force and effect and Buyer shall be obligated to complete the transaction as required by this Agreement.

6.    Closing.

6.1.    Closing Date; Place.  The Closing shall occur on or before _____ ("**Closing Date**"). Closing shall take place at 10:00 A.M. in the offices of Seller's counsel or at such other locations selected by Seller.

6.2.    Seller's Deliveries.  At Closing, Seller shall deliver or cause to be delivered to Buyer the following instruments (in addition to any other instruments contemplated by this Agreement):

8

6.2.1.    Special Warranty Deed with respect to the Land and Improvements, in the form of **Exhibit B** hereto;

6.2.2.    Affidavit in the form of **Exhibit C** hereto;

6.2.3.    Bill of Sale with respect to those items of Personal Property which are furniture, fixtures, and equipment in the form of **Exhibit D**, including all of the Inventory;

6.2.4.    Assignment and Assumption Agreement in the form of **Exhibit E** hereto;

6.2.5.    Buyer-Seller Closing Statement;

6.2.6.    Evidence satisfactory to the Title Company and Title Agent in its reasonable discretion of Seller's authority to execute the instruments delivered at the Closing and to consummate the Closing;

6.2.7.    Any instruments required by Section 9 of this Agreement.

6.3.    <u>Buyer's Deliveries</u>.  At Closing Buyer shall deliver or cause to be delivered to Seller the following instruments (in addition to any other instruments required by the terms of this Agreement):

6.3.1.    Assignment and Assumption Agreement, in the form of **Exhibit E** hereto;

6.3.2.    Buyer-Seller Closing Statement;

6.3.3.    Certificate of Good Standing from the Secretary of State of Buyer's organization;

6.3.4.    Incumbency Certificate specifying the officers of Buyer authorized to act for and on behalf of Buyer with respect to the transaction contemplated hereby together with Secretary's Certificate evidencing adoption of resolutions authorizing Buyer to consummate the purchase;

6.3.5.    A general release, in the form of **Exhibit F** hereto, in favor of Seller; and

6.3.6.    Any instruments required by Section 9 of this Agreement.

6.4.    <u>Possession</u>.  Possession of the Property shall be surrendered at the Closing.

6.5.    <u>Closing Costs and Start-up Fund</u>.  Seller agrees to provide Buyer with start-up funds for the Club in the amount of One Hundred Thousand and No/100 Dollars ($100,000.00), which shall be credited to Buyer at Closing and shall be applied first to Closing Costs and any excess to fund Club Reserves.

7.    <u>Certain Special Provisions Which Shall Survive Closing</u>.  In addition to other provisions of this Agreement which by their terms survive the Closing of the purchase and sale, the following provisions shall also survive the Closing.  Seller will include the provisions indicated in the Special Warranty Deed by which Seller conveys the Land to Buyer (in which case Buyer shall be required to execute the Special Warranty Deed to confirm Buyer's agreement to such provisions) or in a separate instrument to be executed by Buyer and Seller on or before Closing and recorded in the Public Records of the County.

7.1.    <u>Club Covenants</u>.  Buyer recognizes that the Land is subject to the Club Covenants and to the Rules and Regulations established pursuant thereto.  Buyer agrees to comply with all of the terms and provisions thereof insofar as they relate to or affect the Land unless Buyer, as Club Owner, elects to terminate the Club Covenants after Closing.

Club Oasis
3/14/13

7.2.   <u>Employees</u>.   Seller will terminate the employment of all service personnel of Seller performing services at the Clubhouse ("**Employees**") effective as of the Closing Date other than those Employees that Seller intends to offer alternate employment at other locations.  Seller will be responsible for payment of all accrued, unpaid wages, salaries, benefits, vacation and other income items due to the Employees as of the Closing Date and all taxes and other amounts due from Seller in respect thereof. Subsequent to the Feasibility Date, Buyer and Seller shall agree upon a method to advise Employees of the pending sale and to notify them that their continued employment shall be discretionary with Buyer (except Employees that remain employed by Seller shall not receive such notice); provided, however, Buyer may interview each Employee and consider the possibility of hiring such Employee from and after Closing Date.

7.3.   <u>Use of Name</u>.  Due to the integrated nature of ChampionsGate and the product within ChampionsGate, Buyer may use ChampionsGate name and logo with respect to the Clubhouse for general and typical Club purposes (*e.g.*, aerobic classes), but not for commercial use not related to the Club without prior written consent of Seller, which may be granted or withheld in Seller's sole and absolute discretion, and, if given, may be subject to such terms and conditions as Seller shall deem appropriate.  By way of example, if Buyer elects to allow catered events or concessions within the Club, the name and logo may be used as such activities are part of typical Club activities without Seller's consent.  If Buyer wishes to open a real estate sales office for homes in the Club, the name and logo cannot be used without Seller's prior consent.   Seller grants (but without warranty or representation) to Buyer the right to identify the Clubhouse by reference to its location at "CHAMPIONSGATE" and for general and typical Club purposes.

7.4.   <u>Effect</u>.  All of the provisions of this Section 7 shall survive the Closing in accordance with their terms and shall constitute restrictions, covenants, conditions, easements, and obligations which run with title to all or any portion of the Land and which are servitudes upon the Land and shall be binding upon Buyer and Buyer's successors in title to the Land and inure to the benefit of and be enforceable by Seller and such of its assigns as to which Seller specifically assigns its rights hereunder.  Such an assignment may be of all or only certain rights hereunder and may be made on an exclusive or non-exclusive basis, and in any event without the necessity of any joinder or consent of Buyer or any other party.  Absent an express assignment as aforesaid, no person or entity shall be deemed a third party beneficiary or a successor assignee of Seller with respect to any of the provisions of this Section 7 or have any rights to enforce any of the provisions contained herein, nor shall Seller have any duty to any third party to do so.

7.5.   <u>Enforcement; Remedies</u>.   So long as Seller has a development interest in _____, which interest must be established by Seller, violation or attempted violation by Buyer of any provision contained in this Section 7 shall entitle Seller to exercise any and all remedies available in equity.  In addition Seller shall have the right to proceed in equity to compel compliance of the violated or breached provision.  In the event of any litigation arising from any violation or attempted violation by Buyer, the prevailing party shall be entitled to reimbursement from the losing party for all attorneys fees and costs incurred at the trial level and at all levels of appeal.  Any failure by Seller to enforce any provision of this Section 7 in any one instance shall not be deemed a waiver by Seller to enforce the same or any other provision in the future.

8.   <u>Indemnification</u>.   Seller shall indemnify and save harmless Buyer against any and all claims, actions, damage or liability (including  attorney's fees and the costs to prepare any new easements) resulting from Seller's use of the Property after the Closing pursuant to this Agreement.  Seller shall also indemnify and save harmless Buyer against any and all claims, actions, damage or liability resulting from any personal injury claim respecting the Property occurring before Closing.  This Section shall survive Closing.

9.   <u>Warranties And Representations.</u>

9.1.   <u>Buyer's Warranties and Representations</u>.  Buyer warrants and represents that: (a) Buyer has the full right, power, and authority to purchase the Property from Seller as provided in this Agreement

Club Oasis
3/14/13

and to carry out Buyer's obligations hereunder; (b) this Agreement has been duly executed and delivered by Buyer; (c) the execution of this agreement and the Closing to occur hereunder does not and will not violate any contract, covenant or other agreement to which Buyer may be a party or by which Buyer may be bound; and (d) Buyer is purchasing the Property for the continued operation of the Clubhouse.

    9.2.   <u>Seller's Warranties and Representations</u>. Seller warrants and represents that: (a) Seller has the full right, power, authority to sell the Property to Buyer as provided in this Agreement and to carry out Seller's obligations hereunder; (b) Seller is a corporation duly organized and in good standing under the laws of the State of Florida; (c) subject to Section 14.14 hereof, all requisite corporate action necessary to authorize Seller to enter into this Agreement and to carry out Seller's obligations has been obtained; and (d) this Agreement has been duly authorized, executed and delivered by Seller.

    9.3.   <u>Survival</u>. The provisions of this Section 9 shall survive the Closing.

10.   <u>Assignment</u>. The nature of Buyer's composition as a not-for-profit entity all of the members of which are residents of Tamps Palms constitutes a material inducement and a substantial part of the consideration for sale of the Property by Seller to Buyer. Therefore, Buyer may not assign this Agreement, nor may any of Buyer's rights hereunder be transferred in any manner to any person or entity, without Seller's specific prior written consent, which consent may be withheld by Seller in Seller's sole and absolute discretion.

11.   <u>Brokerage</u>. Buyer represents and warrants to Seller that Buyer has not contacted or entered into any agreement with any real estate broker, agent, finder, or any other party entitled to a commission in connection with this transaction, and that Buyer has not taken any action which would result in any real estate broker's, finder's, or other fees or commissions being due or payable to any other party with respect to this transaction. Seller represents and warrants to Buyer that Seller has not contacted or entered into any agreement with any real estate broker, agent, finder, or any other party entitled to a commission in connection with this transaction, and that Seller has not taken any action which would result in any real estate broker's, finder's, or other fees or commission being due and payable to any other party with respect to this transaction. Each party hereby agrees to indemnify, protect, defend (with counsel approved by the party to be indemnified) and to hold the other party harmless from any loss, liability, damage, costs, or expense (including, but not limited to, reasonable attorneys' fees at trial and all appellate levels) resulting to the other party from a breach of the representation and warranty made by such party herein. The provisions of this Section 11 shall survive the Closing and termination of this Agreement.

12.   <u>Default.</u>

    12.1.   <u>Buyer's Default</u>. If this transaction shall not be closed because of default by Buyer, all of Seller's and Buyer's rights hereunder shall be terminated, except that Buyer shall remain obligated pursuant to Sections 3.4 and 3.5 hereof. If, after Closing, Buyer shall default in any obligation of Buyer contained herein, Seller shall be entitled to all remedies available in equity.

    12.2.   <u>Seller's Default</u>. If this transaction shall not be closed because of default of Seller, neither Seller nor Buyer shall have any further rights or obligations hereunder, except that Buyer shall remain obligated pursuant to Sections 3.4 and 3.5 hereof; or Buyer shall have the right to sue for specific performance of this Agreement; provided, however, such specific performance remedy shall be available to Buyer only upon Buyer's full satisfaction of each of Buyer's obligations under this Agreement, including, but not limited to, the issuance of the commitment for the Institutional Loan. The option selected by Buyer shall be Buyer's sole and exclusive remedy, and in no event shall Buyer be entitled to any damages.

    12.3.   <u>No Obligation of Seller after Closing</u>. Buyer expressly acknowledges and agrees that Seller has no obligations with respect to the Property pursuant to this Agreement which survive Closing, except as specifically set forth herein. The provisions of this Section shall survive the Closing.

Club Oasis<br/>3/14/13

13.    No Joint Venture.    Buyer acknowledges and agrees that Seller is not a venturer, co-venturer, insurer, guarantor or partner of Buyer in Buyer's ownership or operation of the Property, and that Seller bears and shall bear no liability whatsoever resulting from or arising out of Buyer's ownership and operation of the Property. Therefore, Buyer agrees to indemnify and hold harmless Seller from and against any and all losses, claims, demands, damages, costs and expenses of whatsoever kind or nature including reasonable attorneys' fees, related to or arising out of any claims against Seller as a result of Buyer's ownership or operation of the Property. The provisions of this Section 13 shall survive the Closing.

14.    Miscellaneous.

    14.1.    Risk of Loss.    Seller agrees to give Buyer prompt notice of any casualty affecting the Property or of any actual or threatened (to the extent that Seller has current actual knowledge thereof) taking or condemnation of all or any portion of the Property. If before Closing, there shall occur:

        14.1.1.    damage to any portion of the Property caused by casualty which would cost an amount equal to or greater than five percent (5%) of the Purchase Price of the Property to repair; or

        14.1.2.    the taking or condemnation of all or any portion of the Property which would interfere with the intended use of the Property;

then, in such event, Buyer shall have the right to terminate this Agreement by written notice thereof delivered to Seller within ten (10) days after Buyer has received notice from Seller or otherwise learns of that event or at the Closing accept all interest of Seller in and to any insurance proceeds or condemnation awards payable to Seller on account of that event, less sums which Seller incurs before the Closing to repair any of the damage. If Buyer elects to terminate this Agreement, neither party shall have any further obligations under this Agreement except that Buyer shall remain liable for the obligations contained in Section 3.4 and 3.5 hereof. If Buyer does not so timely elect to terminate this Agreement, then the Closing shall take place as provided herein and there shall be assigned to Buyer at the Closing all interest of Seller in and to any insurance proceeds or condemnation awards payable to Seller on account of that event, less sums which Seller incurs before the Closing to repair any of the damage.

    If before Closing there occurs:

        (a)    damage to the Property caused by casualty which would cost less than five percent (5%) of the Purchase Price to repair; or

        (b)    the taking or condemnation of a portion of the Property which would not interfere with the intended use of the Property;

then, Buyer may not terminate this Agreement and there shall be assigned to Buyer at the Closing all interest of Seller in and to any insurance proceeds or condemnation awards payable to Seller on account of that event, less sums which Seller incurs before the Closing to repair any of the damage.

    14.2.    Construction.    The terms "Seller" and "Buyer" whenever used in this Agreement shall include the successors and permitted assigns of the respective parties hereto, provided, however, that Buyer's right of assignment is restricted by the provisions hereof. Whenever used, the singular number shall include the plural and the plural the singular, and the use of any gender shall include all genders. The term "including" as used herein shall in all instances mean "including, but not limited to". The term "attorney fees" wherever used in this Agreement shall include attorneys fees, paralegal fees and paraprofessional fees. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the interpretation of this Agreement. This Agreement and any related instruments shall not be construed more strictly against one party than against the other by virtue of the fact that initial drafts may have been prepared by counsel for one of the parties, it being recognized that this Agreement and any related instruments are the product of extensive negotiations between the parties hereto.

Club Oasis
3/14/13

12

14.3.    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, a complete set of which shall be deemed an original, but all of which will constitute the same agreement.

14.4.    <u>Severability and Waiver</u>.  Invalidation of any one Section or provision of this Agreement by judgment or court order shall in no way affect any other Section or provision.  Failure of any party to this Agreement to insist on the full performance of any of its provisions by the other party shall not constitute a waiver of such performance unless the party failing to insist on full performance of the provision declares in writing signed by it that it is waiving such performance.  A waiver of any breach under this Agreement by any party, unless otherwise expressly declared in writing, shall not be a continuing waiver or waiver of any subsequent breach of the same or other provision of this Agreement.

14.5.    <u>Governing Law</u>.  This Agreement is being executed and delivered, and is intended to be performed, in the State of Florida.  The laws of the State of Florida (without regard to conflicts of law) shall govern the validity, construction, enforcement and interpretation of this Agreement.  Venue for any action arising hereunder shall lie exclusively in the Federal or State courts where the Property is located.

14.6.    <u>Further Acts</u>.    In addition to the acts and deeds recited in this Agreement and contemplated to be performed, executed, and/or delivered under this Agreement, Seller and Buyer agree to perform, execute and/or deliver or cause to be performed, executed and/or delivered at Closing or after Closing all further acts, deeds, and assurances reasonably necessary to consummate the transactions or agreements contemplated hereby.

14.7.    <u>Radon Gas</u>.    RADON IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME.  LEVELS OF RADON THAT EXCEED FEDERAL AND STATE GUIDELINES HAVE BEEN FOUND IN BUILDINGS IN FLORIDA. ADDITIONAL INFORMATION REGARDING RADON AND RADON TESTING MAY BE OBTAINED FROM YOUR COUNTY HEALTH DEPARTMENT.

14.8.    <u>Notices</u>.    All notices, demands, requests, and other communications required or permitted hereunder shall be in writing.  All such notices, demands, requests and other communications (and copies thereof) shall be deemed to be received: (a) upon receipt or refusal to accept receipt if sent by messenger, upon personal delivery to the party to whom the notice is directed; (b) if sent by telecopier, upon electronic or telephonic confirmation of receipt from the receiving telecopier machine; or (c) upon receipt or refusal to accept receipt if sent by overnight courier, with request for next Business Day delivery, addressed as follows (or to such other address as the parties may specify by notice given pursuant to this Section):

TO SELLER:              LEN-CG SOUTH, LLC
                        c/o Lennar Homes, LLC
                        4600 West Cypress Street, Suite 200
                        Tampa, Florida 33607
                        Attention: _____
                        Phone no.: (813) 901-5263
                        Facsimile no.: (813) 882-8193

WITH A COPY TO:         Christian F. O'Ryan, Esq.
                        Pennington, Moore, Wilkinson, Bell & Dunbar, P.A.
                        2701 N. Rocky Point Drive, Suite 930
                        Tampa, Florida  33607
                        Attention: Christian F. O'Ryan
                        Phone no. (813) 639-9599
                        Facsimile no. (813) 639-1488

Club Oasis
3/14/13

13

TO BUYER:                    ChampionsGate Master Association, Inc.

                             _____

                             Attention: _____
                             Phone no.: _____
                             Facsimile no.: _____

WITH A COPY TO:              _____

                             _____

                             _____

                             _____

14.9.  <u>Entire Agreement and Amendment</u>.  This Agreement contains the entire understanding between Buyer and Seller with respect to the subject matter hereof.  Neither this Agreement nor any provision hereof may be modified, amended, changed, waived, discharged or terminated orally.  Any such action may occur only by an instrument in writing signed by the party against whom enforcement of the modification, change, waiver, discharge or termination is sought.

14.10.  <u>Recording</u>.  This Agreement shall not be recorded and Buyer agrees that recording same constitutes a default by Buyer.

14.11.  <u>Exhibits</u>.  The Exhibits which are referenced in and attached to this Agreement are incorporated in, and made a part of, this Agreement for all purposes.

14.12.  <u>Time of the Essence</u>.  It is expressly agreed by Seller and Buyer that time is of the essence with respect to this Agreement. If the final day of any period or any date of performance under this Agreement falls on a date which is not a Business Day, then the final day of the period or the date of performance, as applicable, shall be extended to the next day which is a Business Day.

14.13.  <u>No Third Party Beneficiary</u>.  This Agreement is solely between Seller and Buyer and no other party shall be entitled to rely upon any provision hereof for any purpose whatsoever.

14.14.  <u>Requisite Senior Management Approval</u>.  This Agreement is subject to a approval by Seller's senior management.  Neither the submission of any proposal or this Agreement for examination to Buyer, nor any correspondence or course of dealing between Buyer or Seller shall constitute a reservation of or option for the Property or in any manner bind Seller.  No contract or obligation on the part of Seller shall arise until this Agreement is approved by Seller's senior management and fully executed and unconditionally delivered by Seller.  If this Agreement is executed and returned by Seller to Buyer, the requirement for senior management approval shall be deemed to have been obtained.  Buyer may revoke its offer to purchase the Property pursuant to this Agreement if Seller does not execute the same within five (5) days of Seller's receipt of this Agreement fully executed by Buyer.

14.15.  <u>Limitation on Liability</u>.  Buyer expressly agrees that the obligations and liabilities of Seller under this Agreement and any document referenced herein shall not constitute personal obligations of the officers, directors, employees, agents, attorneys, shareholders or other principals and representatives of Seller or Seller's affiliates.  Notwithstanding anything to the contrary, Seller's liability, if any, arising in connection with this Agreement or with the Property shall be limited to Seller's interest in the Property for the recovery of any judgment against Seller, and Seller shall not be personally liable for any such judgment or deficiency after execution thereon.  The limitations of liability contained in this Section shall apply equally to, and inure to the benefit of Seller's present and future officers, directors, agents, employees, attorneys, shareholders or other principals and representatives and their respective heirs, successors and assigns.

14

Club Oasis
3/14/13

14.16.  Confidentiality.

14.16.1. Buyer acknowledges the confidential and proprietary nature of (i) all information, documents, agreements, correspondence, contracts, reports, files, books, records, financial data, and other information delivered or made available by Seller to Buyer pursuant to this Agreement, and (ii) all results, reports, analyses, and other products of tests, inspections, studies, and other due diligence conducted on the Property pursuant to this Agreement, and (iii) this Agreement and the contents and provisions hereof (collectively, the "**Confidential Information**").  Buyer agrees to keep and hold all of the Confidential Information confidential and agrees not to use it for any purpose other than the purposes contemplated by this Agreement.  Buyer shall not disclose any of the Confidential Information to, or discuss any of the Confidential Information to, or discuss any of the Confidential Information with, any third person other than Buyer's counsel, consultants and advisors, the board of directors of Buyer, the homeowners within Tamps Palms and any potential Lender.

14.16.2. Each of Buyer and Seller agrees with the other that prior to Closing it will not make any public announcement about the purchase and sale transaction contemplated hereby or any of the terms hereof, including without limitation any of the Confidential Information, without the prior written consent of the other, except for announcements to the homeowners of Tamps Palms at membership meetings or otherwise.

14.16.3. The provisions of this Section 14.16 shall survive the Closing and any termination of this Agreement.

14.17.  Attorneys fees.  In the event of any litigation between the parties this Agreement, the prevailing party shall be entitled to recover it reasonable attorneys fees, paraprofessional fees, and court costs pretrial and at all trial appellate levels.  This provision shall survive termination or cancellation of this Agreement and closing of this Agreement.

14.18.  **WAIVER OF TRIAL BY JURY.  THE PURCHASER AND THE SELLER HEREBY EXPRESSLY COVENANT AND AGREE TO WAIVE THE RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY LITIGATION OR JUDICIAL PROCEEDING RELATING TO, DIRECTLY OR INDIRECTLY, OR CONCERNING THIS AGREEMENT OR THE CONDUCT, OMISSION, ACTION, OBLIGATION, DUTY, RIGHT, BENEFIT, PRIVILEGE OR LIABILITY OF A PARTY HEREUNDER TO THE FULL EXTENT PERMITTED BY LAW. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN AND IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY THE PURCHASER AND THE SELLER.  THE PURCHASER AND THE SELLER HAVE HAD AN OPPORTUNITY TO SEEK LEGAL COUNSEL CONCERNING THIS WAIVER. THIS WAIVER IS INTENDED TO AND DOES ENCOMPASS EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A JURY TRIAL WOULD OTHERWISE ACCRUE.   THE PURCHASER AND THE SELLER FURTHER CERTIFY AND REPRESENT TO EACH OTHER THAT NO PARTY, REPRESENTATIVE OR AGENT OF THE PURCHASER OR THE SELLER (INCLUDING, BUT NOT LIMITED TO, THEIR RESPECTIVE COUNSEL) HAS REPRESENTED, EXPRESSLY OR OTHERWISE TO THE PURCHASER OR THE SELLER OR TO ANY AGENT OR REPRESENTATIVE OF THE PURCHASER OR THE SELLER (INCLUDING, BUT NOT LIMITED TO, THEIR RESPECTIVE COUNSEL) THAT THEY WILL NOT SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL. THIS PROVISION IS A MATERIAL INDUCEMENT OF ALL PARTIES ENTERING INTO THIS AGREEMENT. THIS WAIVER SHALL APPLY TO THIS AGREEMENT AND ANY FUTURE AMENDMENTS, SUPPLEMENTS OR MODIFICATIONS OF THIS AGREEMENT.  THIS PROVISION SHALL SURVIVE ANY TERMINATION OR CANCELLATION OF THIS AGREEMENT OR CLOSING OF THIS AGREEMENT.**

[Signatures on Following Page]

Club Oasis
3/14/13

15

IN WITNESS WHEREOF, Buyer and Seller have executed this Agreement, each on the date set forth below.

**WITNESSES:**

**"CLUB OWNER"**

LEN-CG SOUTH, LLC, a Florida limited liability company

By:    LENNAR HOMES, LLC, a Florida limited liability company, its Managing Member

           By:_____

_____           Name:_____

Print Name:_____           Title: _____

           Date: _____, 20____

_____

Print Name:_____


**WITNESSES:**

**"BUYER"**

CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation

_____           By:_____

Print Name:_____           Name:_____

           Title: _____

_____           Date: _____, 20____

Print Name:_____

S:\JayZ\Clients\Lennar\Stoneybrook South\ChampionsGate Master\Governing Documents\Club Plan\Club PS Agreement1 - tbd.doc

16

Club Oasis
3/14/13

## SCHEDULE OF EXHIBITS

A    -    Land

B    -    Form of Special Warranty Deed

C    -    Form of Seller's Affidavit

D    -    Form of Bill of Sale

E    -    Form of Assignment and Assumption Agreement

F         Form of General Release from Buyer.

G    -    Inventory

H    -    Pending Litigation

Club  Oasis
3/14/13

**EXHIBIT A**

**Legal Description of Land**

Club Oasis
3/14/13

## EXHIBIT B

**PREPARED BY AND RETURN TO:**
Christian F. O'Ryan, Esq.
Pennington, P.A.
2701 N. Rocky Point Drive, Suite 900
Tampa, Florida 33607

Purchase Price:        $_____

Documentary Stamps: $_____

-----------------------------------SPACE ABOVE THIS LINE RESERVED FOR RECORDING DATA-----------------------------------

### SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED (this "**Deed**") is made as of the ___day of _____, 20___, from LEN-CG SOUTH, LLC, a Florida limited liability company ("**Grantor**") having a mailing address of 4600 West Cypress Street, Suite 200, Tampa, Florida 33607 to CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation, the mailing address of which is _____ (the "**Grantee**").

### W I T N E S S E T H :

THAT Grantor, for and in consideration of the sum of Ten and No/100 Dollars ($10.00), and other good and valuable consideration, the receipt of which is hereby acknowledged, by these presents does grant, bargain and sell unto Grantee, and Grantee's successors and assigns forever, all the right, title, interest, claim and demand that Grantor has or may have in and to the following described real property (the "**Property**") located and situate in the County of Osceola and State of Florida, to wit:

### SEE EXHIBIT A ATTACHED HERETO

The Property is conveyed subject to the following:

Those matter described on **Exhibit B** attached hereto and made a part hereof.

Grantee's Tax Identification No.: _____

The Tax Parcel I.D. #_____

[NOTE: **The "subject to" items and matters, which shall be listed in the Special Warranty Deed actually delivered if a closing occurs, shall be those comprising the Acceptable Encumbrances (as defined in Section 5 of the Agreement for Sale and Purchase of Property) and those permitted to be shown as set forth in Section 5 of the Agreement for Sale and Purchase of Property.**]

Those restrictive covenants set forth on **Exhibit C** attached hereto and made a part hereof.

Grantor does hereby warrant, and will defend, the title to the Property hereby conveyed, subject as aforesaid, against the lawful claims of all persons claiming by, through or under Grantor, but none other.

Club Oasis
3/14/13

Grantee, by acceptance of this Special Warranty Deed, automatically agrees for itself, and its successors and assigns, to observe and to be bound by all of the terms and conditions set forth in **Exhibit B** and all future amendments thereto applicable to the Property.

IN WITNESS WHEREOF, Grantor has caused these present to be executed and its seal to be affixed the day and year first above written.

**WITNESSES:**                                    **"GRANTOR"**

LEN-CG South, LLC, a Florida limited liability company

By:  LENNAR HOMES, LLC, a Florida limited liability company, its Managing Member

Print Name: _____

By: _____
Name: _____
Title: _____

Print Name: _____

Date: _____, 20___

STATE OF FLORIDA            )
COUNTY OF HILLSBOROUGH      )

The foregoing instrument was acknowledged before me this ___ day of _____, 20___, by _____, as _____ of LENNAR HOMES, LLC, a Florida limited liability company, Managing Member of LEN-CG South, LLC, a Florida limited liability company.  He [is personally known to me] [has produced _____ as identification].

My commission expires:

_____
NOTARY PUBLIC, State of Florida at Large

Print Name: _____

Club Oasis
3/14/13

**EXHIBIT A**

**LEGAL DESCRIPTION**

Club Oasis
3/14/13

## EXHIBIT B

**ACCEPTANCE ENCUMBRANCES**

Club Oasis
3/14/13

## EXHIBIT C

### RESTRICTIONS AND COVENANTS

<u>Club Covenant</u>.  Grantee recognizes that the Property is subject to Club Oasis Covenants and to the Rules and Regulations established pursuant thereto.  Grantee agrees to comply with all of the terms and provisions thereof insofar as they relate to or affect the Property unless Grantee, as owner of the Property, elects to terminate Club Oasis Covenants after the execution and delivery of this Special Warranty Deed.

<u>Use of Name</u>.   Due  to  the  integrated  nature  of  _____  and  the  product  within _____, Grantee may use _____ name and logo with respect to the Clubhouse for general and typical Club purposes (*e.g.*, aerobic classes), but not for commercial use not related to the Club without prior written consent of Grantor, which consent may be granted or withheld in Grantor's sole and absolute discretion; provided however, if such consent for the use of the name for commercial use not related to the Club is given, the same may be subject to such terms and conditions as Grantor shall deem appropriate.  By way of example, if Grantee elects to allow catered events or concessions within the Club, the name and logo may be used as such activities are part of typical Club activities without Grantor's consent.  If Grantee wishes to open a real estate sales office for homes in the Club, the name and logo cannot be used without Grantor's prior consent.   Grantor grants (but without warranty or representation) to Grantee the right to identify the Clubhouse by reference to its location at "ChampionsGate" and for general and typical Club purposes.

<u>Effect</u>.  All of the provisions of this **Exhibit C** constitute restrictions, covenants, conditions, easements, and obligations which run with title to all or any portion of the Property and which are servitudes upon the Property and shall be binding upon Grantee and Grantee's successors in title to the Property and inure to the benefit of and be enforceable by Grantor and such of its assigns as to which Grantor specifically assigns its rights hereunder.  Such an assignment may be of all or only certain rights hereunder and may be made on an exclusive or non-exclusive basis, and in any event without the necessity of any joinder or consent of Grantee or any other party.  Absent an express assignment as aforesaid, no person or entity shall be deemed a third party beneficiary or a successor assignee of Grantor with respect to any of the provisions of this **Exhibit C** or have any rights to enforce any of the provisions contained herein, nor shall Grantor have any duty to any third party to do so.

<u>Enforcement; Remedies</u>.  So long as Grantor has a development interest in ChampionsGate, which interest must be established by Grantor, violation or attempted violation by Grantee of any provision contained in this **Exhibit C** shall entitle Grantor to exercise any and all remedies available in equity.  In addition Grantor shall have the right to proceed in equity to compel compliance of the violated or breached provision.  In the event of any litigation arising from any violation or attempted violation by Grantee, the prevailing party shall be entitled to reimbursement from the losing party for all attorneys fees, paraprofessional fees, and costs incurred at the trial level and at all levels of appeal.  Any failure by Grantor to enforce any provision of this **Exhibit C** in any one instance shall not be deemed a waiver by Grantor to enforce the same.

Club Oasis
3/14/13

**JOINDER BY GRANTEE**

CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation, does hereby join in the Special Warranty Deed, to which this Joinder is attached, to acknowledge its acceptance of the Restrictions and Covenants listed on **Exhibit B**.

IN WITNESS WHEREOF, the undersigned has executed this Joinder on this _____ day of _____, 20___.

**WITNESSES:**

**"GRANTEE"**

CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation

_____
Print Name:_____

By:_____
Name:_____
Title: _____

_____
Print Name:_____

Date: _____, 20___

STATE OF FLORIDA            )
                            )   SS.:
COUNTY OF _____   )

The foregoing instrument was acknowledged before me this _____ day of _____, 20___ by _____ as _____ of CHAMPIONSGATE MASTER ASSOCIATION, Inc., a Florida not-for-profit corporation, who is personally known to me or who produced _____as identification on behalf of the corporation.

My commission expires:

_____
NOTARY PUBLIC, State of Florida at Large

Print Name: _____

Club Oasis
3/14/13

## EXHIBIT C

### SELLER'S AFFIDAVIT

BEFORE ME, the undersigned authority personally appeared _____ ("**Affiant**"),
who upon being duly cautioned and sworn, deposes and states as follows:

Affiant is the _____ of LEN-CG SOUTH, LLC, a Florida limited liability company
("**Seller**"), and has been authorized by Seller to make this Affidavit on Seller's behalf.

Seller is the owner in fee simple of those premises legally described as follows (the "**Property**"):

### SEE EXHIBIT A ATTACHED HERETO

Seller has possession of the Property, there is no other person in possession who has any right of
ownership in the Property and there are no facts known to Seller which could give rise to a claim of
ownership being adversely asserted to any of the Property.

The Property is free and clear of all liens, taxes, encumbrances and claims of every kind, nature and
description whatsoever, except for (i) real estate and personal property taxes for the year _____ and
subsequent years, which are not yet due and payable and (ii) easements, restrictions, or other title
matters of record, or listed in the schedule of exceptions in the title insurance policy to insure the fee
simple title to the Property to be received by Buyer in this transaction pursuant to the title commitment
issued in this transaction.  To the extent Seller has failed to pay income, use, sales or any other tax
accruing prior to Closing respecting the Property, Seller shall be responsible for the same.

Within the past ninety (90) days there have been no improvements, alterations or repairs to the Property
for which the costs thereof remain unpaid, and within the past ninety (90) days there have been no
claims for labor or material furnished for repairing or improving the Property that remain unpaid.

There are no construction, materialmens', or laborers' liens against the Property.

Seller has made no additional improvements to the Property and has received no notice of (proposed)
back assessments from Appraiser's Office or bill for back assessments from Tax Collector.

The personal property contained in the Property, and which, if any, is being sold to Buyer mentioned
below, is also free and clear of all liens, encumbrances, claims and demands whatsoever.

All fixtures, equipment, appliances, machines, plumbing, heating and air conditioning systems located
within or upon this Property have been paid for in full and there are no chattel mortgages, title retention
or conditional sales contracts or other encumbrances outstanding against the same.

There are no actions or proceedings now pending in any State or Federal Court to which Seller is a
party, including, but not limited to proceedings in bankruptcy, receivership or insolvency, nor are there
any judgments or liens of any nature which constitute or could constitute a charge or lien upon such
Property.

There are no existing contracts for sale affecting the Property except for the contract between Seller and
Buyer.

Seller has received no warning, notices, notice of violation, administrative complaints, judicial complaints
or other formal notices from any governmental agency alleging that conditions on the Property are in
violation of environmental laws, regulations, ordinances or rules.

This affidavit is (i) made for the purpose of inducing CHAMPIONSGATE MASTER ASSOCIATION, INC.,
a Florida not-for-profit corporation (the "**Buyer**") to purchase the Property, (ii) for the purpose of inducing
North American Title as agent for _____ to issue a policy of title insurance in

Club Oasis
3/14/13

connection with this transaction and to disburse funds in reliance on the title commitment and (iii) made under penalties of perjury.

      FURTHER AFFIANT SAYETH NAUGHT.

By: _____

_____ as

_____ of LEN-CG SOUTH, LLC, a

Florida limited liability company

[CORPORATE SEAL]

STATE OF FLORIDA            )
                           )  SS.:
COUNTY OF   HILLSBOROUGH_____ )

      The foregoing instrument was sworn to and subscribed to before me this _____ day of _____, 20____, by _____ as _____ of LEN-CG SOUTH, LLC, a Florida limited liability company, who is personally known to me or who produced _____ as identification, on behalf of the corporation.

My commission expires:               _____

                                            NOTARY PUBLIC
                                          State of Florida at Large
                                          Print
                                          name: _____

Club Oasis
3/14/13

**EXHIBIT A**

**LEGAL DESCRIPTION**

Club Oasis
3/14/13

## EXHIBIT D

### BILL OF SALE

LEN-CG SOUTH, LLC, a Florida limited liability company ("**Seller**") for the sum of TEN AND NO/100 ($10.00) DOLLARS, lawful money of the United States, paid by CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation (the "**Buyer**") the receipt whereof is hereby acknowledged, has granted, bargained, sold, transferred and delivered, and by these presents does grant, bargain, sell, transfer and deliver unto the such Buyer all of the personal property, now existing, owned by Seller as set forth in attached **Exhibit A** and located on the property described on **Exhibit B**.

TO HAVE AND TO HOLD the same unto the such Buyer forever. Wherever used herein the term "**Seller**" and "**Buyer**" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals and any successors and assigns of the parties hereto.

AND Seller covenants that Seller is the lawful owner of such goods and chattels; that they are free from all liens and/or encumbrances; and Seller will warrant and defend the title of such goods and chattels against the lawful claims and demands of all persons claiming by, through, or under Seller, but none other. The conveyances hereunder are on an "as-is" basis.

[Signature on following page]

Club Oasis
3/14/13

IN WITNESS WHEREOF, Seller has hereunto set its hand and seal effective as of the _____ day of _____, 20___.

**WITNESSES:**

**"SELLER"**

LEN-CG SOUTH, LLC, a Florida limited liability company

By:    LENNAR HOMES, LLC, a Florida limited liability company, its Managing Member

_____
Print Name:_____

By:_____
Name:_____
Title: _____

Date: _____, 20__

_____
Print Name:_____

Club Oasis
3/14/13

**EXHIBIT A**

**Inventory**

Clubhouse Inventory List:

Outside:

Inside:

Club Oasis
3/14/13

**EXHIBIT B**

**Legal Description of Property**

.

Club Oasis
3/14/13

**Exhibit E**

**PREPARED BY AND RETURN TO:**
Christian F. O'Ryan, Esq.
Pennington, P.A.
2701 N. Rocky Point Drive, Suite 900
Tampa, Florida 33607



----------------------------------SPACE ABOVE THIS LINE RESERVED FOR RECORDING DATA----------------------------------

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") is executed by and between LEN-CG SOUTH, LLC, a Florida limited liability company ("**Seller**") and CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation (the "**Buyer**").

### RECITALS:

A.    Pursuant to the Agreement for Sale and Purchase of Property, executed by Seller and Buyer as of the _____ day of _____, 20___ ("**Purchase Agreement**"), Seller shall assign and Buyer shall assume those items of Personal Property and the Club Covenants (as defined in the Purchase Agreement).

B.    The Personal Property includes those service and equipment contracts (the "**Contracts**") set forth in **Exhibit B** attached hereto.

C.    Seller is the owner of the following described real property located in Osceola County, Florida ("**Property**"):

### SEE EXHIBIT A ATTACHED HERETO

NOW THEREFORE, Seller and Buyer agree as follows:

1.    Recitals.  The above Recitals are true and correct and are incorporated into and form a part of this Agreement.

2.    Assignment.  Seller hereby assigns all of its right, title and interest in the Property including, without limitation, the Contracts and all of its rights in and under the Club Covenants to Buyer, on an "as-is" basis.  Seller shall have no further rights with respect to the Property or the Club Covenants.  By way of example, and not of limitation, from and after this date Buyer shall be Club Owner under the Club Covenants and Seller shall have no rights, including lien rights, under the Club Covenants.  Seller may deliver a copy of this Agreement to any party to a Contract.

3.    Assumption.  Buyer hereby assumes all of Seller's obligations under and with respect to the Property including, without limitation, the Contracts, and all of the obligations and rights of Seller as Club Owner under the Club Covenants.

[Signature on Following Page]

Club Oasis
3/14/13

IN WITNESS WHEREOF, this Agreement is signed and sealed as of the _____ day of _____, 20___.

**WITNESSES:**                                          **"SELLER"**

LEN-CG SOUTH, LLC, a Florida limited liability company

By:    LENNAR HOMES, LLC, a Florida limited liability company, its Managing Member

_____
Print Name:_____            By:_____
                                          Name:_____
                                          Title: _____

_____            Date: _____, 20___
Print Name:_____


STATE OF FLORIDA                )
COUNTY OF HILLSBOROUGH          )

     The foregoing instrument was acknowledged before me this ___ day of _____, 20___, by _____, as _____ of LENNAR HOMES, LLC, a Florida limited liability company, Managing Member of LEN-CG South, LLC, a Florida limited liability company.  He [is personally known to me] [has produced _____ as identification].


My commission expires:            _____
                                  NOTARY PUBLIC, State of Florida at Large

                                  Print Name: _____


[Signatures continue on following page]


Club Oasis
3/14/13

IN WITNESS WHEREOF, this Agreement is signed and sealed as of the _____ day of _____, 20___.


**WITNESSES:**                                    **"BUYER"**

                                                  CHAMPIONSGATE MASTER ASSOCIATION, INC.,
                                                  a Florida not-for-profit corporation

_____                  By:_____
Print Name:_____                  Name:_____
                                                  Title: _____

                                                  Date: _____, 20___
_____
Print Name:_____



STATE OF FLORIDA                    )
                                    )  SS.:
COUNTY OF _____         )

        The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____ as _____ of CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation, a Florida not-for-profit corporation, who is personally known to me or who produced _____ as identification on behalf of the corporation.

My commission expires:              _____
                                    NOTARY PUBLIC
                                    State of Florida at Large

                                    Print name:  _____


Club Oasis
3/14/13

**EXHIBIT A**

**LEGAL DESCRIPTION**

Club Oasis
3/14/13

## EXHIBIT B

### Service and Equipment Contracts
**[to be attached]**

Club Oasis
3/14/13

## EXHIBIT F

**PREPARED BY AND RETURN TO:**
Christian F. O'Ryan, Esq.
Pennington, P.A.
2701 N. Rocky Point Drive, Suite 900
Tampa, Florida 33607

——————————————SPACE ABOVE THIS LINE RESERVED FOR RECORDING DATA——————————————

### GENERAL RELEASE

      **KNOW ALL MEN BY THESE PRESENTS:** That CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation (the "**Releasor**"), the mailing address of which is _____, for and in consideration of the sum of TEN DOLLARS ($10.00), and other valuable consideration, received from or on behalf of LEN-CG SOUTH, LLC, a Florida limited liability company (the "**Releasee**"), the mailing address of which is 4600 West Cypress Street, Suite 200, Tampa, Florida 33607, the receipt whereof is hereby acknowledged,

      **DOES HEREBY** remise, release, acquit, satisfy, and forever discharge the Releasee, and its officers, directors, shareholders, employees, attorneys, agents, affiliates, affiliates' officers, directors, shareholders, employees, attorneys, agents, members, partners, representatives, and all other related parties who may be jointly liable with them, (collectively, the "**Releasee's Affiliates**") of and from all, and all manner of, action and actions, cause and causes of action, suits, debts, sums of money, accounts, bills, covenants, controversies, agreements, promises, damages (including consequential, incidental, punitive, special or other), judgments, executions, claims, liabilities and demands, whatsoever, at law and in equity (including, but not limited to, claims founded on tort, contract, contribution, indemnity or any other theory whatsoever), which such Releasor ever had, now has, or which any officer, director, shareholder, representative, successor, or assign of such Releasor, hereafter can, shall or may have, against such Releasee and the Releasee's Affiliates, for, upon or by reason of any matter, cause or thing, whatsoever, from the beginning of the world to the day of these presents, whether known or unknown (either through ignorance, oversight, error, negligence or otherwise), and whether matured or unmatured, and which matter, cause, or thing, relates, in any manner, directly or indirectly, to (a) the property described on **Exhibit A** hereto, or the improvements thereon (collectively, the "**Property**"), or (b) any occurrences, circumstances, and/or documentation (*e.g.*, the Club Covenants) whatsoever, relating to the Property, which occurred or took place prior to the transfer of the Property from Releasee to Releasor (the "**Closing**"), except warranties of the Releasee contained in that certain Special Warranty Deed delivered by Releasee in connection with such Closing and except for personal injury claims respecting the Property, if any, occurring prior to Closing.

[Signature on following page]

Club Oasis
3/14/13

**IN WITNESS WHEREOF**, we have hereunto set our hands and seals this _____ day of _____, 20___.

**WITNESSES:**                                    **"BUYER"**

CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation

By: _____

Name: _____

Title: _____

_____
Print Name:_____

Date: _____, 20___

_____
Print Name:_____


STATE OF FLORIDA                         )
                                         )  SS.:
COUNTY OF _____              )

The foregoing instrument was acknowledged before me this _____ day of _____, 20___ by _____ as _____ of CHAMPIONSGATE MASTER ASSOCIATION, INC., a Florida not-for-profit corporation, on behalf of such corporation who [   ] is personally known to me or [   ] has produced _____ as identification and did not take an oath.


_____
        [NOTARIAL SEAL]

Name: _____
Notary Public, State of _____
Commission No.: _____
My Commission Expires: _____

Club Oasis
3/14/13

**EXHIBIT A**

**LEGAL DESCRIPTION**

Club Oasis
3/14/13

**EXHIBIT G**

**Inventory**

Club Oasis
3/14/13

**EXHIBIT H**

**Pending Litigation Matters**

Club Oasis
3/14/13



**SOUTH FLORIDA WATER MANAGEMENT DISTRICT**
**PERMIT TRANSFER FOR**
**ENVIRONMENTAL RESOURCE   PERMIT NO. 49-01682-P**

**DATE ISSUED : JUL 19,2012**

**PERMITTEE:** LEN - C G SOUTH, L L C

(STONEYBROOK SOUTH PHASE I)
4600 WEST CYPRESS STREET SUITE 200
TAMPA , FL  33607

**ORIGINAL PERMIT ISSUED:**   JULY 12, 2006, MODIFIED AS DESCRIBED IN ATTACHED PERMIT HISTORY.

**ORIGINAL PROJECT AUTHORIZATION:** CONSTRUCTION AND OPERATION OF A SURFACE WATER MANAGEMENT SYSTEM TO SERVE A 430.61-ACRE RESIDENTIAL DEVELOPMENT PROJECT KNOWN AS STONEYBROOK SOUTH PHASE I WITH THE REMAINDER OF THE SITE TO REMAIN UNDEVELOPED AT THIS TIME.

**CURRENT AUTHORIZATION:**   TRANSFER CONSTRUCTION AND OPERATION OF A SURFACE WATER MANAGEMENT SYSTEM TO SERVE A 430.61-ACRE RESIDENTIAL DEVELOPMENT PROJECT KNOWN AS STONEYBROOK SOUTH PHASE I WITH THE REMAINDER OF THE SITE TO REMAIN UNDEVELOPED AT THIS TIME.

**PROJECT LOCATION:** OSCEOLA COUNTY          **SECTION:** 19, 29 - 31 **TWP:** 25S **RGE:** 27E

**PERMIT DURATION:** AS PREVIOUSLY PERMITTED.

In response to Transfer Application No. 120622-22, dated June 11, 2012 this Permit Transfer is issued pursuant to the applicable provisions of Part IV, Chapter 373, Florida Statutes (F.S) and Rules 40E-1.6107 and 40E-4.351, Florida Administrative Code.

All Permit design specifications, special and general/limiting Permit conditions, and other terms and requirements contained in the Permit shall remain in full force and effect unless further modified by the South Florida Water Management District and shall be binding upon the Permittee, for the duration of the Permit, as specified in Rule 40E-4.4321, Florida Administrative Code.

In the event the property is sold or otherwise conveyed, the Permittee shall remain liable for compliance with this Permit until permit transfer to the new owner is approved by the District. Rule 40E-1.6105, Florida Administrative Code requires written notification to the District within 30 days of the transfer of any interest in the permitted real property, giving the name and address of the new owner in interest with a copy of the instrument effecting the transfer.

**SPECIAL AND GENERAL CONDITIONS ARE AS FOLLOWS:**

SEE PAGES 2 - 5 OF 7      ( 28  SPECIAL CONDITIONS )

SEE PAGES 6 - 7 OF 7      ( 19  GENERAL CONDITIONS )

By

Anthony M. Waterhouse, P.E.
Assistant Director
Regulation Division

**PAGE 1 OF 7**

Exhibit F

PERMIT NO : 49-01682-P
PAGE : 2 OF 7

## SPECIAL CONDITIONS

1. THE CONSTRUCTION PHASE OF THIS PERMIT SHALL EXPIRE ON MAY 15, 2016.

2. OPERATION OF THE SURFACE WATER MANAGEMENT SYSTEM SHALL BE THE RESPONSIBILITY OF STONEYBROOK SOUTH HOMEOWNERS ASSOCIATION. WITHIN ONE YEAR OF PERMIT ISSUANCE OR CONCURRENT WITH THE ENGINEERING CERTIFICATION OF CONSTRUCTION COMPLETION, WHICHEVER COMES FIRST, THE PERMITTEE SHALL SUBMIT A COPY OF THE RECORDED DEED RESTRICTIONS (OR DECLARATION OF CONDOMINIUM, IF APPLICABLE), A COPY OF THE FILED ARTICLES OF INCORPORATION, AND A COPY OF THE CERTIFICATE OF INCORPORATION FOR THE ASSOCIATION.

3. DISCHARGE FACILITIES: THE PROJECT PROPOSES 10 DRY RETENTION PONDS AND 3 WET RETENTION PONDS FOR FULL ONSITE RETENTION. THEREFORE, THERE IS NO DISCHARGE FROM THE SITE RESULTING FROM THE PROPOSED PROJECT.

4. THE PERMITTEE SHALL BE RESPONSIBLE FOR THE CORRECTION OF ANY EROSION, SHOALING OR WATER QUALITY PROBLEMS THAT RESULT FROM THE CONSTRUCTION OR OPERATION OF THE SURFACE WATER MANAGEMENT SYSTEM.

5. MEASURES SHALL BE TAKEN DURING CONSTRUCTION TO INSURE THAT SEDIMENTATION AND/OR TURBIDITY VIOLATIONS DO NOT OCCUR IN THE RECEIVING WATER.

6. THE DISTRICT RESERVES THE RIGHT TO REQUIRE THAT ADDITIONAL WATER QUALITY TREATMENT METHODS BE INCORPORATED INTO THE DRAINAGE SYSTEM IF SUCH MEASURES ARE SHOWN TO BE NECESSARY.

7. LAKE SIDE SLOPES SHALL BE NO STEEPER THAN 4:1 (HORIZONTAL:VERTICAL) TO A DEPTH OF TWO FEET BELOW THE CONTROL ELEVATION. SIDE SLOPES SHALL BE NURTURED OR PLANTED FROM 2 FEET BELOW TO 1 FOOT ABOVE CONTROL ELEVATION TO INSURE VEGETATIVE GROWTH, UNLESS SHOWN ON THE PLANS.

8. FACILITIES OTHER THAN THOSE STATED HEREIN SHALL NOT BE CONSTRUCTED WITHOUT AN APPROVED MODIFICATION OF THIS PERMIT.

9. A STABLE, PERMANENT AND ACCESSIBLE ELEVATION REFERENCE SHALL BE ESTABLISHED ON OR WITHIN ONE HUNDRED (100) FEET OF ALL PERMITTED DISCHARGE STRUCTURES NO LATER THAN THE SUBMISSION OF THE CERTIFICATION REPORT. THE LOCATION OF THE ELEVATION REFERENCE MUST BE NOTED ON OR WITH THE CERTIFICATION REPORT.

10. THE PERMITTEE SHALL PROVIDE ROUTINE MAINTENANCE OF ALL OF THE COMPONENTS OF THE SURFACE WATER MANAGEMENT SYSTEM IN ORDER TO REMOVE ALL TRAPPED SEDIMENTS/DEBRIS. ALL MATERIALS SHALL BE PROPERLY DISPOSED OF AS REQUIRED BY LAW. FAILURE TO PROPERLY MAINTAIN THE SYSTEM MAY RESULT IN ADVERSE FLOODING CONDITIONS.

11. THIS PERMIT IS ISSUED BASED ON THE APPLICANT'S SUBMITTED INFORMATION WHICH REASONABLY DEMONSTRATES THAT ADVERSE WATER RESOURCE RELATED IMPACTS WILL NOT BE CAUSED BY THE COMPLETED PERMIT ACTIVITY. SHOULD ANY ADVERSE IMPACTS CAUSED BY THE COMPLETED SURFACE WATER MANAGEMENT SYSTEM OCCUR, THE DISTRICT WILL REQUIRE THE PERMITTEE TO PROVIDE APPROPRIATE MITIGATION TO THE DISTRICT OR OTHER IMPACTED PARTY. THE DISTRICT WILL REQUIRE THE PERMITTEE TO MODIFY THE SURFACE WATER MANAGEMENT SYSTEM, IF NECESSARY, TO ELIMINATE THE CAUSE OF THE ADVERSE IMPACTS.

12. MINIMUM BUILDING FLOOR ELEVATION: SEE EXHIBITS 7A THROUGH 7D.

13. MINIMUM ROAD CROWN ELEVATION: SEE EXHIBITS 7A THROUGH 7D.

14. ENDANGERED SPECIES, THREATENED SPECIES AND/OR SPECIES OF SPECIAL CONCERN HAVE BEEN OBSERVED

PERMIT NO : 49-01682-P
PAGE : 3 OF 7

ONSITE AND/OR THE PROJECT CONTAINS SUITABLE HABITAT FOR THESE SPECIES. IT SHALL BE THE PERMITTEE'S RESPONSIBILITY TO COORDINATE WITH THE FLORIDA FISH AND WILDLIFE CONSERVATION COMMISSION AND/OR THE U.S. FISH AND WILDLIFE SERVICE FOR APPROPRIATE GUIDANCE, RECOMMENDATIONS AND/OR NECESSARY PERMITS TO AVOID IMPACTS TO LISTED SPECIES.

15.   PRIOR TO THE COMMENCEMENT OF CONSTRUCTION RESULTING IN WETLAND IMPACTS AND IN ACCORDANCE WITH THE WORK SCHEDULE IN EXHIBIT NO. 32, THE PERMITTEE SHALL SUBMIT TWO CERTIFIED COPIES OF THE RECORDED CONSERVATION EASEMENT FOR THE MITIGATION AREA AND ASSOCIATED BUFFERS. THE DATA SHALL BE SUPPLIED IN A DIGITAL ESRI GEODATABASE (MDB), ESRI SHAPEFILE (SHP) OR AUTOCAD DRAWING INTERCHANGE (DXF) FILE FORMAT USING FLORIDA STATE PLANE COORDINATE SYSTEM, EAST ZONE (3601), DATUM NAD83, HARN WITH THE MAP UNITS IN FEET. THIS DATA SHALL BE SUBMITTED AS A PAPER MAP DEPICTING THE CONSERVATION EASEMENT OVER THE BEST AVAILABLE SATELLITE OR AERIAL IMAGERY. THIS DATA SHALL ALSO RESIDE ON A CD OR FLOPPY DISK AND BE SUBMITTED TO THE DISTRICT'S ENVIRONMENTAL RESOURCE COMPLIANCE DIVISION IN THE SERVICE AREA OFFICE WHERE THE APPLICATION WAS SUBMITTED.

      THE RECORDED EASEMENT SHALL BE IN SUBSTANTIAL CONFORMANCE WITH EXHIBIT 30. ANY PROPOSED MODIFICATIONS TO THE APPROVED FORM MUST RECEIVE PRIOR WRITTEN CONSENT FROM THE DISTRICT. THE EASEMENT MUST BE FREE OF ENCUMBRANCES OR INTERESTS IN THE EASEMENT WHICH THE DISTRICT DETERMINES ARE CONTRARY TO THE INTENT OF THE EASEMENT. IN THE EVENT IT IS LATER DETERMINED THAT THERE ARE ENCUMBRANCES OR INTERESTS IN THE EASEMENT WHICH THE DISTRICT DETERMINES ARE CONTRARY TO THE INTENT OF THE EASEMENT, THE PERMITTEE SHALL BE REQUIRED TO PROVIDE RELEASE OR SUBORDINATION OF SUCH ENCUMBRANCES OR INTERESTS.

16.   THE WETLAND CONSERVATION AREAS AND UPLAND BUFFER ZONES AND/OR UPLAND PRESERVATION AREAS SHOWN ON EXHIBIT 29 MAY IN NO WAY BE ALTERED FROM THEIR NATURAL OR PERMITTED STATE.   ACTIVITIES PROHIBITED WITHIN THE CONSERVATION AREAS INCLUDE, BUT ARE NOT LIMITED TO: CONSTRUCTION OR PLACING OF BUILDINGS ON OR ABOVE THE GROUND; DUMPING OR PLACING SOIL OR OTHER SUBSTANCES SUCH AS TRASH; REMOVAL OR DESTRUCTION OF TREES, SHRUBS, OR OTHER VEGETATION - WITH THE EXCEPTION OF EXOTIC VEGETATION REMOVAL; EXCAVATION, DREDGING, OR REMOVAL OF SOIL MATERIALS; DIKING OR FENCING; AND ANY OTHER ACTIVITIES DETRIMENTAL TO DRAINAGE, FLOOD CONTROL, WATER CONSERVATION, EROSION CONTROL, OR FISH AND WILDLIFE HABITAT CONSERVATION OR PRESERVATION.

17.   A MAINTENANCE PROGRAM SHALL BE IMPLEMENTED FOR THE PRESERVED WETLAND AND UPLAND AREAS ON A REGULAR BASIS TO ENSURE THE INTEGRITY AND VIABILITY OF THOSE AREAS AS PERMITTED. MAINTENANCE SHALL BE CONDUCTED IN PERPETUITY TO ENSURE THAT THE CONSERVATION AREA IS MAINTAINED FREE FROM CATEGORY 1 EXOTIC VEGETATION (AS DEFINED BY THE FLORIDA EXOTIC PEST PLANT COUNCIL AT THE TIME OF PERMIT ISSUANCE) IMMEDIATELY FOLLOWING A MAINTENANCE ACTIVITY.  COVERAGE OF EXOTIC AND NUISANCE PLANT SPECIES SHALL NOT EXCEED 10% OF TOTAL COVER BETWEEN MAINTENANCE ACTIVITIES.  IN ADDITION, THE PERMITTEE SHALL MANAGE THE CONSERVATION AREAS SUCH THAT EXOTIC/NUISANCE PLANT SPECIES DO NOT DOMINATE ANY ONE SECTION OF THOSE AREAS.

18.   AN AVERAGE 25' WIDE, MINIMUM 15', BUFFER OF UNDISTURBED UPLAND VEGETATION SHALL BE MAINTAINED BETWEEN THE PROPOSED DEVELOPMENT AND EXISTING WETLANDS.  AS SHOWN IN EXHIBIT 29, A 50 FOOT BUFFER SHALL BE MAINTAINED ADJACENT TO THOSE WETLANDS THAT ARE HYROLOGICALLY CONNECTED TO DAVENPORT CREEK.

19.   THE DISTRICT RESERVES THE RIGHT TO REQUIRE REMEDIAL MEASURES TO BE TAKEN BY THE PERMITTEE IF MONITORING OR OTHER INFORMATION DEMONSTRATES THAT ADVERSE IMPACTS TO ONSITE OR OFFSITE WETLANDS, UPLAND CONSERVATION AREAS OR BUFFERS, OR OTHER SURFACE WATERS HAVE OCCURRED DUE TO PROJECT RELATED ACTIVITIES.

20.   PERMANENT PHYSICAL MARKERS DESIGNATING THE PRESERVE STATUS OF THE WETLAND PRESERVATION AREAS AND BUFFER ZONES SHALL BE PLACED AT THE INTERSECTION OF THE BUFFER AND EACH LOT LINE. THESE MARKERS SHALL BE MAINTAINED IN PERPETUITY.

PERMIT NO : 49-01682-P
PAGE : 4 OF 7

21.  A MONITORING  PROGRAM SHALL BE IMPLEMENTED IN ACCORDANCE WITH EXHIBIT NO. 32. THE MONITORING
PROGRAM SHALL EXTEND FOR A PERIOD OF 5 YEARS WITH ANNUAL REPORTS SUBMITTED TO DISTRICT STAFF.

22.  IN ACCORDANCE WITH THE WORK SCHEDULE THE PERMITTEE SHALL SUBMIT VERIFICATION THAT 1.42 FRESHWATER
FORESTED UMAM MITIGATION CREDITS HAV BEEN DEBITED FROM THE REEDY CREEK MITIGATION BANK LEDGER AS
MITIGATION FOR THIS IMPACT.

23.  SILT SCREENS, HAY BALES, TURBIDITY SCREENS/BARRIERS OR OTHER SUCH SEDIMENT CONTROL MEASURES SHALL BE
UTILIZED DURING CONSTRUCTION. THE SELECTED SEDIMENT CONTROL MEASURE SHALL BE INSTALLED LANDWARD
OF THE UPLAND BUFFER ZONES AROUND ALL PROTECTED WETLANDS AND SHALL BE PROPERLY "TRENCHED". ALL
AREAS SHALL BE STABILIZED AND VEGETATED IMMEDIATELY AFTER CONSTRUCTION TO PREVENT EROSION INTO THE
WETLANDS AND UPLAND BUFFER ZONES.

24.  A BERM AND SWALE LOCATED OUTSIDE (LANDWARD) OF THE BUFFER AREAS SHALL BE REQUIRED BETWEEN ALL
UPLAND BUFFER EASEMENTS AND THE DEVELOPABLE AREA OF EACH LOT.    THE BERM/SWALE SHALL BE
CONSTRUCTED IN ORDER TO PROVIDE WATER QUALITY TREATMENT OF RUNOFF FROM DEVELOPABLE AREAS PRIOR
TO ENTERING THE WETLANDS. ANNUAL REPORTS DOCUMENTING THE ADEQUACY OF THE BERM AND SWALE SHALL
BE SUBMITTED TO DISTRICT ENVIRONMENTAL  RESOURCE COMPLIANCE STAFF FOR REVIEW.   REPORTS SHALL
INCLUDE PHOTO PANORAMAS ALONG THE UPLAND BUFFER EASEMENT AND BERM INTERFACE AND A BRIEF
ANALYSIS OF DOMINANT VEGETATION.   DETRIMENTAL CHANGES IN THE WETLAND SHALL BE REPORTED AND
REMEDIAL MEASURES TAKEN TO PREVENT FURTHER IMPACTS TO THE PROTECTED WETLANDS. THE BERM AND SWALE
SHALL BE MAINTAINED IN PERPETUITY AS DESIGNED AND PERMITTED.

25.  ACTIVITIES ASSOCIATED WITH THE IMPLEMENTATION OF THE MITIGATION, MONITORING AND MAINTENANCE
PLAN(S) SHALL BE COMPLETED IN ACCORDANCE WITH THE WORK SCHEDULE ATTACHED AS EXHIBIT NO. 32. ANY
DEVIATION FROM THESE TIME FRAMES WILL REQUIRE PRIOR APPROVAL FROM THE DISTRICT'S ENVIRONMENTAL
RESOURCE COMPLIANCE STAFF. SUCH REQUESTS MUST BE MADE IN WRITING AND SHALL INCLUDE (1) REASON FOR
THE CHANGE, (2) PROPOSED START/FINISH AND/OR COMPLETION DATES; AND (3) PROGRESS REPORT ON THE STATUS
OF THE PROJECT DEVELOPMENT OR MITIGATION EFFORT.

26.  THE FOLLOWING EXHIBITS FOR THE PERMIT ARE INCORPORATED BY REFERENCE HEREIN AND ARE LOCATED IN THE
PERMIT FILE:

EXHIBIT NO. 12A - 12F GOLF COURSE CONSTRUCTION PLANS
EXHIBIT NO. 13A - 13H MASS GRADING PLANS
EXHIBIT NO. 14A - 14E MASS GRADING AND GOLF COURSE AREAS - POND DETAILS
EXHIBIT NO. 15 TRACT B DRAINAGE PLAN
EXHIBIT NO. 16 TRACT B LOT GRADING PLAN
EXHIBIT NO. 17 TRACT B - POND DETAILS
EXHIBIT NO. 18 ROADWAY DRAINAGE MAP
EXHIBIT NO. 19A - 19B ROADWAY PLAN AND PROFILE
EXHIBIT NO. 20 ROADWAY - POND DETAILS
EXHIBIT NO. 21 TRACT C DRAINAGE STRUCTURES
EXHIBIT NO. 22A - 22C TRACT C DRAINAGE PLAN
EXHIBIT NO. 23A - 23C TRACT C LOT GRADING PLAN
EXHIBIT NO. 24 TRACT C OFFSITE POND DETAIL
EXHIBIT NO. 25 TRACT H1 MASTER DRAINAGE PLAN
EXHIBIT NO. 26A - 26C TRACT H1 DRAINAGE PLAN PHASE H1 & H2
EXHIBIT NO. 27A - 27C TRACT H1 LOT GRADING PLAN PHASE H1 & H2
EXHIBIT NO. 28 TRACT H1 POND DETAILS

27.  A WATER USE PERMIT MUST BE OBTAINED PRIOR TO IRRIGATION WITHDRAWALS, UNLESS THE WORK IS EXEMPT
PURSUANT TO CHAPTER 40E - 2.051 F.A.C.

PERMIT NO : 49-01682-P
PAGE : 5 OF 7

28. PRIOR TO ANY FUTURE CONSTRUCTION, THE PERMITTEE SHALL APPLY FOR AND RECEIVE A PERMIT MODIFICATION FOR TRACTS MARKED AS FUTURE PHASES IN THIS APPLICATION.  AS PART OF THE PERMIT APPLICATION, THE APPLICANT FOR THAT PHASE SHALL PROVIDE DOCUMENTATION VERIFYING THAT THE PROPOSED CONSTRUCTION COMPLIES WITH DISTRICT CRITERIA IN EFFECT AT THAT TIME.

GENERAL CONDITIONS

1.  ALL ACTIVITIES AUTHORIZED BY THIS PERMIT SHALL BE IMPLEMENTED AS SET FORTH IN THE PLANS, SPECIFICATIONS AND PERFORMANCE CRITERIA AS APPROVED BY THIS PERMIT.   ANY DEVIATION FROM THE PERMITTED ACTIVITY AND THE CONDITIONS FOR UNDERTAKING THAT ACTIVITY SHALL CONSTITUTE A VIOLATION OF THIS PERMIT AND PART IV, CHAPTER 373. F.S.

2.  THIS PERMIT OR A COPY THEREOF, COMPLETE WITH ALL CONDITIONS, ATTACHMENTS, EXHIBITS, AND MODIFICATIONS SHALL BE KEPT AT THE WORK SITE OF THE PERMITTED ACTIVITY.  THE COMPLETE PERMIT SHALL BE AVAILABLE FOR REVIEW AT THE WORK SITE UPON REQUEST BY DISTRICT STAFF. THE PERMITTEE SHALL REQUIRE THE CONTRACTOR TO REVIEW THE COMPLETE PERMIT PRIOR TO COMMENCEMENT OF THE ACTIVITY AUTHORIZED BY THIS PERMIT.

3.  ACTIVITIES APPROVED BY THIS PERMIT SHALL BE CONDUCTED IN A MANNER WHICH DOES NOT CAUSE VIOLATIONS OF STATE WATER QUALITY STANDARDS. THE PERMITTEE SHALL IMPLEMENT BEST MANAGEMENT PRACTICES FOR EROSION AND POLLUTION CONTROL TO PREVENT VIOLATION OF STATE WATER QUALITY STANDARDS. TEMPORARY EROSION CONTROL SHALL BE IMPLEMENTED PRIOR TO AND DURING CONSTRUCTION, AND PERMANENT CONTROL MEASURES SHALL BE COMPLETED WITHIN 7 DAYS OF ANY CONSTRUCTION ACTIVITY. TURBIDITY BARRIERS SHALL BE INSTALLED AND MAINTAINED AT ALL LOCATIONS WHERE THE POSSIBILITY OF TRANSFERRING SUSPENDED SOLIDS INTO THE RECEIVING WATERBODY EXISTS DUE TO THE PERMITTED WORK. TURBIDITY BARRIERS SHALL REMAIN IN PLACE AT ALL LOCATIONS UNTIL CONSTRUCTION IS COMPLETED AND SOILS ARE STABILIZED AND VEGETATION HAS BEEN ESTABLISHED.  ALL PRACTICES SHALL BE IN ACCORDANCE WITH THE GUIDELINES AND SPECIFICATIONS DESCRIBED IN CHAPTER 6 OF THE FLORIDA LAND DEVELOPMENT MANUAL: A GUIDE TO SOUND LAND AND WATER MANAGEMENT (DEPARTMENT OF ENVIRONMENTAL REGULATION, 1988), INCORPORATED BY REFERENCE IN RULE 40E-4.091, F.A.C. UNLESS A PROJECT-SPECIFIC EROSION AND SEDIMENT CONTROL PLAN IS APPROVED AS PART OF THE PERMIT. THEREAFTER THE PERMITTEE SHALL BE RESPONSIBLE FOR THE REMOVAL OF THE BARRIERS. THE PERMITTEE SHALL CORRECT ANY EROSION OR SHOALING THAT CAUSES ADVERSE IMPACTS TO THE WATER RESOURCES.

4.  THE PERMITTEE SHALL NOTIFY THE DISTRICT OF THE ANTICIPATED CONSTRUCTION START DATE WITHIN 30 DAYS OF THE DATE THAT THIS PERMIT IS ISSUED.  AT LEAST 48 HOURS PRIOR TO COMMENCEMENT OF ACTIVITY AUTHORIZED BY THIS PERMIT, THE PERMITTEE SHALL SUBMIT TO THE DISTRICT AN ENVIRONMENTAL RESOURCE PERMIT CONSTRUCTION COMMENCEMENT NOTICE FORM NUMBER 0960 INDICATING THE ACTUAL START DATE AND THE EXPECTED CONSTRUCTION COMPLETION DATE.

5.  WHEN THE DURATION OF CONSTRUCTION WILL EXCEED ONE YEAR, THE PERMITTEE SHALL SUBMIT CONSTRUCTION STATUS REPORTS TO THE DISTRICT ON AN ANNUAL BASIS UTILIZING AN ANNUAL STATUS REPORT FORM. STATUS REPORT FORMS SHALL BE SUBMITTED THE FOLLOWING JUNE OF EACH YEAR.

6.  WITHIN 30 DAYS AFTER COMPLETION OF CONSTRUCTION OF THE PERMITTED ACTIVITY, THE PERMITEE SHALL SUBMIT A WRITTEN STATEMENT OF COMPLETION AND CERTIFICATION BY A PROFESSIONAL ENGINEER OR OTHER INDIVIDUAL AUTHORIZED BY LAW, UTILIZING THE SUPPLIED ENVIRONMENTAL RESOURCE/SURFACE WATER MANAGEMENT PERMIT CONSTRUCTION COMPLETION/CERTIFICATION FORM NUMBER 0881A, OR ENVIRONMENTAL RESOURCE/SURFACE WATER MANAGEMENT PERMIT CONSTRUCTION COMPLETION CERTIFICATION – FOR PROJECTS PERMITTED PRIOR TO OCTOBER 3, 1995 FORM NO. 0881B, INCORPORATED BY REFERENCE IN RULE 40E-1.659, F.A.C. THE STATEMENT OF COMPLETION AND CERTIFICATION SHALL BE BASED ON ONSITE OBSERVATION OF CONSTRUCTION OR REVIEW OF AS-BUILT DRAWINGS FOR THE PURPOSE OF DETERMINING IF THE WORK WAS COMPLETED IN COMPLIANCE WITH PERMITTED PLANS AND SPECIFICATIONS. THIS SUBMITTAL SHALL SERVE TO NOTIFY THE DISTRICT THAT THE SYSTEM IS READY FOR INSPECTION. ADDITIONALLY, IF DEVIATION FROM THE APPROVED DRAWINGS ARE DISCOVERED DURING THE CERTIFICATION PROCESS, THE CERTIFICATION MUST BE ACCOMPANIED BY A COPY OF THE APPROVED PERMIT DRAWINGS WITH DEVIATIONS NOTED.  BOTH THE ORIGINAL AND REVISED SPECIFICATIONS MUST BE CLEARLY SHOWN. THE PLANS MUST BE CLEARLY LABELED AS "AS-BUILT" OR "RECORD" DRAWINGS. ALL SURVEYED DIMENSIONS AND ELEVATIONS SHALL BE CERTIFIED BY A REGISTERED SURVEYOR.

7.  THE OPERATION PHASE OF THIS PERMIT SHALL NOT BECOME EFFECTIVE: UNTIL THE PERMITTEE HAS COMPLIED WITH THE REQUIREMENTS OF CONDITION (6) ABOVE, AND SUBMITTED A REQUEST FOR CONVERSION OF ENVIRONMENTAL RESOURCE PERMIT FROM CONSTRUCTION PHASE TO OPERATION PHASE, FORM NO. 0920; THE DISTRICT DETERMINES THE SYSTEM TO BE IN COMPLIANCE WITH THE PERMITTED PLANS AND SPECIFICATIONS; AND THE ENTITY APPROVED BY THE DISTRICT IN ACCORDANCE WITH SECTIONS 9.0 AND 10.0 OF THE BASIS OF REVIEW FOR ENVIRONMENTAL RESOURCE PERMIT APPLICATIONS WITHIN THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT, ACCEPTS RESPONSIBILITY FOR OPERATION AND MAINTENANCE OF THE SYSTEM.   THE PERMIT SHALL NOT BE TRANSFERRED TO SUCH APPROVED OPERATION AND MAINTENANCE ENTITY UNTIL THE OPERATION PHASE OF THE PERMIT BECOMES EFFECTIVE. FOLLOWING INSPECTION AND APPROVAL OF THE PERMITTED SYSTEM BY THE DISTRICT, THE PERMITTEE SHALL INITIATE TRANSFER OF THE PERMIT TO THE APPROVED RESPONSIBLE OPERATING ENTITY IF DIFFERENT FROM THE PERMITTEE. UNTIL THE PERMIT IS TRANSFERRED PURSUANT TO SECTION 40E-1.6107, F.A.C., THE PERMITTEE SHALL BE LIABLE FOR COMPLIANCE WITH THE TERMS OF THE PERMIT.

8.  EACH PHASE OR INDEPENDENT PORTION OF THE PERMITTED SYSTEM MUST BE COMPLETED IN ACCORDANCE WITH THE PERMITTED PLANS AND PERMIT CONDITIONS PRIOR TO THE INITIATION OF THE PERMITTED USE OF SITE INFRASTRUCTURE

LOCATED WITHIN THE AREA SERVED BY THAT PORTION OR PHASE OF THE SYSTEM. EACH PHASE OR INDEPENDENT PORTION OF THE SYSTEM MUST BE COMPLETED IN ACCORDANCE WITH THE PERMITTED PLANS AND PERMIT CONDITIONS PRIOR TO TRANSFER OF RESPONSIBILITY FOR OPERATION AND MAINTENANCE OF THE PHASE OR PORTION OF THE SYSTEM TO A LOCAL GOVERNMENT OR OTHER RESPONSIBLE ENTITY.

9.    FOR THOSE SYSTEMS THAT WILL BE OPERATED OR MAINTAINED BY AN ENTITY THAT WILL REQUIRE AN EASEMENT OR DEED RESTRICTION IN ORDER TO ENABLE THAT ENTITY TO OPERATE OR MAINTAIN THE SYSTEM IN CONFORMANCE WITH THIS PERMIT, SUCH EASEMENT OR DEED RESTRICTION MUST BE RECORDED IN THE PUBLIC RECORDS AND SUBMITTED TO THE DISTRICT ALONG WITH ANY OTHER FINAL OPERATION AND MAINTENANCE DOCUMENTS REQUIRED BY SECTIONS 9.0 AND 10.0 OF THE BASIS OF REVIEW FOR ENVIRONMENTAL RESOURCE PERMIT APPLICATIONS WITHIN THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT, PRIOR TO LOT OR UNITS SALES OR PRIOR TO THE COMPLETION OF THE SYSTEM, WHICHEVER COMES FIRST. OTHER DOCUMENTS CONCERNING THE ESTABLISHMENT AND AUTHORITY OF THE OPERATING ENTITY MUST BE FILED WITH THE SECRETARY OF STATE, COUNTY OR MUNICIPAL ENTITIES. FINAL OPERATION AND MAINTENANCE DOCUMENTS MUST BE RECEIVED BY THE DISTRICT WHEN MAINTENANCE AND OPERATION OF THE SYSTEM IS ACCEPTED BY THE LOCAL GOVERNMENT ENTITY. FAILURE TO SUBMIT THE APPROPRIATE FINAL DOCUMENTS WILL RESULT IN THE PERMITTEE REMAINING LIABLE FOR CARRYING OUT MAINTENANCE AND OPERATION OF THE PERMITTED SYSTEM AND ANY OTHER PERMIT CONDITIONS.

10.    SHOULD ANY OTHER REGULATORY AGENCY REQUIRE CHANGES TO THE PERMITTED SYSTEM, THE PERMITTEE SHALL NOTIFY THE DISTRICT IN WRITING OF THE CHANGES PRIOR TO IMPLEMENTATION SO THAT A DETERMINATION CAN BE MADE WHETHER A PERMIT MODIFICATION IS REQUIRED.

11.    THIS PERMIT DOES NOT ELIMINATE THE NECESSITY TO OBTAIN ANY REQUIRED FEDERAL, STATE, LOCAL AND SPECIAL DISTRICT AUTHORIZATIONS PRIOR TO THE START OF ANY ACTIVITY APPROVED BY THIS PERMIT. THIS PERMIT DOES NOT CONVEY TO THE PERMITTEE OR CREATE IN THE PERMITTEE ANY PROPERTY RIGHT, OR ANY INTEREST IN REAL PROPERTY, NOR DOES IT AUTHORIZE ANY ENTRANCE UPON OR ACTIVITIES ON PROPERTY WHICH IS NOT OWNED OR CONTROLLED BY THE PERMITTEE, OR CONVEY ANY RIGHTS OR PRIVILEGES OTHER THAN THOSE SPECIFIED IN THE PERMIT AND CHAPTER 40E-4 OR CHAPTER 40E-40, F.A.C..

12.    THE PERMITTEE IS HEREBY ADVISED THAT SECTION 253.77, F.S. STATES THAT A PERSON MAY NOT COMMENCE ANY EXCAVATION, CONSTRUCTION, OR OTHER ACTIVITY INVOLVING THE USE OF SOVEREIGN OR OTHER LANDS OF THE STATE, THE TITLE TO WHICH IS VESTED IN THE BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND WITHOUT OBTAINING THE REQUIRED LEASE, LICENSE, EASEMENT, OR OTHER FORM OF CONSENT AUTHORIZING THE PROPOSED USE. THEREFORE, THE PERMITTEE IS RESPONSIBLE FOR OBTAINING ANY NECESSARY AUTHORIZATIONS FROM THE BOARD OF TRUSTEES PRIOR TO COMMENCING ACTIVITY ON SOVEREIGNTY LANDS OR OTHER STATE-OWNED LANDS.

13.    THE PERMITTEE MUST OBTAIN A WATER USE PERMIT PRIOR TO CONSTRUCTION DEWATERING, UNLESS THE WORK QUALIFIES FOR A GENERAL PERMIT PURSUANT TO SUBSECTION 40E-20.302(3), F.A.C., ALSO KNOWN AS THE "NO NOTICE" RULE.

14.    THE PERMITTEE SHALL HOLD AND SAVE THE DISTRICT HARMLESS FROM ANY AND ALL DAMAGES, CLAIMS, OR LIABILITIES WHICH MAY ARISE BY REASON OF THE CONSTRUCTION, ALTERATION, OPERATION, MAINTENANCE, REMOVAL, ABANDONMENT OR USE OF ANY SYSTEM AUTHORIZED BY THE PERMIT.

15.    ANY DELINEATION OF THE EXTENT OF A WETLAND OR OTHER SURFACE WATER SUBMITTED AS PART OF THE PERMIT APPLICATION, INCLUDING PLANS OR OTHER SUPPORTING DOCUMENTATION, SHALL NOT BE CONSIDERED BINDING, UNLESS A SPECIFIC CONDITION OF THIS PERMIT OR A FORMAL DETERMINATION UNDER SECTION 373.421(2), F.S., PROVIDES OTHERWISE.

16.    THE PERMITTEE SHALL NOTIFY THE DISTRICT IN WRITING WITHIN 30 DAYS OF ANY SALE, CONVEYANCE, OR OTHER TRANSFER OF OWNERSHIP OR CONTROL OF A PERMITTED SYSTEM OR THE REAL PROPERTY ON WHICH THE PERMITTED SYSTEM IS LOCATED. ALL TRANSFERS OF OWNERSHIP OR TRANSFERS OF A PERMIT ARE SUBJECT TO THE REQUIREMENTS OF RULES 40E-1.6105 AND 40E-1.6107, F.A.C.. THE PERMITTEE TRANSFERRING THE PERMIT SHALL REMAIN LIABLE FOR CORRECTIVE ACTIONS THAT MAY BE REQUIRED AS A RESULT OF ANY VIOLATIONS PRIOR TO THE SALE, CONVEYANCE OR OTHER TRANSFER OF THE SYSTEM.

17.    UPON REASONABLE NOTICE TO THE PERMITTEE, DISTRICT AUTHORIZED STAFF WITH PROPER IDENTIFICATION SHALL HAVE PERMISSION TO ENTER, INSPECT, SAMPLE AND TEST THE SYSTEM TO INSURE CONFORMITY WITH THE PLANS AND SPECIFICATIONS APPROVED BY THE PERMIT.

18.    IF HISTORICAL OR ARCHAEOLOGICAL ARTIFACTS ARE DISCOVERED AT ANY TIME ON THE PROJECT SITE, THE PERMITTEE SHALL IMMEDIATELY NOTIFY THE APPROPRIATE DISTRICT SERVICE CENTER.

19.    THE PERMITTEE SHALL IMMEDIATELY NOTIFY THE DISTRICT IN WRITING OF ANY PREVIOUSLY SUBMITTED INFORMATION THAT IS LATER DISCOVERED TO BE INACCURATE.

PERMIT HISTORY

13-JUL-2012
transfer_history

**Permit No: 49-01682-P**
**Project Description:    STONEYBROOK SOUTH PHASE I**

| Date | Permit No | Type1 | Type2 | | Name | Description |
|---|---|---|---|---|---|---|
| 12-JUL-06 | 051222-25 | ERP NEW INDIVIDUAL | CONSTRUCT/OPERATE | M | US HOMES CORPORATION SOUTH DEVELOPMENT LLC | STONEYBROOK SOUTH PHASE I |
| 26-JUN-07 | 070202-16 | ERP MOD GENERAL | STANDARD PERMIT | M M | U S HOMES CORPORATION SOUTH DEVELOPMENT LLC | STONEYBROOK SOUTH AMENITIES CONSTRUCTION |
| 18-JUL-08 | 080812-20 | ERP MOD GENERAL | STANDARD PERMIT | M | SOUTH DEVELOPMENT LLC | STONEYBROOK SOUTH PH 2 (STONEYBROOK BLVD) |
| 28-JAN-10 | 091223-24 | ERP MOD GENERAL | EXTENSION SB360 | M M | SOUTH DEVELOPMENT LLC US HOME CORPORATION | STONEYBROOK SOUTH PHASE 1 |
| 03-FEB-12 | 111230-4 | ERP MOD GENERAL | COMBINED EXT EMER EXT | M M | SOUTH DEVELOPMENT L L C U S HOME CORPORATION | STONEYBROOK SOUTH |
| 03-FEB-12 | 111230-45 | ERP MOD GENERAL | EXTENSION HB7207 | M | SOUTH DEVELOPMENT L L C | STONEYBROOK SOUTH PHASE 2 (STONEYBROOK BOULEVARD) |
| 03-FEB-12 | 111230-46 | ERP MOD GENERAL | EXTENSION HB7207 | M M | U S HOME CORPORATION SOUTH DEVELOPMENT L L C | STONEYBROOK SOUTH AMENITIES CONSTRUCTION |
| 19-JUL-12 | 120622-22 | ERP TRANS GENERAL | PERMIT TRANSFER | | LEN - C G SOUTH, L L C | STONEYBROOK SOUTH PHASE I |

Page 1 of 1

## MAP OF SURVEY
### "SKETCH DESCRIPTION"

LEGAL DESCRIPTION OF: TRACT R-3 NORTH

Commence at the North 1/4 corner of Section 31, Township 25 South, Range 27 East, Osceola County, Florida; thence N89°42'08"E, a distance of 112.17 feet; thence S00°17'52"E, a distance of 60.00 feet to the Point of Beginning; thence N89°42'07"E, a distance of 54.50 feet to the beginning of a curve, said curve turning to the right through an angle of 34°01'10", having a radius of 590.00 feet, and whose long chord bears S73°17'19"E for a distance of 345.19 feet; thence, S56°16'44"E for a distance of 102.73 feet to a point on a line; thence, S33°43'16"W for a distance of 69.86 feet to the beginning of a curve, said curve turning to the right through an angle of 08°58'14", having a radius of 300.00 feet, and whose long chord bears S38°12'23"W for a distance of 46.92 feet; thence, S42°41'30"W for a distance of 100.05 feet to the beginning of a curve, said curve turning to the right through an angle of 66°51'08", having a radius of 150.00 feet, and whose long chord bears S76°07'05"W for a distance of 165.26 feet; thence N70°27'21"W for a distance of 61.89 feet to the beginning of a curve, said curve turning to the left through an angle of 32°49'29", having a radius of 150.00 feet, and whose long chord bears N86°52'06"W for a distance of 84.76 feet; thence, S76°43'10"W for a distance of 29.94 feet to the beginning of a non-tangential curve, said curve turning to the right through an angle of 13°42'04", having a radius of 1040.00 feet, and whose long chord bears N06°25'48"W for a distance of 248.10 feet; thence, N00°25'14"E for a distance of 74.37 feet to the beginning of a curve, said curve turning to the right through 89°16'53", having a radius of 25.00 feet, and whose long chord bears N45°03'40"E for a distance of 35.13 feet to the Point of Beginning. Containing 3.14 acres, more or less.

SURVEY NOTES:
BEARINGS ARE BASED ON STATE PLANE COORDINATES (NAD 83/90 FLORIDA EAST ZONE) AS DERIVED FROM GPS OBSERVATIONS. AS A REFERENCE THE WEST LINE OF SECTION 31-25-27, BEING N00°25'47"E.
LANDS SHOWN HEREON WERE NOT ABSTRACTED FOR EASEMENTS, RIGHT-OF-WAYS, OR ADJOINERS OF RECORD.

CERTIFIED TO:

I HEREBY CERTIFY THAT THE SURVEY SHOWN HEREON IS IN ACCORDANCE WITH THE MINIMUM TECHNICAL STANDARDS AS SET FORTH BY THE BOARD OF PROFESSIONAL LAND SURVEYORS IN CHAPTER 5J-17, FLORIDA ADMINISTRATIVE CODE, PURSUANT TO SECTION 472.027, FLORIDA STATUTES.

GARY R. ROCHE, P.S.M. 6306

FLORIDA REGISTERED LAND SURVEYOR THIS SURVEY IS NOT VALID WITHOUT THE SIGNATURE AND THE ORIGINAL RAISED SEAL OF A FLORIDA LICENSED SURVEYOR AND MAPPER.

### SHEET 1 OF 2 NOT VALID WITHOUT SHEET 2 OF 2.

FRANKLIN, HART, & REID
CIVIL ENGINEERS – LAND SURVEYORS
1368 EAST VINE STREET, KISSIMMEE, FL 34744
PHONE 846-1216   FAX 846-0037
CERTIFICATE NO. LB 6605

| PREPARATION DATE | PROJECT INFORMATION | | |
|---|---|---|---|
| FIELD SURVEY DATE 0/00/00 | JOB NO. W.O. 130220 | | |
| | DRAWN BY: JDL | | |
| | REVIEWED BY: GRR | | |

Exhibit G



MAP OF SURVEY
"SKETCH DESCRIPTION"

SCALE 1" =100'